IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PRISM TECHNOLOGIES LLC

      Plaintiff,

v.                                                              Civil Action No. 05-214 JJF

VERISIGN, INC., RSA SECURITY, INC.,
NETEGRITY, INC., COMPUTER
ASSOCIATES INTERNATIONAL, INC.,
and JOHNSON & JOHNSON SERVICES, INC.,

      Defendants.

**PLAINTIFF PRISM TECHNOLOGIES LLC'S
OPENING CLAIM CONSTRUCTION BRIEF**

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000
rkirk@bayardfirm.com
astitzer@bayardfirm.com

ATTORNEYS  FOR  PLAINTIFF
PRISM TECHNOLOGIES LLC

OF COUNSEL:

Dirk D. Thomas, Esq.
Robert A. Auchter, Esq.
Kenneth A. Freeling, Esq.
Jason R. Buratti, Esq.
André J. Bahou, Esq.
Chandran B. Iyer, Esq.
Robins, Kaplan, Miller & Ciresi, L.L.P.
1801 K Street, N.W., Suite 1200
Washington, D.C.  20006
(202) 775-0725

# TABLE OF CONTENTS

NATURE OF THE PROCEEDINGS ........................................................................... 1

BACKGROUND ...................................................................................................... 1

OPENING STATEMENT AND SUMMARY OF ARGUMENT .................................. 3

ARGUMENT ........................................................................................................... 8

I.      APPLICABLE LEGAL STANDARDS ................................................................. 8

      A.      General Claim Construction Principles ............................................... 8
      B.      Means or Step Plus Function Claims .................................................... 9
      C.      Software Algorithms as Structure Corresponding to a
            Means Clause ...................................................................................... 10

II.     THIS COURT SHOULD ADOPT PRISM'S PROPOSED
       CONSTRUCTION OF DISPUTED CLAIM TERMS BECAUSE
       THEY ARE CONSISTENT WITH THE ORDINARY AND
       CUSTOMARY MEANINGS ........................................................................ 11

      A.      "client software means" ....................................................................... 12
      B.      "server software means" ...................................................................... 16
      C.      "clearinghouse means" in claim 1 ....................................................... 19
      D.      "clearinghouse means" in claim 24 ..................................................... 24
      E.      "untrusted network" ............................................................................ 25
      F.      "subscriber" ........................................................................................ 26
      G.      "first server computer" ........................................................................ 26
      H.      "operating session" ............................................................................. 27
      I.       "hardware key" ................................................................................... 27
      J.       "connected" ......................................................................................... 28
      K.      "predetermined digital identification" ................................................. 29
      L.      "selected computer resources of at least a [or said]
            first server computer" ......................................................................... 29
      M.     "subscriber client computer" ............................................................... 30
      N.     "identity data" as it relates to the subscriber client computer ............ 30
      O.     "part of said identity data" ................................................................... 31
      P.      "to thereby confirm that said [or a] hardware key is
            connected to said subscriber client computer" .................................... 31
      Q.     "permit[ting] access" ......................................................................... 32

CONCLUSION ......................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
    340 F.3d 1298 (Fed. Cir. 2003)............................................................................ 9

*Atmel Corp. v. Information Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)................................................................... 11, 15, 16

*Berg Tech., Inc. v. Foxconn Int'l, Inc.*,
    1999 U.S. App. LEXIS 2796 (Fed. Cir. Feb. 23, 1999) ............................... 12, 17

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    381 F.3d 1371 (Fed. Cir. 2004)........................................................................... 10

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)............................................................................. 8

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
    424 F.3d 1168 (Fed. Cir. 2005)........................................................................... 12

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,
    279 F.3d 1022 (Fed. Cir. 2002)........................................................................... 24

*Ex parte Lyell*,
    17 USPQ2d 1548 (BPAI 1990)............................................................................ 13

*Generation II Orthotics Inc. v. Medical Tech. Inc.*,
    263 F.3d 1356 (Fed. Cir. 2001)...................................................................... 10, 24

*Harris Corp. v. Ericsson, Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005)........................................................................... 10

*Home Diagnostics, Inc. v. Lifescan Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004)............................................................................. 8

*IMS Tech., Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000)........................................................................... 10

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)............................................................................. 8

*Israel v. Cresswell*,
    166 F.2d 153 (CCPA 1948) ................................................................................. 32

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004).............................................................................. 9

*Masco Corp. v. U.S.,*
    303 F.3d 1316 (Fed. Cir. 2002)..................................................................... 24

*Minton v. Nat'l Ass'n of Securities Dealers, Inc.,*
    336 F.3d 1373 (Fed. Cir. 2003)..................................................................... 32

*O.I. Corp. v. Tekmar Co.,*
    115 F.3d 1576 (Fed. Cir. 1997)............................................................ passim

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)....................................................................... 9

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).................................................................. 8, 9

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)....................................................................... 8

*Rodime PLC v. Seagate Tech., Inc.,*
    174 F.3d 1294 (Fed. Cir. 1999)..................................................................... 10

*S3, Inc. v. NVIDIA Corp.,*
    259 F.3d 1364 (Fed. Cir. 2001)..................................................................... 16

*Specialty Composites v. Cabot Corp.,*
    845 F.2d 981 (Fed. Cir. 1988)......................................................................... 9

*State Street Bank & Trust Co. v. Signature Fin. Group, Inc.,*
    149 F.3d 1368 (Fed. Cir. 1998)..................................................................... 11

*Texas Instruments Inc. v. U.S. Int'l. Trade Comm'n,*
    988 F.2d 1165 (Fed. Cir. 1993)..................................................................... 32

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................... 8, 9

*York Products, Inc. v. Central Tractor Farm & Family Ctr.,*
    99 F.3d 1568 (Fed. Cir. 1996)....................................................................... 10

**Statutes**

35 U.S.C. § 112, ¶6.............................................................................. passim

    **Other Authorities**

Manual of Patent Examination Procedure (MPEP) 6th Ed., § 2173.05 (p) (b) (1995).................. 13

Manual of Patent Examining Procedure (MPEP) 8th Ed., August 2001 ................................ 11, 16

*Microsoft Press Computer Dictionary*, 2nd ed. 1994 ............................................................. 11, 15

*Webster's New Twentieth Century Dictionary* (1983) ............................................................. 26, 27

## NATURE OF THE PROCEEDINGS

This suit involves a charge by plaintiff Prism Technologies L.L.C. ("Prism") that VeriSign, Inc., RSA Security, Inc., and Computer Associates, Inc.,[1] who are providers of internet security products and services, as well as Johnson & Johnson Services, Inc., a user of internet security products (collectively, "defendants"), infringe its U.S. Patent No. 6,516,416 (the '416 patent). (Ex. A). Prism filed a Complaint for infringement of the '416 patent against the defendants on April 11, 2005. (D.I. 1). Prism amended its Complaint on June 22, 2005 (D.I. 30) and on August 11, 2006. (D.I. 191).

This Court entered a Scheduling Order on May 10, 2006. (D.I. 109). As required by Paragraph 7 of that Order, the parties submitted a Joint Claim Construction Statement on August 23, 2006 (D.I. 207) (Ex. B), setting out all disputed claim terms and/or phrases and the parties' proposed interpretations. Prism submits this brief in support of its proposed construction of the disputed claim terms at issue in this litigation.

## BACKGROUND

The United States Patent and Trademark Office ("PTO") issued the '416 patent-in-suit to Richard L. Gregg, Sandeep Giri, and Timothy C. Goeke, on February 4, 2003, based on an application filed on June 11, 1997. The '416 patent claims a system and a method for controlling a computer user's access to "selected computer resources" (also referred to in the '416 patent as "Protected Content") over an untrusted network, such as the internet. (Ex. A, '416 patent, at 1:47-51).[2] These "computer resources" may be stored remotely from the server computer that

---

[1] Computer Associates International, Inc. (CA) completed its acquisition of defendant Netegrity, Inc. on November 24, 2004.

[2] Unless otherwise specified, references in the form X:Y will be to column and line numbers in the '416 patent.

processes the requests for access.  For example, Figs. 3 and 4 of the '416 patent illustrate an embodiment of the patentees' system where the "Protected Content" to which a user requests access is apart and separate from the access server 34, which processes the user's access request, or the clearinghouse 30, which authenticates the user.[3]

In the claims that the Court must interpret, a "subscriber" who is allowed to have access to these "selected computer resources," (*i.e.*, "Protected Content"), is furnished with a "hardware key" (also referred to in the patent as an "access key") that connects to his computer.  The hardware key generates a "predetermined digital identification" which may be read by the user's computer.  ('416 patent at 7:59-61).  The patented system also stores in a "clearinghouse" (1) the "identity data" (of which the "predetermined digital identification" may form a part) of the user's computer and (2) the "identity data" of the access server computer 34 (called the "first server computer" in the claims).  ('416 patent at 4:44-45).

When the subscriber begins an "operating session" in which he seeks access to the selected, *i.e.,* protected, computer resources, he uses his own computer, the "subscriber client computer," to send a message to a "first server computer" (referred to in the '416 patent specification as the "access server 34").  The first server computer then commands the subscriber/user to log in.  ('416 patent at 6:22-25).  The login command includes a request that the subscriber client computer forward the predetermined digital identification, which in the preferred embodiment is read from the hardware key, to the first server computer.  ('416 patent at 35:51-56).  The first server computer then transmits the subscriber's identity data to the clearinghouse.  ('416 patent at 6:25-27).  The clearinghouse "authenticates" the subscriber using the transmitted identity data.  Upon successful authentication, the clearinghouse instructs the first

---

[3]    References to Figures are to figures in the '416 patent unless otherwise specified.

server computer to permit the subscriber/user to have access to the selected computer resources. ('416 patent at 6:28-31). For additional security, the clearinghouse is also adapted to authenticate the identity of the first server computer itself. ('416 patent at 7:4-9 and 15-18). Authentication of the first server computer by the clearinghouse (amongst other things) guards against attacks by hackers who attempt to pose as the first server computer, a so-called "man-in-the-middle" attack.

## OPENING STATEMENT AND SUMMARY OF THE ARGUMENT

The terms that this Court must interpret all appear in the two asserted independent claims of the '416 patent, claims 1 and 24.[4] These independent claims appear below with the terms that require interpretation by this Court in bold italics.

1.      A system for controlling the operation of and access to selected computer resources of at least a *first server computer* by at least one *subscriber client computer* via an *untrusted network* in an *operating session*, without necessarily controlling access to other computer resources provided by the *first server computer* and by other server computers and nonsubscriber client computers, comprising:

   (a)    *clearinghouse means* for storing identity data of said *first server computer* and the *identity data of each of said subscriber client computers*;

   (b)    *server software means* installed on said *first server computer adapted to forward its identity data* and *identity data* of each *subscriber client computer* to said *clearinghouse means* at the beginning of an *operating session* in which access to selected computer resources of said *first server computer* is requested;

   (c)    *client software means* installed on each of said *subscriber client computer*s *adapted to forward its identity data* to said *first server computer* at the beginning of an *operating session* in which access to selected computer resources is requested;

   (d)    at least one *hardware key* connected to the *subscriber client computer*, said key being adapted to generate a *predetermined digital identification*, which identification is *part of said identity data*;

---

[4]    Plaintiff also asserts that defendants infringe dependent claims 4, 5, 15, 16, and 25 of the '416 patent.

3

(e) said *server software means* installed on the *first server computer* being adapted to selectively request the *subscriber client computer* to forward said *predetermined digital identification* to the *first server computer to thereby confirm that said hardware key is connected to said subscriber client computer;*

(f) said *clearinghouse means* being adapted to *authenticate* the identity of said *subscriber client computer* responsive to a request for selected computer resources of said *first server computer* by a *subscriber client computer*;

(g) said *clearinghouse means* being adapted to authenticate the identity of said *first server computer* responsive to said *subscriber client computer* making the request for selected computer resources of said *first server computer*; and,

(h) said *clearinghouse means* being adapted to *permit access* to said selected computer resources responsive to successful initial authentication of said *first server computer* and of said *subscriber client computer* making first[sic, said] request.

24. A method of controlling access to selected computer resources of at least a *first server computer* by at least one *subscriber client computer* via an *untrusted network* during an *operating session*, without necessarily controlling access to other computer resources provided by the *first server computer* and by other server computers and nonsubscriber client computers, comprising the steps of:

(a) registering *identity data* of said *first server computer* and the *identity data of each of said subscriber client computers* and storing the registered *identity data* in a *clearinghouse means* associated with said *first server computer* and said *subscriber client computer*s;

(b) requiring a *subscriber client computer* to forward *its identity data* to said *clearinghouse means* at the beginning of an *operating session* in which access to selected computer resources is requested;

(c) requiring a subscriber client computer to forward a *predetermined digital identification* to said *first server computer to thereby confirm that a hardware key is connected to said subscriber client computer;*

(d) attempting to authenticate the identity of said *subscriber client computer* from said *clearinghouse means* responsive to a request for selected computer resources of said *first server computer* by a *subscriber client computer*;

(e) attempting to authenticate the identity of said *first server computer* from said *clearinghouse means* responsive to said *subscriber client computer* making the request for selected computer resources; and,

(f) ***permitting access*** to said selected computer resources responsive to successful initial authentication of said ***first server computer*** and of said ***subscriber client computer*** making said request.

The disputed claim terms and the parties' respective interpretations are provided in the Joint Claim Construction Statement, attached hereto as Exhibit B.

For the large majority of claim terms requiring interpretation, Prism submits that this Court adopt the plain and ordinary meanings of the words in the claims by applying standard rules of claim construction, *i.e.* by confirming that neither the '416 patent specification nor the prosecution history define the words to have a special meaning or disclaim the ordinary meaning.

Prism also urges this Court to recognize and apply the rule against interpreting claims in a way that excludes the preferred embodiments from falling within the scope of the claims. This rule applies specifically to the claim terms "first server computer" and "selected computer resources." Defendants propose an interpretation of these terms that *requires* the protected content (to which the patented system controls access) to be loaded on or stored on the first server computer. But as pointed out below, the '416 patent shows and describes that the "selected computer resources" (*i.e.*, "Protected Content") in the preferred embodiment of the patented system may reside *outside* of the first server computer, and the first server computer merely acts as a gatekeeper that controls access to at least some of these protected computer resources.

Certain of the claim terms in dispute are written in means-plus-function form and invoke 35 U.S.C. § 112, ¶ 6. Some of those means-plus-function claim terms are embodied in the '416 patent via software, which requires the identification of the particular algorithms disclosed in the patent for performing the recited functions. Many of those means-plus-function claim terms recite that the particular element of the claim "is adapted to" perform a specific function, *i.e.*, that the claimed system have the *capability* of performing the recited function. Defendants seek to

have This court ignore the "adapted to" phraseology used to define the invention and interpret these claim terms to require that the recited function be occurring – not just that an infringing system have the *capability* of performing those functions.   The interpretations sought by defendants ignore the words of the claims and changes structural elements of the claim into process steps, which is improper and should be rejected.  Defendants' proposed interpretations of those means clauses also directly contradict the interpretation of the term "adapted to forward" which they agreed to – "capable of transmitting" – as shown in the Joint Claim Construction Statement.  (Ex. B at p. 22).

The parties also dispute what comprises the recited function of certain of the means-plus-function claim terms.   Specifically, defendants propose that this Court interpret the recited function to include a temporal element or triggering event that defines when the function occurs. Prism, on the other hand, urges that the recited *function* of the subject means clauses should not be interpreted to include any such temporal or triggering event element.  The fact that a recited function must be capable of happening at a specific time or upon the occurrence of a specific event does not implicate the specific algorithm that defines *how* that function is performed.  In other words, the *recited function* of the subject means clauses defines *what* capability must exist, not when that capability occurs.  To the extent that the claims include temporal or triggering event limitations, these limitations should be interpreted under normal rules of claim construction, not under the special rules of Section 112, ¶ 6.

Finally, defendants have made an argument that the '416 patent does not disclose sufficiently definite algorithms to embody some of the software-based means-plus-function claim elements, and that those claims are therefore invalid.  At times, defendants couch this argument in the alternative since they simultaneously point out detailed algorithms (which

include much more than is needed to meet the recited function of the claims), and urge that the claim be limited to these very detailed algorithms. That the defendants can identify algorithms in the '416 patent specification that allegedly embody the software-based means clauses (even as an alternative argument) effectively rebuts their indefiniteness argument.

Defendants' allegations that certain of the means-plus-function clauses in the asserted claims are incapable of interpretation raises an invalidity argument which defendants must prove by clear and convincing evidence. The '416 patent discloses and describes the exact software used in the preferred embodiments of the invention. Prism urges this Court to be mindful that a patent applicant need not include a specific recitation of the exact software code that he chooses to use to embody his invention if such software tools are known in the art and if the applicant identifies them in the patent specification. The inventors did just that in the '416 patent, in addition to providing very detailed flow charts and text describing the algorithms employed in practicing the invention. Prism even listed in the patent specification (at columns 22-25) the various known and off-the-shelf software tools it used for its commercial embodiments of the patented invention. No more is needed to meet the requirements of 35 U.S.C. § 112.

In the following section Prism discusses the controlling legal authority relevant to the various claim construction issues facing this court. In the "Argument" section Prism then applies that law to show how its proposed interpretations conform to the '416 patent specification and that legal authority.

**ARGUMENT**

I.     **APPLICABLE LEGAL STANDARDS**

    A.     **General Claim Construction Principles**

A proper analysis of the scope of patent claims begins with the claim language itself. *E.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Words of a claim are "generally given their ordinary and customary meaning," from the perspective of one skilled in the art at the time of the invention upon reading the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citation omitted); *Home Diagnostics, Inc. v. Lifescan Inc.*, 381 F.3d 1352, 1355-56 (Fed. Cir. 2004). Of course the Court may (and should) look to the words surrounding the claim terms for guidance, because context can illuminate the meaning. *Phillips*, 415 F.3d at 1314. The written description also provides context for the claims, and "is appropriately resorted to 'for the purpose of better understanding the meaning of a claim,' and for 'showing the connection in which a device is used.'" *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal citations omitted). The patent specification or the prosecution history may help to confirm that the patentee's use of a disputed term comports with its plain and ordinary meaning. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342-43 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1582. In the present case, the '416 inventors relied on the ordinary and customary meaning of the language in their patent claims and provided a special definition for only one claim term – "untrusted network."

To cast aside the standard meaning of a claim term, an accused infringer must show the inventor acted as his own lexicographer and unambiguously adopted a different definition. *E.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted); *Vitronics*, 90 F.3d at 1582; *Rexnord*, 274 F.3d at 1342. The same high threshold applies to arguments the patentee disavowed claim scope: "'[A]bsent a clear disclaimer of particular

8

subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean the scope of the invention is limited to that context.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004) (quoting *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d, 1346, 1355 (Fed. Cir. 2003)). "Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) (emphasis in original) (citation omitted). Similarly, the prosecution history may demonstrate how the inventors and the PTO understood terms in the claims, but any purported surrender of claim scope based on the prosecution history must be "clear and unmistakable" – ambiguous prosecution statements are not limiting. *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003); *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1307 (Fed. Cir. 2003) (citing *Omega*). The patentees here did not vary the meaning of any terms in the '416 claims, and did not disavow or surrender any claim scope.

Though technically extrinsic evidence, which cannot serve to vary the meaning of claim terms evident from the intrinsic sources, precedent continues to permit courts to consider dictionaries for guidance on the ordinary and customary meanings of claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1583-85 & n.6; *Phillips*, 415 F.3d at 1322-23.

### B.    Means or Step Plus Function Claims

The last paragraph of section 112 allows an inventor to express a claim limitation as a means (or step) plus function, "without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. To invoke this statutory clause a claim element: (1) must be expressed as a means for performing (or a step

required to perform) a function, *e.g.*, "a step *for*"; (2) must state the specific function performed; and (3) the claim itself must not recite the acts or structure required to perform the function. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1432-1433 (Fed. Cir. 2000) (citing *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1581 (Fed.Cir. 1997)). The word "means" (or "step") in a claim creates a rebuttable presumption that section 112, paragraph 6, applies. *E.g.*, *York Prods, Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1574 (Fed. Cir. 1996). Conversely, as in claim 24 of the '416 patent, a method claim element that does *not* use the phrase "step for" raises the presumption that paragraph 6 does *not* apply. *See Generation II Orthotics Inc. v. Medical Tech. Inc.*, 263 F.3d 1356, 1368 (Fed. Cir. 2001); *see also Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 381 F.3d 1371, 1382 (Fed. Cir. 2004).

Claim 1 of the '416 patent covers a system and recites three elements in this statutory "means-plus-function" form: "client software means," "server software means," and "clearinghouse means." Claim 24 covers a method, on the other hand, and does not employ the Section 112, paragraph 6, claiming format. In particular, the presence of the term "clearinghouse means" in method claim 24, without any statement of a function to be performed, does not trigger a claim interpretation for that element based on 35 U.S.C. § 112, ¶6. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

### C.    Software Algorithms as Structure Corresponding to a Means Clause

For computer-implemented means-plus-function claim elements, the corresponding structure disclosed in the patent specification generally comprises one or more algorithms that accomplish a recited function. *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) (citing *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999)). In *Harris*, the Federal Circuit further noted that, "the corresponding structure of a computer-implemented [means-plus] function must include those features of the algorithm that are

necessary to the performance of the recited function—*not that every detail of the specification's algorithm is a limitation on the claimed invention*." *Id.* at 1249 (emphasis added). An inventor may disclose an algorithm corresponding to a computer-implemented means-plus-function clause in the form of a flowchart or in words. "[E]very step-by-step process, be it electronic or chemical or mechanical, involves an algorithm in the broad sense of the term." *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368, 1374 (Fed. Cir. 1998) (quoting *In re Iwahashi*, 888 F.2d 1370 (Fed. Cir. 1989)). A computer algorithm is a step-by-step process, thus this understanding of "algorithm" applies in the field of computer software. (Ex. F, *Microsoft Press Computer Dictionary*, 2nd ed. 1994, defining "algorithm" as "[i]n the most general sense, any set of instructions that can be followed to carry out a particular task.")

The algorithm behind a means-plus-function element need not be explicitly disclosed in the patent document and "may be implicit in the written description if it would have been clear to those skilled in the art what structure must perform the function recited in the means-plus-function limitation." *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999) (quoting with approval the U.S. Patent Office Interim Supplemental [Examination] Guidelines for Determining the Applicability of 35 U.S.C. § 112, ¶ 6, 64 Fed. Reg. 41,392; 41,393 (1999)); s*ee also*, Manual of Patent Examining Procedure (MPEP) 8th Ed., August 2001 at Section 2181, p. 2100-213. (Ex. D).

## II.  THIS COURT SHOULD ADOPT PRISM'S PROPOSED CONSTRUCTION OF DISPUTED CLAIM TERMS BECAUSE THEY ARE CONSISTENT WITH THE ORDINARY AND CUSTOMARY MEANINGS.

As demonstrated below, Prism proposes definitions for the disputed claim terms of the '416 patent that rely entirely on the ordinary and customary meaning of these terms, as they appear in the patent-in-suit, to a person of ordinary skill in the art in 1997. Prism's preferred

claim constructions are simple, straightforward, and do not improperly incorporate limitations from the specification, or wrongly restrict the claims to the preferred embodiments.

### A.    "client software means"

1(c)    **client software means** installed on each of said subscriber client computers adapted to forward its identity data to said first server computer. . .;

Both parties agree that the term "client software means," which appears in element (c) of claim 1, invokes 35 U.S.C. § 112, ¶ 6. The *function* of the client software means is "*adapted to forward its* [**the subscriber client computer's**] *identity data to said first server computer,*" and the client software means must have the capability of performing that function.

Defendants urge this Court to interpret the phrase "adapted to forward" to mean "forwarding." But such an interpretation introduces the element of a *requirement* into the claim, while the plain language of the claim itself calls only for *capability*. The intrinsic evidence provides no basis for such a departure from the plain meaning of the claim term as written. The term "adapted to" is often used in claim drafting to indicate "capable of." *Berg Tech., Inc. v. Foxconn Int'l, Inc.*, 1999 U.S. App. LEXIS 2796, at *8 (Fed. Cir. Feb. 23, 1999) (stating that claim term "adapted to" is often used in claim drafting to indicate "capable of");[5] *see also, CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1173 (Fed. Cir. 2005). In fact, in the Joint Claim Construction Statement (Ex. B at 22) the parties stipulated that the term "adapted to forward" in claim 1 means "capable of transmitting."

A change from a *capability* to a *requirement* also impermissibly converts this element of system claim 1 into a *step.* Claim 1 is a system claim that defines the attributes, *i.e.*, capabilities,

---

[5]    Pursuant to L.R. 7.1.3(G), Prism points out that the *Berg Tech.* decision was designated as non-precedential by the Federal Circuit and Prism attaches a copy of that decision as Exhibit C hereto. Prism cites to *Berg Tech.* since it specifically acknowledges that use of the term "adapted to" in claim drafting conventionally means that something be "capable of."

of the patented system, not a method claim defining process steps.  The elements of method claim 24 are, properly, steps, but the elements of system claim 1 define structure or functionality – not steps of a method.[6]

Nor does the functional recitation of this claim element require any temporal limitation. As such, the *function* of this means clause should not be read to include the "at the beginning of an operating session" language, as defendants propose.  *See, e.g., O.I. Corp.,* 115 F.3d at 1581. In *O.I. Corp.*, the claim term at issue was "means for passing the analyte slug through a passage."  *Id.*  The Federal Circuit held that the district court erroneously included the word "passage" as part of the means-plus-function clause.  *Id.*  The Court of Appeals reasoned that although the "passage" may act upon the slug while it is being passed, it is not the *means* that *causes* the passing.  *Id.*  Instead, the "passage" is the *place* where the function occurs.  *Id.* (emphasis added).  Thus, in *O.I. Corp.* the Federal Circuit ruled that the *function* of the means clause was to *pass* the analyte slug, and the place where that function occurred was not a limitation of the means clause.  *Id.*

Like the district court in *O.I. Corp.*, the defendants in this case also seek to improperly narrow the function of the "client software means" here by including a temporal limitation to the recited function.  Defendants urge this Court to define the recited function as including the "at the beginning of an operating session" language.  But the recited function is simply having the capability to forward the client computer's identity data to the first server.  The "client software

---

[6]  System claims that define an invention using method steps fail to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2. *Ex parte Lyell,* 17 USPQ2d 1548, 1550 (BPAI 1990).  This rule was contained in the PTO's Manual of Patent Examination Procedure (MPEP) 6th Ed., at the time the application for the '416 patent was being examined, at § 2173.05 (p) (b) (1995) (Ex. E) ("A single claim which claims both an apparatus and the method steps of using the apparatus is indefinite under 35 U.S.C. 112, second paragraph.") (emphasis added).  Therefore, the examiner would not have allowed claim 1 to issue if he thought that the "client software means" element of claim 1 read an affirmative method step, *i.e.* "forwarding," into the claim.

means" is embodied in the subscriber software 36 as described in the '416 patent specification. ('416 patent at 5:40-47). Subscriber software 36 allows for performance, amongst other things, of the login process. (*Id.*). But the subscriber 36 is "controlled by the subscription access server 34 which sends specific commands to the subscriber software 36 to perform the tasks as needed." ('416 patent at 5:45-47). Thus, while claim 1 recites that the "client software means" be capable of forwarding identity data "at the beginning of an operating session," the software (*i.e.*, algorithm) that determines *when* the identity data is forwarded is (in the preferred embodiment) part of the access server 34 and is not part of the subscriber software 36. Therefore, the "client software means" should not be interpreted to include any temporal limitation within its recited function since the algorithm that is "adapted to" forward the identity data performs its function whenever called upon.

To be clear, however, Prism does not ask this Court to *ignore* the temporal or event-triggering limitations that the claim recites in relation to various ones of the means-plus-function clauses. Prism simply urges that this Court not read the *function* of the means clauses to include such temporal or event-triggering requirements. Defining the recited *function* too narrowly risks reading into the claim (under Section 112, ¶ 6) steps of a software algorithm that the claim was not intended to require. The temporal and event-triggering recitations in claim 1 (such as "at the beginning of an operating session" or "responsive to a request for selected computer resources") should be interpreted under normal rules of claim construction and not the special rules of Section 112, ¶ 6.

The *structure* that embodies the client software means is:

> that portion of the identity and access management components (e.g., that portion of the subscriber software running on the subscriber client computer 36 (Fig. 2)) that preferably uses the transmission control protocol/internet protocol (TCP/IP)

*and/or user datagram protocol/internet protocol (UDP/IP) to communicate with the first server computer, and equivalents thereof.*

The structure (*i.e.* algorithm) that embodies the "client software means" is the software that provides the capability to forward data from one computer to another. "Forward" means no more than to "transmit" or "send." The function of sending/transmitting data from computer to computer is fundamental to computer networking in general, and is a technology almost four decades old.[7] The '416 patent states that the subscription access components of the subscriber software 36 preferably use TCP/IP and/or UDP/IP as the algorithm to send data. ('416 patent at 5:56-63). The '416 patent specification gives examples of standard software, such as the Netscape Navigator and Microsoft Internet Explorer web browsers, that use the TCP/IP and/or UDP/IP protocols. ('416 patent at 5:48-50). The '416 patent also specifically identifies the available software products that form the preferred embodiment of the subscriber software (also referred to as the "Client Application"). ('416 patent at 22:46-25:35). One skilled in the art would know and understand what software provides the capability to send data from one computer to another based on the information given in the '416 patent specification. *See Atmel Corp.*, 198 F.3d at 1381-82 (the description of structural support must be such that "one skilled in the art will know and understand what structure corresponds to the means limitation.").

The '416 patent sufficiently describes an algorithm by which the client software means performs its function. An algorithm is "[i]n the most general sense, any set of instructions that can be followed to carry out a particular task." *Microsoft Press Computer Dictionary*, 2nd ed., 1994 (Ex. F). The structure (or algorithm) that supports a means-plus-function claim element need not be explicitly disclosed in the patent document and "may be implicit in the written

---

[7]    National Science Foundation, "History of the Internet,"
        http://www.nsf.gov/statistics/seind98/access/c8/c8s1.htm#c8s1l2

description if it would have been clear to those skilled in the art what structure must perform the function recited in the means-plus-function limitation." *Atmel*, 198 F.3d at 1380; *see also*, Manual of Patent Examining Procedure (MPEP) 8th Ed., August 2001 at Section 2181, p. 2100-213. (Ex. D). In *Atmel*, the Federal Circuit stressed that a district court must determine whether sufficient structure is disclosed in the specification based on the understanding of one skilled in the art. *Atmel*, 198 F.3d at 1381-82. In fact, the law is clear that when disclosing structure that corresponds to a means-plus-function claim element in a patent specification, "patent documents need not include subject matter *that is known in the field of the invention and is prior art, for patents are written for persons experienced in the field of the invention.*" *S3, Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) (emphasis added) (citations omitted). "If the claims when read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 [¶ 2] demands no more." *S3, Inc.*, 259 F.3d at 1367 (quoting *Miles Laboratories, Inc. v. Sheridan*, 997 F.2d 870, 875 (Fed. Cir. 1993)).

      **B.**    **"server software means"**

      1(b)  **server software means** installed on said first server computer adapted to forward its identity data and identity data of each subscriber client computer to said clearinghouse means . . .;

      1(e)  said **server software means** installed on the first server computer being adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer;

The parties agree that the term "server software means," which appears in elements (b) and (e) of claim 1, invokes 35 U.S.C. § 112, ¶ 6. The server software means performs two *functions* in claim 1.

In 1(b), the *function* of the server software means is:

a*dapted to forward its [the first server's] identity data and identity data of each subscriber client computer to said clearinghouse means…;*

The inventors ascribed no special meaning to either the individual words of the phrase, nor the phrase itself, and the literal wording of the claim is unambiguous. Therefore, the function is literally that described in the claim.

Defendants attempt, as they did with the client software means, to have the claim term "adapted to forward" interpreted to mean "forwarding." As before, such an interpretation improperly introduces a *requirement* as opposed to a *capability* into the claim and should be rejected. *Berg Tech., Inc.*, 1999 U.S. App. LEXIS 2796 at *8.

The timing of when such communication occurs is not part of the capability to send the data. Just as with the "subscriber software means," defendants' attempts to define the function to be limited to the *time* at which the identity data is forwarded; *i.e.*, "at the beginning of an operating session," should be rejected. *See, e.g.*, *O.I. Corp.*, 115 F.3d. at 1581 (holding that *place* where function occurs was improperly included as part of means-plus-function element). Introduction of such a temporal limitation is gratuitous since the recited function – being *capable* of forwarding identity data – has no temporal restriction. That is not to say that claim 1 should be interpreted so as to ignore the recitation that the identity data can be forwarded at the beginning of an operating session. Rather, Prism urges only that the temporal capability (and the software algorithm that embodies it) should not be read into the server software means under Section 112, ¶ 6.

The *structure* of the server software means in claim element 1(b) is:

> *that portion of the identity and access management components (e.g., software running on the server 34 (Fig. 2) that preferably uses the transmission control protocol/internet protocol (TCP/IP) and/or user datagram protocol/internet protocol (UDP/IP) to communicate with the subscriber client computer and the clearinghouse 30, and equivalents thereof.*

The structure (*i.e.* software algorithm) of the server software means that accomplishes the function of claim element 1(b) is, as for the client software means, simply that software algorithm that enables data to be sent from one computer to another using TCP/IP and/or UDP/IP protocols. ('416 patent at 5:65-67). The software loaded on access server 34 runs "in conjunction with" a standard web browser, instructing the browser to perform the required actions. ('416 patent at 7:29-30). As the '416 patent describes, once a subscriber requests access to protected content, that request is communicated to the subscription access server 34 (*i.e.*, the "first server") and the access server 34 forwards the login parameters to the clearinghouse 30. ('416 patent at 6:23-28). The "subscription access server 34 and the clearinghouse 30 preferably communicate with each other using TCP/IP. . . ." ('416 patent at 5:65-67). Thus, the "server software means" is adapted to forward identity data to the clearinghouse using the TCP/IP and/or UDP/JP protocols, or their equivalents.

The *function* of the server software means in claim element 1(e) is:

> *adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer*

Defendants' attempt to have the term "adapted to forward" interpreted to mean "forwarding," as before, must fail because it introduces a *requirement* into the claim where only the *capability* is recited.

The *structure* of the server software means in claim element 1(e) is:

> *that portion of the server software that selectively determines whether (e.g., upon a request for access to protected computer resources) to request the subscriber client computer to forward its digital identification to the first server to confirm the presence of a hardware key, and equivalents thereof. The specific algorithm includes that portion at block 150 in Fig. 18 that defines the challenge sent by the Log-in Enforcer from the first server and the response received by the Log-in Enforcer for initial authentication.*

18

The structure, *i.e.*, algorithm, that accomplishes this function, in addition to being described in Fig. 18, is generally described in the '416 patent at 17:32-45. It includes the challenge sent by the log-in enforcer from the first server, and the response received by the log-in enforcer for initial authentication, illustrated in block 150 in Fig. 18. The '416 patent describes an initial authentication, which confirms the presence of the hardware key at the beginning of an operating session. If desired, the patented system also teaches the ability to re-authenticate the presence of the hardware key during the operating session, and the steps of the re-authentication process are described at blocks 222-236 of Fig. 20. However, this element of claim 1 does not require the practice of the re-authentication algorithm.

### C. "clearinghouse means" in claim 1

> 1(a)  **clearinghouse means** for storing identity data of said first server computer and the identity data of each of said subscriber client computers;
>
> 1(f)  said **clearinghouse means** being adapted to authenticate the identity of said subscriber client computer . . ;
>
> 1(g)  said **clearinghouse means** being adapted to authenticate the identity of said first server computer . . ; and,
>
> 1(h)  said **clearinghouse means** being adapted to permit access to said selected computer resources . . .

Both parties agree that the term "clearinghouse means" which appears in elements (a), (f), and (g) of claim 1 invokes section 112, ¶ 6. The clearinghouse means performs three functions in claim 1.

In 1(a), the *function* of the clearinghouse means is:

*storing identity data of said first server computer and the identity data of each of said subscriber client computers.*

The parties do not differ on this function.

The *structure* of the clearinghouse means in claim element 1(a) that performs this function is:

*any clearinghouse server(s) with software capable of storing identity data, and equivalents thereof.*

The storage of data in a server is a conventional hardware and software combination performing the conventional function of storing data in a database. This function is performed by the clearinghouse structured query language (SQL) database shown in, *e.g.*, Fig. 3 and described in the '416 patent at 4:50-51 and 6:57-61. A person of ordinary skill in the art would understand the specific nature of this structure from these references, as well as from the many specific examples of tools for database storage, retrieval, and management listed in columns 22-25 of the '416 patent. The possibility that the system may include "multiple clearinghouses" is stated in the '416 patent at 4:24-31.

In claim element 1(f), the *function* of the clearinghouse means is:

*adapted to authenticate the identity of said subscriber client computer.*

Defendants' attempt to have the phrase "adapted to authenticate" interpreted to mean "authenticating," but that interpretation improperly construes a recited *capability* as a *requirement* and would render this element of the claim a process step rather than a functional capability of the claimed system.

The phrase "responsive to a request for selected computer resources. . ." in claim element 1(f) is not a part of the function of the clearinghouse means; it is, rather, a statement of an event that triggers the performance of this function by the clearinghouse means. The '416 patent teaches that the user/client computer may also be re-authenticated during an operating session and after the user/subscriber client computer has been granted access to selected computer resources. ('416 patent at 12:30-40). Any such re-authentication occurs *during* an operating session and *after* the user has made a request for access to selected computer resources. Thus, the '416 patent teaches that the ability to authenticate the subscriber is a function that *can* occur

20

separate and apart from the user's initial request to access protected content.  Thus, no reason exists to read into the *function* of the clearinghouse means the limitation that the authentication capability *must* occur at a particular time or event.  Whether the clearinghouse means is capable of performing its recited function at a particular time may, indeed, be a requirement of the claim, but that is not the same thing as saying it is a part of the recited function, which would thereby read unnecessary functions (and algorithms) into the means clause.

The *structure* corresponding to the clearinghouse means in claim element 1(f) is:

> *that portion of the clearinghouse software (e.g., a user authentication daemon 58) which authenticates the subscriber client computer, and equivalents thereof.*

The function of authentication[8] is achieved by comparing the user's identity data with data stored in a clearinghouse database server as described, for example, in the '416 patent at 7:7-10, 9:38-42, 17:45-48, and Fig. 18, block 156.  Comparison of digital data is a conventional function of databases that existed at the time of filing the '416 patent application in 1997.  Indeed, examples of commercially available database products that form the preferred embodiment of the invention are listed in col. 22 and col. 23 of the '416 patent under the title "Subscription Database."

In claim element 1(g), the *function* of the clearinghouse means is:

> *adapted to authenticate the identity of said first server computer.*

As with each of the claim terms that recite "adapted to," defendants improperly seek to have a recited *capability* interpreted to be a *requirement*.  As stated before, that attempt should be denied.

---

[8]   The parties agree that "authenticate" means "to determine that something is, in fact, what it purports to be." (Ex. B, Joint Claim Construction Statement) (D.I. 207).

The phrase "responsive to said subscriber client computer making the request . . ." in claim element 1(f) does not comprise a part of the function of the clearinghouse means; it is, rather, a statement of an event that triggers the performance of this function by the clearinghouse means. *See, e.g., O.I. Corp.*, 115 F.3d at 1581 (holding that the term "passage" is merely the *place* where the function occurs and, as such, not part of a means-plus-function clause).

The *structure* of the clearinghouse means in claim element 1(g) is:

> *that portion of the clearinghouse software (e.g., a user authentication daemon 58) which authenticates the first server, and equivalents thereof.*

The function of authentication is achieved by comparing the server's identity data with data stored in a clearinghouse. The '416 patent specifically describes this function of authenticating the first server at the clearinghouse. "For every user authentication request, the user authentication daemon [*item 58 in Fig. 4, which is part of clearinghouse 30*] first insures it is communicating with an authentic subscription access server 34. . . ." ('416 patent at 7:4-8 and 15-17). Comparison of identity data is a conventional function of databases that existed at the time of filing the '416 patent. The '416 patent describes (for the preferred embodiment) the use of structured query language (SQL) clearinghouse databases as part of the clearinghouse 30 ('416 patent at 4:50-54), which communicate with the clearinghouse administration software using an ODBC driver. ('416 patent at 4:63-66). The '416 patent describes examples of such database products useful with the preferred embodiment of the invention beginning at the bottom of col. 22 under the heading "Subscription Database."

Additionally, nothing in this limitation of claim 1 defines *how* identity data is assigned to or retrieved from the first server. The function of the clearinghouse means is simply the capability to authenticate the identity data – not to create it. Thus, to the extent that defendants' allegation that the '416 patent fails to disclose an algorithm for performing this function rests on

an alleged failure to define *how* the first server identity data is assigned, that allegation has no relevance to the claimed function of the clearinghouse means.

The *function* of the clearinghouse means in claim element 1(h) is:

*adapted to permit access to said selected computer resources.*

Defendants again improperly attempt to have a claim element that recites a *capability*, *i.e.* adapted to, interpreted as a specific *requirement* that a process step occur. As noted previously for all the disputed claim terms reciting that the patented system be "adapted to" perform a specified function, that attempt should be denied.

The phrase "responsive to successful initial authentication of said first server computer. . . ." in claim element 1(h) is not part of the function of the clearinghouse means; it is, rather, a statement of an event that triggers the performance of this function by the clearinghouse means. *See, e.g., O.I. Corp.*, 115 F.3d at 1581 (holding that the term "passage" is merely the *place* where the function occurs and, as such, not part of a means-plus-function clause).

The *structure* of the clearinghouse means in element 1(h) is:

*that portion of the clearinghouse software which sends a successful authentication response message to the first server, as shown in Fig. 18 at blocks 158 and 160 and described at col. 17, lns. 45-48, and equivalents thereof.*

As illustrated in blocks 158 and 160 of Fig. 18, and described in the '416 patent at 17:45-48, once the user authentication server, *i.e.*, the clearinghouse, accesses its database of user subscription information and authenticates the user's log-in parameters (block 150), the clearinghouse server sends a "successful authentication response (AR) message" to the session initiator, which in turn communicates with the Log-in Enforcer of the server 34 to grant permission to service the user's request for protected content. (*See*, '416 patent, Fig. 4 and Fig. 18).

23

### D.    "clearinghouse means" in claim 24

Even though the phrase "clearinghouse means" is used in claim 24, that claim element does not invoke section 112, paragraph 6.  Claim 24 describes a method, not a system, and the "clearinghouse means" element of claim 24 does not meet the well-defined conditions for invoking Section 112, ¶ 6 for the following reasons.

Simple use of the phrase "clearinghouse means" in claim 24 does not draw the elements of that claim within the ambit of Section 112, ¶ 6 because the claim expresses no "means or step for performing a specified function."  An element of a method claim like claim 24  that does not use the phrase "step *for*" raises the presumption that Section 112, ¶ 6 *does not* apply.  *See Generation II Orthotics*, 263 F.3d at 1368.  In such a case, a limitation of that claim can *only* be construed as a step-plus-function limitation if the limitation contains *no* specific act.  *Masco Corp. v. U.S.*, 303 F.3d 1316, 1327 (Fed. Cir. 2002).  An "*act*" describes how a function is accomplished, *i.e.*, how the steps of the method are implemented.  *O.I. Corp.*, 115 F.3d at 1583.  The limitations of claim 24 individually describe the precise *acts* required to control access to selected computer resources.  Therefore, these limitations cannot be construed as step (or means)-plus-function claim limitations.

Finally, the parallels between elements of method claim 24 and system claim 1 do not mean that both can be taken as invoking Section 112 ¶ 6.  "[M]ethod claims that parallel, or have limitations similar to, apparatus claims admittedly subject to § 112, paragraph 6 are not necessarily subject to the requirements of § 112, paragraph 6.  'Each claim must be independently reviewed in order to determine if it is subject to the requirements of § 112, paragraph 6.'"  *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1028 (Fed. Cir. 2002) (citing and quoting *O.I. Corp.*).  Therefore, although in claim 1 the term "clearinghouse means" invoked Section 112, ¶ 6, use of that same term in claim 24 does not

automatically invoke that section of the statute.  When analyzed separately, claim 24 fails to recite a specific function for the term "clearinghouse means" and, therefore, should not be interpreted as a means-plus-function claim element.

The *clearinghouse means* of claim 24 should therefore be interpreted to mean:

> *any clearinghouse server(s) or computer(s) with software capable of storing and authenticating identity data.*

This element is described in the '416 patent at, *e.g.*, 6:17-33, referring to "storage by the clearinghouse 30."  Examples of commercial software, available at the time of the invention and capable of storing and authenticating identity data, are described in cols. 22 and 23 of the '416 patent under the heading "Subscription Database."

### E.     "untrusted network"

This claim term should be interpreted to mean:

> *a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous.*

The inventors specifically defined this term in the '416 patent at 3:59-62, and also stated that the internet is an example of an untrusted network. ('416 patent at 1:4).  Defendants improperly attempt to add further, unnecessary limitations to this claim term by seeking an interpretation that limits an untrusted network to one where "[A] client-server application running over such a network has no control over the transmitted information during all the phases of transmission."  In this instance, the patentee acted as his own lexicographer and specifically defined this claim term.  No reason or justification exists for varying from that express definition.

### F.     "subscriber"

*A person, organization, or computer registered to be allowed access to said selected computer resources.*

The terms "subscriber" and "user" are used interchangeably throughout the specification and drawings of the '416 patent, *e.g.*, at 1:63-67, 7:48-53, Fig. 3, Fig. 17 (block 100) and Fig. 18 (blocks 160-168), and mean the same thing in the context of the '416 patent. The term "user" is simply defined as "a person or thing that uses." *Webster's New Twentieth Century Dictionary* (1983) (Ex. G). The specification states that payment for a subscription is *possible* but not necessary; becoming a subscriber "*could* involve things *like* collecting payment, demographic checks, etc." ('416 patent at 14:43-44) (emphases added). Only in (unasserted) claim 8 is the transmission of credit card information mentioned, and it is mentioned there only as one of a number of possible types of "demographic," not necessarily subscription, data. (*See also* '416 patent at 10:15-16). Defendants attempt to have the term subscriber interpreted to *require* a recurring payment. The fact that the '416 patent states that requiring payment from the subscriber is permissive and not mandatory, and the fact that the patent refers to the "subscriber" and a "user" interchangeably, however, establishes that this claim term should not be narrowly interpreted as defendants urge.

### G.     "first server computer"

*A computer that makes available information or other resources.*

The first server computer is the access server 34 shown in Fig. 4, which shows that the resources accessed by a user (the block titled "Protected Contents" in Fig. 4) do *not necessarily reside in* and are *not necessarily stored on* the access server 34.

In the context of claim 1, the first server computer is adapted to perform functions that allow it to provide a user with access to certain resources, forward its own and subscribers'

identity data to the clearinghouse, receive identity data from the client, and request the subscriber client to forward identity data. Ultimately, the first server computer permits the subscriber to have access to the "Protected Content," as shown by the dotted line arrows in Fig. 3. The first server computer performs a gatekeeper function, thereby controlling access to selected computer resources. The first server computer "makes available," or "communicates," certain computer resources. Those resources, however, may be, and in the preferred embodiment are, stored elsewhere. ('416 patent at 7:29-47; 8:39-41).

### H.    "operating session"

*A series of interactions between a subscriber client computer and a server computer during which access to selected computer resources is requested.*

An operating session incorporates a subscriber's request for access to selected computer resources. Claim 1 states that the server software means is adapted to forward the required identity data to the clearinghouse means "at the beginning of an operating session." ('416 patent at 35:38-40). This data must be forwarded *prior to* initial authentication because the authentication process itself operates upon this data. The conventional meaning of "beginning" is "the time or place of starting." *Webster's New Twentieth Century Dictionary* (1983) (Ex. G). There is no evidence that the inventors intended "beginning" to have other than its conventional meaning. Therefore, the initial forwarding of identity data occurs at "the time of starting" an operating session, and the operating session begins upon the request for access to protected content.

### I.    "hardware key"

*A device or object from which data may be read or emitted.*

"Hardware key" is used synonymously with the terms "access key" and "hardware access key" in the specification. ('416 patent at 7:61-65; 6:44; 8:35-36). These terms therefore have

the same meaning.  The hardware key must be connected to the subscriber client computer such that "the access key interface reads the digital ID from the access key." ('416 patent at 17:26-28; Fig. 18).  Moreover, the hardware key need not be separate from or external to the subscriber client computer but may also be built into the computer.  ('416 patent at 21:49-53).  The '416 patent describes multiple forms that the hardware key might have.  ('416 patent at 21:53-22:5). The hardware key's main function is to uniquely identify a user (and/or a device) that desires to access computer resources across an untrusted network.  ('416 patent at 21:45-51).  The particular form that the hardware key takes, such as whether it is external to the subscriber computer, is not a limitation of this term.

J.    "connected"

*In communication with, inserted in, attached to, or built in.*

The hardware key is "connected" to the subscriber client computer, but the term "connection" means more than mere physical attachment.  The '416 patent describes the hardware key as transmitting data to the subscriber client computer, *i.e.*, it must be in "communication with" the subscriber client computer so as to transmit its predetermined digital identification.  The '416 patent specifically teaches that the hardware key may be attached to and separable from the user's computer, or it may be built in to the computer.  ('416 patent at 21:49-53).  Thus, the term "connected" covers instances in addition to physical attachment, and may include instances where the hardware key communicates with the subscribers client computer via, for example, a radio frequency (RF) connection.  The key point is that the subscriber client computer be able to read the "predetermined digital identification" generated by the hardware key, not the particular form of the hardware key or how it communicates.

**K.     "predetermined digital identification"**

*Digital data whose value is known in advance or calculated at the moment.*

According to claim 1, a predetermined digital identification is "generated" by the hardware key. ('416 patent at 7:60-61). The access key may have an application-specific integrated circuit, or ASIC, and a digital identification that is "microcoded into it." ('416 patent at 5:52-55). The ASIC may calculate the predetermined digital identification based on a known algorithm since the hardware key has an integrated circuit chip built into it. ('416 patent at 22:6-45). Thus, so long as the "predetermined digital identification" uniquely identifies the user who possesses the key or the device to which it is connected, the specific digital data need not be static and could be "generated" or "calculated" by the hardware key, as the '416 patent specifically describes.

**L.     "selected computer resources of at least a [or said] first server computer"**

*Computer services, applications, or content that can be accessed (either directly or indirectly) by said first server computer.*

Claims 1 and 24 define a system and a method, respectively, for controlling access to "selected computer resources of *at least* a first server computer." ('416 patent at 35:25-26; 38:35-36). As shown in the proposed interpretation of "first server computer," (section II.G above), the first server computer performs a gate-keeping function, *i.e.,* "subscription access function" ('416 patent at 8:5-6), not a storage function, for protected computer resources. The '416 patent shows clearly, *e.g.,* in Figs. 3 and 4, that these resources are not "located on" the first server computer since these drawings illustrate the "Protected Content" as residing outside of and apart from the first server 34. Thus, there is no justification for defendants' assertion that all of the selected, *i.e.* protected, computer resources requested by the subscriber client computer must be located on the first server computer. Instead, those selected computer resources (or a

portion thereof) may reside elsewhere with access to those resources controlled by the first server(s) acting as gatekeepers.

### M.    "subscriber client computer"

*A programmable electronic device that can store, retrieve, and process data used by a subscriber to attempt to access said selected computer resources*

The subscriber client computer is a device capable of running the client software means. ('416 patent at 35:42-43).  In general, any device capable of running such software is a programmable computer.  One particular example of a subscriber client computer is a desktop PC.  ('416 patent at 5:36).  As show in Fig. 2, it is from the subscriber computer 36 that the user sends his request for protected content, *i.e.*, his attempt to access said selected computer resources.

### N.    "identity data" as it relates to the subscriber client computer

*Data sufficient for the patented system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access said selected computer resources.*

Controlling access to selected computer resources, the objective of the system of claim 1 and the method of claim 24, is achieved by authentication of a subscriber's identity data.  Claim 1 states:  (1) that the subscriber's identity data is stored on the clearinghouse means; (2) that the subscriber's identity data can be forwarded from the subscriber client computer to the first server computer at the beginning of an operating session; (3) that the first server computer can forward the subscriber's identity data and its own identity data to the clearinghouse means; (4) that the clearinghouse means can authenticate the identity of the subscriber client computer and the first server; and (5) that if the authentication is successful a subscriber is permitted access to selected computer resources.  ('416 patent at 35:66-36:3).  The data available to the clearinghouse to authenticate the subscriber client computer is the "identity data" stored at the clearinghouse

means and the identity data forwarded from the subscriber client computer to the clearinghouse via the first server computer. Therefore, the subscriber client computer identity data is that data sufficient to determine entitlement to access. This identity data need not be unique to a particular subscriber client computer since a subscriber (*i.e.*, user) might use his hardware key on many different "client computers" to obtain access to the selected computer resources. One of the goals of the '416 patented invention to provide secure access to protected content for approved *users*, not just for approved computers. Thus, once a hardware key is connected to a particular client computer, the client computer reads the predetermined digital identification from the hardware key and, from that, compiles identity data for that particular subscriber computer for that particular operating session.

### O.    "part of said identity data"

*A portion (or the entirety) of said identity data.*

This term only appears in claim 1 and not in claim 24 and it means exactly what it says. Defendants attempt to have this term interpreted such that it cannot read on the entirety of the identity data and must be a subset of the identity data. But nothing in the '416 patent or prosecution history precludes the "predetermined digital identification" of the hardware key (to which this claim term relates) from being the entirety of the "identity data." Stated differently, no reason exists to require that the "identity data" and the "predetermined digital identification" can't be the same data.

### P.    subscriber client computer"

*Claim 1 – To accomplish part of the recited function of the server software means (see above, "server software means").*

*Claim 24 – The objective of the step of "requiring a subscriber client computer to forward a predetermined digital identification to said first server computer" (see above, "connected") at a given time.*

This phrase is analogous to a "whereby" clause, which merely states the result of the limitations in the claim. The phrase therefore "adds nothing to the patentability of a claim." *Israel v. Cresswell*, 166 F.2d 153, 156 (CCPA 1948); *see also Texas Instruments Inc. v. U.S. Int'l. Trade Comm'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993); *Minton v. Nat'l Ass'n of Securities Dealers, Inc.,* 336 F.3d 1373, 1381 (Fed. Cir. 2003) ("A whereby clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited.") (citation omitted).

Defendants appear to argue that this claim term must be interpreted to require some type of continuous *re-authentication* to confirm that the hardware key remains connected to the client computer during the operating session. But the claim language is broad enough to cover only an initial authentication to confirm that the hardware key is connected to the client computer. Interpreting this claim element to require re-authentication improperly reads limitations into the claim that are not recited and not necessary.

### Q.    "permit[ting] access"

*Permitting the subscriber client computer to access said selected computer resources.*

This phrase is part of the function of the clearinghouse means of claim 1, and is the terminal step of the method of claim 24. The meaning of the phrase is clear; there is no indication that the inventors intended it to have any special meaning.

### CONCLUSION

Prism Technologies requests that this Court construe the disputed elements of the claims of the '416 patent in accordance with their ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention, as set forth above.

September 22, 2006                                   THE BAYARD FIRM


                                                    /s/ Richard D. Kirk (rk0922)
                                                    Richard D. Kirk (rk0922)
                                                    Ashley B. Stitzer (as3891)
                                                    222 Delaware Avenue, Suite 900
                                                    Wilmington, Delaware 19899
                                                    (302) 655-5000
                                                    rkirk@bayardfirm.com
                                                    astitzer@bayardfirm.com

                                                    ATTORNEYS   FOR   PLAINTIFF
                                                    PRISM TECHNOLOGIES LLC

OF COUNSEL:

Dirk D. Thomas, Esq.
Robert A. Auchter, Esq.
Kenneth A. Freeling, Esq.
Jason R. Buratti, Esq.
André J. Bahou, Esq.
Chandran B. Iyer, Esq.
Robins, Kaplan, Miller & Ciresi, L.L.P.
1801 K Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 775-0725

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on September 22, 2006, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Frederick L. Cottrell, III, Esq.
Alyssa M. Schwartz, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899

Patricia S. Rogowski, Esq.
Connolly, Bove, Lodge & Hutz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Ave., 17th Fl.
Wilmington, DE 19801

The undersigned counsel further certifies that copies of the foregoing document were sent by hand on September 22, 2006 to the above counsel and by first-class mail or overnight delivery as indicated to the below counsel:

*Via Federal Express*

John DiMatteo, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

William Lee, Esq.
Wilmer Cutler Hale & Dorr LLP
60 State Street
Boston, MA 02109

Jason Snyderman, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Commerce Square, Suite 2200
2005 Market Street
Philadelphia, PA 19103

Frank C. Cimino, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564

David M. Schlitz
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400

Samir A. Bhavsar
Jeffrey D. Baxter
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX  75201-2980


/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

587422v1