## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRISM TECHNOLOGIES LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 05-214-JJF |
| VERISIGN, INC., RSA SECURITY, INC., | ) | |
| NETEGRITY, INC., COMPUTER | ) | |
| ASSOCIATES INTERNATIONAL, INC., and | ) | |
| JOHNSON & JOHNSON SERVICES, INC. | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

CONNOLLY BOVE LODGE & HUTZ LLP
Patricia Smink Rogowski (I.D. #2632)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington DE 19899
(302) 658-9141

*Attorneys for Defendant, VeriSign, Inc.*

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz (I.D. #2246)
David E. Moore (I.D.#3983)
Hercules Plaza, 6th Floor
1313 N. market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000

*Counsel for Defendants Netegrity, Inc. and
Computer Associates International, Inc.*

RICHARDS, LAYTON & FINGER, P.A.
Frederick L. Cottrell, III (I.D. #2555)
Alyssa M. Schwartz (I.D. #4351)
One Rodney Square
Post Office Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Defendant RSA Security Inc.*

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendant Johnson & Johnson
Services, Inc.*

Dated: September 22, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. v

TABLE OF EXHIBITS ..................................................................................................... vii

INTRODUCTION .............................................................................................................. 1

THE PATENT IN SUIT ..................................................................................................... 1

STATEMENT OF LAW..................................................................................................... 4

ARGUMENT ..................................................................................................................... 6

    I.      HARDWARE KEY LIMITATIONS ................................................................. 6

          A.     "connected" and "hardware key".............................................................. 6

               1.     A hardware key is an external hardware device that physically attaches to the subscriber client computer......................7

               2.     The specification consistently uses the term "connected" to mean physically attached. ........................................................8

               3.     The hardware key contains the predetermined digital identification microcoded into it.................................................9

               4.     Plaintiff's constructions of "hardware key" and "connected" are overbroad and beyond the substantive meaning established by the intrinsic evidence................................9

          B.     "predetermined digital identification" ......................................................10

          C.     "to thereby confirm that said [or a] hardware key is connected to said subscriber client computer".................................................................13

               1.     The specification describes the "to thereby confirm" feature as reauthentication, which occurs after initial authentication but before session termination. ........................................................14

               2.     The prosecution history confirms that the "to thereby confirm" limitation is reauthentication that occurs after initial authentication but before session termination. ....................15

          D.     "operating session" .................................................................................17

               1.     The "operating session" starts after subscriber authentication and ends when authorization is terminated. ...........18

      2.      Plaintiff's interpretation of "operating session" is overly broad and contradicts the specification...........................................19

II.    SUBSCRIBER CLIENT COMPUTER LIMITATIONS ........................................................20

    A.    "subscriber"...............................................................................................20

    B.    "subscriber client computer"..................................................................21

    C.    "identity data" (as it relates to the subscriber client computer) ................23

          1.      The claim language clearly states that the identity data uniquely identifies the subscriber client computer. ........................23

          2.      The identity data includes the predetermined digital identification from the hardware key as well as additional information not stored on the hardware key. ................................25

III.   FIRST SERVER COMPUTER LIMITATIONS ................................................................27

    A.    The "first server computer" stores the selected computer resources. ........28

    B.    The "selected computer resources" are the protected content. ..................29

IV.   MEANS PLUS FUNCTION LIMITATIONS ..................................................................30

    A.    Construction of the claimed functions of the "client software means," "server software means," and "clearinghouse means" must include, and not omit, explicit claim language describing the functions.................................................................................................30

    B.    For numerous claimed functions, the specification fails to describe corresponding structure...................................................................32

          1.      The specification does not describe structure for the "server software means" to forward the first server computer's identity data to the clearinghouse. ...................................33

          2.      The specification does not describe structure for performing the third and fourth claimed functions of the "clearinghouse means.".................................................................33

          3.      The specification does not describe structure for forwarding, storing, or authenticating "identity data of subscriber client computer(s)." ........................................34

    C.    The "server software means" includes the "reauthentication" algorithm as corresponding structure.......................................................36

D.    The Court should construe "clearinghouse means" as used in Claim 24 consistently with its usage in Claim 1.........................................37

V.    "UNTRUSTED NETWORK" LIMITATION ....................................................38

VI.    "PERMIT[TING] ACCESS" LIMITATION ....................................................39

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

ACCO Brands, Inc. v. Micro Security Devices, Inc.,
   346 F.3d 1075 (Fed. Cir. 2003)........................................................................17

Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,
   296 F.3d 1106 (Fed. Cir. 2002)................................................................ passim

Cephalon, Inc. v. Barr Labs., Inc.,
   389 F. Supp. 2d 602 (D. Del. 2005)...............................................................5, 9

Curtiss-Wright Flow Control Corp. v. Velan, Inc.,
   438 F.3d 1374 (Fed. Cir. 2006)........................................................................12

CVI/Beta Ventures, Inc. v. Tura LP,
   112 F.3d 1146 (Fed. Cir. 1997)........................................................................12

Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,
   412 F.3d 1291 (Fed. Cir. 2005)........................................................................32

Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,
   214 F.3d 1302 (Fed. Cir. 2000)........................................................................24

Finisar Corp. v. The DirecTV Group, Inc.,
   416 F. Supp. 2d 512 (E.D. Tex. 2006)............................................................32

Harris Corp. v. Ericsson Inc.
   417 F.3d 1241 (Fed. Cir. 2005)..................................................................32, 36

Impro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,
   450 F.3d 1350 (Fed. Cir. 2006)........................................................................10

J&M Corp. v. Harley-Davidson, Inc.,
   269 F.3d 1360 (Fed. Cir. 2001)..........................................................................5

LG. Philips LCD Co. Ltd. v. Tatung Co.,
   434 F. Supp. 2d 292 (D. Del. 2006)...................................................................5

Markman v. Westview Instruments, Inc.,
   52 F.3d 967 (Fed. Cir. 1995).............................................................................5

MercExchange v. eBay,
   401 F.3d 1323 (Fed. Cir. 2005), reversed on other grounds, 126 S. Ct. 1837 (2006) ............34

Multiform Desiccants, Inc. v. Medzam, Ltd.
   133 F.3d 1473 (Fed. Cir. 1998)..........................................................................5

Netword, L.L.C. v. Centraal Corp.,
 242 F.3d 1347 (Fed. Cir. 2001)........................................................................10

Nystrom v. Trex Co., Inc.,
 424 F.3d 1136 (Fed. Cir. 2005) (en banc), cert denied, 126 S.Ct. 1654 (2006) ...................5, 9

Phillips v. AWH Corp.,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc), cert denied 126 S. Ct. 1332 (2006) .............. passim

Quantum Corp. v. Rodime, PLC,
 65 F.3d 1577 (Fed. Cir. 1995)........................................................................24

Sage Prods., Inc. v. Devon Indus., Inc.,
 126 F.3d 1420 (Fed. Cir. 1997)........................................................................6, 37

Standard Oil Co. v. Am. Cyanamid Co.,
 774 F.2d 448 (Fed. Cir. 1985)........................................................................5

Tehrani v. Hamilton Med., Inc.,
 331 F.3d 1355 (Fed. Cir. 2003)........................................................................32

Texas Instruments Inc. v. U.S. Intern. Trade Comm'n,
 988 F.2d 1165, 1172 (Fed. Cir. 1993)........................................................................21, 24

Vitronics Corp. v. Conceptronic, Inc.,
 90 F.3d 1576 (Fed. Cir. 1996)........................................................................5

Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,
 239 F.3d 1225 (Fed. Cir. 2001)........................................................................37

WMS Gaming, Inc. v. Int'l Game Tech.,
 184 F.3d 1339 (Fed. Cir. 1999)........................................................................32, 36

## STATUTES

35 U.S.C. § 112, ¶ 2 (2000) ........................................................................32

35 U.S.C. § 112, ¶ 6 (2000) ........................................................................5, 6, 30

## TABLE OF EXHIBITS IN APPENDIX

(1) U.S. Patent No. 6,516,416, entitled "Subscription Access System For Use With An Untrusted Network"

(2) File History of U.S. Patent No. 6,516,416 (Bates Nos. P031081-P031454)

(3) August 23, 2006 Joint Claim Construction Statement (D.I. 207)

(4) Prism Document having Bates Nos. P046018.212150-P046018.212.152)

(5) Prism Document having Bates Nos. P008968-P008985

(6) Prism Document having Bates Nos. P008949-P008961

(7) Selected pages from The American Heritage® Dictionary of the English Language, (3d ed. 1997)

(8) Plaintiff's Oct. 24, 2005 Responses to Defendant RSA's First Set Of Interrogatories

(9) Prism Document having Bates Nos. P046018.192231-P046018.192238

(10) Selected pages from the Microsoft Press Computer Dictionary (3d ed. 1997)

## INTRODUCTION

Defendants Verisign, Inc., RSA Security, Inc., Netegrity, Inc., Computer Associates International, Inc., and Johnson & Johnson Services, Inc. (collectively, "Defendants") submit this brief in support of their proposed constructions for the disputed claim terms of the patent-in-suit. The disputed terms are set forth in the parties' Joint Claim Construction Statement, filed August 23, 2006. (D.I. 207).

Defendants' constructions employ the Federal Circuit's teachings in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) cert denied 126 S. Ct. 1332 (2006), which holds that claim terms must be interpreted in view of the intrinsic evidence — the surrounding claim language, the specification, and the prosecution file history. In an attempt to have the Court rewrite its patent, Plaintiff advances unsupportably broad constructions that disregard the specification and wholly ignore the file history, asking the Court to construe terms like "part of" as "the entirety" and "connected" as something other than simply "attached." Because Plaintiff's proposed constructions go well beyond the intrinsic record, Defendants' constructions, which follow Federal Circuit precedent, should be adopted.

## THE PATENT IN SUIT

The patent in suit, U.S. Patent No. 6,516,416 ("the '416 patent"), is entitled "Subscription Access System for Use with an Untrusted Network." The patent describes a system intended to help information providers generate more revenue from subscription services in which subscribers pay for access to protected information made available on the Internet. Ex. 1, 1:9-15. To implement subscription services over an "untrusted network" such as the Internet, information providers must control access to the protected information. Id. 1:15-17; 1:28-30. On the Internet, unlike in private corporate networks, the information provider cannot control who gains access. One way to control access is to simply assign each subscriber a username and

a password.  But this allows subscribers to share usernames and passwords with non-subscribers, resulting in unauthorized access and lost revenue.  Id. 1:30-37.

The patent describes a "subscription access system" intended to provide "superior and effective subscriber authentication" which only allows subscribers to access protected content. Id. 1:63-67.  The system described relies on "two-factor" authentication, which combines an "access key," or "hardware key," with traditional username password schemes.  Id. 14:48-53. The access key is a hardware device external to the subscriber's client computer that physically attaches to the computer.  Id. 21:39-45; see also id. 7:61.  The access key "contains a unique digital identification that is microcoded into it."  Id. 5:52-55.

In addition to the hardware key, the subscription access system includes three other primary components: a "clearinghouse," a "subscription access server," and a "subscriber client computer."  Id. 4:6-12; 5:32-40; Fig. 2.



FIG. 2

The subscription access server 34 -- also referred to as the "first server computer" in the claims -- is used to store the subscription content that the subscriber has paid to access. As shown in Fig. 2, a subscriber using a subscriber client computer 36 (e.g. a personal computer) attempts to access information that is protected on the subscription access server 34 (step [1]). See also id. 5:32-40; 6:22-25. The subscription access server then requires the subscriber to login ([2]).[1] The subscriber client computer forwards login parameters, including the digital ID microcoded into the access key, to the server ([3]). Ex. 1, 13:44-46; 17:19-35.

Next, the subscription access server sends the login parameters to the clearinghouse ([4]), which authenticates the parameters against its database of valid subscriptions.[2] If this authentication by the clearinghouse is successful ([5]), the subscription access server initiates a new operating session and permits the subscriber client computer to access the protected information ([6]).[3] Usage data is then stored ([7]) so that the subscriber can be billed.

During the operating session, the subscription access system periodically checks to ensure that the hardware key remains attached to the subscriber client computer. This is called "reauthentication" in the patent, and it is intended to prevent a subscriber from maintaining an operating session if he or she disconnects the hardware key -- and thus prevent fraudulent access to restricted content by multiple individuals using the credentials of a single subscriber.[4]

The specification, in no uncertain terms, states that reauthentication -- checking to make sure the hardware key remains connected during the operating session -- is an essential feature: "In accordance with an important aspect of the present invention[,] the system is adapted to

---

[1]    Ex. 1, 8:9-13; 8:20-30; 11:22-27; 12:1-22; 13:29-33; 16:53-17:5.
[2]    Id., 7:48-50, 9:35-42, 12:14-18, 13:47-53, 17:37-45.
[3]    Id., 7:50-53; 12:18-22; 13:50-55; 17:45-57.
[4]    Id., 7:59-65; 8:31-38; 11:38-41; 12:23-40; 13:56-14:3; 18:13-19:15.

periodically reauthenticate an active session to prevent unauthorized use by someone who no longer has a key 54 connected to his computer." Ex. 1, 18:13-17.[5]

In their initial application, the inventors attempted to get broad claims that did not require reauthentication. During prosecution, after numerous rejections over prior art (and clearly for reasons of patentability), the inventors redrafted their broadest claims (including asserted Claims 1 and 24) to require reauthentication. The Examiner allowed the amended claims based on the limitations directed to reauthentication:

> [The prior art] fails to disclose "the server requesting digital identification information from the client during an operating session and using the information to confirm that the hardware key associated with the client computer is connected to the subscriber's client computer." This distinct feature has been added to independent claims 1 and 28 [now Claims 1 and 24] and renders them allowable.

Ex. 2 at P031315, P031327.

Nevertheless, Plaintiff argues that the '416 patent covers much more than the "subscription access system" with reauthentication using a connected hardware key that was actually described and claimed. As shown below, Plaintiff's proposed constructions repeatedly ignore what the Federal Circuit in Phillips confirmed are the most important determinants of claim meaning and claim scope -- the specification and prosecution history. Because Defendants' constructions follow Federal Circuit law, they should be adopted.

## STATEMENT OF LAW

### A.     Claim Construction

In Phillips, the en banc Federal Circuit re-emphasized the primacy of the intrinsic evidence -- in particular, the specification and prosecution history -- in claim construction. 415 F.3d at 1312-17. While the words of a claim are to be given their ordinary and customary

---

[5]     See also id., 7:59-65; 8:30-38; 11:38-41; 12:23-40.

meaning from the standpoint of one skilled in the art at the time of the invention, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313.  Thus, "claims 'must be read in view of the specification, of which they are a part.'" Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)) (internal citation omitted).

In Phillips, the Court repeatedly re-emphasized the importance of the specification in claim construction:

- "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

- "The specification is, thus, the primary basis for construing the claims" Id. (quoting Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985)).

- "[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd. 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

See also Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1145 (Fed. Cir. 2005) (en banc), cert denied, 126 S.Ct. 1654 (2006); LG. Philips LCD Co. Ltd. v. Tatung Co., 434 F. Supp. 2d 292, 295 (D. Del. 2006) (J. Farnan); Cephalon, Inc. v. Barr Labs., Inc., 389 F. Supp. 2d 602, 604 (D. Del. 2005) (J. Farnan).

**B.     Means-Plus-Function Limitations**

A "means-plus-function" claim limitation is one that is expressed as a means for performing a specified function without the recital in the claim of sufficient structure to perform the function.  35 U.S.C. § 112, ¶ 6 (2000).  Under § 112, ¶ 6, a means-plus-function limitation "shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." Id.; see also J&M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1367

(Fed. Cir. 2001). Use of the word "means" invokes a presumption that a claim limitation should be interpreted according to § 112, ¶ 6. <u>Sage Prods., Inc. v. Devon Indus., Inc.</u>, 126 F.3d 1420, 1427 (Fed. Cir. 1997).

Claim construction of a means-plus-function limitation is a two-step process. First, the Court must identify the claimed function. <u>Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.</u>, 296 F.3d 1106, 1113 (Fed. Cir. 2002). Second, the Court must look to the specification and identify the corresponding structure to that function. <u>Id.</u> Structure disclosed in the specification is "corresponding structure" only if it is capable of performing the recited function and the specification clearly links or associates that structure to the recited function. <u>Id.</u> at 1113-14.

## ARGUMENT

### I. HARDWARE KEY LIMITATIONS

#### A. "connected" and "hardware key"

| "connected" | |
|---|---|
| <u>Plaintiff</u>: In communication with, inserted in, attached to, or built in. | <u>Defendants</u>: Physically attached. |
| "hardware key" | |
| <u>Plaintiff</u>: A device or object from which data may be read or emitted. | <u>Defendants</u>: External hardware device that physically attaches to the subscriber client computer and contains the predetermined digital identification microcoded into it. |

The construction of the terms "connected" and "hardware key" are intimately intertwined. Claim 1 recites "at least one <u>hardware key connected</u> to the subscriber client computer," and Claims 1 and 24 require that the subscriber client computer "forward [a] predetermined digital identification to [the] first server computer to thereby confirm that [the] <u>hardware key</u> is <u>connected</u> to said subscriber client computer." Both terms require that the hardware key is physically attached to the subscriber client computer. Furthermore, as described

in the specification, a hardware key must contain a predetermined digital identification microcoded into it.

      **1.**      **A hardware key is an external hardware device that physically attaches to the subscriber client computer.**

      The meaning of the term "hardware key" as used in the context of the specification is an external device that physically attaches to the subscriber client computer. "The access key[6] is an <u>external</u> hardware device . . . [that] . . . <u>attaches to the personal computer</u> of the subscriber, preferably on the parallel port of an IBM-compatible personal computer or the ADB port on a Macintosh computer." Ex. 1, 21:39-45 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> 7:61 ("the hardware key attached to the user's computer"). As the specification describes, the hardware key includes a port interface, such as a serial, parallel, and keyboard port, to connect (<u>i.e.</u>, attach) to the subscriber client computer. <u>Id.</u> 22:6-15. Consistent with this description, Fig. 3 shows that the access key 54 is external to the subscriber client computer.



FIG. 3

---

[6]      Plaintiff concedes that the terms "hardware key" and "access key" are used synonymously in the specification and have the same meaning. <u>See</u> Ex. 3 at 19.

    **2.    The specification consistently uses the term "connected" to mean physically attached.**

The specification provides an exact, clear, and concise description of what it means for the hardware key to be "connected" to the subscriber client computer. For example, mirroring the claim language, the specification describes the hardware key as "attached" to the subscriber client computer:

> If the system is utilizing two factor authentication, i.e., the user name and password plus the digital ID generated by the hardware key <u>attached</u> to the user's computer, the session manager 52 periodically communicates with the shared object 66 to perform reauthentication, which involves polling of the subscriber software 36 to insure that the access key 54 continues to be <u>attached</u> to the user computer.

Ex. 1, 7:59-65 (emphasis added); 21:42-45 ("key 54 <u>attaches</u> to the personal computer") (emphasis added); 21:52 ("physical key that is <u>attached</u> to the computer") (emphasis added).

Moreover, the specification uses the terms "connected" and "attached" interchangeably. For example, the specification identifies as "an important aspect of the present invention" that "the system is adapted to periodically reauthenticate an active session to prevent unauthorized use by someone who no longer has a key 54 <u>connected</u> to his computer." Ex. 1, 18:13-17. The next paragraph describes how the system performs this reauthentication: "The access key interface polls the user's machine for the access key 54 (block 232) and a determination is made whether the access key is <u>attached</u> to the user's machine (block 234)." <u>Id.</u> 18:50-53 (emphasis added); <u>see also id.</u> Fig. 20 (234) ("Access Key <u>Attached</u> to User's Machine?") (emphasis added).

This reauthentication process is premised on the fact that the hardware key is an external device that can be attached to and detached from the subscriber client computer. Ex. 1, 18:13-17; 7:59-65; 18:50-53. There would be no need for reauthentication if the hardware key were

built into the subscriber client computer, as Plaintiff proposes. Thus, one of ordinary skill reading the claims in view of the specification could only understand that the use of the term "connected" means to "physically attach" to the subscriber client computer.

### 3. The hardware key contains the predetermined digital identification microcoded into it.

In the specification, the Applicants explicitly defined a hardware key as a hardware device containing the predetermined digital identification microcoded into it. "The access key comprises a <u>hardware component</u> . . . [that] contains a <u>unique digital identification that is microcoded into it</u>." Ex. 1, 5:52-55, Fig. 28 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> 14:50-53 ("If the subscription uses two-factor authentication, the approval process also involves assigning a unique digital ID to the applicant, and <u>microcoding that digital ID inside an access key 54</u>."). Reading the entire patent, including the claims and specification, a person of ordinary skill would have understood that the Applicants intended for the hardware key to have a predetermined digital identification microcoded into it.[7]

### 4. Plaintiff's constructions of "hardware key" and "connected" are overbroad and beyond the substantive meaning established by the intrinsic evidence.

Plaintiff erroneously attempts to broaden the definition of "connected" to include meanings such as "in communication with" or "built in." These concepts are not only unsupported, but are actually in conflict with the intrinsic evidence. <u>See</u> <u>Nystrom</u>, 424 F.3d at 1145 (Fed. Cir. 2005) ("[I]n the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public . . . it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source"); <u>Cephalon</u>, 389 F. Supp. 2d at 605-606.

---

[7]     This is consistent with the extrinsic evidence created by the inventors at the time of the patent. <u>See</u> Ex. 4 at P046018.212150-151.

According to Plaintiff, even if a hardware key is not attached to the subscriber client computer, the hardware key may be "connected" to the subscriber client computer if it is "in communication with" the computer. By this definition, Plaintiff is attempting to sweep in wireless communication devices. There is absolutely no support in the specification for Plaintiff's proposal. Moreover, such a construction is in conflict with the explicit statements in the specification that the hardware key <u>be attached</u> to the subscriber client computer using a parallel, serial, or keyboard port. <u>See</u> Ex. 1, 21:42-45, 22:6-10.

Plaintiff's construction of "hardware key" is similarly overbroad. Plaintiff's construction refers to the data being "read or emitted" from the hardware key. The term "emitted," however, is not supported by any intrinsic evidence. <u>Impro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.</u>, 450 F.3d 1350, 1355 (Fed. Cir. 2006) ("[T]he claims [cannot] enlarge what is patented beyond what the inventor has described as the invention." (quoting <u>Netword, L.L.C. v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001)). Here, the specification describes the predetermined digital identification as being "read" -- not emitted -- from the hardware key. <u>See</u>, <u>e.g.</u>, Ex. 1, Figs. 18 (146), 21 (250); 13:61; 17:26-27 ("the access key interface reads the digital ID from the access key"); 18:62 ("the access key interface reads the digital ID").

### B.     "predetermined digital identification"

| Plaintiff: Digital data whose value is known in advance or calculated at the moment. | Defendants: A data string that is pre-assigned and unique to the hardware key and that cannot be shared with other users. |
|---|---|

The intrinsic evidence establishes that the "predetermined digital identification" in Claims 1 and 24 is a data string that is pre-assigned and unique to the hardware key and that cannot be shared with other users.

According to the specification, when a user applies for a subscription, the user is assigned a "unique" digital ID, which is "microcoded" inside the hardware key:

> The result of the application approval process is that the applicant will now be assigned a unique username and a password. If the subscription uses two-factor authentication, the approval process also involves <u>assigning a unique digital ID</u> to the applicant, and <u>microcoding that digital ID inside an access key</u> 54.

Ex. 1, 14:48-53 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> 1:62-63 ("hardware access key with a <u>unique digital ID</u>") (emphasis added); 5:54-55 (defining an access key as "contain[ing] a <u>unique</u> digital identification that is microcoded into it") (emphasis added). Indeed, to function as "identification," a data string must be unique.

Furthermore, as indicated by the term "predetermined," the predetermined digital identification must be pre-assigned. Claim 1 requires that the predetermined digital identification is part of the identity data of the subscriber client computer that is stored in the clearinghouse means for later use in performing the claimed authentication. Ex. 1, 35:33-35, 49-50. As described in the specification:

> [T]he user authentication server accesses the user's subscription information from its database and authenticates the login parameters (block 156). If using a two-factor authentication, this authentication involves <u>comparison of digital ID</u>, otherwise only username and password are considered as login parameters.

Ex. 1, 17:39-45 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> 12:35-38 ("The session manager 52 authenticates the digital ID by comparing it to the information it has in the session entry for the particular subscriber."). Because the digital identification must be stored in the clearinghouse means in advance of login or initial authentication, it must be pre-assigned.

Also, it is fundamental to the Applicants' claimed invention that the predetermined digital identification cannot be shared with other users. The Applicants emphasized that a primary purpose of their invention is to prevent fraudulent access to resources and the resulting loss of revenue. According to the specification, traditional user name and password schemes "are vulnerable to password fraud because subscribers can share their user names and

password[s] by word of mouth or through Internet news groups, which obviously is conducive to fraudulent access and loss of revenue." Ex. 1, 1:33-37. Thus, an object of their invention was to provide an improved subscription access system that enables a "superior and effective subscriber authentication" that only allows registered subscribers to access protected contents. Id. 1:58-65.

In order to deny unauthorized access to protected content, the predetermined digital identification cannot be shared. If the predetermined digital identification could be shared with non-subscribers, then the system would suffer from the same drawbacks as traditional user name and password authentication schemes. Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1381 (Fed. Cir. 2006) (holding that the correct construction of a patent claim had to take into consideration the specification's explanation of the purpose of the invention); CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1160 (Fed. Cir. 1997) ("In construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration.").

In order to "confirm that [the] hardware key is connected to said subscriber client computer," as required in Claims 1 and 24, the predetermined digital identification cannot be shared with other subscribers. If the predetermined digital identification can be shared by multiple subscribers, then it is possible for multiple hardware keys to contain the same predetermined digital identification. If so, then the mere receipt of a predetermined digital identification would not confirm that "said hardware key" -- the particular hardware key used for initial authentication -- continues to be attached to the subscriber client computer.

**C.   "to thereby confirm that said [or a] hardware key is connected to said subscriber client computer"**

| Plaintiff: Claim 1: Part of the recited function of the server software means (see construction of server software means). Claim 24: Confirming that the hardware key is connected (see definition for connected) to the subscriber client computer at a given time. | Defendants: To verify after initial authentication, but before session termination, that the hardware key remains physically attached to the subscriber client computer [reauthentication]. |
| --- | --- |

The '416 Patent describes two separate authentication processes: (1) initial authentication; and (2) re-authentication. Initial authentication occurs at login to initiate an operating session. Reauthentication, on the other hand, occurs after initial authentication but before session termination, i.e., during an active (operating) session. To reauthenticate, the server computer periodically confirms that the subscriber's hardware key remains attached to the subscriber client computer. Reauthentication is used to "prevent unauthorized use by someone who no longer has a key connected to his computer." Ex. 1, 18:13-17 (emphasis added).

The parties dispute when the claimed "to thereby confirm" limitation occurs. Defendants propose that it occurs "after initial authentication, but before session termination," which is reauthentication (not initial authentication). Defendants' proposal is consistent with the specification's description of the alleged invention and the prosecution history, which demonstrates that both the Applicant and the PTO understood that the "to thereby confirm" language is reauthentication. Yet Plaintiff now proposes that the "to thereby confirm" limitation may occur "at a given time," which it argues includes initial authentication. Its proposal is without intrinsic support and should be rejected.

1.   **The specification describes the "to thereby confirm" feature as reauthentication, which occurs after initial authentication but before session termination.**

The specification makes clear that the "to thereby confirm" language is part of the reauthentication process that occurs after initial authentication but before session termination. The specification describes confirming that the hardware key is connected to the subscriber client computer as part of the reauthentication process:

- "If the system is utilizing two factor authentication, i.e., the user name and password plus the digital ID generated by the hardware key attached to the user's computer, the [server] perform[s] reauthentication which involves polling of the subscriber software 36 to insure that the access key 54 continues to be attached to the user computer." Ex. 1, 7:59-65.

- "In accordance with an important aspect of the present invention and as previously described, the system is adapted to periodically reauthenticate an active session to prevent unauthorized use by someone who no longer has a key 54 connected to his computer." Ex. 1, 18:13-17.

See also Ex. 1, 8:30-38, 12:23-40, 13:56-14:3; see generally Ex. 1, 18:13-19:15.

Plaintiff contends that the "to thereby confirm" limitation may be part of the initial authentication process. That, however, is inconsistent with the specification. The specification teaches that the server computer performs reauthentication (Ex. 1, 7:59-65, 8:30-38, 12:23-40, 13:56-14:3, 18:30-19:15), while the clearinghouse means performs initial authentication (Ex. 1, 7:48-50, 13:50-53, 1737-48).[8] Because the claims require the server computer to perform the "to thereby confirm" function (not the clearinghouse) (Ex. 1 at 35:51-56, 38:52-55), that limitation

---

[8]    Both Claims 1 and 24 identify the clearinghouse means as the element that performs initial authentication. See Claim 1 ("said clearinghouse means being adapted to authenticate the identity of said subscriber client computer responsive to a request for selected computer resources of said first server computer by a subscriber client computer"); Claim 24 ("attempting to authenticate the identity of said subscriber client computer from said clearinghouse means responsive to a request for selected computer resources of said first server computer by a subscriber client computer").

must refer to reauthentication, not initial authentication. Otherwise, the claims would contradict the specification.

Initial authentication starts a new operating session.[9] In contrast, reauthentication renews an already existing operating session. See Ex. 1, 8:34-38, 11:38-41, 12:23-40, 13:63-14:3.[10]. Thus, the "to thereby confirm" limitation (reauthentication) necessarily occurs after initial authentication and before session termination. Accordingly, the specification supports Defendants proposed claim interpretation.

> **2.    The prosecution history confirms that the "to thereby confirm" limitation is reauthentication that occurs after initial authentication but before session termination.**

The originally filed independent claims did not include the "to thereby confirm" language -- they were directed only to the initial authentication, which is the login process. See Ex. 2 at P031193, P031198-99 (Application Claims 1 and 28, which eventually issued as Claims 1 and 24, respectively). That limitation was contained in the dependent claims, such as dependent Claim 5.[11] The Examiner initially rejected all pending claims, including Claim 5, in view of U.S. Patent No. 5,677,953 to Dolphin. See Ex. 2 at P031261-62.

---

[9]    As described in the specification, an active session is initiated after initial authentication or login. See Ex. 1, Abstract ("The clearinghouse authenticates the subscriber and server computers before an operating session occurs. . . . The login parameters are verified by the clearinghouse and a session is then started."), 7:35-38 ("If the login is successful, the subscription access server 34 initiates a session . . . ."), 8:11-13 ("[T]he functions redirect the user to the login process so that a new session can be created for the subscriber."), 8:24 ("to login and start a new session"), 9:35-42 ("to start a new session"), 11:22-27 (indicating that a user must login if there is not active session), 12:14-22, 17:45-55 (stating that the session "a new session entry").

[10]    As described with reference to Figure 20, the first server computer performs reauthentication only for active sessions (block 214) (Ex. 1 at 18:35-38).

[11]    Claim 5, as originally filed, included other language, such as "intermittently requests," that indicates that Claim 5 was directed to reauthentication. This language of Claim 5 corresponds to the description of reauthentication in the specification, which states that the server computer "periodically" performs reauthentication to confirm that the hardware key is attached

To overcome the Dolphin rejection, the Applicants clarified that Claim 5 was directed to reauthentication -- not initial authentication -- by adding to it the underlined words "during an operating session":

> 5.      A system as defined in claim 3 where in said first server computer intermittently requests said subscriber client computer to forward said predetermined digital identification to said first server computer <u>during an operating session</u> to thereby confirm that said hardware key is connected to said subscriber client computer.

Ex. 2 at P031283.  The Applicants represented to the Examiner that the amendment merely reemphasized "pre-existing differences between the invention as claimed and the prior art that has been cited and applied." Ex. 2 at P031284.  Thus, the Applicants already considered the "to thereby confirm" language to occur "during an operating session," even without Claim 5 using those express words.

While the Examiner maintained the rejection of the independent claims directed to initial authentication, he decided that the dependent claims directed to reauthentication (including Claim 5) would be allowable if rewritten in independent form.  <u>See</u> Ex. 2 at P031297.  Without any additional argument, the Applicants amended both Claims 1 and 28 (issued Claims 1 and 24) to incorporate the "to thereby confirm" limitation of dependent Claim 5.  The Applicants stated that they "amended claims 1 and 28 to include features of cancelled claims 3, 5, and 29 to more clearly recite the feature of the present invention." Ex. 2 at P031306.

In his reasons for allowance, the Examiner relied on the "to thereby confirm" limitation from Claim 5, which had been incorporated into both Claims 1 and 28 (issued Claim 24):

> [The prior art] fails to disclose "<u>the server requesting digital</u> <u>identification information from the client during an operating</u> <u>session and using the information to confirm that the hardware key</u>

to the subscriber client computer. Ex. 1, 7:59-65, 8:31-33, 11:38-41, 12:23-25, 18:13-17, 18:42-45.

> associated with the client computer is connected to the subscriber's client computer." This distinct feature has been added to independent claims 1 and 28 and renders them allowable.

Ex. 2 at P031315. Accordingly, the Examiner accepted that the claims are directed to the reauthentication process that occurs during the operating session, that is, after initial authentication before session termination. The Applicants did not refute the Examiner's stated reasons for allowance.

Accordingly, the prosecution history provides conclusive evidence that the "to thereby confirm" limitation is reauthentication and must take place during the operating session -- after initial authentication, but before session termination.[12]

D.    "operating session"

| Plaintiff: A series of interactions between a subscriber client computer and a server computer during which access to selected computer resources is requested. | Defendants: A period of communication between the subscriber client computer and the first server computer that follows successful initial authentication and ends upon termination of authorized access, such as upon a log-out or time-out due to prolonged inactivity. |
| --- | --- |

Although the parties agree that "operating session" refers to communications between the subscriber client computer and the server, they dispute the session's boundaries -- that is, the session's starting and ending points. Accordingly, for this dispute, the Court must determine when the claimed "operating session" begins and when it ends.

---

[12]    Plaintiff's attempt to interpret "to thereby confirm" differently in Claims 1 and 24 should be rejected because it is inconsistent with the claim language itself and its prior prosecution positions. During prosecution, the Applicants and the Examiner treated the independent claims as the same for purposes of rejections, argument, and ultimately allowance. During prosecution, the Examiner stated "Claim 28 is a method claim that is substantially equivalent to system claim 1 and is therefore rejected by a similar rationale." Ex. 2 at P031269, P031293 See ACCO Brands, Inc. v. Micro Security Devices, Inc., 346 F.3d 1075, 1079 (Fed. Cir. 2003) (relying on the Examiner's Reasons for Allowance to reject a patentee's argument that different amendments made to two independent claims should result in different constructions).

Defendants' proposal aligns with the intrinsic evidence, which confirms that an "operating session" (a) begins when the clearinghouse authenticates the subscriber, giving it permission to access the server's content; and (b) ends when the subscriber logs off or the website "times out" and forcibly logs the subscriber off for lack of use. See, e.g., Ex. 1, 19:26-37. Plaintiff interprets "operating session" in an overly broad manner to cover any communications between a client computer and a server, including communications that never result in a successful log in or the ability to operate or access the server's protected resources (e.g., bad username or password or no hardware key).[13] This contradicts the intrinsic evidence, and should be rejected.

> **1.    The "operating session" starts after subscriber authentication and ends when authorization is terminated.**

In accordance with the intrinsic evidence, an "operating session" begins once the subscriber has successfully logged into the system and ends when it logs out, during which time the subscriber is authorized to operate and access the server's protected resources. For example, the specification explicitly states that an operating session does not begin until after the clearinghouse has successfully authenticated the subscriber client computer and the server:

> The clearinghouse authenticates the subscriber and server computers before an operating session occurs…. The login parameters [of the subscriber and the server] are verified by the clearinghouse and a session is then started.

Ex. 1, Abstract (emphasis added). Furthermore, the specification's detailed description of the invention also defines "operating session" -- referred to simply as a session or an active session -- as the period after initial authentication:

> When a subscriber 36 tries to log into a system enabled web site, the [system attempts] to authenticate the subscriber. If successful,

---

[13]    See also Claim 1, which is directed to "[a] system for controlling the operation of and access to selected computer resources" (emphasis added).