> the session manager 52 <u>will start a new session for the user</u> and
> from that point on, <u>the subscriber 36 can access protected contents</u>

Ex. 1, 7:48-53 (emphasis added).  Similarly, the specification's flow diagrams, Figs. 17 and 18,

support Defendants' proposal.  In Fig. 18, the system determines whether authentication was

successful (Step 158).  If the answer is yes -- and only if the answer is yes -- the system begins a

new session for the subscriber to operate and access the server's resources (Steps 160 and 162).

<u>See also</u> <u>id.</u> 8:27-30; 10:17-2.  Accordingly, an "operating session" starts only after the

clearinghouse successfully authenticates the subscriber client computer.[14]

The specification equally is clear that an "operating session" ends when the user logs off

or when the website "times out" and forcibly logs the user off for lack of use.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at

19:26-37 and Figs 20 and 22.

### 2. Plaintiff's interpretation of "operating session" is overly broad and contradicts the specification.

Plaintiff's interpretation of "operating session" is unsupported by the intrinsic evidence,

and must be rejected.  Plaintiff provides no boundaries for when a session starts and ends.  Its

proposal includes unsuccessful communications, such as attempted log-ins by non-subscribers

and unsuccessful log-ins by subscribers (<u>e.g.</u>, those who type in the wrong username or password

or whose key is not connected).  Those communications do not permit the subscriber to operate

or access any of the server's computer resources, and therefore cannot be part of the claimed

"operating session."

---

[14]    The prosecution history is also consistent.  <u>See</u>, <u>e.g.</u>, Ex. 2 at P031284 ("the advantage of
the present invention is its design to <u>secure an operating session</u> ....") (emphasis added).  An
operating session <u>cannot</u> start until the authentication steps have been completed to "secure" the
session.

## II.    SUBSCRIBER CLIENT COMPUTER LIMITATIONS

### A.    "subscriber"

| | |
|---|---|
| Plaintiff: A person, organization, or computer registered to be allowed access to [said] selected computer resources.<br>The term subscriber and the term user are applied synonymously throughout the specification and drawings, and these terms have the same meaning. | Defendants: A user that pays an information provider to receive access to restricted computer resources. |

The "subscriber" of the invention is a user that pays an information provider to receive access to restricted resources made available on an untrusted network, such as the Internet. The specification repeatedly and exclusively uses the terms "subscriber" and "subscription" in connection with generating revenue from content published on the Internet. Thus, a subscriber is different from the general Internet user who freely accesses resources available on the web.

According to the '416 patent, the invention solves the problem of reliably generating revenue on the Internet by controlling access to the content. Ex. 1, 1:15-16 ("In order to generate revenue, there must be control over user access."). The specification criticizes prior art systems where "subscribers can share their user names and password by word of mouth or through Internet news groups, which obviously is conducive to fraudulent access and loss of revenue." Id. 1:33-37. The invention is distinguished in that a "prominent feature of the system of the present invention is that it provides a secure platform for information providers to publish subscription contents to the world wide web in a way that assures revenue generation." Id. 35:10-14 (emphasis added.)

The specification explains that by authenticating subscribers before permitting access and tracking usage, subscribers can be billed for access to protected information. "The present invention implements its platform by restricting subscription contents to subscribers only, and by tracking their usage in a generic transaction model that can be easily integrated to any

subscription billing model." Id., 4:1-5; see also id. 1:47-50. Indeed, every embodiment described in the patent includes a mechanism for generating revenue. Id. 9:28-34 ("credit card processing CGI 78" provided by the subscription access system); 10:15-27; 14:40-45; 35:10-14, and Fig. 16 ("credit card processing CGI 78"); 27:8-43 ("clearinghouse B will be able to charge other subscription access clearinghouses."). In addition, "collecting payment" from the user is listed among the "prerequisites of being a subscriber." Id. at 14:40-45.

Other language in the claims indicates that "subscribers" are paying users. Independent Claims 1 and 24 recite "subscriber client computers" and "nonsubscriber client computers." The claim language makes clear that only "subscriber client computers" are allowed access to restricted resources because the "subscriber" has paid for access. Thus, to construe "subscriber" to be synonymous with any user (as Plaintiff proposes) would impermissibly read the term "nonsubscriber" out of the claims. See Texas Instruments Inc. v. U.S. Intern. Trade Comm'n, 988 F.2d 1165, 1172 (Fed. Cir. 1993) ("[T]he construction [Plaintiff] proposes must fail because it would read a limitation out of the claim.").

Because revenue generation is essential to the invention, as evidenced by the specification and claims, the "subscriber" of the invention cannot be any user, as Plaintiff proposes, but rather a user that pays for access to protected resources.[15]

**B.    "subscriber client computer"**

| Plaintiff: A programmable electronic device that can store, retrieve, and process data used by a subscriber to attempt to access said selected computer resources. | Defendants: A computer that a subscriber uses to access selected computer resources of the first server computer. |
|---|---|

The parties appear to agree that the "subscriber client computer" is a hardware device. The claim language and specification clearly distinguish the "subscriber client computer" from

---

[15]    Defendant's construction is also consistent with documents created by the inventors prior to the patent filing. See, e.g., Ex. 5, P008968-P008985 at p. 2; Ex. 6, P008949-P008961.

the software ("client software means") installed on it.  The parties' definitions diverge in that Plaintiff proposes the broad definition "programmable electronic device" which potentially covers hardware devices, such as microprocessor chips, that are not personal computers.

The specification consistently describes the subscriber's computer as a "desktop" or personal computer that "runs the web browser and also includes subscription access subscriber software 36 which is part of the present invention that enables it to access enabled web sites." Ex. 1, 5:35-40.  See also id. 4:39-40 ("The subscriber software 36 on the other hand, resides on the subscriber's desktop machine."); 9:1-3 ("The subscriber software 36 is installed on the subscriber's personal computer."); 14:48-58 (subscribers "install the subscription access subscriber software 36 on their desktop"); 14:63-66.  Also, Figs. 1 and 2 depict subscriber computer 36 as a desktop computer.

When discussing the hardware key, the specification explains that the key attaches to a port on the subscriber's "personal computer."  See, e.g., id., 21:43-45 ("The key 54 attaches to the personal computer of the subscriber, preferably on the parallel port of an IBM-compatible personal computer or the ADB port on a Macintosh computer"); 22:6-11 ("access key 54 includes a port interface 480 which provides an interface to support the personal computer of the subscriber 36.")  See also id. Fig. 3 (subscriber 34 and key 54).  Thus, the "subscriber client computer" is a personal computer or desktop to which a hardware key can be attached.

Similarly, the claims recite "subscriber client computers" that (a) run the "client software means" in order to request resources of the "first server computer," and (b) physically connect to a hardware key.  The Defendants' proposed definition -- a computer that a subscriber uses to access the server's restricted resources -- is consistent with this intrinsic evidence and therefore should be adopted.  In contrast, Plaintiff's construction lacks support in the specification for a generic "programmable electronic device" beyond a computer and should be rejected.

**C.    "identity data" (as it relates to the subscriber client computer)**

| "Identity data" | |
|---|---|
| Plaintiff:    Data sufficient for the patented system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access said selected computer resources. | Defendants:    Information that (a) uniquely identifies the subscriber client computer and (b) which includes the predetermined digital identification from the hardware key as well as additional information not stored on the hardware key. |
| "Part Of Said Identity Data" | |
| Plaintiff:    A portion (or the entirety) of the identity data. | Defendants:    Some, but not all, of the identity data of the subscriber client computer. |

The parties' constructions of these two limitations are intertwined and present two main substantive disputes. The first dispute is whether the identity data "uniquely identifies the subscriber client computer," as Defendants propose, or identifies "a person, organization, and/or computer," as Plaintiff proposes. The second dispute is whether the hardware key's predetermined digital identification <u>can alone</u> be considered the claimed "identity data."

**1.    The claim language clearly states that the identity data uniquely identifies the subscriber client computer.**

The express language of Claims 1 and 24 requires that the identity data uniquely identify the subscriber client computer. Claim 1 requires:

- that the clearinghouse means store "identity data of each of said subscriber client computers" (35:33-34);

- that the server software means forward the "identity data of each subscriber client computer" (35:36-37);

- that the client software means installed each of said subscriber client computer forward "its identity data"[16] (35:42);

- that the clearinghouse means authenticate "the identity of said subscriber client computer" (35:57-58);

---

[16]    The parties agree that "its" refers to the identity data of the subscriber client computer. <u>See</u> Ex. 3 at 24.

- that the clearinghouse means permit access to selected computer resources responsive to "successful initial authentication of said first server computer and of said subscriber client computer" (35:67-36:2).

Similarly, Claim 24 requires:

- registering "the identity data of each of said subscriber client computers" (38:43);

- requiring a subscriber client computer to forward "its identity data" (38:47-48);

- attempting to authenticate "the identity of said subscriber client computer" (38:56-57);

- permitting access to selected computer resources responsive to "successful initial authentication . . . of said subscriber client computer" (38:65-67.)

Each of these express limitations makes clear that the recited "identity data" identifies the subscriber client computer.

Plaintiff, however, improperly attempts to write the words "client computer" out of the phrase "subscriber client computer" in the claims.  In its proposed construction, Plaintiff attempts to construe "identity data" as identifying a "subscriber" (which Plaintiff defines as a "person, organization, and/or computer") rather than identifying a "subscriber client computer." By doing so, it writes the words "client computer" out of Claims 1 and 24.  See Texas Instruments, 988 F.2d at 1172.  This is inconsistent with Plaintiff's own construction of "subscriber client computer," which Plaintiff recognizes is a "programmable electronic device." Ex. 3 at 21.  Thus, the plain import of the words in Claims 1 and 24 is that the identity data identifies a device, the subscriber client computer, as opposed to the user of that device.

Plaintiff may argue that the specification describes user authentication, but that is not what is claimed.  See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1308-09 (Fed. Cir. 2000) (holding that "the unambiguous language of the . . . claim[s] controls over any contradictory language in the written description"); see also Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("courts do not redraft claims").

2.    **The identity data includes the predetermined digital identification from the hardware key as well as additional information not stored on the hardware key.**

The second dispute on "identity data" is whether the hardware key's predetermined digital identification <u>can alone</u> be considered the claimed "identity data." Because it directly addresses this question, Defendants also discuss "part of said identity data" here. To resolve both claim term disputes, the Court must determine whether some additional identifying information over and above the predetermined digital identification must be present to meet the claim term "identity data."

According to the '416 patent, the "identity data's" content depends on which type of authentication scheme the system employs -- one factor or two factor. When using one factor authentication, the identity data is the subscriber's "conventional user name and password." <u>See</u>, <u>e.g.</u>, Ex. 1, 1:60-61. When using two-factor authentication, the "identity data" additionally includes the predetermined digital identification from the "hardware access key." <u>Id.</u> 1:61-63. In a two factor authentication system, the subscriber must present "identity data" from both factors for the system to authenticate it.

a)    *The Claims Make Clear That Identity Data Is Something More Than Just the Predetermined Digital Identification*

The claim language itself requires "identity data" to be more than just the predetermined identification for three primary reasons. First, the claims recite as two distinct elements the subscriber client computer's "identity data" and the hardware key's "predetermined digital identification." Because they are separate claim elements, they cannot mean the same thing.[17]

---

[17]    The term "hardware key" and its "predetermined digital identification" were added during prosecution to the independent claims, which initially recited only "identity data." <u>See</u> Ex. 2 at P031302, P031304-05.

Second, Claim 1 states that "said key being adapted to generate a predetermined digital identification, which identification is <u>part of said identity data</u>." Because the predetermined digital identification forms only "part of" said "identity data," and not its entirety, "identity data" must include more than the predetermined digital identification.[18]

Third, the dependent claims further support Defendants' proposal. For example, dependent Claim 3 indicates that the subscriber client computer identity data includes a client name, a client password <u>and</u> the predetermined digital identification -- not just the predetermined digital identification. Dependent Claims 15 and 25 also indicate that "identity data" is something other than just the predetermined digital identification.

> b)    *The Specification Confirms That Identity Data Includes The Predetermined Digital Identification And Something Else*

The specification describes the use of both one factor and two factor authentication and makes clear that the hardware key is "optional" and used only with two factor authentication:

> More particularly, it is an object of the present invention to provide such an improved subscription access system that provides secure access through either a one factor (conventional user name and password) or <u>two factor authentication (using an optional hardware access key with a unique digital ID)</u>, thus enabling a superior and effective subscriber authentication which only allows registered subscribers to access protected contents and subscriber authorization which determines the subscriber's access level within a protected site.

Ex. 1, 1:58-67 (emphasis added).

In <u>every</u> instance where the hardware key is referenced, the specification requires the system to use two-factor authentication. "The subscriber preferably also includes an access [<u>i.e.,</u> hardware] key for providing <u>two factor authentication</u>. . . ." <u>Id.</u> 5:50-55 (emphasis added). The

---

[18]    There really can be no dispute as to the proper interpretation of "part of." It means some, but not all of, the whole. <u>See, e.g.,</u> Ex. 7 at 995 (defining "part" as a portion, division, piece, or segment of a whole). There is no basis to interpret it as the "entirety" as Plaintiff does.

hardware key's digital identification "is used in conjunction with the user name and password to provide two factor authentication." Id. 21:45-49.  The second factor -- the hardware key's digital identification -- is different from the first factor because it is something that the subscriber must carry with it or possess, not memorize like its name and password.[19]  "If the subscription uses two-factor authentication, the approval process also involves assigning a unique digital ID to the applicant, and microcoding that digital ID inside an access key." Ex. 1 14:48-54 (emphasis added); see also id. 2:28-32; 3:45-47; 5:15-18; 7:59-65; 13:44-46; 14:50-58; Figs. 3, 18, 20-21. In contrast, when the '416 patent mentions subscription services that offer one-factor authentication only, the disclosure indicates that "access [hardware] keys 54 are not used." Id. 14:31-36.

Because independent claims 1 and 24 both include a hardware key, both independent claims cover only the two-factor authentication embodiment.  This requires the identity data to include the key's predetermined digital identification, and some other identifying information. Therefore, the identity data of claims 1 and 24 must be more than just the hardware key's predetermined digital identification, as that is only one of the two factors of authentication. Accordingly, Defendants' construction comports with the intrinsic evidence and should be adopted.

## III.    FIRST SERVER COMPUTER LIMITATIONS

| "first server computer" | |
|---|---|
| Plaintiff:  A computer that makes available information or other resources. | Defendants:  A computer that stores the selected computer resources accessed by a subscriber client computer. |
| "selected computer resources" | |

---

[19]    Generally, two factor authentication requires (1) something is known (such as a name and password) and (2) something is held (such as physical key) or built into the computer.  See Ex. 1, 21:49-54.

| Plaintiff: Computer services, applications, or content that can be accessed by (either directly or indirectly) said first server computer. | Defendants: The restricted resources requested by the subscriber client computer that are located on the first server computer. |
| --- | --- |

Independent Claims 1 and 24 state that the invention controls access to "the selected computer resources of at least a first server computer" requested "by at least one subscriber client computer." The claims and specification state that the "first server computer" stores protected contents that can be accessed via the Internet by the "subscriber client computer" upon successful authentication by the "clearinghouse." In other words, the "first server computer" is a computer that stores the selected computer resources to which the subscriber client computer may be granted access. It is not simply "a computer that makes available information or other resources," (i.e., any computer) as Plaintiff proposes.

**A.    The "first server computer" stores the selected computer resources.**

The specification describes the "first server computer" generally as a "subscription access server 34." See Ex. 1, Figs. 1-3 (item 34 with "protected content").[20] As illustrated in Fig. 2 and as described in the specification, server 34 communicates with clearinghouse 30 which authenticates the subscriber client computer that has requested access to the server's protected content:

> The first step is for the subscriber 36 to request protected content and that request is communicated to the subscription access server 34 which then commands the subscriber to login. ...

> If the parameters are valid, a response is provided by the clearinghouse 30 to the subscription access server 34 which then communicates the protected content to the subscriber 36.

---

[20]    The term "first server computer" is used in the claims of the '416 patent but not the specification.

Id. at 6:22-31.[21] In other words, subscriber client computer 36 requests protected content from

server 34, and following successful authentication by clearinghouse 30, server 34 sends its

protected content to subscriber computer 36. The subscription access server 34 includes

software (shared object 66) that stores and retrieves the protected content. See id., 5:16-18; Fig.

4 ("ISA Shared Object 66"; "Protected Contents"); Figs. 10-15.

**B.      The "selected computer resources" are the protected content.**

As noted above, the "selected computer resources" are the restricted resources, or

protected content, located on the "first server computer" that are requested by the "subscriber

client computer." Plaintiff contends that the "selected computer resources" are any "computer

services, applications, or content" without regard for where they reside, or how they are

protected. Plaintiff's definition ignores the plain language of Claims 1 and 24, which recite that

the "selected computer resources" belong to the "first server computer," that the "selected

computer resources" are accessed by the subscriber client computer, and that only "selected

computer resources" are accessed. It also ignores the teachings of the specification. An essential

feature of the invention is that the "selected computer resources" are protected and not freely

available on the web. See, e.g., Ex. 1, 6:22-31; 18:5-7; Figs. 2-4 and Fig. 19 (block 186).

If the patentee had intended for the first server computer to simply make available

selected computer resources stored elsewhere (such as on other server computers) as Plaintiff

proposes, the patentee could have mirrored the language he used in describing the "other

computer resources" that are "provided by the first server computer and by other server

computers and non-subscriber clients computer." The patentee, however, did not describe the

"selected computer resources" in this manner. Thus, Plaintiff's proposed definition is contrary to

the intrinsic evidence.

---

[21]     See, e.g., Ex. 1., 6:22-31; 7:66-8:9; 18:5-7. See also id. Figs. 2-4 and 19.

Plaintiff also defines the "selected computer resources" as being accessed <u>by</u> the first server computer.  But the plain language of the claims recites that the selected resources are accessed "by at least one subscriber client computer."  Also, the specification teaches that the protected content is sent <u>from</u> the first server computer <u>to</u> the subscriber client computer.  <u>See,</u> <u>e.g.</u>, <u>id.</u>, 6:22-31 and Fig. 2.  Therefore, Defendants' proposed definition -- that the "selected computer resources" are requested by the subscriber client computer and located on the first server computer -- should be adopted.

## IV.    MEANS PLUS FUNCTION LIMITATIONS

The parties agree that "client software means," "server software means," and "clearinghouse means" (as used in Claim 1) are limitations governed by Section 112 ¶ 6.[22]  The parties also agree in substance as to many aspects of the claimed functions for these limitations.  <u>See</u> <u>generally</u> Ex. 3 at 7-16.  Defendants dispute Plaintiff's constructions, which ignore explicit claim language and fail to show how the specification links structure to the claimed functions.  Section 112, ¶ 6 requires more.  <u>Cardiac</u>, 296 F.3d at 113-14.

### A.    Construction of the claimed functions of the "client software means," "server software means," and "clearinghouse means" must include, and not omit, explicit claim language describing the functions.

The principal differences in the parties' proposals concerning the claimed functions are highlighted in the tables below:

| "client software means" | |
|---|---|
| Plaintiff: "adapted to forward its [the subscriber client computer's] identity data to said first server computer" | Defendants: "forward[ing] its [subscriber client computer's] identity data to said first server computer <u>at the beginning of an operating session in which access to selected computer resources is requested</u>." |

---

[22]    The parties' dispute whether "clearinghouse means" in Claim 24 is also governed by Section 112 ¶ 6.  That dispute is addressed below in subsection D.

| "server software means" | |
|---|---|
| Plaintiff: First Function: "adapted to forward its [the first server's] identity data and identity data of each subscriber client computer to [a] clearinghouse means" | Defendants: "forward[ing] [the first server computer's] identity data and identity data of each subscriber client computer to said clearinghouse means <u>at the beginning of an operating session in which access to selected computer resources of said first server computer is requested.</u>" |

| "clearinghouse means" | |
|---|---|
| Plaintiff: First Function: (a) "for storing identity data of said first server computer and the identity data of each of said subscriber client computers" | Defendants: "storing identity data of said first server computer and the identity data of each of said subscriber client computers." |
| Second Function: "adapted to authenticate the identity of said subscriber client computer" | "authenticat[ing] the identity of said subscriber client computer <u>responsive to a request for selected computer resources of said first server computer by a subscriber client computer.</u>" |
| Third Function: "adapted to authenticate the identity of said first server computer" | "authenticat[ing] the identity of said first server computer <u>responsive to said subscriber client computer making the request for selected computer resources of said first server computer.</u>" |
| Fourth Function: "adapted to permit access to said selected computer resources" | "permit[ting] access to said selected computer resources <u>responsive to successful initial authentication of said first server computer and of said subscriber client computer.</u>" |

In each of the above limitations, the disputed language in Defendants' construction is a word-for-word reproduction of the recited claim language, and describes the claimed function. Ex. 1 at 35:38-40, 35:62 - 36:2. This explicit claim language should be reflected in the Court's construction of the function. See Cardiac, 296 F.3d at 1113 (improper to broaden scope of claimed function by ignoring clear limitations in claim language). In each instance, the language excluded by Plaintiff inaccurately broadens the function beyond what is claimed. For example, with respect to the client software means, the claimed function is not forwarding the identity data at <u>any</u> time; rather, the claimed function is forwarding the identity date at a <u>particular</u> time -- at the beginning of an operating session. Likewise, with respect to the clearinghouse means, the

claimed authentication functions are not any instance of authentication at any time and for any

reason; rather, the claimed functions are specifically limited to authenticating the subscriber

client computer and first server computer responsive to the subscriber client computer making a

request for selected computer resources.

**B.    For numerous claimed functions, the specification fails to describe corresponding structure.**

Where, as here, the specification indicates that computers or general-purpose

microprocessors will perform the recited function, the corresponding structure must include the

algorithm described in the specification for performing the function. See Harris Corp. v.

Ericsson Inc., 417 F.3d 1241, 1253 (Fed. Cir. 2005) (corresponding structure for computer-

implemented means-plus-function term limited to algorithm disclosed in specification); WMS

Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1348-49 (Fed. Cir. 1999). The specification

must precisely define each step of an algorithm to perform the recited function because it is that

precise algorithm that defines the structure corresponding to the function. Tehrani v. Hamilton

Med., Inc., 331 F.3d 1355, 1362 (Fed. Cir. 2003) (vacated and remanded where district court

failed to "determine the precise algorithm that is part of the recited structure").

If the specification fails to disclose corresponding structure for the recited function --

which, for a computer implemented function, requires precise disclosure of an algorithm for

performing the recited function -- the claim, by definition, fails to satisfy the definiteness

requirement of 35 U.S.C. § 112, ¶ 2, and is therefore invalid. 35 U.S.C. § 112, ¶ 2 (2000);

Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1301-02 (Fed.

Cir. 2005); Finisar Corp. v. The DirecTV Group, Inc., 416 F. Supp. 2d 512, 518-19 (E.D. Tex.

2006) (holding claim invalid as indefinite because mere recitation in specification of claimed

function did not constitute requisite disclosure of algorithm for performing recited functions). In

this case, the specification does not disclose algorithms for performing numerous claimed functions of the "client software means," "server software means," and "clearinghouse means."

> **1.  The specification does not describe structure for the "server software means" to forward the first server computer's identity data to the clearinghouse.**

As shown above, Plaintiff and the Defendants agree that forwarding the first server computer's identity data to the clearinghouse means is part of the first claimed function of the "server software means" limitation. Yet no structure is described in the specification for performing this function. Plaintiff cites generally to Fig. 2 of the patent, but nothing in Fig. 2 describes an algorithm by which information purporting to be the server computer's identity data is forwarded to the clearinghouse means. The description of Fig. 2 in the specification indicates only that the server forwards the <u>subscriber's</u> login parameters to the clearinghouse, and does not mention the server forwarding its own identity data. <u>See</u> Ex. 1, 6:25-30.

> **2.  The specification does not describe structure for performing the third and fourth claimed functions of the "clearinghouse means."**

The third and fourth claimed functions of the clearinghouse means are, respectively, as follows: "authenticat[ing] the identity of said first server computer responsive to said subscriber client computer making the request for selected computer resources of said first server computer;" and "permit[ting] access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber client computer." The specification fails to describe structure for performing either of these functions.

For the third clearinghouse function -- "authenticating" the first server computer's identity -- Plaintiff contends that Column 7, lines 4-10 reveals corresponding structure. This excerpt from the specification merely states that the authentication daemon of the clearinghouse "first ensures that it is communicating with an authentic subscription access server 34". Ex. 1,

7:4-6. This ambiguous passage is not clearly linked to the claimed "authenticating" function, and provides no description of structure showing whether, or how, the server computer identity is authenticated. See Cardiac, 296 F.3d at 1113-14.

Regarding the fourth claimed function, Plaintiff points to the "successful initial authentication" response from the clearinghouse's authentication server (Ex. 1, 17:45-48). But the claims and specification make clear that this response preceeds granting permission to access the protected content. See Ex. 1, Fig. 2 (step 5), Fig. 18 (160-168), and 17:54-57.

### 3.    The specification does not describe structure for forwarding, storing, or authenticating "identity data of subscriber client computer(s)."

As explained above, the claimed functions of the client software means and the server software means require forwarding the identity data of one or more "subscriber client computer(s)." The claimed functions of the clearinghouse means require storing identity data of "each of [the] subscriber client computers," and authenticating the identity of a subscriber client computer in response to its request for selected computer resources.

The specification does not disclose corresponding structure for these claimed functions. As explained in Section II.C.1, Plaintiff incorrectly conflates the identity data of the subscriber client computer with the identity data of the subscriber. However, the claims plainly refer to the computer's identity data and should be so construed. See, e.g., MercExchange v. eBay, 401 F.3d 1323, 1331 (Fed. Cir. 2005) (distinguishing "identification code[s]" for people from those for machines), reversed on other grounds, 126 S. Ct. 1837 (2006) (remanding for reconsideration of injunctive relief). No structure is described by which a subscriber client computer's identity data is forwarded to a first server computer, or forwarded by the server software means to the clearinghouse means, or stored and/or authenticated by the clearinghouse means.

a)    *Even if the user, not the computer, is to be authenticated, the corresponding structure must include the specific algorithms described in the specification for performing the claimed functions involving such data.*

As noted above, the Court should decide that the subscriber client computer, not the user, is what is authenticated. Should the Court determine, however, that the user, not the subscriber client computer, is to be authenticated, the corresponding structure must include the specific algorithms described in the specification for performing the claimed functions of forwarding, storing, and authenticating user data. See Cardiac, 296 F.3d at 1113-14.[23] These algorithms are described in detail in the Defendants' claim construction proposal. See Ex. 3 at 7-16.[24]

Plaintiff's proposed constructions incorrectly suggest that the corresponding structure may be any software for performing the recited functions, and make vague reference to various "components" mentioned in the specification, but fail to identify specific algorithms for performing the functions of forwarding, storing, and authenticating identity data. For example, Plaintiff's suggested structure for the forwarding function of the "client software means" is the component "that preferably uses the transmission control protocol/internet protocol (TCP/IP) and/or user datagram protocol/internet protocol (UDP/IP) to communicate with the first server computer." Ex. 3 at 7 (citing Ex. 1, 5:56-59; Fig. 2). This is unlinked to any algorithm that specifically describes forwarding username, password, and/or digital identification as the identity

---

[23]    With respect to the server software means, even if the Court finds that a user name, password, and/or digital identification may be a subscriber client computer's identity data, no structure is described for forwarding each such set of identity data to the clearinghouse means at the beginning of an operating session. At most, structure is described for forwarding one subscriber client computer's identity data.

[24]    For example, with respect to the client software means, the Defendants have identified the login, user authentication, and session initiation flow chart illustrated in Fig. 18, including at least blocks 148 and 150, and described at Ex. 1, 30-35. This algorithm is the only one in the specification clearly associated with the function of forwarding the user, password and digital ID to the first server computer.

data.[25] Moreover, Plaintiff improperly cites to the specification as a mere example ("See, e.g." and "preferably") rather than as a necessary limitation as required by the use of means-plus-function claim language.

Plaintiff's contentions regarding the corresponding structure for the "server software means"[26] and the "clearinghouse means"[27] are similarly deficient for failure to identify algorithms described for performing the claimed functions. Plaintiff's proposals thus invite error under the Federal Circuit's decisions. See Harris, 417 F.3d at 1253; WMS Gaming, 184 F.3d at 1348-49.

### C.    The "server software means" includes the "reauthentication" algorithm as corresponding structure.

The parties disagree as to the structure for performing the second claimed function of the server software means. This function includes the limitation -- "to thereby confirm that said hardware key is connected to said subscriber client computer" -- the "reauthentication" limitation. Structure for the reauthentication algorithm is described in the Defendants' proposal (Ex. 3 at 10-11) and is clearly linked to the recited function.

Plaintiff concedes that the "to thereby confirm" function may be satisfied by the reauthentication algorithm, citing blocks 222 through 236 of Fig. 20, but also attempts to link initial authentication to the recited function. Plaintiff cites block 150 of Fig. 18, but this

---

[25]    Nothing in the specification describes structure that forwards a user name, password, and/or digital identification to the first server computer at the beginning of an operating session in which access to selected computer resources is requested, as recited in the claims.

[26]    Plaintiff cites generally to Fig. 2 of the patent, but ignores the specific algorithm for forwarding the subscriber's identity data form the subscription access server to the clearinghouse described in 8:20-30, 12:14-18, 17:35-42 and Figs. 3-4 and 18.

[27]    Regarding the first claimed function of the "clearinghouse means," Plaintiff's citations to the specification refer to the content of the clearinghouse (Ex. 1, 6:57-61) and the embodiments with multiple clearinghouses (Ex. 1, 4:24-31), not describe storing identity data, the claimed function. Similarly, for the clearinghouse means' second function, Plaintiff's proposed construction fails to identify the algorithm by which the clearinghouse authentication daemon actually goes about authenticating identity data. Id. 9:35-42; 17:35-48.

structure does not confirm that the hardware key is connected. Thus, initial authentication --
which is done by the clearinghouse -- is not corresponding structure for the recited function of
the server software means. See Cardiac, 296 F.3d at 1113-14.

### D.    The Court should construe "clearinghouse means" as used in Claim 24 consistently with its usage in Claim 1.

Plaintiff admits that "clearinghouse means" is a means-plus-function limitation when
used in Claim 1. In its initial responses to Defendants' interrogatories, Plaintiff also admitted
that "clearinghouse means" was a means-plus-function limitation as used in Claim 24. See, e.g.,
Ex. 8 at 13-14.

Plaintiff now argues, contrary to its earlier admission, that the "clearinghouse means"
limitation is not a means-plus-function limitation when used in Claim 24. As Plaintiff must
concede, however, the limitation recites the word "means," giving rise to the presumption that
§ 112, ¶ 6 applies. See Sage Prods., 126 F.3d at 1427. That presumption may be rebutted only
where either (1) no function is recited corresponding to the means; or (2) even if a function is
recited, sufficiently definite structure for performing the function is also recited in the limitation.
See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1232 (Fed. Cir. 2001).

Claim 24 explicitly recites three functions performed from the "clearinghouse means."[28]
As shown in the table below, these functions of "clearinghouse means" appear in substantially
the same form in Claim 1:

| Claim 1 | Claim 24 |
|---|---|
| **First Function**: storing identity data of said first server computer and the identity data of each of said subscriber client computers | storing the registered identity data [of said first server computer and the identity data of each of said subscriber client computers] in a clearinghouse means |
| **Second Function**: authenticat[ing] the identity | attempting to authenticate the identity of said |

---

[28]    The fourth function of the clearinghouse means of Claim 1 -- the "permitting access" function -- is also recited in Claim 24, but it is not explicitly linked to the clearinghouse means.

| | |
|---|---|
| of said subscriber client computer responsive to a request for selected computer resources of said first server computer by a subscriber client computer | subscriber client computer from said clearinghouse means responsive to a request for selected computer resources of said first server computer by a subscriber client computer |
| **Third Function**: authenticat[ing] the identity of said first server computer responsive to said subscriber client computer making the request for selected computer resources of said first server computer | attempting to authenticate the identity of said first server computer from said clearinghouse means responsive to said subscriber client computer making the request for selected computer resources |

The "clearinghouse means" limitation of Claim 24 does not contain sufficiently definite

structure for performing the recited functions. Plaintiff concedes as much, having implicitly

admitted that "clearinghouse means" in Claim 1 does not contain sufficiently definite structure to

rebut the presumption that it is a means-plus-function limitation. No additional recitation of

structure exists in Claim 24. Therefore, Plaintiff cannot rebut the statutory presumption, and

"clearinghouse means" as used in Claim 24 should be construed consistently with the

interpretation of that limitation in Claim 1.

## V.    "UNTRUSTED NETWORK" LIMITATION

| | |
|---|---|
| Plaintiff: A public network with no controlling organization, with the path to access the network being undefined and the user being anonymous. | Defendants: A public network with no controlling organization, with the path to access the network being undefined and the user being anonymous. A client-server application running over such a network has no control over the transmitted information during all the phases of transmission. |

It is undisputed that the patentee explicitly defined the term "untrusted network" in the

specification of the '416 patent. The specification provides a two-sentence definition:

> As used herein, an untrusted network is defined as a public
> network with no controlling organization, with the path to access
> the network being undefined and the user being anonymous. A
> client-server application running over such a network has no
> control over the transmitted information during all the phases of
> transmission.

Ex. 1, 3:59-64 (emphasis added).[29]  Plaintiff's proposal drops the second sentence.

Plaintiff ignores the portion of the specification's explicit definition that requires applications to relinquish control over data transmissions in the "untrusted network."  However, the patentee clearly intended to limit the scope of the term "untrusted network" relative to control over transmitted information.  This is evidenced by the specification's comparison between an untrusted network and a private corporate network.  See Ex. 1, 1:17-27.

In discussing the purpose of the invention, the patentee explained that when a provider publishes content on an untrusted network, such as the Internet, "[a]ny user with a web browser can then access the web site and view its contents."  Ex. 1, 1:17-21.  The "untrusted network" is compared to a private corporate network, which has control over transmitted information.  In a private network, "the corporate data that is desired [can] be displayed without the private network being accessible to the rest of the web."  Id. at 1:21-27.  By contrast, to provide control over data transmitted via an "untrusted network", "the present invention provides a platform to securely publish subscription contents on a web site."  Id. at 3:64-66.  See Phillips, 415 F.3d at 1313 ("[T]he best source for understanding a technical term is the specification.").  Defendants' proposed construction acknowledges the express limitations described in the specification.

## VI.    "PERMIT[TING] ACCESS" LIMITATION

| Plaintiff:  Permit[ing] the subscriber client computer to access said selected computer resources of the first server computer. | Defendants:  Authorize the use of otherwise restricted computer resources. |
|---|---|

Defendants propose a straightforward and objective definition for "permit[ting] access."  Plaintiff refuses to provide an interpretation -- it merely repeats the claim language -- and fails to

---

[29]    This definition is consistent with documents created by the inventors at the time of the alleged invention.  See Ex. 9 at P46018.192237.

provide any reasonable basis on which to object to Defendants' proposal. For this reason alone, the Court should adopt Defendants' proposal.

Defendants' proposal is correct because it is the term's ordinary meaning in view of the specification. For example, the specification uses the term "authorization" when discussing a subscriber's ability to access the server's restricted contents after successful authentication. See Ex. 1, 6:57-61, Fig. 18 (Step 168). Moreover, "permit" ordinarily means to authorize someone to do something, and in the computing environment, refers to preassigned "permissions" that authorize users to access particular resources based on assigned security levels.[30] Accordingly, Defendants' proposal is correct.

## CONCLUSION

For all of the reasons stated above, this Court should adopt Defendants' proposed constructions for the disputed terms.

---

[30] See Ex. 7 at 1018 ("Allow the doing of (something), to consent to, to grant consent or leave to (someone), or to authorize."); Ex. 10 at 361 (defining "permission," in a network or multi-user computer environment, as the ability of a particular user to access a particular resource by means of his or her user account).

*Of Counsel:*

Edward F. Mannino
Jason A. Snyderman
John D. Simmons
AKIN GUMP STRAUSS HAUER & FELD LLP
One Commerce Square, Suite 2200
2005 Market Street
Philadelphia, PA 19103
(215) 965-1200

Frank C. Cimino
Daniel E. Yonan
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
(202) 887-4000

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Patricia Smink Rogowski*

Patricia Smink Rogowski (I.D. #2632)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington DE 19899
(302) 658-9141

*Attorneys for Defendant, VeriSign, Inc.*

*Of Counsel:*

William F. Lee
David B. Bassett
Mark D. Selwyn
Gregory P. Teran
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Alyssa M. Schwartz*

Frederick L. Cottrell, III (I.D. #2555)
Alyssa M. Schwartz (I.D. #4351)
One Rodney Square
Post Office Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Defendant RSA Security Inc.*

*Of Counsel:*

BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel. 202-639-7700

Samir A. Bhavsar
Jeffery D. Baxter
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6500

*Of Counsel:*

John M. DiMatteo
Neal K. Feivelson
Leslie M. Spencer
WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

POTTER ANDERSON & CORROON LLP

*/s/ Richard L. Horwitz*

Richard L. Horwitz (I.D. #2246)
David E. Moore (I.D.#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000

*Counsel for Defendants Netegrity, Inc. and
Computer Associates International, Inc.*

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendant Johnson & Johnson
Services, Inc.*

Dated: September 22, 2006
173500.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September, 2006, the attached **DEFENDANTS'**

**OPENING CLAIM CONSTRUCTION BRIEF** was served upon the below-named counsel at

the address and in the manner indicated:


Richard D. Kirk, Esquire                                          HAND DELIVERY
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899

Dirk D. Thomas, Esquire                                   VIA ELECTRONIC MAIL
Robin, Kaplan, Miller & Ciresi, LLP
1801 K Street, N.W., Suite 1200
Washington, DC  20006


*/s/ John G. Day*
_____
John G. Day