# Exhibit A

**VeriSign**

REFERENCE GUIDE



**Authentication Services**

Glossary

Where it all comes together. ™

VeriSign, Inc. 00020577

VERI-0018095

Glossary

| Term | Definition |
|------|------------|
| Physician Authentication Service | VeriSign product that provides digital trust services to the healthcare community. The American Medical Association (AMA) provides free Digital IDs (AMA Internet IDs) to qualifying medical professionals. The AMA is the Registration Authority for the Physician Authentication Service. VeriSign operates the Physician Authentication Service on behalf of the AMA. *See also* AMA Internet ID. |
| Physician Authentication Service Relying Parties | Organizations that implement the Physician Authentication Service and use AMA Internet IDs to authenticate users and control access to information and services. *See also* AMA Internet ID; Physician Authentication Service. |
| Physician Profiling Service | VeriSign Web service that Physician Authentication Service Relying Parties can query for information about persons who hold AMA Internet IDs. *See also* AMA Internet ID; Physician Authentication Service. |
| Pilot System | Prototype system running test versions of VeriSign products and services. The test system allows the Affiliate or enterprise to "try out" the system to ensure proper operation of their PKI-enabled applications. Certificates, Certificate Authorities, and transactions issued on the test system cannot be used outside the test system. *See also* Production System. |
| PIN | *See* Personal Identification Number. |
| PIN Entry Device | *See* Luna PIN Entry Device. |
| PKCS | *See* Public Key Cryptography Standards. |
| PKI | *See* Public Key Infrastructure. |
| PKI Hierarchy | Set of IAs whose functions are organized according to the principle of delegation of authority and related to each other as subordinate and superior IA. *See also* Public Key Infrastructure. |
| Plaintext | Unencrypted, readable data. *See also* Ciphertext. |

VeriSign, Inc. 00020577

VERI-0018157

# Exhibit B



**VeriSign**     INSTALLATION GUIDE

Unified Authentication v3.0

Installation and Configuration Guide

Where it all comes together.™

VeriSign, Inc. 00021392 ■ September 22, 2005

VERI-0000203

> **Note**  A Management and Lifecycle Service running on a Windows platform does not require IIS to support SSL.

## Pilot and Production Modes

You can install Unified Authentication in a pilot mode before installing it on your production systems. This enables you to test your configuration against test data and users before allowing it to access production data. You install and configure the pilot system in a separate but parallel system as the production system, so that you can leave the pilot system running while installing and testing the production system.

+ Because Active Directory entries are tagged with a Management and Lifecycle Service identifier, the pilot and production systems can make use, without conflict, of the same Active Directory server. (When users run the Token Manager application, they must specify the pilot or production Management and Lifecycle Service.)

+ Use the original VeriSign CD set to install both the pilot and the production software (Validation Service and Management and Lifecycle Service only).

  – During installation, specify the appropriate registration file: pilot or production.

  – There is no need to re-run the script that updates the schema.

+ If your system is integrated with another server (for example, a VPN server), then the server can be configured to use only one of the systems, but not both.

+ Continue to run the pilot system until you are sure that the production system is operating properly, and then shut the pilot system down.

## PSO Engagement

Your original service contract may include assistance from the VeriSign Professional Services Organization (PSO) for the initial installation and configuration of Unified Authentication. Once your organization has enrolled for Unified Authentication, VeriSign will contact you to schedule your Unified Authentication installation. This initial visit by PSO personnel is known as the PSO engagement.

> **Note**  If you have no contract for PSO support, your organization will independently install and configure Unified Authentication.

VERI-0000224

# Exhibit C



**VeriSign®**
The Value of Trust™

# Go Secure! for Web Applications
### Installation and Configuration Guide



CUSTOMER MANUAL

Customer Support: +1-650-426-3535 or 1-800-579-2848

enterprise-pkisupport@verisign.com

VeriSign, Inc. 00010854

VERI-0019988

- **Customize end user enrollment pages**

  Since you added to the lifecycle pages, you should customize your lifecycle to add elements especially for your organization. If you want to customize your lifecycle pages, for example, your organization's logo or use a different color or font, you must make these changes by using Notepad or another text editor to edit the HTML files in <webroot>\htmldocs\VSApps . Refer to Chapter 2, "Understanding Local Hosting" in *Managed PKI Technical Reference* for information about customizing locally hosted pages.

## Next

Now that the Managed PKI account is configured, you can implement the appropriate Go Secure! for Web Applications solution.

If you are configuring one Managed PKI service for multiple Web applications, continue with "Special Case: Configuring One Managed PKI Service for Multiple Web Applications" on page 101.

Information concerning roaming, certificate renewal, revocation, and using Virtual Private Networks (VPN) begins on page 102.

If you are configuring Access Control, continue with:

- Chapter 6, "Configuring Web Access on SunONE Enterprise Server," provides instructions for configuring the SunONE Enterprise Web server to support an example Web access application (provided on the Go Secure! for Web Applications CD).

- Chapter 7, "Configuring Web Access on Stronghold Secure Server," provides instructions for configuring the Stronghold Secure Web server to support an example Web access application (provided on the Go Secure! for Web Applications CD).

- Chapter 8, "Configuring Web Access on Microsoft Internet Information Server," provides instructions for configuring Microsoft Internet Information Server to support an example Web access application (provided on the Go Secure! for Web Applications CD).

VERI-0020099

## Configuring Certificate Validation

This section lists the options that configure the chain validation and revocation checking options for the PTA server.

To make use of this functionality, add appropriate parameters from this list to the options.txt or iis_opts.txt file.

**Note** You must specify values for cfg-filename, cache-dir and file-prefix. The other parameters are optional, but are required for certain functionality.

Table A-2  Certificate validation options

| Parameter | Example | Description |
|-----------|---------|-------------|
| cfg-filename | "/VeriSign/pta/config/rsaverify.cfg" | **Required parameter.** The configuration file that the plug-in should read. |
| file-prefix | "/VeriSign/pta/certcache" | The directory containing certificates and CRLs. |
| url-prefix<br>CRL status the checking only | "http://onsitecrl.verisign.com/" | The URL-prefix to be prepended to URL locations. |
| cache-dir | "/VeriSign/pta/certcache" | **Required parameter.** The local directory in which downloaded certificates and CRLs are stored.<br>cache-dir must be an existing directory. The plug-in does not create the directory if it does not exist. The Web server must have write access to this directory. If there is a problem with this directory, the plug-in attempts to use a system-wide TEMP directory. |
| ocsp-url<br>(OCSP status checking only) | http://onsite-ocsp.verisign.com | The URL that the PTA uses to access VeriSign's OCSP responder.<br>Note that this takes precedence over CRL based checking if no-crl-check=0 |

VERI-0020204

# Exhibit D

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

▬▬▬▬▬▬▬▬ Attorneys at Law

**DANIEL E. YONAN**
202.887.4497/fax: 202.887.4288
dyonan@akingump.com

January 18, 2006

**Via UPS**

André J. Bahou, Esquire
Robins, Kaplan, Miller & Ciresi L.L.P.
Suite 1200
1801 K Street, N.W.
Washington, DC 20006-1307

Re:    *Prism Technologies LLC v. VeriSign, Inc., et al.*
      Civil Action No. 1:05-CV-00214-JJF

Dear Mr. Bahou:

Enclosed pleased find VeriSign's initial document production CDs containing VERI 0000001 – 0229363. Further responsive materials will be produced on a rolling basis.

We have marked our documents using the "Confidential" and "Highly Confidential – Attorneys' Eyes Only" designations as defined in our draft protective order sent to you on December 13, 2005. Our understanding is that Prism will abide by those designations until the protective order is finalized. *See* 01/05/06 ltr. from A. Bahou to J. Snyderman *et al.*; *see also* L.R. 26.2. Should the parties-in-suit or the Court alter the scope of those designations, Prism will then identify any documents that it believes VeriSign should "re-designate" in view of the modified language.

Also, please advise us when we can expect to receive Prism's document production. You mentioned as early as November 2005 that Prism's production was available. However, to date, we have not received an electronic copy set.

Very truly yours,

Daniel E. Yonan

# Exhibit E

**Rick Gregg**    *Dallas office*

From:    Olsen, Mike [MOlsen@verisign.com]
Sent:    Wednesday, January 26, 2005 4:09 PM
To:    'rick.gregg@amrco.com'
Cc:    Collida, Bart
Subject: RE: Follow Up Questions

Rick –
There is no authentication mechanism for the sender, but we have another way of avoiding man in the middle attacks - we use a nonce in the request and response. the OCSP protocol specifications has a full definition of this mechanism. There is also an option to do signed OCSP requests, which I don't think it is supported in CVM. You should open a case with our support organization to get this confirmed.

As far as the second question: the server that is maintaining the SSL connection is responsible for the credential timeout. We have a plug-in that will re-direct the request to a VeriSign responder, we do not control all the aspects of the SSL connection. You may want to check the server vendor documentation to see if their SSL module allows for setting such a parameter or it is a fix value.

OCSP is by definition a real-time certificate status check protocol, so there is no caching done on any part. There is one exception - we are somehow caching pre-generated OCSP responses in TGV (Trusted Global Validation) and use the Atlas infrastructure to make them available throughout the Internet. However, this has been put in place to alleviate the expected load when Longhorn is released (all code signing certificate will be verified using OCSP), and only a few public CAs are now fully integrated in TGV. It is a controlled delay between the certificate status change and the availability of the pre-generated OCSP response in Atlas, but the caching is still done on the responder side, not on the client. In the case of a private CA, the standard VeriSign OCSP responder will be used, which is as the name implies - on-line: the response is actually constructed real-time by consulting the back-end database for the certificate status. The client doesn't cache this status, as it would defeat the purpose of a real-time check.

I'll try to reach you via phone to discuss as well.  Thanks, Mike

From: Olsen, Mike
Sent: Tuesday, January 25, 2005 5:35 PM
To: 'rick.gregg@amrco.com'
Cc: Collida, Bart
Subject: RE: Follow Up Questions

Hi Rick
Here are responses to the outstanding technical questions.

7.  I need additional clarity and details on the following technical questions:
    a.  Is the CVM installed on the financial services web server portal authenticated by the VeriSign server in an OCSP environment? Need to provide security against a spoofed web server, man in the middle attacks, replay attacks, etc. Please provide a detailed technical response on how this is accomplished.

    VeriSign operates a trusted and scalable OCSP responder where web server applications can point to for real time certificate status. Currently VeriSign does not have an off the shelf OCSP plug-in. We would integrate into OCSP supported in the native applications.  Our consultants have done custom PKI consulting work to build an client OCSP plug-in.  We are looking into packaging in it. Also, the CVM supports both OCSP lookups and CRL downloads.

**P 032971**

b.  After initial authentication of the client PC by the CVM installed on the financial services web server portal using OCSP, does the CVM have the capability to re-authenticate the smart card or token? How is this interval determined? This is an important requirement since we need to make sure that the token or smart card remains connected to the machine during access to high value information or transaction execution.

Within the SSL protocol in IIS or your web server you turn off its revocation checking to use VeriSign's CVM.  Regular session timeouts apply here for re-authenticating with OCSP.

See attached OCSP and CVM guide for more details.

Also attached is a PTA demo we had built for Kmart.

Let me know if you need more clarifications.

Thanks, Mike

-----Original Message-----
From: Rick Gregg [mailto:rick.gregg@amrco.com]
Sent: Thursday, January 20, 2005 4:16 PM
To: Collida, Bart
Subject: Follow Up Questions

Hi Bart!

It was nice speaking with you again. To summarize the outstanding issues:

1.  Need to understand the pricing models on Go Secure! For Web Applications and the Unified Authentication Service.

2.  Need to get a couple of customer references for both Go Secure! For Web Applications and the Unified Authentication Service.

3.  Need to make sure VeriSign is committed to the future development and roll out of strong authentication service offerings.

4.  It would be helpful to get a copy of the OATH specification(s) as a risk mitigation strategy in case VeriSign decides to discontinue their strong authentication service offerings.

5.  Does VeriSign have a ROI model for use in evaluating a VeriSign service offering versus an in-house integration effort (i.e. RSA Cleartrust)?

6.  If there is a self-service style of demo available it would be helpful, but not necessary.

8.  I need additional clarity and details on the following technical questions:
    c.  Is the CVM installed on the financial services web server portal authenticated by the VeriSign server in an OCSP environment? Need to provide security against a spoofed web server, man in the middle attacks, replay attacks, etc. Please provide a detailed technical response on how this is accomplished.
    d.  After initial authentication of the client PC by the CVM installed on the financial services web server portal using OCSP, does the CVM have the capability to re-authenticate the smart card or token? How is this interval determined? This is an important requirement since we

1/26/2005                                              P 032972

need to make sure that the token or smart card remains connected to the machine during access to high value information or transaction execution.

Rick Gregg
Consultant
Affiliated Management Resources
Voice: (402) 934-2021 ext. 104
Fax: (402) 934-2023

P 032973

# Exhibit F

## This Document Filed Under Seal

# Exhibit G

## This Document Filed Under Seal

# Exhibit H



Slip Copy
Slip Copy, 2006 WL 20777 (S.D.Ind.)
**(Cite as: Slip Copy)**

Ͱ

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana, Indianapolis Division.
CENTILLION DATA SYSTEMS, LLC., Plaintiff,
v.
CONVERGYS CORPORATION, Qwest Communications International, and Qwest Corporation, Defendants,
QWEST CORPORATION and Qwest Communications Corporation, Plaintiffs,
v.
CENTILLION DATA SYSTEMS, LLC., and CTI Group (Holdings), Inc., Defendants.
**No. 104CV0073LJM-WTL.**

Jan. 4, 2006.

Grant S. Palmer, Matthew J. Siembieda, Blank Rome, LLP, Philadelphia, PA, Peter S. Weissman, Victor M. Wigman, Denise Catherine Lane-White, Hemant Keeto Sabharwal, Blank Rome, LLP, Washington, DC, for Plaintiff.

Edward Han, Mark D. Wegener, Matthew J. Moore, Brian Sherwood Seal, Howrey Simon Arnold & White LLP, Washington, DC, James Dimos, Joel E. Tragesser, Randall R. Riggs, Locke Reynolds LLP, James W. Riley, Jr., Riley Bennett & Egloff LLP, Indianapolis, IN, Hector G. Gallegos, Vincent J. Belusko, J. Manena Bishop, Morrison & Foerster LLP, Los Angeles, CA, Stephen J. Tan, Brown Reavis & Manning PLIC, Jill Morgan Ballo, Davis Wright Tremaine LLP, Seattle, WA, for Defendants.

Leonard D. Steinman, Blank Rome, LLP, New York, NY, Michael C. Greenbaum, Blank Rome, LLP, Washington, DC, Phillip J. Fowler, David C. Campbell, Bingham McHale LLP, Indianapolis, IN.

*ORDER ON DEFENDANTS' & COUNTERCLAIM PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11*

MCKINNEY, Chief J.

**\*1** This cause is now before the Court on defendants', Qwest Communications International, Qwest Corporation, and Qwest Communications Corporation, and counterclaim plaintiff's, Qwest Communications Corporation (collectively "Qwest"), Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 ("Rule 11").[FN1] Qwest contends that plaintiff, Centillion Data Systems LLC ("Centillion"), failed to make an appropriate pre-filing investigation into its infringement allegations against Qwest. In particular, Qwest challenges Centillion's allegation that Qwest infringes the "means for transferring" element of claim 1 of U.S. Patent No. 5,287,270 (the " '270 patent"), under the doctrine of equivalents. Qwest argues that Centillion's reliance on the doctrine of equivalents is wrong as a matter of law. Moreover, Qwest avers that Centillion never obtained a copy of the allegedly infringing software so that it could properly analyze whether or not the product infringed. These failures, Qwest contends, evidence that Centillion's pre-filing infringement analysis and factual analysis were not objectively reasonable, which makes Rule 11 sanctions appropriate. Qwest argues that dismissal of Centillion's claims with prejudice, and attorneys' fees for the entire litigation is an appropriate sanction.

> FN1. Plaintiff, Centillion Data Systems LLC, has moved to maintain under seal certain exhibits for *in camera* inspection. The Court GRANTS the motion, but notes that references to those exhibits herein are vague enough that sealing of this order is unwarranted.

Centillion argues that it obtained all the information it needed to make a pre-filing factual and infringement analysis from Qwest's public statements about its software and from a report it obtained from an independent investigator who conducted what Centillion terms as "a detailed investigation of Qwest's billing analysis products." Pl.'s Opp'n Br. at 2. Centillion claims that it used this information coupled with its own knowledge of the '270 patent and its prosecution history to make a good faith, informed comparison of the claims of the '270 patent and Qwest's billing analysis software product line. Moreover, Centillion contends that the instant motion is an attempt to have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Court rule on the merits of the case without the benefit of discovery, and meets the Rule 11 standard for frivolity itself.

For the reasons discussed herein, the Court DENIES Qwest's Motion for Sanctions.

## I. *DISCUSSION*

Because the issue of Rule 11 sanction is a procedural issue that is not unique to patent law, the Court applies the law of the Seventh Circuit. *See Power Mosfet Tech., LLC v. Siemens AG,* 378 F.3d 1396, 1407 (Fed.Cir.2004). Under Seventh Circuit law "a court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose. In particular, a frivolous argument or claim is one that is 'baseless and made without a reasonable and competent inquiry." ' *Fries v. Helsper,* 146 F.3d 452, 458 (7th Cir.1998) (quoting *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1362 (9th Cir.1990) (*en banc* )). The test is an objective one. *See Thompson v. Duke,* 940 F.2d 192, 195 (7th Cir.1991).

**\*2** In the first instance, Qwest asks the Court to delve into the merits of Centillion's infringement analysis; in other words, Qwest asks the Court to interpret a key claim of the '270 patent before any claim construction hearing has been held or motion for summary judgment has been filed. The Court refuses to make these types of determinations at this stage of the litigation. *Cf. Cooter & Gell v. Harmarx Corp.,* 496 U.S. 384, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (stating that determination that a Rule 11 sanction is appropriate "is not a judgment on the merits," nor even "a district court's assessment of the legal merits of the complaint," but rather "requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate"). To the extent that Qwest's current motion seeks a determination on the merits, it is premature and the Court declines Qwest's invitation to decide the merits on the current record. To the extent that Qwest seeks to assert that Centillion's allegations of infringement are legally flawed and frivolous on their face, the Court cannot agree at

this stage of the litigation.

In the second instance, Qwest challenges Centillion's factual inquiry into Qwest's allegedly infringing software products. Qwest contends that an objectively reasonable patent holder would have obtained a copy of the allegedly infringing software and at least used it before it determined that the software infringed the '270 patented software. Qwest argues that this failure is patently unreasonable. Centillion counters that it utilized a third-party analysis of the software, and Qwest's own publicly available information about the allegedly infringing software to determine that each element of the '270 patent claims read on Qwest's products. Centillion contends that its analysis would not have been changed by obtaining and testing the software product itself.

The Court agrees with Qwest, that under the circumstances presented in this case, Centillion's failure to obtain copies of the allegedly infringing software and to use it to ascertain more about how the software functions was objectively unreasonable. Centillion asserts that the information it had about how Qwest's software worked allowed it to adequately assess whether the software infringed each element of the '270 patent. But, the Court has reviewed that information and finds it is largely advertising fluff, including the "analysis" provided by the independent investigator. The advertising information that Centillion relied upon does not clarify how the customer-defined reports are generated. In other words, the product features do not indicate whether there is a "means for transferring" the customer-defined reports from the "data processing means to said personal computer data processing means" as required by the '270 patent. The list of product features clearly identifies the myriad of reports that the Qwest software can generate, as well as the flexibility allowed to the customer, but these product features are not the elements of the patent. Centillion's analysis of the product features to develop its infringement analysis uses too many inferences that should have been investigated.

**\*3** Centillion argues that it would not have changed its analysis if it had obtained Qwest's allegedly infringing software because it already had the data it needed and because it could not have reverse engin-

Slip Copy                                                                              Page 3
Slip Copy, 2006 WL 20777 (S.D.Ind.)
(Cite as: Slip Copy)

eered the software code pursuant to Qwest's licensing agreements. But Centillion did not have the data it needed to ensure that Qwest's software met every element of the claimed invention, either literally or under the doctrine of equivalents. Centillion only had product features from which it inferred that Qwest's software should perform in a certain way. Moreover, the Court would not expect Centillion to violate a licensing agreement or other law to make a factual inquiry into potential infringement. In this case, obtaining the software and testing its limitations on manipulating and/or receiving data would have given Centillion a factual basis from which to conclude that Qwest's software did in fact exhibit each of the '270 patent's limitations.

Centillion relies upon two Federal Circuit cases for the proposition that it need not have actually obtained the allegedly infringing product to have performed an objectively reasonable pre-filing investigation: Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295 (Fed.Cir.2004), and Antonious v. Spalding & Even-flow Cos., 275 F.3d 1066 (Fed.Cir.2002), reh'g denied.FN2 In both cases, the Federal Circuit stated that Rule 11 requires "at a minimum, that an attorney interpret the asserted patent claims and compare the accused [product] with those claims before filing a claim alleging infringement." Q-Pharma, 360 F.3d at 1300-01 (citing, inter alia, Antonious, 275 F.3d at 1072). Whether the patent owner must obtain the product an analyze it, according to the Federal Circuit, depends on the circumstances surrounding the pre-filing infringement analysis. Id. at 1301-02.

> FN2. The Court notes that the procedural posture of both Q-Pharma and Antonious were different than this case. In both of those cases, the district court decided the issue of sanctions after the summary judgment phase of the litigation. Therefore, both the Q-Pharma and Antonious courts addressed the legal inquiry sufficiency of the pleadings in those cases as well as the factual inquiry sufficiency.

In Q-Pharma, the patent covered a product whose "principal active ingredient" was a certain chemical. Id. at 1301. The patentee read the limitation broadly,

to include any product that used a therapeutic amount of the chemical. Id. The patentee relied upon the advertising of the alleged infringer and the listed ingredients on the product to file its claims of infringement. The Federal Circuit determined that the patentee's reliance on advertising claims and labeling of the alleged infringer's product, without a chemical analysis of the product, was reasonable, particularly in light of the patentee's non-frivolous interpretation of the patent. Id. at 1302. Moreover, the Q-Pharma court emphasized that the patentee's analysis was buttressed by its having obtained a sample of the allegedly infringing product, and having reviewed not only the advertising, but also the labeling of the product to determine that infringement was probable. Id.

Unlike in Q-Pharma where the patentee had obtained all the necessary information from advertisements and the actual label from the product itself to determine that the necessary ingredient met the patentee's interpretation of the claims, Centillion did not have the necessary factual information from Qwest's product literature, website or Centillion's independent investigator, to determine whether the "means for transferring" limitation was met. In other words, there was no ingredient list from which Centillion could make the inference that summary reports were generated on the "data processing means" away from the customer's computer and then transferred to the customer's computer via the "means for transferring."

*4 In Antonious, the patent was directed to an improved perimeter weight structure for metal golf club heads. Antonious, 275 F.3d at 1069. After analysis of a single allegedly infringing metal wood, review by sight of other allegedly infringing metal woods, and product literature, the patentee filed suit against the alleged infringer claiming that twenty-one products infringed the patent. Id. at 1075. In fact, not all of the alleged infringer's products had the relevant disputed structure. In assessing whether the patentee's attorneys had made the requisite factual inquiry, the Federal Circuit stated that

> when a number of different products are charged with infringement it is not always necessary for the plaintiff's attorneys to inspect each product separately to verify the facts on which the plaintiff bases its in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 4
Slip Copy, 2006 WL 20777 (S.D.Ind.)
**(Cite as: Slip Copy)**

fringement allegations. At a minimum, however, the evidence uncovered by the patent holder's investigation must be sufficient to permit a reasonable inference that all the accused products infringe.

*Id.* The Federal Circuit remanded *Antonious* to the district court for further fact-finding on the reasonableness of the patentee's attorneys' inquiry. *Id.* at 1076.

Even if the Federal Circuit had decided that the inquiry by the patentee's attorneys in *Antonious* was objectively reasonable, the Federal Circuit did not find that no analysis of the existing product was *per se* reasonable. Moreover, unlike the golf clubs at issue in *Antonious,* in this case, it is computer software that is at issue, which based on the nature of the product, may function in a myriad of different ways, yet produce the same result, or allow its creator to advertise the same feature.

In summary, the Court finds that Centillion's factual inquiry was objectively unreasonable because Centillion, nor its lawyers, never actually tested the allegedly infringing products to see if they met each of the '270 patent's limitations. However, the Court finds that a sanction in this case is inappropriate. Qwest boasts that it raised the issue of Centillion's inquiry to Centillion before this cause was filed. Yet, it waited nearly two years after the filing of this suit, and over a year after the filing of its answer to bring the issue to the Court's attention. Having waited so long to formally challenge Centillion's action, Qwest can hardly say that it has been prejudiced by the filing of the complaint. Moreover, Qwest is not prejudiced by the factual deficiency because Centillion has made clear to Qwest from the start what aspects of Qwest's products Centillion claims infringes each element of the '270 patent's claims. In other words, Qwest has always been on notice that Centillion considers certain features of Qwest's software products to infringe certain elements of the '270 patent's claims. In addition, because Qwest makes no specific denials of infringement, it cannot say it has been prejudiced by Centillion's inferences. For these reasons, the Court finds that no sanctions are appropriate.

**\*5** Finally, Centillion requested that the Court find

Qwest's instant motion frivolous and appropriately sanction Qwest for its dilatory rather than substantive filing. Having found at least a portion of Qwest's argument persuasive, the Court declines Centillion's invitation to find Qwest's motion frivolous to the point of warranting sanctions.

## II. *CONCLUSION*

For the foregoing reasons, the Court DENIES defendants', Qwest Communications International, Qwest Corporation, and Qwest Communications Corporation, and counterclaim plaintiff's, Qwest Communications Corporation, Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11. Plaintiff's, Centillion Data Systems LLC, Motion to Maintain Under Seal Exhibits for *In Camera* Inspection is GRANTED.

IT IS SO ORDERED.

S.D.Ind.,2006.
Centillion Data Systems, LLC v. Convergys Corp.
Slip Copy, 2006 WL 20777 (S.D.Ind.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1436261 (Trial Motion, Memorandum and Affidavit) Convergys' Reply in Support of Its Motion to Compel Discovery (Apr. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1173272 (Trial Motion, Memorandum and Affidavit) Centillion Data Systems, LLC's Brief in Opposition to Defendant Convergys Corp.'s Motion to Compel Discovery (Mar. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 1461473 () Declaration of Jack D. Grimes, Ph.D. in support of Centillion Data Systems' Claim Construction Reply Brief (Mar. 21, 2006) Original Image of this Document (PDF)
• 2006 WL 1173271 (Trial Motion, Memorandum and Affidavit) Convergys' Memorandum in Support of its Motion to Compel Discovery (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1113687 (Trial Motion, Memorandum and Affidavit) Qwest and Convergys's Answering Memorandum on Claim Construction (Mar. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 1461472 () Declaration of Dr. H.E. Dun-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 20777 (S.D.Ind.)
**(Cite as: Slip Copy)**

smore in Support of Qwest's Opposition to Centil-
lion's Opening Claim Construction Brief (Mar. 7,
2006) Original Image of this Document (PDF)

• 2005 WL 3605900 (Trial Motion, Memorandum
and Affidavit) Centillion's Opposition to Qwest's Mo-
tion for Sanctions Pursuant to Fed.R.Civ.P. 11 (Nov.
28, 2005) Original Image of this Document (PDF)

• 2005 WL 3605899 (Trial Motion, Memorandum
and Affidavit) Memorandum in Support of Motion
for Sanctions Pursuant to Fed. R. Civ. P. 11 (Nov. 9,
2005) Original Image of this Document (PDF)

• 1:04cv00073 (Docket) (Jan. 12, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit I

AKIN GUMP
STRAUSS HAUER & FELD LLP

Attorneys at Law

Virginia Chan
VChan@akingump.com
(202) 887-5276

September 29, 2006

**Via E-Mail and UPS**
André J. Bahou, Esquire
Robins, Kaplan, Miller & Ciresi L.L.P.
Suite 1200
1801 K Street, N.W.
Washington, DC 20006-1307

Re: *Prism Technologies LLC v. VeriSign, Inc., et al.*
Civil Action No. 1:05-CV-00214-JJF

Dear Mr. Bahou:

Enclosed please VeriSign's production of documents bearing the Bates numbers VERI-1597029 through VERI-1602805.

Please contact Daniel Yonan if you have any questions.

Very truly yours,

Virginia Chan
Paralegal

Enclosures
cc: Daniel E. Yonan, Esq. (w/o enclosure)