## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PRISM TECHNOLOGIES LLC

      Plaintiff,

v.

VERISIGN, INC., RSA SECURITY, INC.,
NETEGRITY, INC., COMPUTER
ASSOCIATES INTERNATIONAL, INC.,
and JOHNSON & JOHNSON SERVICES,
INC.,

      Defendants.

Civil Action No. 05-214-JJF

**REDACTED VERSION**

## PLAINTIFF PRISM TECHNOLOGIES LLC'S
## CLAIM CONSTRUCTION ANSWERING BRIEF

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899-5130
(302) 655-5000
rkirk@bayardfirm.com
astitzer@bayardfirm.com
ATTORNEYS FOR PLAINTIFF
PRISM TECHNOLOGIES LLC

OF COUNSEL:

Dirk D. Thomas
Robert A. Auchter
Kenneth A. Freeling
André J. Bahou
Aziz Burgy
ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
1801 K Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 775-0725

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT AND SUMMARY OF PRISM'S
      ANSWER...........................................................................................................1

II.   ARGUMENT.......................................................................................................5

      A.    THIS COURT SHOULD REJECT EACH OF DEFENDANTS'
            PROPOSED CLAIM CONSTRUCTIONS AS CONTRARY TO
            STANDARD RULES OF CLAIM INTERPRETATION AND TO
            THE INTRINSIC EVIDENCE OF RECORD.............................................5

            1.    Defendants' definitions of the "hardware key" and
                  "connected" are narrower than the claims and the
                  specification permit or require...........................................................5

                  a.    The claims require only that the hardware key be
                        connected to the subscriber client computer.........................5

                  b.    The inventors recognized that "connection" does
                        not mean "physical attachment" ..........................................6

            2.    Defendants' definition of "predetermined digital
                  identification" reads unnecessary limitations into that term.............7

            3.    Defendants impermissibly attempt to limit "to thereby
                  confirm that said [or a] hardware key is connected to said
                  subscriber client computer" to re-authentication only......................8

                  a.    Both authentication and re-authentication invoke
                        the same processes and hardware ........................................9

                  b.    The '416 patent inventors never distinguished their
                        invention over the prior art based on "re-
                        authentication," and claim differentiation strongly
                        cautions against reading claims 1 or 24 to require
                        re-authentication ...............................................................10

            4.    Defendants' definition of "operating session" is in
                  contradiction to the plain claim language ......................................11

            5.    Defendants urge the Court to adopt a meaning for
                  "subscriber" that contradicts their own understanding of the
                  term ...............................................................................................12

            6.    Defendants impermissibly attempt to read limitations from
                  the specification into the definition of "subscriber client
                  computer"......................................................................................14

            7.    "Identity data" need not include more than the
                  "predetermined digital identification," and claim
                  differentiation strongly cautions against interpreting this
                  term to require any specific data....................................................15

8.    "Part of Said Identity Data" may be an entire part ........................17

9.    The "first server computer" need not store all the protected computer resources and need only act as a gatekeeper to control access to those resources ....................................................17

10.   "Selected computer resources of at least a [or said] first server computer" are not necessarily located on the first server computer ...............................................................................20

11.   Defendants' definition of the function of the "client software means" includes a temporal element that is not part of the function of this means clause .........................................20

12.   Defendants' definitions of the functions of the "server software means" include a temporal element that is not part of the function of this means clause...................................................22

13.   Defendants' definition of the function of the "clearinghouse means" in claim 1 includes a temporal or event-triggering element that is not part of the function of this means clause..............................................................................22

14.   Claim 24 is not a means-plus-function claim under 35 U.S.C. § 112, ¶ 6...............................................................................23

15.   The specification sufficiently describes structure corresponding to the "means" elements of claim 1 .......................24

16.   Defendants' proposed interpretation of "untrusted network" reads an additional and unnecessary limitation into a term expressly defined in the patent specification ...................................26

17.   "Permitting access" may be different than "authorizing use" and no basis exists to paraphrase a claim term that is clear on its face ...........................................................................26

III.    CONCLUSION.............................................................................................27

# TABLE OF AUTHORITIES

## Cases

*ABB Automation, Inc. v. Schlumberger Res. Mgmt. Services*,
  2003 U.S. Dist. LEXIS 7597 (D. Del. May 6, 2003) ..................................................... 25

*Atmel Corp. v. Information Storage Devices, Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999) ................................................................................... 24

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
  303 F.3d 1332 (Fed. Cir. 2002) ............................................................................. 21, 22

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) ............................................................................. 24, 25

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
  381 F.3d 1371 (Fed. Cir. 2004) ................................................................................... 23

*Generation II Orthotics Inc. v. Medical Tech. Inc.*,
  263 F.3d 1356 (Fed. Cir. 2001) ................................................................................... 23

*Liebel-Flarsheim v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ..................................................................................... 11

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003), *cert. denied*, 541 U.S. 959 (2004) ............................. 24

*O.I. Corp. v. Tekmar Co.*,
  115 F.3d 1576 (Fed. Cir. 1997) ......................................................................... 21, 22, 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..................................................................................... 1

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................................... 1

*Reiker Ent., Inc. v. Fan Brace, Inc.*,
  2000 U.S. App. LEXIS 20881(Fed. Cir. Aug. 16, 2000) ................................................ 21

*Varco, L.P. v. Pason Sys. USA Corp.*,
  436 F.3d 1368 (Fed. Cir. 2006) ................................................................................. 7, 14

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................... 19

## <u>Statutes</u>

35 U.S.C. § 112, ¶ 2 ........................................................................................... 25

35 U.S.C. § 112, ¶ 6 ..................................................................................... 23, 25

## <u>Other Authorities</u>

*American Heritage Dictionary* (4th ed. 2000) ................................................... 12

*McGraw-Hill Dictionary of Scientific and Technical Terms* (5th ed. 1994) ..................... 14

*Webster's II New Riverside University Dictionary* (1984) ......................................... 18, 19

*Webster's New Twentieth Century Dictionary* (2d ed. 1983) ........................................... 11

Pursuant to this Court's May 10, 2006 Scheduling Order (D.I. 109), plaintiff,
Prism Technologies LLC ("Prism") hereby submits this answering brief to defendants'
opening *Markman* brief. (D.I. 268). Prism's Opening *Markman* Brief is at D.I. 266.

## I.     PRELIMINARY STATEMENT AND SUMMARY OF PRISM'S ANSWER

Patent claim language is to be given the "ordinary and customary meaning" that it
would have had "to a person of ordinary skill in the art in question at the time of the
invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The only
exceptions to this rule arise where the intrinsic record (the patent claims, the patent
specification, and the prosecution history) demonstrates that: (i) the inventor acted as his
own lexicographer by giving a "special definition … to a claim term … that differs from
the meaning it would otherwise possess;" or (ii) that the inventor made an "intentional
disclaimer, or disavowal of claim scope" that would narrow a claim term's usual
meaning. *Id.* at 1316 (citation omitted). Any disavowal of claim scope in the intrinsic
record must be "unequivocal" and "both clear and unmistakable." *Omega Eng'g, Inc. v.
Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003). Finally, a patent claim should
not be limited to the embodiments shown in the specification. *Phillips*, 415 F.3d at 1323
("although the specification often describes very specific embodiments of the invention,"
the Federal Circuit has "repeatedly warned against confining the claims to those
embodiments.").

Defendants' *Markman* brief asks this Court to depart from these basic tenets of
claim construction. Specifically, and by way of example, defendants' proffered claim
constructions suffer fatal deficiencies in at least the following ways:

1.    Defendants seek interpretations that depart from how the terms are defined within the claim itself. For example, claim 1 recites that the first server has the capability to forward the "identity data" of the subscriber client computer to the clearinghouse means "*at the beginning of an operating session.*" Method claim 24 also recites the step of forwarding the subscriber identity data to the clearinghouse "*at the beginning of an operating session.*" Since the clearinghouse cannot authenticate the subscriber until it receives that "identity data," the "operating session" begins – by definition in the claims – *before* the subscriber is authenticated. Yet defendants ask this Court to ignore how the *claims* define when the operating session begins and, instead, rule that the "operating session" does not begin until *after* the subscriber is authenticated. By defining the operating session in this way, defendants attempt to have the claims interpreted to require "re-authentication."

2.    Defendants seek to read limitations from the embodiments of the invention described in the patent specification into the claims. Specifically, defendants ask this Court to rule that claim 1 *requires* the ability to (or claim 24 requires the step of) re-authenticate the subscriber by confirming that the hardware key remains connected to the client computer *during* an operating session. But that capability and that step are specifically recited in *dependent* claims 13 and 26, which describe features of the claimed invention where the subscriber's "predetermined digital identification" is requested "during an operating session" and after initial authentication. The doctrine of claim

2

differentiation strongly opposes reading this re-authentication feature into independent claims 1 or 24, which do not recite or require that feature.

Similarly, defendants seek to have independent claims 1 and 24 limited to a system where the subscriber (also referred to simply as a "user" in the '416 patent) pays a fee for access to the protected computer resources. But dependent claims 10 and 30 specifically recite this concept of "billing" for access, and no such billing requirement is recited in either of independent claims 1 or 24 from which claim 10 and claim 30 (via claim 28) depend, respectively. The doctrine of claim differentiation again strongly cautions against interpreting independent claims 1 or 24 as defendants propose.

Likewise, defendants ask this Court to interpret the "identity data" of the subscriber client computer to somehow require what the '416 patent specification refers to as two-factor authentication. According to defendants, the "predetermined digital identification" generated by the hardware key is one authentication factor that comprises part of the subscriber "identity data," and the subscriber's user name and password comprise the remainder of the identity data and the second factor of authentication. However, independent claims 1 and 24 do not recite or require two-factor authentication, and dependent claims 3 and 25 specifically add the subscriber's user name and password as limitations on the "identity data." Thus, the doctrine of claim differentiation counsels against defendants' proposed interpretation of this claim term also.

3.    Defendants seek to have the claims interpreted in a way that excludes the preferred embodiments of the invention as described and illustrated

3

in the patent specification and drawings. Specifically, defendants ask this Court to rule that the "selected [i.e., protected] computer resources" must reside on the claimed "first server computer" and that those computer resources cannot reside on other computers to which the "first server computer" controls access. But the parties both recognize that the claimed "first server computer" is described, depicted, and embodied in the '416 patent by access sever 34, which is shown in Figs. 3 and 4 and identified as the preferred embodiment of the invention. ('416 patent at 2:37-43). These drawings illustrate that the "Protected Content" to which the patented system and method control access (the "selected computer resources" of the claims) reside *outside of* the box defining access server 34. In fact, nowhere in the '416 patent is the "Protected Content" illustrated as residing *on* access server 34 (the "first server" of the claims), although the '416 patent does not preclude storing some "Protected Content" on the first server.

Defendants also attempt to limit certain of the claim terms to the preferred embodiments by asserting that the inventors referred to certain features of those embodiments as being important to the "present invention." But the '416 patent inventors never *disclaimed* a scope of protection for their invention that the words of the claims otherwise provide, and certainly did not do so with the necessary "clear and unmistakable" surrender that Federal Circuit authority requires to support a finding of disclaimer. The inventors were careful to describe the embodiments of their invention depicted in the drawings as only their "preferred embodiments" ('416 patent at 2:39-3:15), and to the descriptions in the

4

specifications as merely "various embodiments" of the invention. ('416 patent at 35:15-21).

These are only examples of why the claim interpretations urged by defendants should be rejected. Prism addresses each of the specific claim interpretations below and, in conjunction with the reasoning and authorities described in its Opening Brief (D.I. 266), explains why defendants' proffered interpretations should be rejected.

## II.    ARGUMENT

### A.    THIS COURT SHOULD REJECT EACH OF DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS AS CONTRARY TO STANDARD RULES OF CLAIM INTERPRETATION AND TO THE INTRINSIC EVIDENCE OF RECORD

#### 1.    Defendants' definitions of the "hardware key" and "connected" are narrower than the claims and the specification permit or require

| "hardware key" | |
|---|---|
| **Prism:** A device or object from which data may be read or emitted. | **Defendants:** External hardware device that physically attaches to the subscriber client computer and contains the predetermined digital identification microcoded into it. |
| "connected" | |
| **Prism:** In communication with, inserted in, attached to, or built in. | **Defendants:** Physically attached. |

##### a.    The claims require only that the hardware key be connected to the subscriber client computer

Claim 1 requires only "at least one hardware key connected to the subscriber client computer" ('416 patent at 35:47-48)[1] and server software means adapted to "confirm that said hardware key is connected to said subscriber client computer." ('416 patent at 35:55-56). Claim 24 recites the step of requiring a subscriber client computer to forward a digital identification to the first server "to thereby confirm that a hardware key

---

[1]    Citations in the form (*Col. line*) refer to column and line numbers of the '416 patent.

is connected to said subscriber client computer." ('416 patent at 38:54-55). This connection between the hardware key and the subscriber client computer is of such a nature that the digital ID can be *read* from the key ('416 patent at 17:26-28; Fig. 18 at block 146). The claims do not *require* any specific type of connection, e.g., physical attachment. Most importantly, the patent itself gives specific alternatives to a hardware key that is physically attached to a computer. These alternatives – ignored by defendants – include "a credit card, a key, an ATM card, or the like which is known to have been assigned and given to a specific person." ('416 patent at 22:1-5). In fact, the '416 patent specifically states that the hardware key may be "built into the computer" as distinguished from a physical key that is "attached" to the computer. ('416 patent at 21:51-53).

Defendants also attempt to have the term "hardware key" interpreted to require that the predetermined digital ID be "microcoded" into it. But claim 1 only recites that the hardware key be "adapted to generate a predetermined digital identification." ('416 patent at 35:48-49). Claim 24 includes no recitation at all about what is stored on or generated by the hardware key, and neither claim 1 nor claim 24 say anything about "micro-coding."

### b.    The inventors recognized that "connection" does not mean "physical attachment"

The '416 patent states that the hardware key "attaches to" the personal computer of the subscriber, "*preferably* on the parallel port" ('416 patent at 21:43, emphasis added), and then goes on to say that the key may be "built into the computer" or could be "a credit card, a key, an ATM card, or the like. . . ." ('416 patent at 21:52-22:5). The claims at most require that the hardware key be connected to the computer in such a way

that data can be read or emitted. Defendants also argue that the inventors did not

describe any embodiment of a hardware key that connects wirelessly to the computer.

(D.I. 268 at 10). But patent claims are not limited to only those features described in the

specification, and later-developed technology is commonly allowed to be covered by

broad claim terms. *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1375-76 (Fed.

Cir. 2006) (citing *Sri Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed.

Cir. 1985) ("The law 'does not require that an applicant describe in his specification

every conceivable and possible future embodiment of his invention.'") (*en banc*)).

    2.    **Defendants' definition of "<u>predetermined digital identification</u>" reads unnecessary limitations into that term**

| "predetermined digital identification" | |
|---|---|
| **Prism:** Digital data whose value is known in advance or calculated at the moment. | **Defendants:** A data string that is pre-assigned and unique to the hardware key and that cannot be shared with other users. |

Defendants seek to have this Court add the qualifications that the predetermined

digital identification be "unique" and that it "cannot be shared with other users." But the

claim does not include those additional limitations and defendants cite no intrinsic

evidence to support such a narrowing definition. The only basis for defendants' addition

is their own circular reasoning, displaying a misunderstanding of how the invention

works: "it is fundamental to the Applicants' claimed invention that the predetermined

digital identification cannot be shared with other users." (D.I. 268 at 11). The

specification states, however, only that it was the "traditional user name and password"

that were vulnerable to sharing and fraud. (D.I. 268 at 12; 1:33-34). The use of a

hardware key for authentication improved upon the traditional user name and password

scheme since a user would know when his hardware key had been stolen, but would not necessarily know that his user name and password had been compromised.

Moreover, nothing stated by the '416 patent inventors about their invention *precludes* the sharing of a hardware key amongst an authorized user group. The hardware key need not identify anything other than itself, and it can preferably (but not necessarily) be associated with a particular user or person. Once connected to a client computer device, and once the predetermined digital identification is read from the hardware key, it identifies the client computer that the subscriber happens to be using.

3. **Defendants impermissibly attempt to limit "to thereby confirm that said [or a] hardware key is connected to said subscriber client computer" to re-authentication only**

| "to thereby confirm that said [or a] hardware key is connected to said subscriber client computer" | |
|---|---|
| **Prism:**<br>Claim 1 : Part of the recited function of the server software means (see construction of server software means).<br>Claim 24: Confirming that the hardware key is connected (see definition for connected) to the subscriber client computer at a given time. | **Defendants:** To verify after initial authentication, but before session termination, that the hardware key remains physically attached to the subscriber client computer [re-authentication]. |

Claim 1 expressly recites that the first server is adapted to forward the "identity data" of the subscriber client computer to the clearinghouse "*at the beginning of an operating session.*" ('416 patent at 35:36-40). Claim 1 also recites that the hardware key is adapted to generate a "predetermined digital identification" that is part of the subscriber's "identity data." (*Id.* at 35:48-50). Thus, by the express words of the claim, the hardware key must be "connected" to the subscriber client computer "at the beginning of an operating session" so that the "predetermined digital identification" can be read from the hardware key and forwarded to the clearinghouse for authentication. Claim 1,

therefore, reads on *initial authentication* and is not limited to re-authentication by this

claim term or any other claim term. The same applies to claim 24 and the step of

"requiring a subscriber client computer to forward a predetermined digital

identification . . . to thereby confirm that a hardware key is connected to said subscriber

client computer." That step reads on initial authentication and is not limited to re-

authentication.[2]

### a.    Both authentication and re-authentication invoke the same processes and hardware

Defendants attempt to distinguish between authentication and re-authentication by

stating that it is the server computer that performs the latter, while it is the clearinghouse

that performs the former. (D.I. 268 at 14). But defendants' argument assumes that the

subscriber's predetermined digital identification is *only* forwarded to the first server

during re-authentication, which is simply not the case. The subscriber's predetermined

digital identification is also sent to the first server *during initial authentication* (i.e.,

during log-in) as specifically shown and described in Fig. 18 of the '416 patent. Thus,

neither claim 1 nor claim 24 are *limited* to re-authentication simply because they require

confirmation that the hardware key is connected to the subscriber computer. That

confirmation occurs during initial authentication as well.

---

[2]    Moreover, since the '416 patent specifically describes that the hardware key can be "built into" the client computer, ('416 patent at 21:51-53), there is no reason to implicitly limit the claimed invention to a hardware key that can be physically attached and detached from the computer. In instances where the hardware key is "built into" the computer, there is no reason to check to see if it remains "attached" during the operating session. It is never removed – it is built in.

      b.      **The'416 patent inventors never distinguished their invention over the prior art based on "re-authentication," and claim differentiation strongly cautions against reading claims 1 or 24 to require re-authentication**

Re-authentication had nothing to do with the examiner's allowance of claims 1 and 24 and is therefore not an essential part of the claimed invention. In his reasons for allowing these claims, the Examiner stated:

> The closest prior art, Stefik (US 5,629,980) shows a system for controlling access to digital materials over a network by using a usage rights criteria for each subscriber or buyer. However, Stefik fails to disclose "the server requesting digital identification information from the client during an operating session and using the information to confirm that the hardware key associated with the client computer is connected to the subscriber's client computer." This distinct feature has been added to independent claims 1 and 28 and renders them allowable.[3]

This statement by the Examiner does not distinguish between initial authentication and any subsequent re-authentication. It focuses solely on the fact that the prior art *Stefik* patent does not disclose a server that requests digital identification information from the client *at any time* to thereby confirm the presence of the hardware key. Claims 1 and 24 each define the "operating session" as *beginning* when the client computer's "identity data" is forwarded to the clearinghouse, i.e., before the clearinghouse has authenticated the subscriber. Thus, the Examiner's reference to "during an operating session" includes initial authentication. Moreover, dependent claim 13 (which depends directly from claim 1) and dependent claim 26 (which depends from claim 24) both define the feature of querying the client computer to generate its digital

---

[3]    D.I. 269 at Ex. 2, Bates No. P031314-15 (emphasis in original). These cited pages of the prosecution history appear at the end of the Examiner's Sept. 25, 2000 Office Action. Then-pending application claim 28 eventually issued as claim 24 of the '416 patent. (D.I. 269, Ex. 2 at P031304).

identification "during an operating session" (claims 13 and 26) and "subsequent to initial authentication" (claim 26). Thus, dependent claims 13 and 26 recite the concept of re-authentication and, under the doctrine of claim differentiation, that concept should not be read in to claims 1 and 24. *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) (using the doctrine of claim differentiation to undermine accused infringer's contention that all of the claims of the patents-in-suit require the presence of a pressure jacket).

### 4.    Defendants' definition of "<u>operating session</u>" is in contradiction to the plain claim language

| "operating session" | |
|---|---|
| **Prism:** A series of interactions between a subscriber client computer and a server computer during which access to selected computer resources is requested. | **Defendants:** A period of communication between the subscriber client computer and the first server computer that follows successful initial authentication and ends upon termination of authorized access, such as upon a log-out or time-out due to prolonged inactivity. |

Claims 1 and 24 require the forwarding of the subscriber's identity data to the clearinghouse means "at the beginning of an operating session in which access to selected computer resources . . . is requested." ('416 patent at 35:38-41; 38:49-51). Neither "at" nor "beginning" are technical terms and no intrinsic evidence exists to show that the inventors intended to define these words with other than their conventional meanings. Conventionally, "at" is used to indicate a location or position, as in time or place, and "beginning" is conventionally "the time or place of starting." *Webster's New Twentieth Century Dictionary* (2nd ed. 1983) (Ex. A). Therefore, the claim language states clearly when an operating session begins – when the subscriber client computer identity data is forwarded to the clearinghouse – and such forwarding of identity data occurs *before* the

11

clearinghouse has authenticated the subscriber/user, not *after* initial authentication as

defendants propose.[4]

### 5. Defendants urge the Court to adopt a meaning for "subscriber" that contradicts their own understanding of the term

| "subscriber" | |
|---|---|
| **Prism:** A person, organization, or computer registered to be allowed access to [said] selected computer resources. The term subscriber and the term user are applied synonymously throughout the specification and drawings, and these terms have the same meaning. | **Defendants:** A user that pays an information provider to receive access to restricted computer resources. |

The term "subscriber" in the field of computers and networks refers to someone

authorized to receive information, and does not necessarily require payment of a fee.[5]

The '416 patent uses the terms "subscriber" and "user" synonymously, thereby

establishing that they were intended to mean the same thing, as pointed out in Prism's

Opening *Markman* Brief. (D.I. 266 at 26). Defendants ask the Court to add the

requirement of payment to the definition of "subscriber." In doing so, defendants

---

[4]    Although the abstract of the '416 patent may refer to an "operating session" that starts after user authentication, the *claims* specifically define the "operating session" as beginning the request for access when the subscriber client computer identity data is forwarded to the clearinghouse, i.e., *before* authentication has occurred. Regardless, the invention does not depend on when the "operating session" is defined to begin. A user of the claimed invention might begin to time an operating session upon a request for access to "Protected Content," upon authentication of the user, or at some other time. This dispute about when an "operating session" begins arises solely as a result of defendants' attempt to read a "re-authentication" limitation into the independent claims. But the doctrine of claim differentiation strongly suggests that independent claims 1 and 24 do not require such a re-authentication limitation, as does the fact that the Examiner's statement of reasons for allowance apply to initial authentication of the presence of the hardware key and are not specific to re-authentication. (*See* Section II.3.b *supra*).

[5]    *See*, Ex. B, *American Heritage Dictionary* (4th ed. 2000), which defines "subscribe" in the context of the Internet as: "4) To authorize (someone) to receive or access electronic texts or services, especially over the Internet."

contravene their own use of the word in the context of their accused products, as shown below.

Defendants themselves use the word "subscriber" consistent with Prism's definition. For example, defendant JJSI requires J&J employees who apply for a "digital identity" (which allows them to access JJSI's protected computer resources) to sign what JJSI calls a "JJEDS Digital Identity Subscriber Agreement" (Ex. C at JJ008813). The signature line of the agreement is labeled SUBSCRIBER SIGNATURE, and is prefaced by a paragraph that reads:

> IN WITNESS WHEREOF, SUBSCRIBER has caused this Digital Certificate Subscriber Agreement to be duly executed as of the date set forth below.

Obviously, JJSI does not charge its employees (or those of its affiliates) a fee to access JJSI's protected computer resources, and the Subscriber Agreement reflects no such charge.

Likewise, defendant Netegrity (a wholly-owned subsidiary of defendant Computer Associates), in its "Policy Design" document for the accused infringing SiteMinder product, uses the term "subscriber" to refer to a user of the accused system and does not limit that term to a user who pays a subscription fee. (Ex. D at CA000610). Similarly, defendant VeriSign uses a dictionary of terms that defines "subscriber" as a user of a computer network and not necessarily one who pays a fee. (Ex. E at VERI-0054602).

While the inventors' preferred embodiment of the invention at the time they filed the '416 patent application may have incorporated the ability to bill subscribers for access to protected computer resources, that potential feature of the invention was not recited in

independent claims 1 and 24. In fact, dependent claims 10 and 30 specifically recite that billing feature. Here again, the doctrine of claim differentiation strongly cautions against adopting defendants' proposed interpretation of this claim term.

> **6.    Defendants impermissibly attempt to read limitations from the specification into the definition of "<u>subscriber client computer</u>"**

| "subscriber client computer" | |
|---|---|
| **Prism:** A programmable electronic device that can store, retrieve, and process data used by a subscriber to attempt to access said selected computer resources. | **Defendants:** A computer that a subscriber uses to access selected computer resources of the first server computer. |

The McGraw-Hill Dictionary of Scientific and Technical Terms defines a "computer" as "[a] device that receives, processes, and presents data. . . ." *McGraw-Hill Dictionary of Scientific and Technical Terms* (5th ed. 1994) (Ex. F). Defendants ask this Court to limit the term "subscriber client computer" to a PC. (D.I. 268 at 22). Defendants, however, can point to no intrinsic evidence that the inventors of the '416 patent intended "computer" to necessarily be limited to a PC. Since 1997, when the inventors filed their application for the '416 patent, devices that can act as computers and perform the functions and steps defined in the asserted claims have expanded well beyond a desktop or laptop PC. The fact that the preferred embodiment of the subscriber client computer in 1997 may have been a PC does not mean that the claims are so limited. *See Varco, L.P.*, 436 F.3d at 1375-76.

7.    "**Identity data**" need not include more than the "predetermined digital identification," and claim differentiation strongly cautions against interpreting this term to require any specific data

| "Identity data" | |
|---|---|
| **Prism:** Data sufficient for the patented system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access said selected computer resources. | **Defendants:** Information that (a) uniquely identifies the subscriber client computer and (b) which includes the predetermined digital identification from the hardware key as well as additional information not stored on the hardware key. |

Initially, it is important to note that claims 1 and 24 define the "identity data" differently, notwithstanding defendants' attempts to treat both claims the same. Specifically, claim 1 defines the "predetermined digital identification" generated by the hardware key as part of the "identity data." In contrast, claim 24 does *not* define the "predetermined digital identification" as being part of the "identity data," although claim 24 does not exclude that. Thus, defendants' argument that the "identity data" recited in claim 1 must include something in addition to the "predetermined digital identification" generated by the hardware key (because that digital ID is defined in claim 1 as "part of" the identity data) lacks any support whatsoever in relation to claim 24, which does not include the "part of" modifier.

Moreover, with respect to claim 1, no reason exists to conclude that the "identity data" *must* include data separate and apart from the predetermined digital ID. Defendants attempt to support this part of their claim interpretation by pointing out that one embodiment of the invention described in the '416 patent includes so-called "two-factor" authentication. (D.I. 268 at 25-27). But neither claim 1 nor claim 24 are limited to two-factor authentication. In fact, dependent claims 3 and 25 specifically recite that the "identity data" include the information that defendants point to as the second factor of

15

authentication, i.e., a password and user name. Thus, the doctrine of claim differentiation again strongly cautions against adopting defendants' proffered interpretation of this term.

Defendants also attempt to limit the "identity data" to data that uniquely identifies a computer and excludes data that might uniquely identify a user or even a group of users. But the "identity data" as recited in claim 1 includes the "predetermined digital identification" that the hardware key is adapted to generate. Nowhere does the '416 patent describe or suggest that the hardware key must, of necessity, be uniquely associated with one specific computer. That is certainly a possibility, such as where the hardware key is built in to the computer. ('416 patent at 21:51-53). But in instances where the hardware key is a separate device, the subscriber client computer only has the claimed "identity data" when it "connects" to the hardware key and reads the predetermined digital identification from the key.

Defendants also attempt to make what is an irrelevant distinction between authentication of hardware as opposed to authentication of the user of the hardware. Within the limits of trust under which the patented system must operate (i.e., under the assumption that the hardware key is actually in possession of the person who should have it), when an individual or organizational subscriber's hardware key, for example, is connected to any computer, that computer becomes that subscriber's "client computer." Thus, the "identity data" that is associated with any particular client computer may be derived from data stored on or generated by the hardware key – which hardware key is possessed by the user/subscriber. No reason exists to limit claim 1 (or claim 24) to any particular client computer other than the client computer that the subscriber happens to be using at any particular time to gain access to protected resources.

8.    **"Part of Said Identity Data" may be an entire part**

| "Part Of Said Identity Data" | |
|---|---|
| **Prism:** A portion (or the entirety) of the identity data. | **Defendants:** Some, but not all, of the identity data of the subscriber client computer. |

As noted in the immediately preceding paragraph, defendants improperly attempt to limit claim 1 (which is the only claim that recites the "part of" term) to require that the "identity data" *must* include data in addition to the "predetermined digital identification." Defendants' argument in this regard amounts to an improper attempt to read two-factor authentication in to claim 1. The doctrine of claim differentiation (via dependent claims 3 and 25), however, strongly rebuts any such interpretation of either claim 1 or claim 24, as does the proscription against reading limitations from a preferred embodiment in to the claims.

9.    **The "first server computer" need not store all the protected computer resources and need only act as a gatekeeper to control access to those resources**

| "first server computer" | |
|---|---|
| **Prism**: A computer that makes available information or other resources. | **Defendants**: A computer that stores the selected computer resources accessed by a subscriber client computer. |

Defendants urge this Court to rule that the first server computer must actually *store* the computer resources to which a subscriber seeks access. But that interpretation would preclude the claims from reading on the preferred embodiments of the invention described and shown in the '416 patent. Certainly, the first server computer "communicates the protected content to the subscriber" ('416 patent at 6:29-31), or "send[s] the protected content to the user." ('416 patent at Fig. 19, block 186; 18:6-7). But the *way* the first server computer does this in the embodiment illustrated in the

drawings and described in the patent specification is by instructing a "Service Function" to make those resources available. In Figure 3, for example, the first server computer is the block labeled 34. The "Protected Contents" are outside of block 34, and the lines, with arrows, show that the path over which "Protected Contents" can be sent to a subscriber passes through the "Service Function" block, not through server 34. When a subscriber has been authenticated, the first server computer 34 communicates, through the server application 44, to the "Service Function" block. This communication is an instruction to allow the "Protected Contents" to flow to the subscriber 36.

Similarly, in the embodiment illustrated in Fig. 4, the "Protected Content" resides *outside* the first server 34 and is accessed by the server 34 through the "Service Function," which also resides outside of server 34. Figure 4 shows that the path for the "Protected Content" to reach the subscriber may be from the "Service Function" and through server 34, while Fig. 3 shows that an alternative path is for the "Service Function" to be instructed by server 34 to send the "Protected Contents" directly to the user across the Internet. The patent instructs that, upon authentication, "[t]he server application invokes the appropriate service function to send the protected content to the user." ('416 patent at 18:5-7 and Fig. 19, block 186). That is, the server application "invokes"[6] the service function to send the "Protected Content," remotely located, to the subscriber. The precise path through which the "Protected Contents" are transmitted to the subscriber client computer, and the location where those "Protected Contents" are stored, is not described in the '416 patent. Rather, the drawings show that the system

---

[6]    "invoke: 1. To call on for aid, support, or inspiration." *Webster's II New Riverside University Dictionary* (1984) (Ex. G).

architecture for that storage and retrieval of the "Protected Contents" could take multiple forms and is left to the discretion of the system implementer.

Defendants' argument is based on misinterpretation of a single word in the preambles of claims 1 and 24. For example, the preamble of claim 24 recites:

> A method of controlling access to selected computer resources *of* at least a first server computer by at least one subscriber client computer . . . without necessarily controlling access to other computer resources provided by the first server computer. . . .

('416 patent at 38:35-40; emphasis added). While defendants prefer to interpret "of" as meaning "contained in," the word "of" has over twenty listed meanings, including "associated with," "identified by," and "with reference to." *Webster's II New Riverside University Dictionary* (1984) (Ex. G). In light of the specific illustrations in the '416 patent that show the "Protected Content" residing outside of the first server computer, it is clear that the defendants have chosen the wrong interpretation of the word "of." Defendants' proposed interpretation excludes the preferred embodiments of the invention specifically illustrated in Figs. 3 and 4 of the '416 patent, which show the "Protected Content" residing outside of the box which defines the first server 34. Claim interpretations that exclude the preferred embodiments described in the patent are seldom, if ever, correct. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

Additionally, defendants' reference to Fig. 2 of the '416 patent to argue that the selected computer resources originate from the first server misses the point. Fig. 2 merely illustrates that the "Protected Content" may be transmitted to the subscriber *through* the first server, it does not *require* the "Protected Content" to *originate* at the first server, although that is a possibility. Moreover, from a practical standpoint, there is

no reason to believe that the inventors intended to limit the *amount* of "Protected Content" to what could be stored on a single server computer. The invention resides in a system and method for controlling *access* to computer resources, and is not limited by the *volume* of such computer resources.

> **10.** **"Selected computer resources of at least a [or said] first server computer" are not necessarily located on the first server computer**

| "selected computer resources of at least a [or said] first server computer" | |
|---|---|
| **Prism**: Computer services, applications, or content that can be accessed by (either directly or indirectly) said first server computer. | **Defendants**: The restricted resources requested by the subscriber client computer that are located on the first server computer. |

As demonstrated above, the '416 patent specification shows and describes that the "selected computer resources of at least a first server computer," in the context of claims 1 and 24 may, and preferably do, reside outside of the first server computer. The first server computer acts as a gatekeeper, controlling the operation of gates, such as the "Service Function," which allow subscribers to have access to those resources. ('416 patent at Fig. 19, block 186). As noted above, defendants' proposed interpretation of where the selected computer resources must reside would improperly exclude from the scope of the claims the preferred embodiments described and illustrated in the '416 patent.

> **11.** **Defendants' definition of the function of the "client software means" includes a temporal element that is not part of the function of this means clause**

As discussed in Prism's Opening *Markman* Brief, defendants' construction of this term not only states what the function of the client software means *is*, but *when* it must be performed. The Federal Circuit has explained that in identifying the function of a means

clause, statements in the claim as to *where* the function is performed are not part of the

function itself. *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997)

("Although the passage may act upon the slug by channeling it while it is being passed, it

is not the means that causes the passing. Rather, it is the place where the function occurs,

not the structure that accomplishes it."). Likewise, in *BBA Nonwovens Simpsonville, Inc.*

*v. Superior Nonwovens, LLC*, 303 F.3d 1332 (Fed. Cir. 2002), the Federal Circuit refused

to read the *function* of a means clause to include the recitation of *where* the function

occurred or *when* it occurred. *BBA Nonwovens Simpsonville*, 303 F.3d at 1343-44.

Specifically, the means-plus-function clause at issue in that case read:

> d) corona means cooperating with said attenuator and *positioned* for
> electro-statically charging the filaments so that repelling forces are
> induced in the filaments to more uniformly spread the filaments
> *before* they are deposited on said collection surface to form a web.
> *Id.* at 1343 (emphases added).

The defendant urged that the function of the "corona means" should include *where* the

corona means was *positioned* and *when* the filaments were deposited. *Id.* at 1344. The

district court and the Federal Circuit disagreed with defendant's position. The Federal

Circuit found that while these position and temporal limitations were certainly part of the

claim, they comprise "a separate limitation *not subject* to section 112, paragraph 6. What

the 'corona means' is and where it is located are two different things." *Id.*[7]

---

[7]    In an analogous, but unpublished, decision the Federal Circuit interpreted the function of a
means-plus-function claim term that recited a "support means . . for supporting the
interconnecting brace . . . *during and after* final expansion of the brace. . . ." *Reiker Ent , Inc. v.
Fan Brace, Inc* , 2000 U.S. App. LEXIS 20881, *4 (Fed. Cir. Aug. 16, 2000). When identifying
the function for the "support means," the Federal Circuit did not include the temporal limitation
that specified supporting the interconnecting brace "before and after" final expansion of the
brace. *Id.* at *11-12. Pursuant to Local Rule 7.1.3(G), Prism attaches a copy of this unpublished
decision as Ex. H.

12. **Defendants' definitions of the functions of the "<u>server software means</u>" include a temporal element that is not part of the function of this means clause**

Defendants make the same error in defining this term as they did in defining "client subscriber means" – they have impermissibly included within the recited function the *time* at which the function is performed. For the same reasons as discussed above and in Prism's Opening *Markman* Brief, the Court should adopt Prism's definition of the function of the "server software means."

Defendants do not contest Prism's definition of the second function of the "server software means" in claim 1.

13. **Defendants' definition of the function of the "<u>clearinghouse means</u>" in claim 1 includes a temporal or event-triggering element that is not part of the function of this means clause**

Defendants make the same mistake in their definitions of the functions of the "clearinghouse means" in claim 1 as they did in their definitions for the other means-plus-function clauses of claim 1 – they have impermissibly added an element that does not comprise part of the recited function. In this case, they equate the *stimulus that triggers performance of the function* to the function itself. The improperly added stimuli are: 1) the request for computer resources by the subscriber client computer; or 2) the successful authentication of the first server and subscriber client computers. Just as *O.I. Corp* and *BBA Nonwovens* show that the place where a function is performed or when it is performed is not part of the function itself, the stimulus that triggers the function is also not part of the function itself.

The functions of the clearinghouse means in claim 1 are not directed to determining when the recited functions should be performed. In other words, the claim

does not recite (hypothetically) "means for determining when a subscriber client computer has made a request for access to selected computer resources." Had the claims been so written, the function of the means clause might well include the algorithm used to detect the recited event. But that is not how the means clauses of claim 1 are written, and those means clauses should not be interpreted as if they had been so written.

### 14.    Claim 24 is not a means-plus-function claim under 35 U.S.C. § 112, ¶ 6

Defendants' argument that "clearinghouse means" in claim 24 is a means-plus-function limitation rests upon a misrepresentation of the presumptions dictated by "means" terminology. Claim 24 is a method claim in which three elements refer to operations involving a "clearinghouse means." For a method claim that does not use the phrases "means *for*" or "step *for*" (such as claim 24), there is a presumption that § 112, ¶ 6 does *not* apply. *See Generation II Orthotics Inc. v. Medical Tech. Inc.,* 263 F.3d 1356, 1368 (Fed. Cir. 2001); *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 381 F.3d 1371, 1382 (Fed. Cir. 2004). No basis exists to rebut this presumption that § 112, ¶ 6 *does not* apply to claim 24, or for this Court to otherwise interpret claim 24 as a means-plus-function claim, even though claim 1 should be so interpreted. "The mere fact that a method claim is drafted with language parallel to an apparatus claim with means-plus-function language does not mean that the method claim should be subject to an analysis under § 112, ¶ 6." *Generation II Orthotics,* 263 F.3d at 1368 (citation omitted). Each limitation of each claim must be independently reviewed to determine if it is subject to the requirements of § 112, ¶ 6. *Id.*

In performing an independent review, the Court must take into account the wording of claim 24. Here, unlike in claim 1, it is the steps to be taken, not the apparatus

involved, that is claimed. The "clearinghouse means" in claim 24 has no *function* specifically associated with it. The alleged functions identified by defendants are, in fact, the steps of the claimed method. For this claim, then, "clearinghouse means" must be interpreted according to the usual precepts of claim construction and as proposed by Prism in its Opening *Markman* Brief.

### 15.     The specification sufficiently describes structure corresponding to the "means" elements of claim 1

The '416 patent sufficiently describes both the algorithms and the hardware by which the "means" elements of claim 1 perform their functions. The computer algorithms are either explicitly described, or are implicit, and the description of the functions is sufficiently clear that one skilled in the art could determine what structures would be necessary to perform the recited functions. *See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999). The Federal Circuit, in *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed. Cir. 2003), *cert. denied*, 541 U.S. 959 (2004), held that "there would be no need for a disclosure of the specific program code if software were linked to the converting function and one skilled in the art would know the kind of program to use." Prism has identified those specific algorithms in its Opening *Markman* Brief, and defendants have not met their burden of establishing by clear and convincing evidence that a person of ordinary skill in the art could not discern those algorithms based on the detailed disclosures in the '416 patent. *See Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77, 1382 (Fed. Cir. 2001). Defendants have merely denied that the '416 patent includes a disclosure of any algorithms, but do not offer any support for that denial, e.g., expert testimony or the testimony of a person skilled in the art. Such denials do not suffice to meet defendants'

24

burden on this issue, which burden requires proof, by clear and convincing evidence, of the absence of any algorithm for performing the recited function since defendants ask this Court to invalidate the claims under § 112, ¶ 2 and ¶ 6. *Budde*, 250 F.3d at 1376-77.

As pointed out in Prism's Opening *Markman* Brief, the algorithm that embodies a particular means-plus-function clause *only* includes those steps needed to perform the *recited* function. The '416 patent describes and illustrates very detailed algorithms for performing the specific functions recited in claim 1. *See ABB Automation, Inc. v. Schlumberger Res. Mgmt. Services*, 2003 U.S. Dist. LEXIS 7597 (D. Del. May 6, 2003) ("a court must identify the algorithm disclosed in the specification (often in the form of figures or flowcharts) when construing means-plus-function claim limitations involving a microprocessor programmed to carry out an algorithm.") (citations omitted). Those algorithms also define how numerous additional, *unrecited* functions are performed, e.g., demographic usage tracking. Prism has been careful to identify only that portion of the algorithms disclosed in the '416 patent necessary to perform the recited function. However, to rebut defendants' contentions that the '416 patent does not describe *any* algorithm for performing the recited functions, Prism includes herewith as Ex. I a chart identifying the complete algorithms described in the '416 patent that perform the recited *and* the unrecited functions of the means clauses in claim 1. Prism does so merely to rebut defendants' allegation that the patent fails to describe *any* such algorithms, but does not do so to suggest that *all* of the functionality from the preferred embodiments of the algorithms should be interpreted as part of claim 1.

16.    **Defendants' proposed interpretation of "<u>untrusted network</u>" reads an additional and unnecessary limitation into a term expressly defined in the patent specification**

The inventors expressly defined an "untrusted network" in the patent specification:

> An untrusted network is defined as a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous.

('416 patent at 3:59-62). This language is sufficiently clear to require no further explanation or addition. Defendants, however, would define an untrusted network in terms of the properties of a computer application, not the network itself. The inventors' own definition of the network itself is sufficient.

17.    **"Permitting access" may be different than "authorizing use" and no basis exists to paraphrase a claim term that is clear on its face**

| "permitting access" | |
|---|---|
| **Prism:** Permit[ting] the subscriber client computer to access said selected computer resources. | **Defendants**: Authorize the use of otherwise restricted computer resources. |

Prism's interpretation of "permitting access" follows the wording of the claims. Defendants do not present any justification for departing from the clear wording of the claims. To "authorize" something might connote some type of proactive step. While the claim term "permitting access" does not exclude proactively granting a user access to the selected computer resources, there is no reason to paraphrase words in a claim that are clear on their face and have an ordinary meaning.

26

## III.    CONCLUSION

For the reasons presented above and in its Opening *Markman* Brief, Prism urges this Court to adopt its proffered interpretations of the disputed claim terms and to reject defendants' competing interpretations.

THE BAYARD FIRM

October 13, 2006

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899-5130
(302) 655-5000
rkirk@bayardfirm.com
astitzer@bayardfirm.com
ATTORNEYS FOR PLAINTIFF
PRISM TECHNOLOGIES LLC

OF COUNSEL:

Dirk D. Thomas, Esq.
Robert A. Auchter, Esq.
Kenneth A. Freeling, Esq.
André J. Bahou, Esq.
Aziz Burgy, Esq.
Robins, Kaplan, Miller & Ciresi, L.L.P.
1801 K Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 775-0725

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on October 16, 2006, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Frederick L. Cottrell, III, Esq.
Alyssa M. Schwartz, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899

Patricia S. Rogowski, Esq.
Connolly, Bove, Lodge & Hutz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Ave., 17th Fl.
Wilmington, DE 19801

The undersigned counsel further certifies that copies of the foregoing document were sent by hand on October 16, 2006 to the above counsel and by first-class mail or overnight delivery as indicated to the below counsel:

*Via Federal Express*

John DiMatteo, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

William Lee, Esq.
Wilmer Cutler Hale & Dorr LLP
60 State Street
Boston, MA 02109

Jason Snyderman, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Commerce Square, Suite 2200
2005 Market Street
Philadelphia, PA 19103

Frank C. Cimino, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564

David M. Schlitz
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400

Samir A. Bhavsar
Jeffrey D. Baxter
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

587422v1