IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PRISM TECHNOLOGIES LLC<br><br>Plaintiff,<br><br>v.<br><br>VERISIGN, INC., RSA SECURITY, INC., NETEGRITY, INC., COMPUTER ASSOCIATES INTERNATIONAL, INC., and JOHNSON & JOHNSON SERVICES, INC.,<br><br>Defendants. | C.A No. 05-214 JJF |

**DECLARATION OF RICHARD D. KIRK IN SUPPORT OF PRISM TECHNOLOGIES LLC'S MOTION FOR LEAVE TO SUPPLEMENT THE MARKMAN HEARING RECORD**

I, Richard D. Kirk, declare as follows:

1. I am an attorney with the law firm of The Bayard Firm, counsel representing Plaintiff in the above-captioned action.

2. I have been admitted to practice before this Court.

3. This Declaration is submitted in support of Prism Technologies LLC's Motion For Leave to Supplement the Markman Hearing Record.

4. Attached to this Declaration as **Exhibit 1** is a true and correct copy of excerpts from the Markman Hearing in this case held on November 9, 2006 (pp. 1-4, 53-56, 61-68, 129-132).

5. Attached to this Declaration as **Exhibit 2** is a true and correct copy of excerpts from Mr. Sandeep Giri's deposition taken on October 30, 2006 (pp. 1-3, 277-279).

643693-1

November 20, 2006

THE BAYARD FIRM

Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000
rkirk@bayardfirm.com

ATTORNEYS FOR PLAINTIFF PRISM
TECHNOLOGIES LLC

# EXHIBIT 1

Prism v. Verisign, et al.                    CondenseIt™                    CA No. 05-214 (JJF)

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           IN AND FOR THE DISTRICT OF DELAWARE
 3                          - - -
 4   PRISM TECHNOLOGIES LLC         :  CIVIL ACTION
                                    :
 5           Plaintiff              :
                                    :
 6   vs.                            :
                                    :
 7   VERISIGN, INC., RSA SECURITY,  :
     INC., NETEGRITY, INC., COMPUTER:
 8   ASSOCIATES INTERNATIONAL, INC.,:
     and JOHNSON & JOHNSON SERVICES,:
 9   INC.,                          :
                                    :
10           Defendants             :  NO. 05-214 (JJF)
11                          - - -
12                    Wilmington, Delaware
                      Thursday, November 9, 2006
13                    1:05 o'clock, p.m.
14                          - - -
15   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
16                          - - -
17   APPEARANCES:
18           THE BAYARD FIRM
             BY:  RICHARD D. KIRK, ESQ.
19
20              -and-
21
22
23
                                Valerie J. Gunning
24                              Official Court Reporter
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2
             ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 3           BY:  DIRK D. THOMAS, ESQ.,
                  ANDRE J. BAHOU, ESQ. and
 4                AZIZ BURGY, ESQ.
                  (Washington, D.C.)
 5
             Counsel for Plaintiff
 6
 7           CONNOLLY, BOVE, LODGE & HUTZ, LLP BY:
             PATRICIA S. ROGOWSKI, ESQ.
 8
 9              -and-
10
             AKIN GUMP STRAUSS HAUER & FELD LLP
11           BY:  FRANK C. CIMINO, ESQ. and
                  (Washington, D.C.)
12
13              -and-
14
             AKIN GUMP STRAUSS HAUER & FELD LLP.
15           BY:  JASON SNYDERMAN, ESQ.
                  (Philadelphia, Pennsylvania)
16
17           Counsel for Defendant Verisign, Inc.
18
19           RICHARDS, LAYTON & FINGER
             BY:  ALYSSA M. SCHWARTZ, ESQ.
20
21              -and-
22
             WILMER CUTLER HALE & DORR LLP
23           BY:  GREG TERAN, ESQ. and
                  MARK SELWYN, ESQ.
24                (Boston, Massachusetts)
25
```

Page 3

```
 1   APPEARANCES (Continued):
 2
             POTTER, ANDERSON & CORROON
 3           BY:  RICHARD L. HORWITZ, ESQ.
 4
                -and-
 5
 6           BAKER BOTTS L.L.P
             BY:  DAVID M. SCHLITZ, ESQ.
 7                (Washington, D.C.)
 8
                -and-
 9
10           BAKER BOTTS L.L.P.
             BY:  JEFFREY D. BAKER, ESQ.
11                (Dallas, Texas)
12           Counsel for Netegrity, Inc. and
                Computer Associates International, Inc.
13
14           ASHBY & GEDDES
             BY:  STEVEN J BALICK, ESQ.
15
16              -and-
17
             WILLKIE FARR & GALLAGHER LLP
18           BY:  JOHN DiMATTEO, ESQ.,
                  LESLIE SPENCER, ESQ. and
19                DAVID LEE, ESQ.
                  (New York, New York)
20
21           Counsel for Defendant
             Johnson & Johnson Services, Inc.
22
23                          - - -
24   ALSO PRESENT: PRISM TECHNOLGIES LLC.
                   JERRY KORTH and
25                 RICH GREGG
```

Page 4

```
 1
 2                  P R O C E E D I N G S
 3
 4           (Proceedings commenced in the courtroom,
 5   beginning at 1:05 p.m.)
 6
 7           THE COURT: Good afternoon. Be seated, please.
 8   They're.
 9           This case isn't underfunded. All right. There's
10   an issue about, I'm not sure if it's an still an issue,
11   because I think I answered the request, but about whether or
12   not during the time allotted for a Markman presentation
13   hearing argument, whether a party is permitted to present
14   witnesses.
15           I have historically allowed that based on my
16   understanding that although there are suggestions about what
17   a Markman decision can involve and what any court proceeding
18   can allow, that the main thrust of a Court's consideration of
19   Markman issues is to manage it in the context of the issues
20   of the case, the complexity and any potential dispositive
21   opportunity, and that dictates timing, the -- again, the
22   extent of the hearing, and the extent of the Court's
23   willingness to construe dispute terms, that being, for
24   instance, the number.
25           So although typically, the presentation.
```

November 9, 2006                                                                    Page 1 - Page 4

Case 1:05-cv-00214-JJF    Document 377    Filed 11/20/2006    Page 5 of 17

Prism v. Verisign, et al.                CondenseIt™                CA No. 05-214 (JJF)

Page 53

1  THE COURT: Good afternoon.
2  MR. HORWITZ: Rich Horwitz, on behalf of Computer
3  Associates and Netegrity.
4       First, with respect to those submissions, I think
5  that's the first that we've heard of that and we would like
6  to at least have the opportunity, given their size, that if
7  there's something that we feel we can't address today, that
8  we be given the opportunity to address those submissions.
9       THE COURT: Sure. You can do that.
10  MR. HORWITZ: Thank you, your Honor.
11       Now, what I'm prepared to do is just tell you
12  what each of our primary spokesmen are going to address. If
13  your Honor would prefer to get appearances from everyone, we
14  can do that as well, but I can just tell you what each of the
15  people sitting at the table are going to talk about today.
16  What we've tried to do is break up the terms at issue so that
17  we don't repeat things among the defendants. It has been an
18  arduous task, but we have been able to split them up in a way
19  that may not be exactly the same way that the plaintiffs
20  addressed them, but in a way that made sense to us.
21       And Greg Teran at this end of the table is going
22  to be discussing the means-plus-functions terms. For the
23  record, he's from Wilmer Hale, and is on behalf of the RSA
24  defendants.
25  MR. TERAN: Good afternoon, your Honor.

Page 54

1  THE COURT: All right.
2  MR. HORWITZ: Next is David Schlitz, from Baker
3  Botts, on behalf of CA and Netegrity, and he's going to speak
4  about the to thereby confirm and re-authentication issues,
5  the hardware key and connected issues and the predetermined
6  digital identification issues.
7  MR. SCHLITZ: Good afternoon, your Honor.
8  THE COURT: Good afternoon.
9  MR. HORWITZ: Next is Frank Cimino, from Akin
10  Gump, on behalf of VeriSign. He's going to identify the
11  identity data and the part of identity data.
12  MR. CIMINO: Good afternoon, your Honor.
13  MR. HORWITZ: Then, on the end, John DiMatteo,
14  for J&J, from Wilkie Farr, and Mr. DiMatteo is going to
15  provide a little bit of a tutorial and then also discuss the
16  subscriber client computer and the first server, selected
17  computer resources.
18  THE COURT: All right. Thank you.
19  MR. HORWITZ: Thank you.
20  MR. DiMATTEO: Good afternoon, your Honor.
21  THE COURT: Good afternoon.
22  MR. DiMATTEO: It's a beautiful day outside, a
23  shame to be inside talking clearinghouse means, but,
24  nevertheless, here we are.
25       There are a couple things I agree with plaintiff,

Page 55

1  and the first one is that you have to construe these terms as
2  of 1997, and that's going to be important for two claim
3  limitations I'm going to address, particularly the term
4  subscriber, but I will come back to that.
5       I would like to just think about 1997 and just
6  put ourselves in that mind-set as it applies to the Internet
7  and some events.
8       Rolling back the clock, then, President Clinton
9  was just elected to his second term. However, the Supreme
10  Court said that his lawsuit with Paula Jones will go forward,
11  which did ultimately become the Monica Lewinski incident.
12       My in-laws in Kennett Square were very happy that
13  Alan Iverson had just joined the 76'ers and is playing that
14  year. And something that's near and dear to Judge Robinson,
15  I believe the first stent case was filed in this court to be
16  then a series of numerous cases to follow.
17       The Internet at that time was becoming very
18  popular. If you recall, back then we were receiving AOL and
19  Prodigy and Compu-Serve disks in the mail because we were
20  still dialing up. NetScape and MicroSoft were in a browser
21  war, which one was going to do better than the other. And it
22  was becoming important to content providers, media companies,
23  like Wall Street Journal and Playboy. They are two companies
24  that Prism documents talk about.
25       Well, why was it important to Wall Street Journal

Page 56

1  and Playboy? Well, they were on the Internet and they wanted
2  to make sure that certain of their articles people had to pay
3  for, or in the case of Playboy, I understand they also had
4  some photographs as well and they wanted to sell content on
5  the Internet. They wanted people to pay for it.
6       Now, the way they would do it is what you heard,
7  what they call this first -- this idea of logging on with the
8  user name and password and the specification talks about this
9  and it begins at Column 1.
10       Can we show green graph 1?
11       I forgot my laser pointer. I'm sorry, your
12  Honor. Thank you.
13       This is at Column 1, the place I always like
14  to begin with a patent case. It said, this patent is
15  directed to subscription access systems. It talks about
16  these untrusted networks, which we've heard about.
17  Information providers, however, like the Wall Street Journal
18  or Playboy, want to generate revenue from subscription
19  services and protect their assets. And there's a problem
20  with that.
21       Can we go a little further down? This is at
22  Column 1, lines 20 to 37.
23       To implement these access systems, the Wall
24  Street Journal, using just a user name and password, they're
25  vulnerable to password fraud because subscribers can share

Case 1:05-cv-00214-JJF    Document 377    Filed 11/20/2006    Page 6 of 17

Prism v. Verisign, et al.                 CondenseIt™                 CA No. 05-214 (JJF)

Page 61

1  Well, I agree with plaintiffs, that every
2  subscriber is a user under this system. Not every user is a
3  subscriber. First, the claim tells us that.
4       Can we go back to G9? That there exists other
5  computers and nonsubscriber client computers in the world.
6  Not every user is a subscriber. The similar analogy is all
7  federal judges are lawyers, but not all lawyers are judges,
8  just like all subscribers are users, not all users are
9  subscribers.
10      Well, what does the specification tell us? Well,
11 it makes it clear that this patent is directed to the Wall
12 Street Journals and the Playboys and the Internet content
13 providers who want money.
14      Can we go back to Column 1, please? This is at
15 lines 8 to 14.
16      Information providers want to generate revenue
17 from subscription services. They're generating revenue. The
18 whole term of subscription services again and again in this
19 patent focuses on getting money from subscribers. It's the
20 common use of the term as well.
21      Let's take a look at column 35. Again, a
22 prominent feature of the system of the present invention, not
23 a preferred embodiment, the present invention, secured
24 platform to provide publish subscription contents, that's the
25 Wall Street Journal articles, on the worldwide web that

Page 62

1  assures revenue generation.
2       Now, we also submitted, your Honor,
3  contemporaneous documents, like Exhibit 5, that Prism was
4  using.
5       Can I have G25, please? This is at Page 967 of
6  Exhibit 5. It is completely focused on generating revenue
7  and using that term synonymous with subscription and
8  subscription services.
9       Now, against this body of evidence, a fair
10 reading of this patent, anybody reading this at that time,
11 Prism makes a few arguments: First, it points to the
12 doctrine of claim differentiation, which we all know is
13 not a hard and fast rule, but something that this Court can
14 look at, and it points to Claim 10.
15      Can we go to G14, please?
16      And they say, look, this is talking about
17 billing. Therefore, Claim 1 must be something
18 different.
19      I submit, your Honor, this actually supports
20 our argument. The type of billing being claimed here is
21 not just billing for access, which is presumed in Claim 1,
22 it's billing based on what content is used. If you want
23 to look at the Wall Street Journal past articles, that's
24 25 cents. If you want to look at today's Op-Ed journal,
25 that's a dollar. If you want to look at the Playboy

Page 63

1  articles, that is $1. If you want to look at Ms. June,
2  that may be $5.
3       That's the billing scheme being claimed in
4  Claim 10. It is not just adding the limit that a subscriber
5  will now be billed, and, indeed, it assumes that take place.
6       Let's look at the specification that they sight,
7  G16. This is at Column 14, lines 39 to 47. It talks about
8  different ways to to sign up subscribers and it says you can
9  immediately have them accessed or, an alternative, you can
10 have application data to ensure that the applicant meets all
11 prerequisites of being a subscriber. This could involve
12 things like collecting payment. You are going to pay before
13 you use it as opposed to pay after, demographics and the
14 like. Again, this is consistent with understanding the term
15 subscription and subscriber as being somebody who pays for
16 content.
17      Now, the dictionary wars, your Honor. They
18 like to cite to a dictionary and defendants' products,
19 literature that they have found in our production. They
20 violate two rules of claim construction that are fairly
21 well established. The first one, your Honor, is that
22 the claims are construed as of the time of application.
23 Phillips' en banc decision made that very clear. The
24 definition of subscriber at that time is not as they
25 propose. All right.

Page 64

1       In 1997, the term subscriber did not have the
2  use that it has today. What do I mean by that? Well,
3  today, the term subscriber, as you've seen in our
4  literature, can be somebody who just accesses some
5  content over the Internet, and that's seen by defendants'
6  definition circa 2000.
7       Can I have their Exhibit B, your Honor that they
8  submitted? It's now the year 2000. President Bush has been
9  elected at the end of the year. We're talking about the Y2k
10 fear.
11      In that time period, the dictionary has added
12 to it this concept, to contract to receive and pay -- to
13 receive allowed access to electronic text for services by
14 subscription. That's a 2000 definition for subscriber, but
15 in 1997, if you would go to the dictionary that they use for
16 all their other definitions, and this is new, your Honor,
17 this is Webster's new unabridged dictionary that they
18 submitted. May I approach?
19      THE COURT: Yes.
20      (Mr. DiMatteo handed documents to the Court.)
21      MR. DiMATTEO: Can we go to the next screen?
22      As of 1997, you don't see that definition there.
23 It is missing. But you do have a definition provided by
24 the specification, when you read it, in the dictionary:
25 To agree to receive and pay for a periodical for a specified

Case 1:05-cv-00214-JJF    Document 377    Filed 11/20/2006    Page 7 of 17

Prism v. Verisign, et al.    CondenseIt™    CA No. 05-214 (JJF)

Page 65

1  period of time. That's the way subscription is used in this
2  patent. That's the way it was used in 1997. Any fair
3  reading of the specification supports that.
4       Defendants cannot jump ahead to 2000 and take
5  a different definition and apply it.
6       In the same vein, your Honor, they cannot look
7  to our products which were developed years later and for
8  that same reason rely on our description using the
9  contemporary use of the term to support their 1997
10 claim definition.
11      The law and not looking at the accused product
12 that's fairly familiar to the Court. My favorite is Scripps
13 Clinic. It's a case worked on what when I was a -- all
14 right. Enough about subscriber. Let's talk about the next
15 claim term. Can we go back to the preamble, G9?
16      All right. Before the Court is the claim
17 limitation, a first server computer -- I'm sorry -- access to
18 selected computer resources of at least a first server
19 computer.
20      Now, the debate -- the parties agree that the
21 protected content is the selected computer resources. The
22 debate is framed in the claim charts.
23      Can I have G9, please?
24      The proper construction of that is that
25 the first server has the protected content. It has

Page 66

1  the computer resources, a computer that stores selected
2  computer resources. The plaintiffs are advocating for
3  a much broader term that it just has to make available
4  other resources.
5       So the question before the Court is: Does
6  the first server contain this protected content? In
7  other words, does that server have those Wall Street Journal
8  articles, the Playboy photographs, or whatever we're
9  paying to access, or can they exist elsewhere and not on
10 the first server?
11      Well, it's pretty clear from the claim
12 language -- go back to G9 -- we can go to a full screen
13 on that -- that a first server computer by at least --
14 that the computer resources of the first server computer,
15 it's consistent with our definition. Moreover, it says
16 there are other computer resources that could be available
17 by the first server. They may be elsewhere. And other
18 server computers and nonsubscriber client computers can
19 be available, too.
20      But what the claim is reciting is that these
21 selected computer resources are on the first server. It's
22 the very words of the claim tell us where that -- those
23 computer resources reside.
24      Now, what does that mean in the context of the
25 specification? The defendants' argument is based on the idea

Page 67

1  that the first server computer is just the service access
2  computer. What do I mean by that?
3       You see Figure 2 here. In Figure 2, you have two
4  different things: Website server that has the content and
5  the ISA server. They want the first server computer to be
6  just the subscription access server. That's a complicated
7  term, but you can see it in the -- let me just go to -- can
8  we call up Figure 3? Actually, Figure 2.
9       Go back one. Figure 1. All right. One more.
10 Figure 1, please.
11      The patent talks about two different servers. It
12 talks about a web server and this subscription access server,
13 two different types of server. However, it describes them as
14 working together on the same machine throughout the
15 specification.
16      Let me begin at Column 4, lines 34 through 39.
17      Can I have Graph 21, please? The major
18 components of the system preferably reside on a back office
19 platform. That's the clearinghouse. This is in the back
20 office here.
21      It has a secure interface to communicate with the
22 subscription access servers which reside on the same machine
23 which hosts the web server. I will say that again: The
24 subscription access server is on the same machine as the web
25 server.

Page 68

1       The patent goes on to Column 5, lines 16 to 18:
2  Subscription access server consists of a shared object, which
3  is incorporated as part of the web server, so that the server
4  can protect the contents as will be discussed.
5       Let's go to Column 7, lines 29 to 32.
6       With respect to the subscription access server,
7  in conjunction with NetScape or MicroSoft web server, it
8  works together with the web server.
9       It's shown in Figure 2 that this computer here
10 has this website with server, and it's driven home, your
11 Honor, when we look at Figure 29 and 30.
12      Let's go to Figure 29. Here, we have a
13 first server that has a web server and a subscription
14 access server. A second server, same thing: Content
15 and server, content and subscription access server again
16 and again.
17      We can take a look at the specification
18 where it describes that. This is at Column 29, 36 through
19 42: Distributed architecture of the system software
20 enables multiple web server, each of which may host their
21 own copy of a server to communicate and interact with one
22 or more clearinghouse, each with a copy of their own access
23 server.
24      What does this all mean, your Honor? Why is
25 this all relevant to us today? Well, if we go back to the

Case 1:05-cv-00214-JJF   Document 377   Filed 11/20/2006   Page 8 of 17

Prism v. Verisign, et al.                 CondenseIt™                CA No. 05-214 (JJF)

Page 129

encryption mechanism of some kind. It indicates that authentic servers and authentic clearinghouses are supposed to be able to communicate with each other. It does not say who authenticates whom. It doesn't say how the authentication occurs.

And although Mr. Thomas, in his argument earlier this afternoon, issued by reference some pre-existing standards for public encryption, none of these are mentioned anywhere in the specification. And, more importantly, even if they were, that still would not matter. It's what's in the four corners of the spec. The default proof case, which we've cited, shows that you can't incorporate by reference. You have to have it in the specification.

Now, we asked one of the inventors whether this particular passage from the patent was -- whether he could identify a step-by-step process or an algorithm from this passage. We asked that of Mr. Sandeep Giri, who's one of the three inventors, and we were only able to take his deposition a week ago from Monday.

Now, Mr. Giri, we would suggest, is the driving force technologically behind the invention. He's not somebody affiliated with the plaintiff. He's off in San Francisco.

We asked, having read that description, can you tell me what the step-by-step process for authenticating the

Page 130

server is? There's an objection. Mr. Giri's answer was, yeah, not really, because by reading that, a portion of the patent, I have no opinion.

Now, if Mr. Giri, the inventor of this patent, was then unable to tell us the step-by-step process, how could one of ordinary skill in the art discern it from a mere sentence in the specification? We would suggest that it could not be done.

And, in fact, as some of the -- the answer behind why there's only one sentence in the specification about public/private key encryption and instead of more fulsome algorithms such as we've seen for some of the other algorithms is because Prism simply had not developed those algorithms yet. I recognize the time limits here and time does not permit me to discuss this evidence in length.

We filed some of the relevant testimony in the documents yesterday.

The long and short of it is that the documents and the testimony that we were able to obtain from Mr. Giri showed that Prism did not have algorithms and the inventors did not have algorithms for performing this function until -- they didn't even start to work on them until a few weeks after they filed their patent application. That's why there's nothing in the specification that comes close to

Page 131

being a disclosure of an algorithm, a disclosure of structure, your Honor, and that should give the Court some confidence in concluding, which is apparent from the face of the specification itself, that there just simply isn't structure there.

And that's my presentation. I would be happy to answer any questions.

THE COURT: All right. Thank you.

MR. TERAN: Thank you.

MR. THOMAS: I will try to keep it short, your Honor.

THE COURT: No problem.

MR. THOMAS: I will take them in turn.

I believe the first discussion was with respect to this aspect of whether subscriber means somebody that has to be paying for access.

I would just point out there, your Honor, that, for example, in Column 1, lines 12 to 14 of the '416 patent, it's expressly stated that a provider of content may wante to generate revenue by charging for access. It's permissible.

We're not suggesting that you can't use this invention in a pay-as-you-go scheme. Sure, you can. As a matter of fact, that may have been the preferred embodiment at the time. That is not what the claim said.

Page 132

The specification shows that the applicants knew how to say charge for access. They said it in the specification with respect to the then-preferred embodiment. They didn't say it in the claims, or if they did, they just said it in the dependent claim, where they talked about tracking usage data and then billing for that usage. They knew how to claim that concept if they wanted to and they left it out of the broad independent claim.

As far as what -- in terms of subscriber, your Honor, you could have a free subscription to something. People have been subscribing to content over the Internet since well before this invention came about. They weren't necessarily being charged for it.

One of the definitions that was up there on the screen was to sign up or to place one's signature below it. We would submit, yes, that's registering, and that's what we think subscriber means. It's a user, somebody who registers to get access to the protected content. That's what subscriber means.

The question about selected computer resources and whether those resources have to reside on the access server or the first server, your Honor, there's a difference between saying something is a resource of something versus a resource that resides on a computer.

# EXHIBIT 2

COPY

1

1   UNITED STATES DISTRICT COURT OF DELAWARE
2                   Civil Division
3   _____
4   Prism Technologies                       :
5              Plaintiff,                    :
6         v.                                 : C.A. No:
7   Verisign, Inc.,                          : 05-214-JJF
8   RSA Security, Inc.,                      :
9   Associates International, Inc.,          :
10  Johnson & Johnson Services, Inc.         :
11            Defendants.                    :
12  _____  :
13                           Washington, D.C.
14                           Monday, October 30, 2006
15  Deposition of: SANDEEP GIRI called for oral examination
16  by counsel for Plaintiff, pursuant to notice, at the
17  Law Offices of Robins, Kaplan, Miller & Ciresi, 1801
18  K Street, Northwest, Suite 1200, Washington, D.C.,
19  before Jacqueline Schultes, Registered Professional
20  Reporter and Certified Realtime Reporter, associate of
21  Ellen Grauer Court Reporting, beginning at 9:10 a.m.,
22  when were present on behalf of the respective parties:
23         ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24                  New York, New York
                      212-750-6434
25                    Ref: 82410

2

On behalf of Plaintiff Prism Technologies
 DIRK THOMAS, ESQUIRE
 ANDRE J. BAHOU, ESQUIRE
 Robins, Kaplan, Miller & Ciresi, LLP
 1801 K Street, Northwest, Suite 1200
 Washington, D.C., 20006
 (202) 775-0725
 Email: ajbahou@rkmc.com

On behalf of Defendant RSA Security, Inc.
 GREGORY P. TERAN, ESQUIRE
 Wilmer, Cutler, Pickering, Hale and Dorr, LLP
 60 State Street
 Boston, Massachusetts, 02109
 (617) 526-6574
 Email: gregory.teran@wilmerhale.com

On behalf of Defendant Johnson & Johnson Services, Inc.
 DAVID D. LEE, ESQUIRE.
 Willkie, Farr & Gallagher, LLP
 787 Seventh Avenue
 New York, NY  10019-6099
 (212) 728-8674
 Email: dlee1@willkie.com

```
                                                          3
 1   On behalf of Verisign, Inc.
 2      JOHN D. SIMMONS, ESQUIRE
 3      Akin, Gump, Strauss, Hauer & Feld, LLP
 4      One Commerce Square
 5      2005 Market Street
 6      Suite 2200
 7      Philadelphia, PA 19103-7013
 8      (215) 965-1200
 9      Email: jsimmons@akingump.com
10
11   On behalf of CA and Netsentives
12      JEFFERY D. BAXTER, ESQUIRE
13      Baker Botts, LLP
14      2001 Ross Avenue
15      Dallas, Texas   75201-2980
16      (214) 953-6791
17      Email: jeff.baxter@bakerbotts.com
18
19
20   ALSO PRESENT:
21      Catherine Rupprecht; Robins, Kaplan, Miller & Ciresi
22      Solomon A. Frances, Videographer
23
24
25
```

1  GIRI
2  using a public private key mechanism so that only
3  authentic servers" and I think that means to say an
4  authentic subscription access clearinghouse "can
5  communicate with each other."
6      Do you see that?
7    A.  Yes.
8    Q.  What is the step-by-step process based on
9  that description by which the clearinghouse
10 authenticates the server?
11     MR. THOMAS:  Object to the form of the
12 question.  Seeks an opinion; seeks a legal conclusion,
13 and is based on an incomplete hypothetical, since the
14 witness hasn't had time to read the remainder of the
15 document.
16     THE WITNESS:  Um, as we talked about that
17 earlier, the question about patent, phrases or lines,
18 words out of the patent, it's hard for me to, just by
19 hearing you read that and all of it, describe what it
20 means, whether it's a step-by-step process or not and
21 what's the scope of it.  It sounds similar, has
22 similarities to the description we were talking about
23 earlier.
24 BY MR. TERAN:
25   Q.  What description is that?

278

GIRI

A. Um, the description of, um, server authentication at clearinghouse. It has similarities to it. But that is just because the words are being used.

Q. Having read that description can you tell me what the step-by-step process for authenticating the server is?

MR. THOMAS: Object to the form of the question. Asked and answered; lacks foundation; seeks a legal conclusion; seeks an opinion based on a hypothetical question.

THE WITNESS: Yeah, not really. Because by reading that, a portion of the patent, I have no opinion.

MR. TERAN: I have nothing further.

VIDEOGRAPHER: The time is 4:57 p.m., we are going off the record.

(Off the record.)

VIDEOGRAPHER: Time is 5:04 p.m. We are back on the record.

EXAMINATION BY COUNSEL FOR CA AND NETSENTIVES BY MR. BAXTER:

Q. Mr. Giri, my name is Jeff Baxter. I'm with the law firm of Baker Botts, and we represent CA in

1           GIRI
2  this lawsuit. I wanted to ask you about a couple of
3  things that you testified about earlier that I'm not
4  sure I understand.
5           You mentioned that you were investigating
6  existing services at one point; is that correct?
7           MR. THOMAS: Object to the form.
8  BY MR. BAXTER:
9      Q.   Such as America Online?
10          MR. THOMAS: Object to the form of the
11 question.
12          THE WITNESS: Um, I'm not sure if I said we
13 were investigating them. Um, my recollection is that
14 we -- I stated those as examples of existing practices.
15 BY MR. BAXTER:
16     Q.   And you said one of the disadvantages that
17 you identified was -- with these existing systems was
18 the sharing of log-in?
19     A.   Yes.
20     Q.   What do you mean by that?
21     A.   Um, our general understanding, as I recall it
22 right now, at the time was, um, if you had a log-in, a
23 user name and password, while you were logged in to a
24 service, you could give that user name and password to
25 somebody else and they would use the same user name and

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on November 20, 2006, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Frederick L. Cottrell, III, Esq.
Alyssa M. Schwartz, Esq.
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899

Patricia S. Rogowski, Esq.
Connolly, Bove, Lodge & Hutz, LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Ave., 17th Fl.
Wilmington, DE 19801

The undersigned counsel further certifies that copies of the foregoing document were sent by hand on November 20, 2006 to the above counsel and by first-class mail or overnight delivery as indicated to the below counsel:

*Via Federal Express*

John DiMatteo, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

William Lee, Esq.
Wilmer Cutler Hale & Dorr LLP
60 State Street
Boston, MA 02109

Jason Snyderman, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Commerce Square, Suite 2200
2005 Market Street
Philadelphia, PA 19103

Frank C. Cimino, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564

587422-1

| | |
|---|---|
| David M. Schlitz<br>Baker Botts L.L.P.<br>1299 Pennsylvania Avenue, NW<br>Washington, DC  20004-2400 | Samir A. Bhavsar<br>Jeffrey D. Baxter<br>Baker Botts L.L.P.<br>2001 Ross Avenue<br>Dallas, TX  75201-2980 |

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

587422-1