**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PRISM TECHNOLOGIES LLC<br><br>Plaintiff,<br><br>v.<br><br>VERISIGN, INC., RSA SECURITY, INC.,<br>NETEGRITY, INC., COMPUTER<br>ASSOCIATES INTERNATIONAL, INC.,<br>and JOHNSON & JOHNSON SERVICES,<br>INC.,<br><br>Defendants. | Civil Action No. 05-214 JJF<br><br><br>**REDACTED PUBLIC VERSION**<br>**Exhibits Volume 3 of 4** |

**PLAINTIFF PRISM TECHNOLOGIES LLC'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO COMPEL DEFENDANT VERISIGN, INC. TO PRODUCE
THE SOURCE CODE OF ITS ACCUSED PRODUCTS**

**February 2, 2007**

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000
rkirk@bayardfirm.com
astitzer@bayardfirm.com

ATTORNEYS FOR PLAINTIFF PRISM
TECHNOLOGIES LLC

OF COUNSEL:

Dirk D. Thomas
Robert A. Auchter
Kenneth A. Freeling
André J. Bahou
Aziz Burgy
Chandran B. Iyer
ROBINS, KAPLAN, MILLER & CIRESI LLP
1875 Eye Street, N.W., Suite 300
Washington, D.C. 20006-5409
(202) 775-0725

# EXHIBIT 32

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PRISM TECHNOLOGIES LLC

           Plaintiff,

      v.

VERISIGN, INC., RSA SECURITY, INC.,
NETEGRITY, INC., COMPUTER
ASSOCIATES INTERNATIONAL, INC.,
and JOHNSON & JOHNSON SERVICES,
INC.,

           Defendants.

Civil Action No. 05-214 JJF

**PLAINTIFF PRISM TECHNOLOGIES LLC'S OBJECTIONS AND RESPONSES TO
DEFENDANT VERISIGN, INC.'S FIRST SET OF INTERROGATORIES (Nos. 1-10)**

Plaintiff Prism Technologies LLC ("Prism") provides the following responses and objections to VeriSign, Inc.'s ("VeriSign") First Set of Interrogatories. Prism will supplement these responses as required by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court.

**GENERAL OBJECTIONS**

For its General Objections, Prism objects to VeriSign's interrogatories, instructions and definitions as follows. Prism hereby incorporates its definitions as set forth in its Revised First Set of Document Requests to VeriSign.

      A.      Prism objects to these interrogatories to the extent they impose obligations or requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware, or the Orders of this Court. Prism does not consider itself bound by VeriSign's instructions and definitions.

606362v1

B.      Prism objects to these interrogatories as vague, overly broad, unduly burdensome to the extent that they request information not relevant to a claim or defense of any party, not reasonably calculated to lead to the discovery of admissible evidence, or as otherwise exceeding the scope of permissible discovery.

C.      Prism objects to these interrogatories to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity. No part of Prism's response constitutes a waiver of any privilege or immunity.

D.      Prism objects to these interrogatories to the extent they seek information that is not in its possession, custody or control or that is publicly available or has already been provided to the Defendants.

E.      Prism objects to these interrogatories to the extent that they comprise sub-parts or compound questions and, therefore, exceed or may exceed the number of interrogatories permitted in this action.

F.      Prism objects to the definition of "Prism," "YOU," and "YOUR" as overly broad to the extent those terms request information from legal entities not within the scope of this litigation or within the possession, custody or control of Prism or not subject to Prism's legal recourse and/or otherwise outside the enforceable scope of the laws of the United States of America.

G.      Prism objects to these interrogatories to the extent they assume incorrect facts.

H.      Prism objects to these interrogatories as premature to the extent that they call for construction of the claims of the patent-in-suit and there has not yet been a determination of

claim construction by the Court in this case. Therefore, Prism specifically reserves its right to change, modify, or otherwise supplement the claim constructions presently asserted.

      I.      Prism objects to these interrogatories on the grounds that discovery has just begun and Prism has not completed its investigation of all facts relating to Defendants' infringement of the patent-in-suit or its formulation of its contentions with respect to such issues. Therefore, Prism specifically reserves its right to change, modify, or otherwise supplement its allegations based on discovery to be obtained from the Defendants or its own investigation.

      J.      Prism objects to these interrogatories to the extent that they call for premature expert discovery.

      K.      To the extent not objected above, Prism incorporates by reference its objections to VeriSign's First Set of Document Requests.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

With reference to the claim charts attached as Exh. A, in which the first column lists the claim elements and/or steps of independent claims 1, 19 and 24 of the '416 patent, complete the second column by stating the Plaintiff's claim interpretation contentions for each element and/or step (set forth in each row of Exh. A), as a whole, as well as for each specifically bolded and quoted word and/or phrase, and complete the third column by stating all basis and support for those contentions, including citing all portions of the specification and prosecution history, and identifying and describing all other evidence, if any, that Plaintiff believes supports its contentions. If Plaintiff contends that any of the claim elements are means-plus-function elements construed pursuant to 35 U.S.C. § 112 paragraph 6, so state and provide plaintiff's contention as to the function to be performed and the identity of the corresponding structure in the specification for performing it, and the scope of equivalents, if any. If Plaintiffs contend that any claim element that includes the word "means" is *not* means-plus-function (as it is presumed to be under the law), state all basis and evidence for this contention.

### RESPONSE TO INTERROGATORY NO. 1:

Prism incorporates its general objections, and specifically its General Objections A, C, E, H, I, and J. Prism specifically objects to the "scope of equivalents" inasmuch as Defendants'

have not yet responded to discovery and the potential scope of equivalents is dependent, in part, on the structure and operation of the accused devices. At present, Prism asserts that the asserted claims read literally on the accused products and services, but reserves its rights to allege infringement by equivalent as discovery or the Court's claim constructions may require. Prism objects to this interrogatory as a premature contention interrogatory. Prism has not completed its investigation of all facts or its formulation of all contentions with respect to such issues. Prism objects to this interrogatory as overly broad and unduly burdensome to the extent it seeks information regarding claims that are not asserted or at issue in this case, specifically claim 19. Prism objects to this interrogatory to the extent it calls for subject matter not relevant to a claim or defense of any party, not reasonably calculated to lead to the discovery of admissible evidence, or as otherwise imposing obligations or requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware, or the Orders of this Court.

Subject to and without waiving these objections, Prism responds as follows. The terms of at least claims 1 and/or 24 of the '416 patent should be given their plain and ordinary meaning. Prism incorporates herein its response to Interrogatory No. 2 to provide its disclosure of how the plain and ordinary meaning of the claim terms read on the presently accused products. The following means plus function elements of claims 1 and 24 have the functions specifically recited in the claim for that means plus function element. The structure embodying the means plus function element is identified below. Prism reserves its right to change, modify, or otherwise supplement its contentions regarding the structure that embodies each means clause.

### Clearinghouse Means

The corresponding structure of the claimed "clearinghouse means" is the clearinghouse database server 56 and the user authentication daemon 58. *See* '416 patent, col. 6, line 66 to col. 7, line 9.

### Server Software Means

The corresponding structure of the claimed "server software means" is that portion of the session manager 52, *see* '416, patent col. 7, lines 49-50, that operates in conjunction with the user authentication daemon 58 to forward the identity data of the first server computer and the subscriber client computer to said clearinghouse means. The server software means also includes the "access key validator" block (as shown in Fig. 3, at reference number 34) which requests the subscriber client computer to forward its digital identification to the first server to confirm the presence of a hardware key.

### Client Software Means

The corresponding structure of the "client software means" includes that portion of the subscriber software 36 that is adapted to forward the identity data of the client computer to said first server computer at the beginning of an operating session.

## INTERROGATORY NO. 2:

For each claim of the '416 patent that Plaintiff contends is infringed by VeriSign, identify each activity, product, device, part, or system manufactured, imported, used or sold by VeriSign that, according to Plaintiff, embodies, is covered by, makes use of, or otherwise practices any claim of the patent-in-suit and, with reference to Plaintiff's claim interpretation contentions provided in response to Interrogatory No. 1, state with particularity the basis for each of Plaintiff's contentions as to how each asserted claim of the patent-in-suit is infringed, either literally or under the doctrine of equivalents, directly (under 35 U.S.C. § 271(a)) or indirectly (under 35 U.S.C. § 271 (b) or § 271 (c)) by VeriSign.

**RESPONSE TO INTERROGATORY NO. 2:**

Prism incorporates its general objections, and specifically its General Objections A, C, E, H, I, and J. Prism objects to this interrogatory as a premature contention interrogatory. Prism has not, as yet, had the opportunity to conduct meaningful discovery to determine the full extent of products made, used, sold, and/or offered for sale by VeriSign that infringe the '416 patent. Since discovery is ongoing and VeriSign has not yet responded to Prism's discovery requests, Prism reserves the right to change, modify, or otherwise supplement its current infringement contentions, including identifying additional products and/or services offered by VeriSign that infringe one or more claims of the '416 patent.

Subject to and without waiving these objections, Prism responds as follows. Prism alleges, to date, that the VeriSign's Unified Authentication Solution meets all the elements of at least claims 1 and/or 24.

| US Patent #6,516,416 | VeriSign's Solution |
|---|---|
| 1.) A system for controlling the operation of and access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network in an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers, comprising: | The VeriSign Certificate Validation Module (CVM) installed on a Web Server provides the functions of the first server. The CVM communicates with the subscriber client computer (an operating session) using the Internet (an untrusted network) to control access to selected computer resources. A subscriber client computer is used to access computer resources controlled by the CVM. Both subscriber client computers and nonsubscriber client computers can also access resources not controlled by the CVM on the Web Server (first server). Both subscriber client computers and nonsubscriber client computers can also access other Web Servers (e.g.. www.yahoo.com).[1,2] |
| 1a.) clearinghouse means for storing identity data | The clearinghouse means consists of the |

---

[1] *VeriSign Authentication Services*, VeriSign, Inc, 2000 (P 032680-032708).
[2] *VeriSign Unified Authentication - The Next Generation of Strong Authentication*, VeriSign, Inc., 2004 (P 032709-032726).

| US Patent #6,516,416 | VeriSign's Solution |
|---|---|
| of said first server computer and the identity data of each of said subscriber client computers; | VeriSign hosted ATLAS OCSP Responder and the ATLAS Central Authoritative Database.[3] The identity data of the CVM (first server) and each subscriber client are stored in the ATLAS Central Authoritative Database. The identity data of the first server is an X.509 digital certificate. The identity data of the subscriber client is a X.509 digital certificate stored on the hardware key (VeriSign Unified Authentication USB Token or third party Smart Card). |
| **1b.)** server software means installed on said first server computer adapted to forward its identity data and identity data of each subscriber client computer to said clearinghouse means at the beginning of an operating session in which access to selected computer resources of said first server computer is requested; | The CVM (first server) signs an OCSP request with its identity data and forwards the OCSP request containing the subscriber client computer identity data to the ATLAS OCSP Responder (clearinghouse means) at the beginning of an operating session when resources controlled by the CVM are requested by the subscriber client computer.[4,5] |
| **1c.)** client software means installed on each of said subscriber client computers adapted to forward its identity data to said first server computer at the beginning of an operating session in which access to selected computer resources is requested; | VeriSign Personal Trust Agent (PTA) software is the client software means installed on each of said subscriber client computers.[6] The PTA software forwards the identity data (X.509 digital certificate) stored on the USB Token or Smart Card to the CVM at the beginning of an operating session when computer resources controlled by the CVM are requested by the subscriber client computer.[7] |
| **1d.)** at least one hardware key connected to the subscriber client computer, said key being adapted to generate a predetermined digital identification, which identification is part of said identity data; | The VeriSign Unified Authentication USB Token or third party Smart Card is the hardware key which is connected to the subscriber client computer's USB port or by a Smart Card reader. A X.509 digital certificate (predetermined digital identification) can be stored on Token or Smart Card. The digital certificate comprises the subscriber identity data.[8,9] |

[3] *ATLAS – The Advanced Transaction Look-up and Signaling Platform*, VeriSign, Inc., January 23, 2003 (P 032727-032742).

[4] *Managed PKI Certificate Validation and Parsing Guide*, VeriSign, Inc., 2002, pp. 73-76 (P 032823-032826).

[5] *RFC 2560 – X.509 Internet Public Key Infrastructure Online Certificate Status Protocol – OCSP*, IETF, June 1999, pg. 7 (P 032851).

[6] *Mobile Notebook Security*, Alex Deacon, Trust Services Architect, Verisign, Inc., Intel Corporation, September 9-12, 2002, pp. 11-17 (P 032876-032882).

[7] *Certificate Validation Module (CVM) User's Guide*, VeriSign, Inc., 2000 (P 032893-032970).

[8] *VeriSign Authentication Services*, VeriSign, Inc, 2000 (P 032680-032708).

| US Patent #6,516,416 | VeriSign's Solution |
|---|---|
| **1e.)** said server software means installed on the first server computer being adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer; | The CVM (first server) can selectively request the identity data from the subscriber client computer. This is accomplished by setting a session timeout in the Web Server. The CVM monitors the Web Server timeout event. Upon the firing of the timeout event, the CVM request the identity data from the subscriber client computer.[10] |
| **1f.)** said clearinghouse means being adapted to authenticate the identity of said subscriber client computer responsive to a request for selected computer resources of said first server computer by a subscriber client computer; | The ATLAS OCSP Responder (clearinghouse) is adapted to authenticate the identity of said subscriber client computer responsive to a request for selected computer resources controlled by the CVM (first server) by a subscriber client computer.[11] |
| **1g.)** said clearinghouse means being adapted to authenticate the identity of said first server computer responsive to said subscriber client computer making the request for selected computer resources of said first server computer; and, | Upon receiving the signed OCSP request message from the CVM, the ATLAS OCSP Responder decrypts the OCSP request message using the identity data of the first server stored in the ATLAS Central Authoritative Database thereby authenticating the identity of the first server.[12] |
| **1h.)** said clearinghouse means being adapted to permit access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber client computer making first request. | The ATLAS OCSP Responder (clearinghouse) permits access to computer resources controlled by the CVM (first server) upon successful initial authentication of both the CVM (first server) and the subscriber client computer. |
| **24.)** A method of controlling access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network during an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers, comprising the steps of: | The VeriSign Certificate Validation Module (CVM) installed on a Web Server provides the functions of the first server. The CVM communicates with the subscriber client computer (an operating session) using the Internet (an untrusted network) to control access to selected computer resources. A subscriber client computer is used to access computer resources controlled by the CVM. Both subscriber client computers and nonsubscriber client computers can also access resources not |

---

[9] *VeriSign Unified Authentication - The Next Generation of Strong Authentication*, VeriSign, Inc., 2004 (P 032709-032726).

[10] *E-Mail from Mike Olsen (VeriSign) to Rick Gregg*, VeriSign, Inc., January 26, 2005 (P 032971).

[11] *Managed PKI Certificate Validation and Parsing Guide*, VeriSign, Inc., 2002, pp. 73-76 (P 032823-032826).

[12] *E-Mail from Mike Olsen (VeriSign) to Rick Gregg*, VeriSign, Inc., January 26, 2005 (P 032971).

| US Patent #6,516,416 | VeriSign's Solution |
|---|---|
|  | controlled by the CVM on the Web Server (first server). Both subscriber client computers and nonsubscriber client computers can also access other Web Servers (e.g. www.yahoo.com).[13,14] |
| **24a.)** registering identity data of said first server computer and the identity data of each of said subscriber client computers and storing the registered identity data in a clearinghouse means associated with said first server computer and said subscriber client computers; | The clearinghouse means consists of the VeriSign hosted ATLAS OCSP Responder and the ATLAS Central Authoritative Database.[15] The identity data of the CVM (first server) and each subscriber client are stored in the ATLAS Central Authoritative Database. The identity data of the first server is an X.509 digital certificate. The identity data of the subscriber client is a X.509 digital certificate stored on the hardware key (VeriSign Unified Authentication USB Token or third party Smart Card). |
| **24b.)** requiring a subscriber client computer to forward its identity data to said clearinghouse means at the beginning of an operating session in which access to selected computer resources is requested; | VeriSign Personal Trust Agent (PTA) software is the client software means installed on each of said subscriber client computers.[16] The PTA software forwards the identity data (X.509 digital certificate) stored on the USB Token or Smart Card to the CVM at the beginning of an operating session when computer resources controlled by the CVM are requested by the subscriber client computer.[17] |
| **24c.)** requiring a subscriber client computer to forward a predetermined digital identification to said first server computer to thereby confirm that a hardware key is connected to said subscriber client computer; | The VeriSign Unified Authentication USB Token or third party Smart Card is the hardware key, which is connected to the subscriber client computer's USB port or by a Smart Card reader. A X.509 digital certificate (predetermined digital identification) can be stored on Token or Smart Card. The digital certificate comprises the subscriber identity data.[18,19] The Personal Trust Agent (PTA) software is installed on the |

[13] *VeriSign Authentication Services*, VeriSign, Inc, 2000 (P 032680-032708).
[14] *VeriSign Unified Authentication - The Next Generation of Strong Authentication*, VeriSign, Inc., 2004 (P 032709-032726).
[15] *ATLAS – The Advanced Transaction Look-up and Signaling Platform*, VeriSign, Inc., January 23, 2003 (P 032727-032742).
[16] *Mobile Notebook Security*, Alex Deacon, Trust Services Architect, Verisign, Inc., Intel Corporation, September 9-12, 2002, pp. 11-17 (P032876-032882).
[17] *Certificate Validation Module (CVM) User's Guide*, VeriSign, Inc., 2000 (P 032893-032970).
[18] *VeriSign Authentication Services*, VeriSign, Inc, 2000 (P 032680-032708).
[19] *VeriSign Unified Authentication - The Next Generation of Strong Authentication*, VeriSign, Inc., 2004 (P 032709-032726).

| US Patent #6,516,416 | VeriSign's Solution |
|---|---|
| | subscriber client computer and forwards the digital certificate to the CVM (first server). The CVM confirms that the hardware key is connected.[20] |
| **24d.)** Attempting to authenticate the identity of said subscriber client computer from said clearinghouse means responsive to a request for selected computer resources of said first server computer by a subscriber client computer; | The VeriSign hosted ATLAS OCSP Responder (clearinghouse) authenticates the identity of the subscriber client computer responsive to a request for selected computer resources of the CVM (first server) by a subscriber client computer.[21] |
| **24e.)** attempting to authenticate the identity of said first server computer from said clearinghouse means responsive to said subscriber client computer making the request for selected computer resources; and, | Upon receiving the signed OCSP request message from the CVM, the ATLAS OCSP Responder decrypts the OCSP request message using the identity data of the first server stored in the ATLAS Central Authoritative Database thereby authenticating the identity of the first server.[22,23] |
| **24f.)** permitting access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber client computer making said request. | The ATLAS OCSP Responder (clearinghouse) permits access to computer resources controled by the CVM (first server) upon successful initial authentication of both the CVM (first server) and the subscriber client computer. |

**INTERROGATORY NO. 3:**

Describe in detail when Plaintiff first became aware of and/or first had knowledge of each activity, product, device, system and/or equipment identified in response to Interrogatory No. 2; identify each person who had such knowledge; describe the circumstances under which each such person first became aware of and acquired such knowledge; and describe all facts, documents and things that refer and/or relate to this knowledge.

**RESPONSE TO INTERROGATORY NO. 3:**

Prism incorporates its general objections, and specifically its General Objections A, B, C, D, E, and I. Subject to and without waiving these objections, Prism responds that Richard L.

---

[20] *Mobile Notebook Security*, Alex Deacon, Trust Services Architect, Verisign, Inc., Intel Corporation, September 9-12, 2002, pp. 11-17 (P 032876-032882).
[21] *Managed PKI Certificate Validation and Parsing Guide*, VeriSign, Inc., 2002, pp. 73-76 (P 032823-032826).
[22] *E-Mail from Mike Olsen (VeriSign) to Rick Gregg*, VeriSign, Inc., January 26, 2005 (P 032971).
[23] *RFC 2560 – X.509 Internet Public Key Infrastructure Online Certificate Status Protocol – OCSP*, IETF, June 1999, pg. 7 (P 032851).

606362v1
- 10 -

Gregg and Gerald C. Korth had knowledge of VeriSign's Solution (VeriSign Unified

Authentication) as early as October 27, 2004. Richard L. Gregg and Gerald C. Korth first gained

knowledge of VeriSign's Solution through VeriSign's press release of September 21, 2004.

Documents relating to Prism's knowledge of VeriSign's Solution will be produced in response to

VeriSign's First Set of Requests for the Production of Documents and Things to Plaintiff Prism

Technologies LLC Nos. (1-40). Further, pursuant to Fed. R. Civ. Pro. 33(d), Prism states that the

information sought is contained within Prism's document production and the burden of

extracting the requested information is substantially equal for VeriSign as it is for Prism.

### INTERROGATORY NO. 4:

For each asserted claim of the '416 patent, (a) state Plaintiff's contentions regarding
date(s) of the invention, including the date(s) of conception and reduction to practice, (b) identify
each person involved in its conception and each person involved in its reduction to practice, (c)
describe in detail all circumstances regarding conception, reduction to practice and any diligence
exercised from the date of conception to the date of reduction to practice and identify each
person involved in any such diligence, (d) identify the specific location of each such conception
and reduction to practice, and (e) identify all documents and things referring to, relating to, or
concerning the conception, reduction to practice, and any diligence from the date of conception
to the date of reduction to practice.

### RESPONSE TO INTERROGATORY NO. 4:

Prism incorporates its general objections, and specifically its General Objections A, B, C,

D, E, and I. Subject to and without waiving these objections, Prism responds as follows.

Starting around March 1996, Richard L. Gregg began the process that led to the conception of

the subject matter in the asserted claims of the '416 patent when a potential customer, Data

Transmission Network Corp. (DTN), asked Mr. Gregg if he could develop a system using the

Internet that would replace DTN's existing satellite-based transmission network. Upon

undertaking that challenge, Mr. Gregg conceived of the '416 patented invention and directed its

development and approved the software design and system architecture as well as managed the

606362v1

- 11 -

design project and performed system tests. The subject matter of the asserted claims of the '416

patent was described in a Functional Specification no later than May 6, 1996. Sandeep Giri and

Timothy C. Goeke participated in the development of the system along with Mr. Gregg and,

under Mr. Gregg's supervision, coded the software for the project. In July 1996, Prism

performed a confidential demonstration of the prototype system for DTN personnel. Richard L.

Gregg performed the demonstration at DTN's offices, while Sandeep Giri and Timothy C. Goeke

managed the computer servers at Prism Resources. That prototype system and its demonstration

to DTN constitutes an actual reduction to practice of the invention defined by the asserted claims

of the '416 patent.

Documents relating to the conception and reduction to practice will be produced in

response to VeriSign's First Set of Requests for the Production of Documents and Things to

Plaintiff Prism Technologies LLC Nos. (1-40). Further, pursuant to Fed. R. Civ. Pro. 33(d),

Prism states that the information sought is contained within Prism's document production and

the burden of extracting the requested information is substantially equal for VeriSign as it is for

Prism.

**INTERROGATORY NO. 5:**

Excluding the "references cited" on the face of the '416 patent, identify all prior art, including without limitation publications and acts, of which Plaintiff is aware with respect to each of the patent-in-suit and related patents, including prior art located in any prior art search or otherwise brought to the attention of Plaintiff, and state how and when each item of prior art identified came to Plaintiff's attention.

**RESPONSE TO INTERROGATORY NO. 5:**

Prism incorporates its general objections, and specifically its General Objections A, B, C,

D, and E. This interrogatory, on its face, requests the identification of any and all information

that preceded the conception of the invention claimed in the '416 patent. It is therefore objected

605362v1

- 12 -

to as seeking information not relevant to any issue in this case. Subject to and without waiving these objections, Prism responds as follows.

All known, relevant, non-cumulative prior art to the '416 patent has been identified in the related, pending U.S. Patent Application No. 10/230,638. Any such prior art not identified on the face of the '416 patent or its certificate of correction did not become known, to the best of Prism's knowledge, to any person having any obligation under 37 C.F.R. 1.56 until after the issuance of the '416 patent. Further, pursuant to Fed. R. Civ. Pro. 33(d), Prism states that the information sought is contained within Prism's document production and the burden of extracting the requested information is substantially equal for VeriSign as it is for Prism.

## INTERROGATORY NO. 6:

If Plaintiff is seeking an award of any sum of money, whether by damages or otherwise, state the amount of money Plaintiff seeks and describe the manner in which the amount was calculated, including each element of damage or component of recovery that Plaintiff seeks, the amount sought for each element or component, the manner in which each element or component was calculated or determined, and should identify the source of each number used in the calculation, and identify the person or persons who is most knowledgeable with respect to the subject matter of this Interrogatory.

**RESPONSE TO INTERROGATORY NO. 6:**

Prism incorporates its general objections, and specifically its General Objections A, E, I, and J. Prism objects to this interrogatory as a premature contention interrogatory. Prism has not completed its investigation of all facts or its formulation of all contentions with respect to such issues. Prism objects to this interrogatory seeking "an amount of money" as such request seeks information that is solely in the possession or custody of VeriSign. Subject to and without waiving these objections, Prism responds as follows. Pursuant to 35 U.S.C. § 284, Prism seeks "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." Prism's contention regarding the amount of that "reasonably royalty" has not yet been determined.

Richard L. Gregg, Gerald C. Korth, and Gregory Duman are the persons within Prism most knowledgeable with respect to the subject matter of this interrogatory. Prism anticipates using at least one damages expert to opine on the amount of damages owed to it by VeriSign, which expert will also have knowledge or information sought by this interrogatory.

**INTERROGATORY NO. 7:**

Describe in detail the business of Prism and all predecessor companies, from its inception until present, identify all directors, officers and employees of such companies over that time period, and identify all financial records relating to costs and revenues from the '416 patent.

**RESPONSE TO INTERROGATORY NO. 7:**

Prism incorporates its general objections, and specifically its General Objections A, B, E, and F. Subject to and without waiving these objections, Prism responds as follows.

In 1997, and since the company's inception, Richard L. Gregg was Prism Resources, Inc.'s President and sole Director.

606362v1

In 1998 Prism Resources, Inc.'s officers and directors were Richard L. Gregg, President/Director; Brad Mellott, Director; and Drew Miller, Director. From 1998-2000, at various times, Prism Resources, Inc.'s officers and directors were Richard L. Gregg (President/Director), Mark Weiss (Chief Technology Officer), Gary Bunjer (Chief Financial Officer and Chief Operating Officer), Rick Kingsbury (Vice President of Sales), Brad Mellott (Director), and Drew Miller (Director). In 2001, Richard L. Gregg executed a shareholders buyout of certain other shareholders. From 2001 to present (October 24, 2005), Richard L. Gregg and family closely-hold all shares of Prism Resources, Inc., which is a 43% owner in Prism Technologies LLC.

In August 2003, Prism Technologies LLC purchased Prism Resources Inc.'s equipment, product software, the '416 patent, and rights to the related continuation-in-part application (U.S. Patent Application 10/230,638), and assumed certain of Prism Resources, Inc.'s debt and accounts payable. Currently (October 24, 2005), Prism Technologies LLC's managing members are Gregory J. Duman (President), Richard L. Gregg (Vice President and Chief Technology Officer), Gerald C. Korth (Vice President of Business Development and Licensing), David P. Stokes (Vice President and Chief Legal Officer), and William E. Fisher (Manager).

Prism Resources, Inc. conducted business in the field of custom software development and the related commercialization of such software until around May 2001. From then until August 2003, Prism Resources was engaged in winding down its business. Since August 2003, Prism Technologies LLC has been conducting business regarding the licensing and management of intellectual property in the field of computer security.

## FINANCIAL RECORDS

In 1997 the expenses for the '416 patent related to the patent application and its prosecution, and research and development of commercial embodiments of that patent. The '416 patent has not been licensed to any entity.

Documents identifying Prism Resources, Inc.'s and Prism Technologies LLC's employees and financial records will be produced in response to VeriSign's First Set of Requests for the Production of Documents and Things to Plaintiff Prism Technologies LLC Nos. (1-40). Further, pursuant to Fed. R. Civ. Pro. 33(d), Prism states that the information sought is contained within Prism's document production and the burden of extracting the requested information is substantially equal for VeriSign as it is for Prism.

## INTERROGATORY NO. 8:

Identify and describe in detail any attempt to license, sell or otherwise commercialize or transfer rights to the '416 patent, and identify and describe the terms of any such agreements, including licensing and sales agreements.

## RESPONSE TO INTERROGATORY NO. 8:

Prism incorporates its general objections, and specifically its General Objections A, C, E, and I. Subject to and without waiving these objections, Prism responds as follows.

Prism developed commercial embodiments of at least some of the subject matter described in the '416 patent for American Business Information, Inc. ("ABI"), Securities America, Inc. ("SAI"), and Construction Network Services, Inc. ("CNS").

To the extent they exist, non-privileged documents describing any attempt to license, sell, transfer, or otherwise commercialize the '416 patent will be produced in response to VeriSign's First Set of Requests for the Production of Documents and Things to Plaintiff Prism Technologies LLC Nos. (1-40). Pursuant to Fed. R. Civ. Pro. 33(d), Prism states that the

606362v1

information sought is contained within Prism's document production and the burden of

extracting the requested information is substantially equal for VeriSign as it is for Prism.

**INTERROGATORY NO. 9:**

Identify all entities and/or person that now or in the past have held rights (*e.g.*, ownership, right-to-sue, right-to-recovery, etc.) to the '416 patent and any patent claiming priority to the '416 patent, and state the nature of rights held (including, whether appropriate, the quantity held by each entity or person).

**RESPONSE TO INTERROGATORY NO. 9:**

Prism incorporates its general objections, and specifically its General Objections A, B, E,

and F. Subject to and without waiving these objections, Prism responds as follows. As

inventors, Richard L. Gregg, Sandeep Giri, and Timothy C. Goeke initially held the rights to the

relevant subject matter of the '416 patent. Richard L. Gregg, Sandeep Giri, and Timothy C.

Goeke assigned their rights Prism Resources, Inc. Prism Resources, Inc. subsequently

transferred its rights in the '416 patent to Prism Technologies LLC. Ownership rights in the

continuing prosecution application No. 10/230,638 transferred along with ownership rights to the

'416 patent.

**INTERROGATORY NO. 10:**

Identify and describe the specifics of any pre-complaint infringement analysis.

**RESPONSE TO INTERROGATORY NO. 10:**

Prism incorporates its general objections, and specifically its General Objections A, B, C,

and I. Subject to and without waiving these objections, Prism responds as follows. Prism

reviewed and evaluated publicly available documents regarding VeriSign, Inc.'s; RSA Security,

Inc.'s; Computer Associates, Inc.'s; Netegrity, Inc.'s; and Johnson & Johnson Services Inc.'s

(JJSI) infringing products. The claim chart provided in the response to Interrogatory No. 2

herein provides a cross-reference to certain of the documents reviewed by Prism in conducting

its pre-filing infringement analysis.  Likewise, the responses to RSA and Computer

Associates/Netegrity's interrogatories include a claim chart with cross-references to the

documents used to conduct the pre-filing infringement analyses for those infringing products.

October 24, 2005

THE BAYARD FIRM

_Richard D. Kirk_ (signature)

Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899-5130
(302) 655-5000
ATTORNEYS FOR PLAINTIFF PRISM
TECHNOLOGIES LLC

OF COUNSEL:
Dirk D. Thomas, Esq.
Robert A. Auchter, Esq.
Kenneth A. Freeling, Esq.
Jason R. Buratti, Esq.
André J. Bahou, Esq.
Robins, Kaplan, Miller & Ciresi, L.L.P.
1801 K Street, N.W., Suite 1200
Washington, D.C.  20006
(202) 775-0725

606362v1

- 18 -

**VERIFICATION**

I hereby declare on the basis of knowledge and belief, or information otherwise provided and believed by me to be true and correct, under penalty of perjury under the laws of the United States of America, that the foregoing answers to these interrogatories are true and correct.

Executed on  October 24, 2005

Mr. Richard L. Gregg
Vice President and Chief Technology Officer
Prism Technologies LLC
14707 California Street
Suite 5
Omaha, Nebraska 68154-1952

# EXHIBIT 33:
# FILED UNDER SEAL

# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PRISM TECHNOLOGIES LLC

           Plaintiff,

      v.

VERISIGN, INC., RSA SECURITY, INC.,
NETEGRITY, INC., COMPUTER
ASSOCIATES INTERNATIONAL, INC.,
and JOHNSON & JOHNSON SERVICES,
INC.,

           Defendants.

Civil Action No. CA 05-00214 JJF

**MATTHEW B. WEINSTEIN'S DECLARATION IN SUPPORT OF PLAINTIFF
PRISM TECHNOLOGIES LLC'S MOTION TO COMPEL DEFENDANT VERISIGN,
INC. TO PRODUCE THE SOURCE CODE OF THE ACCUSED PRODUCTS**

I, Matthew B. Weinstein, hereby declare as follows:

1.     My name is Matthew B. Weinstein.  I am a Law Clerk in the Washington, D.C. office of Robins, Kaplan, Miller & Ciresi, L.L.P.

2.     I hold a Bachelor of Science degree in Computer Engineering from the University of Maryland in College Park, Maryland and am a second-year law student at American University, Washington College of Law in Washington, D.C.

3.     From January, 2003 to August, 2005, I owned and operated an information technology consulting company, which among other things, performed custom software design for its clients.

4.     As part of my duties at Robins, Kaplan, Miller, & Ciresi, I have reviewed a majority of the documents produced by VeriSign during the course of this litigation.

5.     VeriSign produced over 1.6 million pages of documents of which 1.2 million pages were e-mail and associated attachments.

6.     A significant majority of the documents mentioned above describe the accused products' functionality using high-level design and marketing terms.

7.     The same documents mentioned above do not provide sufficient detail on the conclusive functionality of the accused products nor sufficient detail to rebut VeriSign's non-infringement contentions.

8.     The same documents mentioned above do not contain any "highly confidential technical design and architecture documents" as described by VeriSign in its September 26, 2006 letter to Andre Bahou.

9.     The accused products' source code is the most appropriate such document, electronically stored information, or thing as defined by FED. R. CIV. P. 34(a), in my opinion, that would be sufficient to establish, conclusively, the functionality of the accused products or rebut VeriSign's non-infringement contentions.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 31st day of January, 2007.

Matthew B. Weinstein

# EXHIBIT 35

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PRISM TECHNOLOGIES LLC,

                                    Plaintiff,

    v.

VERISIGN, INC., RSA SECURITY, INC.,
NETEGRITY, INC., COMPUTER
ASSOCIATES INTERNATIONAL, INC.,
And JOHNSON & JOHNSON
SERVICES, INC.

                                    Defendants.

Civil Action No. 05-214-JJF

**JURY TRIAL DEMANDED**

**AFFIDAVIT OF PLAINTIFF'S EXPERT MICHAEL I. SHAMOS,
PH.D, J.D., CONCERNING VERISIGN SOURCE CODE**

I, Michael Ian Shamos, depose and say as follows:

**BACKGROUND & QUALIFICATIONS**

1.  My name is Michael I. Shamos.  I am a Distinguished Career Professor in the School of

Computer Science at Carnegie Mellon University in Pittsburgh, Pennsylvania.  I was a founder and

Co-Director of the Institute for eCommerce at Carnegie Mellon and I now direct a graduate degree

program in eBusiness Technology.  My résumé is attached as Exhibit 1 to this affidavit.

2.  I teach graduate courses at Carnegie Mellon in Electronic Commerce, including

eCommerce Technology, Electronic Payment Systems, Electronic Voting and eCommerce Law and

Regulation and have done so since 1999.

3.  From 1979-1987 I was the founder and president of two computer software development

companies in Pittsburgh, Pennsylvania, Unilogic, Ltd. and Lexeme Corporation.

4.  I am an attorney admitted to practice in Pennsylvania and have been admitted to the Bar

of the U.S. Patent and Trademark Office since 1981.

1

5.  I have previously testified in a number of cases concerning computer software, intellectual property, electronic payment, electronic voting and electronic commerce matters. My résumé in Exhibit 1 contains a list of cases in which I have testified in the last ten years.

6.  I have been retained as a technical expert by the law firm of Robins Kaplan Miller & Ciresi LLP ("RKMC"), which represents Plaintiff Prism Technologies LLC ("Prism") in this action.

7.  I have been engaged through Expert Engagements LLC ("EE"), a firm that locates expert services for law firms. EE charges $475 per hour for my services, of which I receive $425. I am one of the owners of EE.

8.  RKMC has asked me to opine on whether certain products of Defendants infringe the patent at issue. I have been hindered in forming my opinions by the refusal of Verisign to produce the necessary materials.

9.  I am aware that early in this case Prism requested production of the accused authentication system of Defendant Verisign, Inc. I am also aware that, to this day, Verisign has refused to produce its source code for examination by Prism's representatives.

10. I have reviewed two items of correspondence between counsel for Prism and counsel for Verisign, discussed below, in which Verisign repeats its refusal to produce its source code under any circumstances.

11. I have been asked by RKMC to explain Prism's need for source code in order to evaluate Verisign's contentions of non-infringement.

## SOURCE CODE

12. "Source code" refers to the human-readable version of a computer program, the version in which it was originally written. In contradistinction to other descriptions of a piece of software, such as flowcharts, logic diagrams, functional requirements, specifications and documentation, all of which may be incomplete or in error, it is source code that reveals how a program behaves in practice.

AFFIDAVIT OF PLAINTIFF'S EXPERT MICHAEL I. SHAMOS, PH.D, J.D., CONCERNING SOURCE CODE,
CIVIL ACTION 05:214-JJF.

13. Design documentation and specifications of a system are rarely sufficient alone to prove infringement because the system as built and operated may differ substantially from that documentation. In this regard it is similar to the architectural plan of a building as designed, which may differ from the building as built.

14. In this regard source code, which reveals the real workings of the system, cannot be regarded as cumulative to any amount of documentation.

15. Designs cannot infringe utility patents. Prism must prove how the Verisign system actually operates, not how it was intended to operate, and needs access to source code to do so.

16. Claim 1 of the asserted patent reads, in its entirety (letters added for convenience):

"A system for controlling the operation of and access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network in an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers, comprising:

(a) clearinghouse means for storing identity data of said first server computer and the identity data of each of said subscriber client computers;

(b) server software means installed on said first server computer adapted to forward its identity data and identity data of each subscriber client computer to said clearinghouse means at the beginning of an operating session in which access to selected computer resources of said first server computer is requested;

(c) client software means installed on each of said subscriber client computers adapted to forward its identity data to said first server computer at the beginning of an operating session in which access to selected computer resources is requested;

(d) at least one hardware key connected to the subscriber client computer, said key being adapted to generate a predetermined digital identification, which identification is part of said identity data;

(e) said server software means installed on the first server computer being adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer;

(f) said clearinghouse means being adapted to authenticate the identity of said subscriber client computer responsive to a request for selected computer resources of said first server computer by a subscriber client computer; and

(g) said clearinghouse means being adapted to authenticate the identity of said first server computer responsive to said subscriber client computer making the request for selected computer resources of said first server computer; and

(h) said clearinghouse means being adapted to permit access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber client computer making first request."

3

17. The behavior of Verisign in this case suggests that it plans to contest the presence of each element of every claim, regardless of any Markman construction to be offered by the Court, as it is entitled to do. Prism, therefore, must have access to information sufficient to meet its burden of proving infringement. It is flatly unfair to allow Verisign to conceal the very information needed by Prism, crucial evidence of how the software functions, while at the same time permitting it to lie in wait with its own source code prepared to refute any argument Prism may make.

18. Claim 1 alone includes three means elements among its eight limitations. Prism will be constrained in its application of these means elements to structures disclosed in the patent and their equivalents. The case may well turn on precisely how Verisign has implemented these elements (or not), which depends sensitively on what the source code reveals.

### VERISIGN'S ARGUMENTS

19. In a letter to Prism's counsel dated September 6, 2006, Verisign's lawyer, Daniel E. Yonan, in explaining Verisign's refusal to produce even a single source code line of its accused system, made the following arguments: (1) Prism never purchased the Verisign system; (2) Prism did not request source code until after the close of discovery; (3) Verisign's source code is "highly sensitive"; (4) Verisign has already produced to Prism "materials that clearly disclose in detail how each Accused Product operates"; (5) Prism should have examined Verisign's product before filing suit.

20. Argument (1), relating to Prism's failure to purchase the Accused Product, finds no support in law. Federal Rule 34 provides a mandatory procedure for obtaining evidence in a case that does not require the plaintiff to buy the very item that has given rise to its claim.

21. Argument (2) is based on the false assertion that Prism had not previously requested the source code.

22. Argument (3), that Verisign's source code is "highly sensitive," is disingenuous. While I express no opinion whether the source code is highly sensitive or not, that basis for refusing to produce it is inconsistent with Verisign's contention (4) that Prism already has "materials that clearly disclose in detail how each Accused Product operates." If this were true, then producing the

4

source code would disclose no deeper secrets, only more precision, so it cannot, according to Verisign, be any more sensitive than the documents Verisign has already produced.

23. Conversely, if the source code indeed contains highly sensitive additional material, then materials essential for Prism to determine how the Accused Products work has been wrongfully withheld by Verisign.

24. Argument (4) is incorrect. The documentation of a computer system never fully describes what the system actually does or how it operates. A manual for Microsoft Word might explain its functions at a user level, but does not go into the logic or algorithms by which it operates. Thus it is with the Accused Products. Whether they are infringing or not depends on how they work internally, not on what interfaces they present to a user.

25. Argument (5), that Prism should have examined the source code before filing suit, is circular. It is well recognized in patent cases that a plaintiff often cannot know from outward inspection of a software product how it operates internally. A plaintiff is not required to possess proof of infringement before filing suit – it need merely possess information sufficient to support a reasonable belief that infringement has occurred.

26. Verisign's argument on this point would render discovery completely unnecessary in all civil cases. Because the plaintiff would have to possess enough information to prove his case before filing suit, discovery could not possibly add anything of value.

27. In a letter to Prism's counsel dated November 28, 2006, Verisign's lawyer, Daniel E. Yonan, supplemented his earlier letter with additional unjustified arguments to the effect that (6) Verisign has already produced 1.6 million pages of discovery to Prism and the source code would only be cumulative; and (7) "we have not informed you we would not permit inspection of source code," a not-so-subtle use of the double negative to conceal outright refusal to comply with the Federal Rules.

28. Argument (6) is false. As explained above, the source code contains details not ascertainable from the 1.6 million pages already produced. Possibly, this is precisely the reason Verisign flooded Prism with irrelevant documents instead of simply producing the source code.

5

29. Argument (7), even if it is interpreted to mean that Verisign would permit inspection of the source code under appropriate circumstances, is legally flawed. Source code is a document, not a "thing," and under Rule 34 the requestor is entitled to "inspect, copy, test, or sample any designated documents or electronically stored information — including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained — translated, if necessary, by the respondent into reasonably usable form." Prism has not been afforded the opportunity to do any of the above permitted acts on the source code.

30. Even if Verisign's argument (7) can be considered as an oblique offer to allow inspection of the source code, inspection is not an appropriate response to a discovery request at this late date. Source code is complex, and cannot be read easily as a novel might be. It is typically subjected to automated analysis tools, administrative utility software, and search engines to reveal its structure. "Inspection" is far too cursory a process to comply with Prism's discovery needs and is insufficient under Rule 34.

31. The source code of the Accused Products will occupy considerably fewer pages than the 1.6 million pages already produced by Verisign. In my opinion, the only reason that Verisign would produce 1.6 million pages and then complain that producing the source code would be burdensome after having undertaken to conceal the source code raises the justifiable inference that the Accused Products are indeed infringing. If Verisign disputes this point, it might lay the contention to rest by producing the source code.

32. In examining the code, I would comply scrupulously and to the letter with any protective order or confidentially agreement imposed by the Court.

### CONCLUSION

33. The Verisign source code long ago requested by Prism is necessary to Prism's case and should be ordered to be produced.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct and represent my opinions as an expert.

6

Executed on January 19, 2007 in Pittsburgh, PA.

Michael Ian Shamos, Ph.D., J.D.

AFFIDAVIT OF PLAINTIFF'S EXPERT MICHAEL I. SHAMOS, PH.D, J.D., CONCERNING SOURCE CODE, CIVIL ACTION 05:214-JJF.

Resume (short)

# Resume of Michael Ian Shamos

**ACADEMIC**
Education
Foreign Languages
Honors
Editorships
Publications

**LEGAL**
Experience
Bar Admissions
Expert Witness
Legislative Testimony
Arbitration

**ELECTRONIC VOTING**
Experience
Legislative Testimony
Publications

**BUSINESS**
Experience
Consulting
Directorships

**PERSONAL DATA**
Contact Information

**PUBLICATIONS**
Science
Digital Libraries
Electronic Voting
Billiards
In Preparation

**INVITED TALKS**
Electronic Commerce
Science and Law
Electronic Voting

**MISCELLANEOUS**
Personal Data

## Education

**A.B.** (1968) Princeton University (Physics). Thesis: "An Absorber Theory of Gravitational Radiation". Advisor: John A. Wheeler.

**M.A.** (1970) Vassar College (Physics). Thesis: "An Absorber Theory of Acoustical Radiation." Advisor: Morton A. Tavel.

**M.S.** (1972) American University (Technology of Management).

**M.S.** (1973) Yale University (Computer Science).

**M.Phil.** (1974) Yale University (Computer Science).

**Ph.D.** (1978) Yale University (Computer Science). Thesis: "Computational Geometry". Thesis committee: David Dobkin, Martin H. Schultz, Stanley C. Eisenstat.

**J.D.** (1981) Duquesne University, *cum laude*.

## Foreign Languages

French, Russian (good reading and technical translation skills, fair conversational ability).

## Academic Experience

Distinguished Career Professor, Institute for Software Research and Language Technologies Institute, School of Computer Science, Carnegie Mellon University (2001- ). Principal Systems Scientist (1998-2001). Principal Lecturer (2002-2003). Teaching Professor (2003- ). Faculty, Tepper School of Business, Carnegie Mellon University (1999-2005).

Co-Director, Carnegie Mellon Institute for eCommerce (1998- ). Vice-Chair, University Research Council (2000-2002), Director, eBusiness Technology degree program

Resume (short)

Contact Information

(2003-).

Director, Universal Library, Carnegie Mellon University (1998-).

Visiting Professor, Department of Electrical and Electronic Engineering, The University of Hong Kong (2001- ).

Adjunct Faculty, Carnegie Mellon University, Department of Computer Science (1981-1998). Formerly Assistant Professor, Carnegie Mellon University, Departments of Computer Science and Mathematics (1975-81), Dept. of Statistics (1978-81).

**Recent courses taught (Carnegie Mellon):**
Algorithm Design and Analysis 15-451 (Comp. Sci.)
Intellectual Capital and its Protection 45-886 (MBA)
Ecommerce Technology 20-751 (MSEC program)
Electronic Payment Systems 20-753 (MSEC program), 96-774 (MSIT program)
Ecommerce Law and Regulation 46-840 (MSEC program)
Electronic Voting 17-803
Ubiquitous Computing, 96-761

**Honors and Awards**

Fellow, Society of the Sigma Xi (1974-83).

IBM Fellowship, Yale University (1974–75).

SIAM National Lecturer (1977–78).

Distinguished Lecturer (computer science), University of Rochester (1978); McGill University (1979).

Duquesne University Law Review (1980–81).

Black & White Scotch Achiever's Award (first annual, 1991, for contributions to bagpipe musicography).

Industry Service Award of the Billiard and Bowling Institute of America, 1996 (for contributions to billiard history).

Billiard Worldcup Association official referee (2001-)

Resume (short)

## Editorships

Editor-in-Chief, <u>Journal of Privacy Technology</u> (2003- 2006).

Member of Editorial Board, *Electronic Commerce Research Journal* (2000- ).

Member of Editorial Board, *Pittsburgh Journal of Technology, Law and Policy* (1999- ).

Dr. Shamos has reviewed scientific papers for <u>*Communications of the ACM*</u>, *Mathematical Reviews*, *IEEE Computer*, *IEEE Transactions on Computers*, <u>*Information Processing Letters*</u>, <u>*Journal of the ACM*</u> and the <u>*Journal of Computational Physics*</u>.

Contributing Editor, <u>*Billiards Digest*</u> magazine (1990- ).

## Legal Experience

Special Counsel, <u>Reed Smith LLP</u> (2000-2003), electronic commerce law.

Shareholder, <u>The Webb Law Firm</u> (1996-2000), intellectual property law. Associate (1990-95).

Private practice of law (1987-90), intellectual property

Associate, law firm of <u>Buchanan, Ingersoll, P. C.</u> (1985-87), Emerging Companies Department.

General Counsel, <u>Carnegie Group, Inc.</u> (1983-85), artificial intelligence company.

Private practice of law (1981-83), computer law.

## Bar Admissions

<u>Supreme Court of Pennsylvania</u> (1981– ).

<u>United States District Court for the Western District of Pennsylvania</u> (1981– ).

United States Patent and Trademark Office (1981– ).

United States Tax Court (1982– ).

United States Court of Appeals for the Armed Forces (1982– ).

United States Court of Appeals for the Third Circuit (1982– ).

United States Supreme Court (1985– ).

United States Court of Appeals for the Federal Circuit (1985– ).

## Expert Witness

Dr. Shamos serves as an expert witness in computer software and electronic voting cases. He has participated in the following:

*C.W. Communications, Inc. v. International Research Service, Inc.*, Civil Action No. 84-890, (W.D. Pa. 1984), aff'd. Case No. 88-3331 (3d Cir., Oct. 31, 1988). Dr. Shamos testified as to the fame of the "Computerworld" trademark. Result: permanent injunction against its infringement. Judge McCune's Memorandum and Order states. "We accept the conclusion drawn by Dr. Shamos."

*E.F. Hutton, Inc. v. Gipson* (W.D. Pa. 1985). Dr. Shamos testified as to fraud in the inducement by a computer hardware supplier. Result: compensatory damages + $250,000 punitive damages.

*Levinson Steel Co. v. American Software, Inc. et al.*, Civil Action No. 96-282, W.D. Pa. (1996). Dr. Shamos testified for plaintiff concerning bad faith estimates of computer system capacity. Result: settlement in favor of plaintiff in an undisclosed amount. Contact: Anthony Basinski, Esq., Reed Smith LLP.

*ASE Limited v. INCO Alloys International, Inc.*, Civil Action No. 98-1266, (W.D. Pa. 1998). Dr. Shamos testified for defendant concerning breach of computer services contract by declaratory judgment plaintiff. Result: determination that defendant was free to seek services from a different

vendor.

*Twentieth Century Fox Film Corp. v. iCraveTV.*, 53 U.S.P.Q. 2d 1831 (W.D. Pa. 2000). Testified for Plaintiffs concerning Internet technology used to stream video from U.S. TV stations through web sites in Canada. Result: TRO and preliminary injunction issued against defendants prohibiting continued infringement in the U.S. Contact: Gregory Jordan, Esq., Reed Smith LLP.

Invited testimony before the British House of Lords, Subcommittee B of the European Union Committee, April 20, 2000. Subject: European regulation of eCommerce. View testimony.

*Universal Studios, Inc. v. Reimerdes,* 111 F. Supp. 2d 294 (S. D.N.Y. 2000), aff'd 273 F.3d 429 (2d Cir. 2001). Testified for plaintiff movie studios concerning accused software for decrypting DVDs in the first case interpreting the Digital Millennium Copyright Act. Result: permanent injunction issued in favor of plaintiffs on August 17, 2000. Contact: William Hart, Esq., Proskauer Rose LLP. View testimony. View opinion. View appellate opinion.

*MercExchange, L.L.C. v. eBay, Inc. et al.*, Case No. 2:01-CV-736 (E.D. Va. 2001). Served as an expert for defendant eBay in an infringement case concerning U.S. Patent 6,202,051 for Internet auctions. Case is pending; following Dr. Shamos' reports, Defendants obtained a summary judgment of noninfringement of the subject patent, one of several at issue in the suit. Contact: Tim Teter, Esq., Cooley Godward LLP.

*Powerquest Corp. v. Quarterdeck Corp. et al.*, Case No. 2:97-CV-0783 (D. Utah 1997). Served as an expert for plaintiff PowerQuest in an infringement case concerning U. S. Patents 5,675,769 and 5,706,472 for a method of resizing hard disk partitions. Dr. Shamos testified at the Markman hearing. Case settled when one of the defendants acquire plaintiff. Contact: Gregg Anderson, Esq., Merchant & Gould, Denver, CO.

*Sightsound.Com Inc. v. N2K Inc. et al.*, C.A. 98-118 (W.D. Pa. 1998). Serving as an expert for defendants, including a subsidiary of Bertelsmann AG, concerning validity of U.S. Patents 5,191,573 and 5,966,440 for distribution of digital

audio via telecommunications lines.  Case settled.  Contact: <u>Steven M. Hayes, Esq.</u>, Parcher, Hayes & Snyder, 500 Fifth Avenue, New York, NY 10110.

*Freemarkets, Inc. v. B2eMarkets, Inc.*, C.A. 02-162-SLR (D. Del. 2002).  Served as an expert witness for plaintiff concerning infringement of U.S. patents <u>6,216,114</u> and <u>6,223,167</u> concerning methods of conducting electronic auctions.  Case settled two weeks after expert attended a demonstration of the accused product.  Contact: <u>D. Michael Underhill, Esq.</u>, Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Ave. N.W., Washington, DC 20004.

*Lifecast.com, Inc. v. ClubCorp, Inc.*, AAA Case No. 71Y1170076301 (Dallas, TX).  Served as an expert witness for respondent in a case alleging copyright infringement of Internet websites.  Testified at arbitration.  Result: Complainant's claims denied; award for respondent on counterclaims and for attorney's fees.  Contact: <u>Bill Whitehill, Esq.</u>, Gardere Wynne Sewell LLP, 1601 Elm St., Dallas, TX 75201.

*IP Innovation LLC v. Thomson Learning, Inc. et al.*, Case H-02-2031 (S.D. Tex. 2002).  Served as a expert for defendant The Princeton Review, Inc. concerning alleged infringement of U.S. Patent <u>4,877,404</u> relating to online delivery of educational courses.  Summary judgment of non-infringement obtained for defendant after favorable Markman proceeding.  Contact: <u>Peter Vogel, Esq.</u>, Gardere Wynne Sewell LLP, 1601 Elm St., Dallas, TX 75201.

*Starpay.com LLC et al. v. Visa International Service Association et al.*, Case 3-03-CV-976-L (N.D. Tex. 2003).  Serving as an expert for defendant Visa concerning alleged infringement of U.S. Patent <u>5,903,878</u> relating to online authentication of credit card customers.  Dr. Shamos provided the court with a Markman tutorial on Oct. 22, 2004.  Status: pending.  Contact: <u>Johnny A. Kumar, Esq.</u>, Heller Ehrman White & McAuliffe, LLP, 1717 Rhode Island Ave. NW, Washington, D.C., 20036.

*Safeclick LLC v. Visa International Service Association et al.*, Case C-03-5865 (N.D. Cal. 2003).  Serving as an expert for defendant Visa concerning alleged infringement of U.S. Patent <u>5,793,028</u> relating to online authentication of credit

card customers.  Summary judgment of noninfringement granted for Visa based on expert reports.  Contact: <u>Stanley Young, Esq.</u>, <u>Heller Ehrman, LLP</u>, 275 Middlefield Road, Menlo Park, CA 94025.

*Wells Fargo Bank Minnesota, NA et al. v. UBS Warburg Real Estate Securities, Inc.*, Case 02-2849 (192d Judicial District, Dallas Cty., Tex, 2002) and *LaSalle Bank, NA et al. v. UBS Warburg Real Estate Securities, Inc.*, Case 02-2899-G (134th Judicial District, Dallas Cty., Tex, 2002).  Serving as an expert for defendant UBS Warburg in an electronic discovery matter involving a case of first impression regarding Texas Discovery Rule 196.4 allocating costs of discovery of electronic records.  Status: pending.  Contact: <u>Dawn Estes, Esq.</u>, <u>Gardere Wynne Sewell LLP</u>, 1601 Elm St., Dallas, TX 75201.

*American Association of People with Disabilities et al. v. Shelley et al.*, Case No. CV04-1526 FMC (PJWx) (C. D. Calif., 2004).  Served as an expert for plaintiff AAPD, which has brought a claim against the California Secretary of State that requiring DRE voting machines to be equipped with audit trails violates the rights of disabled persons.  Plaintiffs' application for TRO and preliminary injunction denied.  Contact: <u>John McDermott. Esq.</u>, <u>Howrey Simon Arnold & White</u>, 550 South Hope St., Suite 1100, Los Angeles, CA 90071.

*Paul Ware v. Target Corp.*, CA 4:03-CV-0243-HLM (N.D. Ga., 2003).  Served as an expert for defendant Target Corp., a large retailer, in a case involving U.S. patent 4,707,492, claiming a method of conducting credit card sales.  Case settled during Markman preparations.  Contact: <u>Thomas Burke, Esq.</u>, <u>Fish & Neave</u>, 1251 Ave. of the Americas, New York, NY 10020.

*Viad Corp., v. C. Alan Cordial et al.,* No. 03-1408 (W.D. Pa., filed 2003).  Served as an expert for defendants in an action alleging misappropriation of trade secrets relating to software for automating certain aspects of the exhibit booth and trade show industries.  Status: case settled immediately before trial, after plaintiff's unsuccessful Daubert challenge of Dr. Shamos.  Contact: <u>Barbara Scheib, Esq.</u>, <u>Cohen & Grigsby, P.C.</u>, 11 Stanwix Street, Pittsburgh, PA 15222.

*Schade et al. v. Maryland State Bd. of Elections et al.*, Case No. C0497297 (Cir. Ct. Anne Arundel Cty. Md., 2004). Serving as an expert for defendants in a case challenging the decision of the Board of Elections not to decertify Diebold AccuVote system.  Result: Plaintiff's motion for preliminary injunction denied, upheld on appeal.  Judge Manck's opinion cites Dr. Shamos' testimony as follows: "the court finds Dr. Shamos, Defendants' expert, to be the true voice of reason and the most credible expert in this matter."  Remainder of case is pending.  Contact: Michael Berman, Esq., Deputy Attorney General, 200 St. Paul Place, Baltimore, MD 21202-2021.

*Wexler et al. v. Lepore et al.*, Case No. 04-80216 (CIV-COHN) (S.D. Fla. 2004) .  Served as an expert for defendants, various Florida election supervisors against claim by U.S. Congressman Robert Wexler that use of DRE voting machines without paper audit trails violates the equal protection clause of the U.S. Constitution.  Dr. Shamos testified on Oct. 19, 2004.  The trial judge rendered judgment in favor of defendants on Oct. 25.  Contact: Jason Vail, Esq., Assistant Attorney General, Department of Legal Affairs, The Capitol, Tallahassee, FL 32399-1050.  Opinion.

*Siemens Information and Communication Networks, Inc. v. Inter-Commercial Business Systems, Inc.*, Civil Action 3-03CV2171-L (N.D. Tex. 2004).  Served as an expert for defendant against claim of copyright infringement based on reverse-engineered firmware resident in telephone switching systems.  Status: case settled shortly after the submission of Dr. Shamos's rebuttal report on non-infringement.  Contact: Bill Whitehill, Esq., Gardere Wynne Sewell LLP, 1601 Elm St., Dallas, TX 75201.

*Soverain Software LLC v. Amazon.com, Inc.*, C.A. No. 6:04-CV-14 (E.D. Tex. 2004).  Served as an expert for plaintiff regarding asserted patents 5,708,780, 5,715,314 and 5,909,492, relating to the shopping cart paradigm of electronic commerce.  Status: settled in Sept. 2005 with Amazon paying $40 million to Soverain and taking a license under the patents in suit.  Contact: Thomas L. Giannetti, Esq., Jones Day, 222 E. 41st St., New York, NY 10017.

*CollegeNET, Inc. v. The Princeton Review, Inc.*, Case '051205KI (D. Ore. 2005).  Serving as a expert for defendant

The Princeton Review, Inc. concerning alleged infringement of U.S. Patent 6,460,042 relating to online delivery of educational courses.  Case is pending.  Contact: Peter Vogel, Esq., Gardere Wynne Sewell LLP, 1601 Elm St., Dallas, TX 75201.

*CombineNet, Inc. v. Verticalnet. Inc.*, GD 05-018911 (Ct. Common Pleas, Allegheny Cty., PA).  Served as an expert for plaintiff in an action for trade secret misappropriation relating to a system for conducting electronic auctions. Plaintiff won in arbitration.  Contact: Mark Knedeisen, Esq., Kirkpatrick & Lockhart Nicholson Graham LLP, 535 Smithfield Street, Pittsburgh, PA 15222-2312.

*RealSource, Inc. v. Best Buy Co., Inc. et al.*, No. A04-CA-771-LY (W.D. Tex.).  Serving as an expert for defendant Lowe's Companies, Inc., against a claim of infringement of U.S. patent 5,732,136 relating to validation of point-of-sale debit card transactions.  Provided a tutorial to the Court during Markman proceedings concerning debit card technology. Case is pending.  Contact: Michael S. Connor, Esq., Alston & Bird LLP, Bank of America Plaza, 101 South Tryon St, Suite 4000, Charlotte, NC 28280-4000.

*DE Technologies, Inc. v. Dell, Inc. et al.*, No. 7:04-CV-00628 (W.D. Va.).  Serving as an expert for plaintiff DE Technologies, Inc., asserting a claim of infringement of U.S. patents 6,460,020 and 6,845,364,  relating to a system for implementing international sales transactions.  Case is pending.  Contact: David Marder, Esq., Robins Kaplan Miller & Ciresi LLP, 800 Boylston Street, 25th Floor, Boston, MA 02199.

*Eaton Power Quality Corp. v. J.T. Packard & Associates*, No. 05 C 3545 (N.D. Ill. 2005).  Serving as expert for plaintiff in a claim of software copyright infringement involving a system for configuring industrial uninterruptible power supplied. Case is pending.  Contact: Keith Schoeneberger, Esq., LeBoeuf, Lamb, Greene & MacRae LLP, Suite 1175, 180 North Stetson Ave., Chicago, IL 60601-6783.

*Taylor et al. v. Onorato et al.*, CA 06-481 (W.D. Pa 2006). Serving as an expert for Commonwealth of Pennsylvania defendants in an action seeking to enjoin the use of electronic voting machines in Allegheny County, PA.  Dr.

Shamos testified at length in a preliminary injunction hearing held April 25-27, 2006. The injunction was denied on April 28. The remainder of the case is pending. Contact: Mark Aronchick, Esq., Hangley Aronchick Segal & Pudlin, One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103.

*FedEx Ground Package System, Inc. v. Applications International Corp.*, CA No. 03-1512 (W.D. Pa.). Serving as an expert for defendant counterclaiming for copyright infringement and trade secret misappropriation relating to software for maintaining occupational health and safety records. Case is pending. Contact: Ronald Hicks, Esq., Meyer, Unkovic & Scott LLP, 1300 Oliver Bldg., Pittsburgh, PA 15222.

*NetMoneyIN, Inc. v. Verisign, Inc. et al.*, Cv-01-441-TUC-RCC (D. Ariz.). Serving as an expert for defendants Bank of America Merchant Services, Inc. and Wells Fargo Bank, N.A., who are accused of infringing claim 23 of U.S. patent 5,822,737, relating to an electronic payment system. Case is pending. Contact: Robert Smith, Esq., Kirkpatrick & Lockhart Nicholson Graham, LLP, State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111-2950.

*Contois Music Technology, LLC v. Apple Computer, Inc.*, 2:05-CV-163 (D. Vermont, filed Feb. 13, 2006). Served as an expert for plaintiff in an action alleging that the Apple iTunes software infringed U.S. patent 5,864,868, relating to a method for selecting music from am electronic catalog. Case settled after a favorable Markman order. Contact: John Rabena, Esq., Sughrue Mion, PLLC, 2100 Pennsylvania Avenue, NW, Suite 800, Washington, DC 20037-3213.

*Banfield et al. v. Cortes*, 442 MD 2006 (PA Cmwlth. Ct.). Serving as an expert for defendant Secretary of the Commonwealth of Pennsylvania in an action to compel the decertification of all electronic voting machines in Pennsylvania. Case is pending.

*Remote Inventory Systems, Inc. v. WESCO Distribution, Inc.*, AAA Case No. 55 171 00493 05 (Pittsburgh, PA). Serving as an expert for respondent in a case alleging misappropriation of trade secrets in a computerized

inventory system.  Case is pending.  Contact: <u>Kirsten Rydstrom, Esq.</u>, <u>Reed Smith LLP</u>, 435 Sixth Ave., Pittsburgh, PA 15219.

*SyncSort, Inc. v. Innovative Routines International, Inc.,* Civil Action No.  04-3623 (WHW) (D. New Jersey).  Serving an an expert witness for defendant in an action alleging misappropriation of trade secrets embodied in plaintiff's Unix sorting software.  Case is pending.  Contact: <u>David R. Fine, Esq.</u>, <u>Kirkpatrick & Lockhart Nicholson Graham, LLP</u>, 17 N. Second Street, 18th Floor, Harrisburg, PA 17101-1507.

## Legislative Testimony

Testimony before the Texas Legislature concerning electronic voting, Austin, Texas, 1987.  Result: passage of the Texas Electronic Voting Law.

Invited <u>testimony</u> before the British House of Lords, Subcommittee B of the European Union Committee, April 20, 2000.   Subject: European regulation of eCommerce.

<u>Testimony</u> before the Pennsylvania Legislature State Government Committee concerning electronic voting, Philadelphia, March 10, 2004.

<u>Testimony</u> before the United States Commission on Civil Rights concerning electronic voting, Washington, DC, April 9, 2004.

<u>Testimony</u> before the U.S. House of Representatives Committee on Science concerning voting system certification, Washington, DC, June 24, 2004.

<u>Testimony</u> before the U.S. House of Representatives Committee on House Administration concerning voting system security, Washington, DC, July 7, 2004.

<u>Testimony</u> before the U.S. House of Representatives Committee on Government Reform concerning electronic voting technology, Washington, DC, July 20, 2004.

Testimony on DREs and paper trails before the Virginia Legislature Study Commission on Voting System Certification and Security, Richmond, VA, August 16, 2004.

Testimony before the Election Assistance Commission, Technical Guidelines Development Committee, Subcommittee on Computer Security and Transparency, Gaithersburg, MD, Sept. 20, 2004.

Testimony before the House Ways and Means Committee of the Maryland General Assembly on voting machine paper trails, Annapolis, MD, December 7, 2004.

Testimony before the U.S. House of Representatives Committee on House Administration concerning paper trails, Washington, DC, September 28, 2006.

Testimony before the U.S. Election Assistance Commission concerning the Voting System Testing and Certification Program, Washington, DC, October 26, 2006.

## Arbitration

Dr. Shamos has served as an arbitrator in computer-related disputes for the American Arbitration Association.

## Electronic Voting

Dr. Shamos has served as an examiner of electronic voting systems and consultant on electronic voting.

Consultant to the Pennsylvania Secretary of the Commonwealth (2004- ).

Project SERVE Security Peer Review Group (2003).

Attorney General's Designee for electronic voting examinations, State of Texas (1987-2000).

Attorney for Counsel to the Secretary of the Commonwealth, Commonwealth of Pennsylvania. (1998-2000); Statutory Examiner for electronic voting, Commonwealth of Pennsylvania (1980-1996).

Consultant to Montgomery County, Pennsylvania (1996).

Consultant to the Secretary of State of Nevada (1996).

Consultant to the Delaware Legislature (1989).

## Business Experience

President, Unus, Inc., database publishing software (formerly Unilogic, Ltd.) (1990-1992)

President, Lexeme Corporation (1984-87), software language translation products.

Managing Partner, Shamos and Tchen (1978-82), computer consulting firm.

Supervisory Programmer, National Cancer Institute (1970-72), while a commissioned officer in the United States Public Health Service (O-3).

Associate Engineer, IBM Corporation (1968-70), design of manufacturing information systems.

## Consulting

Morgan Stanley Dean Witter (2000-2002 ).  Contact: Stephanie Homes.

McKinsey & Co. (1999-2001).   Contact: Will Draper (BTO Stamford)

Bell Atlantic Corporation (1999-).  Contact: John Martin.

LG-CNS, South Korea (2002-).  Project to automate the Korean court system.

## Directorships

Unilogic, Ltd. (1979–87) (later Unus, Inc. d/b/a Cygnet Publishing Technologies, 1987- ).  Database publishing software.

The Billiard Archive (1983– ).  Historical nonprofit foundation.

Lexeme Corporation (1984-1987).  Computer source language translation.

Insurance Technology Corporation (1992–1995).  IT consulting for the insurance industry.

## Personal Data

Date of birth: April 21, 1947.

Married to Julie Shamos (formerly Julie Van Allen), August 12, 1973.

Children: Josselyn (born May 20, 1982), Alexander (born August 3, 1984).

Military Status: Veteran (Commissioned Officer, U.S. Public Health Service, 1970-72).

Health: excellent

## Contact Information

Office Address:
Language Technologies Institute
4515 Newell Simon Hall
Carnegie Mellon University
Pittsburgh, PA  15213
Office Telephone:  412-268-8193
Office Fax: 412-268-6298
Email: shamos@cs.cmu.edu

Home Address:
605 Devonshire Street
Pittsburgh, PA  15213-2904
Home Telephone:  412-681-8398
Home Fax: 412-681-8916

## Publications

### SCIENCE

Books

1. *Computational Geometry: An Introduction*, with F. P. Preparata. Springer-Verlag (1985, revised ed., 1991), 390 pp.  ISBN 0387961313. According to Citeseer, this is the 28th most frequently cited work in

computer science.

2. *Vyichislitel'naya Geometria: Vyedyeniye.* Russian translation of "Computational Geometry: An Introduction." Moscow: Mir Publishers (1989). ISBN 5030010416.

3. *Keisan kikagaku nyumon.* Japanese translated by T. Asano and T. Asano of *Computational Geometry: An Introduction,* with F. P. Preparata. Soken Shuppan (Jul. 1992). ISBN4795263213.

4. *Handbook of Academic Titles.* 198 pp. (Nov. 2002). An encyclopedia of various academic designations used at over 1000 colleges and universities in the United States.

5. *Geometria obliczeniowa. Wprowadzenie.* Polish translation of "Computational Geometry: An Introduction." Warsaw: Helion (2003) 392 pp. ISBN 83-7361-098-7.

Articles

1. "On the Piezoelectric Effect in Bone," with M. H. Shamos and L. S. Lavine. *Nature* **197**:81 (1963).

2. "An Absorber Theory of Acoustic Radiation," with M. A. Tavel. *Journal of the Acoustical Society of America* **54**:46–49 (1973).

3. "Problems in Computational Geometry." Unpublished book manuscript (1974, revised 1977). Distributed in photocopy.

4. "Geometric Complexity." *Proceedings of the Seventh Annual ACM Symposium on Automata and Theory of Computation* (May 1975) 224–233.

5. "Closest-point Problems," with D. J. Hoey. *Proceedings of the Sixteenth IEEE Symposium on Foundations of Computer Science* (Oct. 1975) 151–162.

6. "Divide and Conquer in Multidimensional Space," with J. L. Bentley. *Proceedings of the Eighth Annual ACM Symposium on Automata and Theory of Computing* (May 1976) 220–230.

7. "Geometric Intersection Problems," with D. J. Hoey. *Proceedings of the Seventeenth Annual IEEE Symposium on Foundations of Computer Science* (Oct. 1976) 208–215.

8. "Lower Bounds from Complex Function Theory," with G. Yuval. *Proceedings of the Seventeenth Annual IEEE Symposium on Foundations of Computer Science* (Oct. 1976) 268–273.

9. "Geometry and Statistics: Problems at the Interface." In *Algorithms and Complexity: New Directions and Recent Results*, J. F. Traub, ed., Academic Press (1976) 251–280.

10. "Divide and Conquer for Linear Expected Time," with J. L. Bentley. *Information Processing Letters* 7 (1977) 87–91.

11. "A Problem in Multivariate Statistics: Algorithm, Data Structure, and Applications," with J. L. Bentley. *Proceedings of the Fifteenth Allerton Conference on Communications, Control and Computers* (Sep. 1977) 193–201.

12. "Optimal Algorithms for Structuring Geographic Data," with J. L. Bentley. *Proceedings of the Harvard Conference on Topological Data Structures for Geographic Information Systems* (Oct. 1977) 43–51.

13. "Computational Geometry." Ph.D. Thesis, Yale University (1978). University Microfilms, Ann Arbor, MI.

14. "On Time and Space," with A. R. Meyer. In *Perspectives on Computer Science*, A. K. Jones, ed. Academic Press (1978).

15. *Combinatorics on Graphs I: Graph Polynomials*. Unpublished book manuscript (1978).

16. "Robust Picture Processing Operators and Their Implementation as Circuits." *Proceedings of the Fall 1978 Workshop on Image Processing*, Carnegie Mellon University (1978).

17. "A practical system for source language translation," with T. R. Kueny and P. L. Lehman. *Proceedings of the National Conf. on Software Reuseability and Maintainability*, pp. B-1 – B-12, Washington, DC (Sep. 1986).

18. "The Early Years of Computational Geometry -- A Personal Memoir." *Advances in Discrete and Computational Geometry* (B. Chazelle, J. E. Goodman, and R. Pollack, eds.), *Contemporary Mathematics*, Amer. Math. Soc., Providence (1998).

### DIGITAL LIBRARIES

Articles

1. "Machines as readers: a solution to the copyright problem." J. Zhejiang Univ. Science 6A, 11, pp. 1179-1187 (Nov. 2005).

Reports

1. "Japanese Digital Information Policy, Intellectual Property and Economics," in "Digital Information Organization in Japan," International Technology Research Institute (1998).

### ELECTRONIC VOTING

Articles

1. "Voting System Certification — An Examiner's View." Invited paper presented at the Election Center Conference, Reno, Nevada (Sep. 1989).

2. "Electronic Voting — Evaluating the Threat." Proc. Third ACM Conf. on Computers, Freedom & Privacy, San Francisco, CA (Mar. 1993).

3. "Paper v. Electronic Voting Records — An Assessment." Proc. 14th ACM Conf. on Computers, Freedom & Privacy, Berkeley, CA (Apr. 2004).

4. "Evaluation of Voting Systems," with P.L. Vora, B. Adida, R. Bucholz, D. Chaum, D. Dill, D. Jefferson, D. Jones, W. Lattin, A. Rubin and M. Young, Commun. ACM 47(11):144 (2004).

### BILLIARDS

Books

1. *Pool.* New York: Mallard Press division of Bantam-Doubleday-Dell Promotional Book Company (Aug. 1991). 128 pp. ISBN 0-7924-5310-7.

2. *Le billard et le billard américain.* Paris: Minerva, 1992, reprinted 1997. 128 pp. Translation by Jean-Yves Prate of the author's American book, *Pool.* ISBN 2–8307–0160–7 (1992), 2-8814-3135-6 (1997).

3. *The Illustrated Encyclopedia of Billiards.* New York: Lyons & Burford (1993). 310 pp. ISBN 1-55821-219-1.

4. *Pool Snooker Carambola.* Padua: Facto Edizioni (1993). 128 pp. Italian translation of *Pool.* Translated by Elisabetta Bezzon. ISBN 88-85860-20-6. The only English-language billiard book ever published in Italian.

5. _Pool_.  New York: Friedman/Fairfax (Jun. 1994). 128 pp.  ISBN 1-56799-061-4.   Paperback edition of the author's 1991 _Pool_.

6. _Shooting Pool: The People, the Passion, the Pulse of the Game,_ with photographs by George Bennett.  New York: Artisan (Jun. 1998). 144 pp.  ISBN 1-885183-95-X.   A Book-of-the-Month Club bonus selection (Fall, 1998).

7. _Setting the Stage for Fifty Years_. Coralville, IA: Billiard Congress of America (Jun. 1998). 88 pp.   A history of the Billiard Congress of America.

8. _The New Illustrated Encyclopedia of Billiards_.  New York: Lyons Press (1999).  320 pp.  ISBN 1-55821-797-5.  An expanded and revised edition of _The Illustrated Encyclopedia of Billiards_.

9. _The Complete Book of Billiards_.  New York: Gramercy Books (2000). 306 pp.  ISBN 0-517-20869-5.  Reissue of author's 1993 _The Illustrated Encyclopedia of Billiards_.

## In Preparation

### SCIENCE

Books

1. _A Catalog of the Real Numbers_.   A list, patterned after Sloane & Plouffe, The Encyclopedia of Integer Sequences, Academic Press (1995). Over 8000 interesting real numbers arranging in lexical order by decimal expansion, with accompanying formulas.

2. _Handbook of Academic Titles_.

Articles

1. _Overcounting Functions_.   A systematic method of transforming certain multiple summations into single summations, with new number-theoretic results.

2. _Property Enumerators and a Partial Sum Theorem_.   A new result allowing rapid symbolic evaluation of certain types of double summations.

### LAW

Books

1. *A Dictionary of American Intellectual Property*.

## Invited Talks

### ELECTRONIC COMMERCE

"The U.S., Korea and the Internet Bubble." Korea International Trade Association (Seoul, July 2003).

"Electronic Judiciary Services in the United States." Address at the Supreme Court of Korea (Dec. 2004).

"eGovernment in the United States." Public address at the University of Hong Kong (Feb. 2005).

### SCIENCE AND LAW

"Digital Property in the 21st Century." Keynote address for the Spring Meeting of the American Intellectual Property Law Association, Pittsburgh, PA (May 2000). View slides.

"Who Owns This Algorithm?" Carnegie Mellon University (Nov 1991); Microelectronics and Computer Corporation (Jan. 1992); Univ. of Texas at Austin (Jan. 1992); UCLA (Feb. 1992).

"New Computer Technology and Its Application to Worker's Compensation." Forum IV, Newport Beach, CA (Feb. 1992).

"The Office of the Future, If There Is One." 1994 IAIABC Conf., Pittsburgh, PA (Sep. 1994).

"The Fringes of Infringement." University of Texas, Austin, TX (Sep. 1995).

"The Arts and the Internet." Allegheny County Bar Association Continuing Legal Education course (June 26, 1996).

"The Universal Information Resource." Inventing the Future, Symposium in Honor of Raj Reddy's 60th Birthday, Carnegie Mellon University, Pittsburgh, PA (May 1998).

"The Universal Library." University of Texas at Austin (Sep. 1998)

"The Universal Library and Its Role in Scientific Information." Keynote address to the RNA Society symposium on Emerging Sources of RNA

Information, Arlington, VA (Dec. 8, 1998).

"Digital Property in the 21st Century."  Luncheon address to the American Intellectual Property Law Association, Pittsburgh, PA (May. 2000).

"The Future of eCommerce."  Address to the Association for Corporate Growth, Pittsburgh, PA (Dec. 2001).

"Copyright Protection and Distance Learning."  Hong Kong Intellectual Property Office (Feb. 2002).

"Surprises in Experimental Mathematics."  Carnegie Mellon University Mathematics Seminar (Feb. 2002).

"The Universal Dictionary." Address at International Institute of Information Technologies (IIIT), Hyderabad, India (Jan. 2003).

"The Million Book Projects."  Public address at the University of Hong Kong (Jan. 2003).

"Mathematics and the Privacy Laws."  ALADDIN Workshop on Privacy in D.A.T.A., Pittsburgh, PA (Mar. 2003).

"Machines as readers: a solution to the copyright problem."  1st Int'l Conf. on Universal Digital Library, Hangzhou, China (Nov. 2005).

"University Technology Transfer: How to Fix It." Asia Conference on Technology Transfer (ACTT) 2006, Seoul, S. Korea (Mar. 2006).

### ELECTRONIC VOTING

"Voting System Certification — An Examiner's View."  Election Center Conference, Reno, Nevada (Sep. 1989).

"Electronic Voting — Evaluating the Threat." Third Conf. on Computers, Freedom and Privacy, San Francisco, CA (Mar. 1993).

"What's Happing in Florida?" Carnegie Mellon University (Nov. 2001)."

"Electronic Voting: The Technology of Democracy." Hong Kong University (Feb. 2004).

"Theory v. Practice in Electronic Voting."  DIMACS (Rutgers Univ., May 2004).

"HAVA: Are We Ready?" Panel at the League of Women Voters National Convention, Washington, DC (Jun. 2004).

"Testing Voting Machines." Panel at the American Enterprise Institute, Washington, DC (Jun. 2004).

"Electronic Voting: Promise and Peril." Talk at the Moritz College of Law, Ohio State University (Sep. 2004).

"Is e-voting ready for prime time: Legal and technical issues regarding the upcoming Presidential election." Panel at John Marshall Law School (Chicago, IL, Oct. 2004).

"Is Electronic Voting Reliable?" Talk to the Kiwanis Club of Dubuque, Iowa (Feb. 2005).

"The Top Ten Problems in Practical Electronic Voting." Int'l Workshop on Mathematics and Democracy, Ettore Majorana Centre, Erice, Sicily (Sept. 2005).

"Why Don't We Have Paper Trails in Pennsylvania?" Carnegie Mellon Univ. CyLab Seminar, Pittsburgh, PA (Jan 2006).

"Paper Trails and the Pennsylvania Certification Process." County Commissioners Association of Pennsylvania 2006 Spring Conference, Harrisburg, PA (Mar. 2006).

"The 2006 Elections: Are We Ready?" Panel at the American Enterprise Institute, Washington, DC (Sept. 2006)

"What's Right with Electronic Voting?" University Lecture Series, Carnegie Mellon University (Oct. 12, 2006)

"What Happened in Yesterday's Election?" Center for Research on Computation and Society, Harvard University (Nov. 8, 2006)