# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRISM TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 05-214-JJF |
| VERISIGN, INC., RSA SECURITY, INC., | ) | |
| NETEGRITY, INC., COMPUTER | ) | |
| ASSOCIATES INTERNATIONAL, INC., and | ) | **REDACTED** |
| JOHNSON & JOHNSON SERVICES, INC., | ) | **PUBLIC VERSION** |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
THEIR MOTION FOR LEAVE TO FILE
AMENDED ANSWERS AND COUNTERCLAIMS**

WILKIE FARR & GALLAGHER LLP
John M. DiMatteo
Neal Feivelson
Leslie M. Spencer
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

ASHBY & GEDDES
Steven J. Balick (#2114)
John G. Day (# 2403)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19801
(302) 654-1888

*Attorneys for Defendant, Johnson &
Johnson Services, Inc.*

AKIN GUMP STRAUSS HAUER & FELDLLP
Edward F. Mannino
Jason Snynderman
John D. Simmons
2005 Market Street, Suite 2200
Philadelphia, PA 19103
(215) 965-1200

Frank C. Cimino, Jr.
Daniel E. Yonan
Jin-Suk Park
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4020

CONNOLLY, BOVE, LODGE & HUTZ, LLP
Patricia Smink Rogowski (#2632)
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

*Attorney for Defendant Verisign, Inc.*

WILMER CUTLER PICKERING
    HALE AND DORR LLP
William F. Lee
David B. Bassett
Mark D. Selwyn
Gregory P. Teran
60 State Street
Boston, MA 02109
(617) 526-6000

RICHARDS, LAYTON & FINGER, P.A.
Frederick L. Cottrell III (#2555)
Steven J. Fineman (#4025)
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700

*Attorneys for Defendant, RSA Security Inc.*

BAKER BOTTS LLP
David M. Schlitz
1299 Pennsylvania Avenue
Washington, D.C. 20004-2400
(202) 639-7700

Samir A. Bhavsar
Jeffrey D. Baxter
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6500

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz (#2246)
David E. Moore (#3983)
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000

*Attorneys for Defendant, Netegrity, Inc. and
Computer Associates International, Inc.*

Dated: April 9, 2007

## Table Of Contents

INTRODUCTION .................................................................................................................1

ARGUMENT ....................................................................................................................1

I.    Defendants Sought Leave Promptly After Obtaining Discovery Necessary To Plead Inequitable Conduct With The Requisite Specificity Under Rule 9(b) .............................2

II.   Defendants' Proposed Amendment Will Not Prejudice Plaintiff Or Delay The Case ........4

III.  The Proposed Amendment Is Not Futile Because The Defendants Indisputably Have Stated A Valid Claim For Inequitable Conduct .........................................................5

        A.    U.S. Patent Nos. 5,715,314 and 5,724,424 (Open Market References).......7

        B.    FORTEZZA .........................................................................................7

        C.    CompuServe ........................................................................................8

        D.    RFC 1704 ............................................................................................8

        E.    Security Dynamics White Paper (Kerberos System) ................................9

CONCLUSION .................................................................................................................10

## Table Of Authorities

ADCO Prods., Inc. v. Carlisle Syntec Inc.,
    110 F. Supp. 2d 276, 278 (D. Del. 2000).................................................................2, 4

Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.,
    989 F. Supp. 1237, 1248 (N.D. Cal. 1997) ...............................................................3

Alvin v. Suzuki,
    227 F.3d 107, 121 (3d Cir. 2000)..............................................................................5

American Lumber Corp. v. National R.R. Passenger Corp.,
    886 F.2d 50, 54 (3d Cir. 1989)..................................................................................4

Brown v. Philip Morris Inc.,
    250 F.3d 789, 796 (3d Cir. 2001) .............................................................................5

Edwards v. City of Goldsboro,
    178 F.3d 231, 242 (4th Cir. 1999) ............................................................................4

Enzo Life Sciences, Inc. v. Digene Corp.,
    270 F. Supp. 2d 484, 490 (D. Del. 2003) .............................................................1, 2

Go Med. Indus. Pty Ltd. v. C.R. Bard, Inc.,
    1995 WL 605802, at *4 (N.D. Ga. July 6, 1995), aff'd, 101 F.3d 715 (Fed. Cir. 1996).....3

HCC, Inc. v. RH&M Machine Co.,
    39 F. Supp. 2d 317, 324 (S.D.N.Y. 1999) ...............................................................6

Howze v. Jones & Laughlin Steel Corp.,
    750 F.2d 1208, 1212 (3d Cir. 1984)..........................................................................4

In re Burlington Coat Factory Litig.,
    114 F.3d 1410, 1434 (3d Cir. 1997)..........................................................................5

In re NAHC, Inc. Sec. Litig.,
    306 F.3d 1314, 1332 (3d Cir. 2002)..........................................................................5

Lorenz v. CSX Corp.,
    1 F.3d 1406, 1414 (3d Cir. 1993)..............................................................................4

MercExchange, L.L.C. v. eBay, Inc.,
    271 F. Supp. 2d 784, 787 (E.D. Va. 2002) ...........................................................2, 6

Moore v. Tartler,
    986 F.2d 682, 685 (3d Cir. 1993)).............................................................................5

Rhone-Poulenc Agro S.A. v. Monsanto Co.,
    73 F. Supp. 2d 537, 539 (M.D.N.C. 1999) .................................................................2

Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,
    93 F.R.D. 858, 863 (D. Del. 1982) ...........................................................................3

Smith & Nephew, Inc. v. Surgical Solutions, Inc.,
    353 F. Supp. 2d 135, 139-40 (D. Mass. 2004)....................................................5

Symbol Technologies, Inc. v. Proxim Inc.,
    2003 WL 1905637, *2-3 (D. Del. 2003)............................................................2

## INTRODUCTION

In this patent case, as in most, the facts underlying the inequitable conduct were in the exclusive possession of the plaintiff, and only through its documents and depositions of the inventors and prosecuting attorneys could these facts be discovered. There was nothing unusual or exceptional about the timing of defendants' motion to amend -- it was brought only after the completion of a thorough, careful investigation that continued through the end of fact discovery in January. Prism does not and cannot point to any way in which it would be prejudiced by the timing of the amendment. As for Prism's final argument of "futility," it too must fail because it is based on fundamentally the wrong standard and, in any event, simply overlooks the considerable evidence that points to a conclusion of inequitable conduct. When the correct standard is applied, it is clear that the motion should be granted because defendants have stated a valid claim for inequitable conduct with the degree of particularity mandated by Fed. R. Civ. P. 9(b).

## ARGUMENT

### I. Defendants Sought Leave Promptly After Obtaining Discovery Necessary To Plead Inequitable Conduct With The Requisite Specificity Under Rule 9(b)

This Court found in Enzo that the "good cause" requirement of Fed. R. Civ. P. 16(b) is satisfied by filing an amendment to plead inequitable conduct soon after satisfying the pleading requirements of Rule 9(b). Enzo Life Sciences, Inc. v. Digene Corp., 270 F. Supp. 2d 484, 490 (D. Del. 2003) (Farnan, J.) ("with regards to the 'good cause' requirement of Rule 16(b), the Court concludes that Digene filed its amendment soon after it was able to satisfy the pleading requirements of Rule 9(b)"). In the instant case, the discovery necessary for Defendants to properly plead inequitable conduct with the requisite specificity under Rule 9(b) included the depositions of Prism's patent prosecution counsel, Messrs. Greer and Martin, as well as two of

the named inventors, Messrs. Giri and Gregg. Defendants completed this discovery on January

20, 2007 with the deposition of Prism patent counsel, Mr. Thomas Martin. On February 21,

2007, just *one month* after Mr. Martin's deposition, Defendants sought Prism's consent to file

amended answers and counterclaims. Such diligence does not constitute undue delay under the

Rule 16 standard. See Enzo, 270 F. Supp. 2d at 490 ("there was no undue delay" where consent

to amend sought January 23, 2003 following depositions on December 18-19, 2002); Symbol

Technologies, Inc. v. Proxim Inc., 2003 WL 1905637, *2-3 (D. Del. 2003) (Ex. K) ("no evidence

that the delay of plaintiff's amendment is undue" where "facts supporting its inequitable conduct

claims did not come to light until the September 2002 depositions and then plaintiff began

conducting an investigation to confirm these facts."); ADCO Prods., Inc. v. Carlisle Syntec Inc.,

110 F. Supp. 2d 276, 278 (D. Del. 2000) (granting motion to amend to add an inequitable

conduct claim less than two months before trial); MercExchange, L.L.C. v. eBay, Inc., 271 F.

Supp. 2d 784, 787 (E.D. Va. 2002) (granting leave to add inequitable conduct as an affirmative

defense on motion filed after close of discovery).

   Prism argues that defendants should have sought amendment immediately after

the depositions of Messrs. Giri and Gregg and that the depositions of Messrs. Greer and Martin

were "factually irrelevant." (Prism Opp. Mem. (D.I. 446) at 4.) This argument is at best

hindsight. In an inequitable conduct claim, the actions of patent prosecution counsel are

unquestionably relevant – prosecuting attorneys are under the same duty of disclosure as the

patentee. Defendants were entitled to confirm the knowledge and actions of the prosecuting

attorneys to satisfy the pleading requirements for inequitable conduct. See Rhone-Poulenc Agro

S.A. v. Monsanto Co., 73 F. Supp. 2d 537, 539 (M.D.N.C. 1999) ("The witnesses deposed in

October 1998 were important fact witnesses regarding both of the allegations upon which the

inequitable conduct claim relies, and by waiting until after the depositions to file its Motion, Monsanto appropriately fulfilled its obligation to investigate its claim thoroughly prior to making it."); Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc., 989 F. Supp. 1237, 1248 (N.D. Cal. 1997) (defendant "was entitled to confirm factual allegations before amending to include the inequitable conduct defense"); Go Med. Indus. Pty Ltd. v. C.R. Bard, Inc., 1995 WL 605802, at *4 (N.D. Ga. July 6, 1995) (Ex. L), aff'd, 101 F.3d 715 (Fed. Cir. 1996) (granting motion to amend to add inequitable conduct defense notwithstanding information regarding alleged misconduct was discovered nearly ten months earlier because the court "will not penalize defendant for obtaining additional, confirming information . . . to support its claims – especially given that Rule 9(b) requires that allegations of fraud, such as inequitable conduct before the U.S. Patent Office, be stated with particularity").

Defendants questioned Messrs. Greer and Martin about their own searches and knowledge of the prior art, and about Prism's knowledge and actions. Both attorneys, however, testified that                              REDACTED

(See Ex. M, Greer deposition at Tr. 37:6-38:2; Ex. N, Martin deposition at 101:11-18; 102:24 - 103:14.) That defendants did not further examine these attorneys about specific references of which they claimed to have no knowledge is beyond the point. Defendants were diligent in taking the steps necessary to prepare their defense and counterclaim of inequitable conduct – and in seeking consent to amend, just one month after deposing patent counsel. By contrast, the cases that Prism cites, Rose Hall and Lorenz, involved several *years*, not a few weeks or months, elapsed time between the moving party confirming the relevant information and filing their motion to amend. Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp., 93 F.R.D. 858, 863 (D. Del. 1982) ("the facts which plaintiff would

3

now assert as a basis for its claim . . . were well known for over five years") (emphasis added);

Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) (delay of nearly two years in filing

proposed amendment was unreasonable).

      Moreover, Prism's focus on defendants' so-called delay is misplaced. "Delay

alone . . . is an insufficient ground upon which to deny a motion to amend." Howze v. Jones &

Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984). See also American Lumber Corp. v.

National R.R. Passenger Corp., 886 F.2d 50, 54 (3d Cir. 1989) ("delay alone is an insufficient

reason to deny amendment"); ADCO, 110 F. Supp. 2d at 278 (granting accused infringer's

motion to add inequitable conduct claim on eve of Markman hearing, two months before trial).

"Rather, the delay must be accompanied by prejudice, bad faith, or futility," Edwards v. City of

Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999). None of these factors exist here. Indeed, Prism

has not even asserted prejudice or bad faith. Also, as discussed more fully below, Prism has not

met its burden of establishing that the amendment would be futile – that it could not withstand a

motion to dismiss pursuant to Rule 12(b)(6).

## II. Defendants' Proposed Amendment Will Not Prejudice Plaintiff Or Delay The Case

      Prism has not (and cannot) assert that defendants' proposed amendment will

cause undue prejudice. First, the amendment does not jeopardize the schedule in this case. No

trial date has been set. Indeed, by stipulation of the parties, the scheduling order was amended to

postpone the trial date until at least five months after this Court's claim construction ruling (D.I.

409, entered on January 19, 2007), which issued on April 2, 2007. Dispositive motions are not

due until ninety days after the claim construction ruling. Expert reports have not been

exchanged.

      Second, Prism had ample opportunity to take discovery concerning the four

asserted references – Open Market, FORTEZZA, CompuServ, and RFC 1704. At least as early

as Mr. Gregg's November 2006 depositions, Prism was on notice of defendants' allegations

respecting these references.  As Prism admits,                          REDACTED

                              (Prism Br. at 5-8.)  Defendants even asked Mr. Gregg and Mr.

Giri about                    REDACTED                'Ex. O, Gregg (30)(b)(6)

deposition at Tr. at 270:17-277:21; Ex. P, Giri deposition at Tr. at 284:5-289:4.)  Prism could

have cross-examined Mr. Gregg or any of the other witnesses about these references.  Prism did

not.  In any event, all the relevant witnesses and documents are within Prism's control.  Thus,

Prism will not be prejudiced by Defendants' proposed amendment.

## III.    The Proposed Amendment Is Not Futile Because The Defendants Indisputably Have Stated A Valid Claim For Inequitable Conduct

        Prism does not dispute that the proposed amendment states a valid claim for

inequitable conduct and does so with the degree of particularity required by Fed. R. Civ. P. 9(b).

That alone disposes of Prism's "futility" argument, which improperly attempts to attack the

claim on the merits rather than under the correct standard of Fed. R. Civ. P. 12(b)(6).

        Under Third Circuit precedent, "an amendment would be futile when 'the

complaint, as amended, would fail to state a claim upon which relief could be granted." In re

NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002). See also Alvin v. Suzuki, 227 F.3d

107, 121 (3d Cir. 2000) ("An amendment is futile if the amended complaint would not survive a

motion to dismiss for failure to state a claim upon which relief could be granted.").  In other

words, in assessing the alleged futility of an amendment, a court "applies the same standard of

legal sufficiency as applies under Rule 12(b)(6)," In re Burlington Coat Factory Litig., 114 F.3d

1410, 1434 (3d Cir. 1997), and therefore "must accept as true all of the factual allegations in the

complaint as well as the reasonable inferences that can be drawn from them." Brown v. Philip

Morris Inc., 250 F.3d 789, 796 (3d Cir. 2001) (citing Moore v. Tartler, 986 F.2d 682, 685 (3d

Cir. 1993)). <u>See also</u> <u>Smith & Nephew, Inc. v. Surgical Solutions, Inc.</u>, 353 F. Supp. 2d 135,

139-40 (D. Mass. 2004) (granting motion to amend to assert a claim of inequitable conduct

where "Defendant's claim cannot be said to be 'futile' because it appears to be properly pled and

the Court is not at liberty, at this juncture, to consider the weight of the evidence");

<u>Mercexchange,</u>, 271 F. Supp. 2d at 786-89 (granting motion to amend to assert a claim of

inequitable conduct; "In deciding motion for leave to amend, the court does not weigh the

evidence, but rather simply determines whether sufficient allegations are present to support the

amendment."); <u>HCC, Inc. v. RH&M Machine Co.</u>, 39 F. Supp. 2d 317, 324 (S.D.N.Y. 1999)

(granting motion to amend to assert a claim of inequitable conduct; "consideration of the

evidentiary basis for a proposed claim is inappropriate" because on a motion for leave to amend,

defendant need not "'prove' inequitable conduct or materiality.  They merely need to set forth

allegations sufficient to state a cause of action under the applicable statute.").

   In the present case, defendants have stated a claim satisfying the elements of

inequitable conduct with respect to five separate prior art references.  (<u>See</u>, <u>e.g.</u>, VeriSign, Inc.'s

Proposed Third Amended Answer, Affirmative Defenses and Counterclaims at ¶24.)  Prism does

not (and cannot) dispute that any one of the five withheld references would independently form a

valid basis for an inequitable conduct claim.

   In short, Prism's "futility" argument does exactly that which the Third Circuit has

stated is impermissible in the context of a motion to amend.  Prism does not accept as true the

defendants' factual allegations, but argues the weight of the evidence (and usually in an entirely

conclusory manner), and draws all inferences in its favor rather than in favor of the defendants.

In so doing, Prism not only ignores the applicable legal standard, but overlooks the troublesome

facts uncovered during discovery with respect to each of the references, as explained more fully below.

**A.**    **U.S. Patent Nos. 5,715,314 and 5,724,424 (Open Market References)**

Prism does not dispute the high materiality of the Open Market references to the patentability of the '416 Patent, as alleged at ¶24g-i.  Instead, Prism insists that "[d]efendants cannot point to any evidence that supports their allegation that Mr. Gregg or Prism ever examined U.S. Patent Nos. 5,715,314 and 5,724,424."  (D.I. 446 at 5.)  That is simply incorrect.

In fact, Mr. Gregg            REDACTED

(See VeriSign, Inc.'s Proposed Third Amended Answer, Affirmative Defenses and Counterclaims at ¶24d and Ex. B.)  In his deposition, Mr. Gregg

REDACTED

(Id. at ¶24e and Ex. C at Tr. 349:6-13 (emphasis added).)  Mr. Gregg

REDACTED

**B.**    **FORTEZZA**

With the FORTEZZA system, as with the Open Market patents, Prism simply wishes to overlook Mr. Gregg's deposition testimony that demonstrates his awareness of FORTEZZA and its materiality.  Mr. Gregg specifically testified that

REDACTED

(VeriSign, Inc.'s Proposed Third Amended Answer, Affirmative

Defenses and Counterclaims at ¶24l and Ex. E at Tr. 346:4-5.)

REDACTED

." (Id. at ¶24m and Ex. E.)  Although Mr. Gregg disagreed in his deposition that FORTEZZA is material, his denial does not make it so, as Prism seems to insist. Mr. Gregg's testimony clearly supports the inference that he possessed sufficient information about FORTEZZA to know he had a duty to disclose this prior art system to the Patent Office.

### C. **CompuServe**

Prism does not (and cannot) dispute that Prism and Mr. Gregg were aware of CompuServe's Remote Passphrase Authentication (RPA) system and how it worked, as alleged at ¶24p-r.  Mr. Gregg admitted REDACTED                  :.  (Id. at ¶24r and Ex. G at Tr. 266:4-267:9.)  Moreover, in 1996, a year before the patent was filed, Prism

REDACTED

'  (Id., Ex. F) (emphasis added.)  Thus, at the time of filing, Prism believed that          REDACTED

Now, without making any actual comparison of the CompuServe system to the asserted claims, Prism contends, in conclusory fashion, that this art is immaterial.

### D. **RFC 1704**

Prism does not dispute that at least one of the inventors, Sandeep Giri, had knowledge of RFC 1704, as alleged in the proposed amendment at ¶24v-w.  When deposed, Mr. Giri conceded that                REDACTED

(Ex. P, Giri Deposition at Tr. 285:17-19)  Once again, Prism says that RFC 1704 is cumulative and

8

immaterial, but RFC 1704 discloses

REDACTED

(Id. at Tr. 284:5-9, 286:2-

288:2.)

**E.     Security Dynamics White Paper (Kerberos System)**

Here, too, Prism does not dispute that Mr. Gregg and the other inventors were

aware of the Security Dynamics White Paper and the Kerberos system described therein, as

alleged in the proposed amendment at ¶24z-cc.  As Mr. Gregg testified at his deposition:

REDACTED

(Proposed Amended Answer and Counterclaims at Ex. G (Tr. 223:14-21).)

The challenge that Prism makes to the materiality of the Security Dynamics White

Paper is utterly devoid of substance.  Typical of its approach, Prism again simply asserts that this

prior art is cumulative and immaterial, without offering any specific explanation for such a

conclusion.  In contrast, the defendants have provided Prism with a detailed claim chart

demonstrating that the asserted independent claims of the '416 Patent are invalid in view of the

Kerberos system when combined with smart cards.  (See Ex. Q, Kerberos Invalidity Claim Chart

and Ex. R, U.S. Patent No. 5,590,199 to Krajewski.)  This is the combination that Mr. Gregg

conceded was     REDACTED     , which he was aware of but did not

disclose to the Patent Office.

9

## CONCLUSION

For all of the above reasons and the reasons set forth in their opening memorandum, defendants respectfully request that their motion be granted, and that they be permitted to amend their respective answers and counterclaims to assert the defense of inequitable conduct.

*Of Counsel:*

John M. DiMatteo
Neal Feivelson
Leslie M. Spencer
WILKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

_____
Steven J. Balick (#2114)
John G. Day (# 2403)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19801
(302) 654-1888

*Attorneys for Defendant, Johnson & Johnson Services, Inc.*

*Of Counsel:*

Edward F. Mannino
Jason Snynderman
John D. Simmons
AKIN GUMP STRAUSS HAUER & FELD LLP
2005 Market Street, Suite 2200
Philadelphia, PA 19103
(215) 965-1200

Frank C. Cimino, Jr.
Daniel E. Yonan
Jin-Suk Park
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4020

CONNOLLY, BOVE, LODGE & HUTZ, LLP

*/s/ Patricia Smink Rogowski*

_____
Patricia Smink Rogowski (#2632)
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141

*Attorney for Defendant Verisign, Inc.*

*Of Counsel:*

William F. Lee
David B. Bassett
Mark D. Selwyn
Gregory P. Teran
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Frederick L. Cottrell III*
_____
Frederick L. Cottrell III (#2555)
Steven J. Fineman (#4025)
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

*Attorneys for Defendant, RSA Security Inc.*


*Of Counsel:*

David M. Schlitz
BAKER BOTTS LLP
1299 Pennsylvania Avenue
Washington, D.C. 20004-2400
(202) 639-7700

Samir A. Bhavsar
Jeffrey D. Baxter
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6500

POTTER ANDERSON & CORROON LLP

*/s/ Richard L. Horwitz*
_____
Richard L. Horwitz (#2246)
David E. Moore (#3983)
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

*Attorneys for Defendant, Netegrity, Inc. and Computer Associates International, Inc.*

Dated: April 9, 2007
179537.1

# EXHIBIT K



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Symbol Technologies, Inc. v. Proxim Inc.D.Del.,2003.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SYMBOL TECHNOLOGIES, INC., Plaintiff,
v.
PROXIM INCORPORATED, Defendant.
**No. 01-801-SLR.**

April 17, 2003.

Andre G. Bouchard, and Karen L. Pascale, of Bouchard, Margules & Friedlander, Wilmington, Delaware, for Plaintiff.
Eric J. Lobenfeld, Ira J. Schaefer, and Jonathan M. Sobel, of Clifford, Chance, US, LLP, New York, New York, of counsel.
Richard L. Horwitz, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware, for Defendant.
Harry J. Roper, George S. Bosey, Raymond N. Nimrod, Aaron A. Barlow, and Timothy J. Barron, of Roper & Quigg, Chicago, Illinois, of counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

## I. INTRODUCTION

*1 On December 4, 2001, plaintiff Symbol Technologies, Incorporated ("Symbol") filed this action against defendant Proxim, Incorporated (" Proxim") alleging infringement of four U.S. Patents owned by plaintiff. (D.I.1) On December 18, 2001, Proxim answered the complaint and asserted, *inter alia*, a counterclaim of infringement of one of its own patents. (D.I.6) On January 9, 2002, this court entered a scheduling order requiring all amendments to the pleadings to be submitted by August 1, 2002, with discovery to be concluded by January 31, 2003. Trial is currently scheduled to

begin on September 8, 2003. Presently before the court is plaintiff's motion for leave to amend its complaint. (D.I.160) This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. For the reasons that follow, plaintiff's motion to amend is granted.

## II. STANDARD OF REVIEW

"A party may amend the party's pleading once as a matter of course at anytime before a responsive pleading is served...." Fed.R.Civ.P. 15(a). " Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be given freely when justice so requires." *Id.* Courts may deny leave to amend where they find "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment...." *Foman v. Davis,* 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*

## III. DISCUSSION

Plaintiff seeks leave of the court to amend its complaint to add additional allegations of inequitable conduct by defendant in procuring U.S. Patent No. 5,231,634 ("the '634 patent"), the patent asserted in defendant's counterclaim of infringement against plaintiff. (D.I.160) Plaintiff also seeks to re-style its prior request for declaratory relief of invalidity, non-infringement and unenforceability of the '634 patent as an affirmative count seeking a declaratory judgment of said requests. Finally, plaintiff seeks to amend its complaint to reflect the fact that it is no longer asserting one of its patents,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2

Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

U.S. Patent No. 5,688,803 ("the '803 patent"), in this case.

In support of its motion to amend, plaintiff contends that the facts supporting its inequitable conduct claims did not come to light until the end and beyond of discovery. Plaintiff states that although fact discovery ended on October 17, 2002, the parties have both been actively taking numerous fact discovery depositions into early December 2002. Based on these facts, plaintiff contends that it has not delayed in bringing its inequitable conduct allegations and defendant would not be unduly prejudiced by the amendment.

*2 Defendant opposes plaintiff's motion for leave to amend on a number of grounds. (D.I.161) First, defendant argues that plaintiff's motion is untimely. In support of this argument, defendant contends that at no time prior to December 2002 did plaintiff indicate that it would be pursing additional inequitable conduct claims. Furthermore, all the documents relied on by plaintiff for its inequitable conduct allegations were produced as early as May 24, 2002. Plaintiff also deposed numerous witnesses about many of these documents with regard to any potential inequitable conduct in September 2002. Thus, defendant argues plaintiff's delay is undue and solely the fault of plaintiff.

Next, defendant argues that allowing the amendment will prejudice it and burden the court. Defendant argues that allowing the amendment at this late date would require it to take additional discovery which would increase its costs and potentially delay the case. Furthermore, the inequitable conduct allegations would certainly be raised on summary judgment and, therefore, the amendment would delay this briefing as well.

Finally, defendant argues that plaintiff's amendment would be futile. In support of this argument, defendant asserts that plaintiff's inequitable conduct charge is legally deficient for at least two reasons. First, plaintiff alleges in its amended complaint that defendant committed inequitable conduct. As a matter of law, only a natural person, not a corporation, can commit inequitable conduct. Plaintiff's complaint fails to point to any specific

person who committed inequitable conduct during the prosecution of the '634 patent. Second, plaintiff fails to properly plead inequitable conduct under Fed.R.Civ.P. 9(b).

Defendant's final concern is that plaintiff's amendment removing references to the now non-asserted '803 patent may curtail its unfair competition claims and claims for attorneys fees based on this patent.

In its reply, plaintiff argues that it did not delay seeking to amend and, additionally, delay alone is not the basis for denial of a motion for leave to amend. (D.I.166) It asserts that it conducted a reasonable and diligent investigation of the facts surrounding inequitable conduct despite defendant's efforts to hinder the investigation. The documents defendant produced in May 2002 were "buried among 200 boxes of documents" produced within a two-week period. The facts supporting its inequitable conduct claims did not come to light until the September 2002 depositions and then plaintiff began conducting an investigation to confirm these facts. A key fact needed was the source code related to the charges which defendant delayed in providing until December 2002.

Next, plaintiff argues that allowing the amendment will not prejudice defendant or burden the court. In support of this argument, plaintiff contends that defendant has been on notice of its charges since December 2002 and its on-sale bar affirmative defense (related to the inequitable conduct charge) has been in the case since the beginning. Therefore, no extensive additional discovery will be required and all of the facts related to the conduct of the inventors is under the control of defendant.

*3 Finally, plaintiff argues that its amendment is not futile. It argues that its amended complaint names specific individuals who were aware of material references and failed to disclose them to the patent office. It also asserts that its complaint is properly pled under Rule 9(b)

Upon review of the parties' arguments and the amendments to the complaint, the court shall grant plaintiff's motion. The court agrees with plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that allowing the amendment will not unfairly prejudice defendant or cause delay to the case. Plaintiff's proposed amendment is narrow and largely based on facts defendant has known throughout the case. Furthermore, based on the record, there is no evidence that the delay of plaintiff's amendment is undue or that it is being made in bad faith or for a dilatory motive.

The court does not believe the amendment will prolong discovery or delay trial. To the extent defendant needs to conduct any additional depositions related to the narrow issue of inequitable conduct, the court will allow the discovery and plaintiff shall produce any requested witness promptly. Furthermore, inequitable conduct is rarely appropriately decided on summary judgment so defendant's concerns about its ability to brief the issue are not persuasive.

Finally, defendant's concerns that plaintiff's amendments will curtail its unfair competition claims and claims for attorneys fees based on the '803 patent shall be assuaged. Defendant will still be entitled to pursue these claims against plaintiff at trial.

### IV. CONCLUSION

For the reasons stated, plaintiff's motion for leave to amend its complaint (D.I.160) is granted. An appropriate order shall issue.

### ORDER

At Wilmington this 17th day of April 2003, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that plaintiff's motion for leave to amend its complaint (D.I.160) is granted.

D.Del.,2003.
Symbol Technologies, Inc. v. Proxim Inc.
Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24302583 () Supplemental Expert Report of Dr. Izhakrubin (Mar. 2, 2003) Original Image of this Document (PDF)
• 2003 WL 24302584 () Deposition of Izhak Rubin (Mar. 2, 2003) Original Image of this Document (PDF)
• 2003 WL 24307200 (Trial Pleading) Amended Complaint (Jan. 2, 2003) Original Image of this Document (PDF)
• 2002 WL 33003952 () Rebuttal Expert Report of Joseph V. Colaianni (Dec. 24, 2002) Original Image of this Document (PDF)
• 2002 WL 33003953 () Expert Report of Joseph V. Colaianni (Dec. 20, 2002) Original Image of this Document (PDF)
• 2002 WL 33003954 () Videotaped Deposition of Kurt F. Bauer (Dec. 4, 2002)
• 2002 WL 33006690 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Symbol's Motion to Dismiss Proxim's Sixth, Seventh and Eighth Counterclaims, and to Strike Proxim's Tenth Affirmative Defense (Jan. 31, 2002) Original Image of this Document (PDF)
• 1:01CV00801 (Docket) (Dec. 04, 2001)
• 2001 WL 34900760 () (Partial Testimony) (2001) Original Image of this Document (PDF)
• 2001 WL 34900761 () Expert Report of Joseph V. Colaianni (2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L



Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1995 WL 605802 (N.D.Ga.), 32 Fed.R.Serv.3d 18
**(Cite as: Not Reported in F.Supp.)**

**H**

Go Medical Industries Pty, Ltd. v. C.R. Bard, Inc.N.D.Ga.,1995.
United States District Court, N.D. Georgia.
GO MEDICAL INDUSTRIES PTY, LTD.,
Plaintiff-Counterclaim Defendant
v.
C.R. BARD, INC., Defendant-Counterclaimant
**Civ. A. No. 1:93cv-1538-HTW.**

July 6, 1995.

### ORDER OF COURT

HORACE T. WARD, Senior District Judge:
*1 This matter is currently pending before this court on the following motions: (1) Medical Marketing Group, Inc.'s ("MMG")[FN1] motion to quash subpoena or in the alternative for protective order; (2) plaintiff's motions for a protective order; (3) defendant's motions to compel discovery, and (4) defendant's motion for leave to amend answer.

### BACKGROUND

This case is a patent infringement suit brought by plaintiff against defendant. The patent-in-suit is U.S. Patent No. 4,652,259 ("the '259 patent"), which relates to urinary catheters. Said patent issued on the fourth application. The first application was filed on September 12, 1979, but was subsequently abandoned. At approximately the same time, plaintiff allegedly filed a continuation application; this application also was abandoned and another continuation application was filed on March 21, 1985. The '259 patent issued on March 24, 1987.

On June 8, 1993, plaintiff filed a petition with the U.S. Patent Office to revive this first application. Defendant claims that -- in order to obtain the September 12, 1979 filing date -- 37 C.F.R. § 1.183 dictates that this petition had to be filed within three (3) months after the applicant became aware of the

abandoned status of the application. In support of the petition, B.J. Powell, plaintiff's counsel, filed an affidavit stating that he was first notified of the abandonment -- that is, the lack of copendency between the first and second applications -- "on or about March 8, 1993."

Three of the above motions relate to defendant's discovery requests, in which defendant seeks, *inter alia,* information regarding plaintiff's knowledge of a lack of copendency between plaintiff's first and second patent applications. [FN2] More specifically, defendant seeks information to determine whether plaintiff became aware of this lack of copendency prior to March 8, 1993. Plaintiff asserts that the information requested by defendant is protected by the attorney-client and/or work-product privileges. Defendant argues that these privileges do not allow plaintiff to withhold this information from defendant.

### DISCUSSION

*A. Medical Marketing Group, Inc.'s Motion To Quash Subpoena Or In The Alternative For Protective Order; Plaintiff's Motions For A Protective Order*

MMG moves this court for an order quashing a subpoena served by defendant on MMG requesting production of documents relating to "any comparisons between the MMG-O'Neil urinary catheters and the Bard Touchless catheters."[FN3] MMG claims that the requested information is protected by the attorney-client and/or the work product privileges. However, other than a videotape, MMG has failed to specifically identify any documents for which it asserts the above privileges. Moreover, MMG has cited no case law or other authority in support of its motion, other than a general reference to Fed.R.Civ.P. 45.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1995 WL 605802 (N.D.Ga.), 32 Fed.R.Serv.3d 18
**(Cite as: Not Reported in F.Supp.)**

This court agrees with defendant that MMG has failed to carry its burden that the requested information is privileged. *See United States v. Schaltenbrand,* 930 F.2d 1554, 1562 (11th Cir.), *cert. denied,* 112 S. Ct. 1348 (1993). Nor has MMG sufficiently described the withheld documents, as required by Fed.R.Civ.P. 26(b)(5) and 45(d)(2), so as to allow defendant to contest the privilege claim on a document-by-document basis.

**\*2** With respect to the attorney-client privilege, MMG has failed to show that "'the communication was made to him confidentially, in his professional capacity, for the purpose of securing legal advice or assistance.'" *Id.* (citation omitted). MMG also has neglected to show, as it is required to show, that the privilege has not been waived. *Weil v. Investment/Indicators, Research and Management, Inc.,* 647 F.2d 18, 25 (9th Cir. 1981). While the privilege is construed narrowly, waiver of the privilege is applied broadly. *United States v. Moody,* 763 F. Supp. 589, 597 (M.D.Ga. 1991), *aff'd,* 977 F.2d 1240 (11th Cir. 1992), *cert. denied,* 112 S. Ct. 640 (1991). This court concludes that MMG has failed to carry its burden of showing that any of the requested documents are within the attorney-client privilege; thus, MMG must produce these documents.

In addition, MMG claims that a videotape is subject to the work-product privilege under Fed.R.Civ.P. 26(b)(3), thus this court should not compel its production. In its reply memorandum, MMG makes the assertion that the videotape was prepared at counsel's request in anticipation of litigation; MMG has not offered an affidavit or any other evidence to support its claim of work-product privilege.[FN4] *See* Fed.R.Civ.P. 26(b)(3). This court concludes that MMG shall, within ten (10) days of their receipt of this Order, produce the videotape at issue under seal to this court, which will make an *in camera* review of the videotape before determining whether it should be produced to defendant.

MMG also requests, in the alternative, that this court issue a protective order (1) limiting the depositions of Messrs. Golden and Starke to the issue of defendant's alleged infringement of the MMG O'Neil catheter, and (2) limiting the

documents produced by these individuals to those documents not subject to the work-product privilege. MMG offers no support for this protective order, thus this court will not grant plaintiff's request.[FN5]

Plaintiff also moves this court for a protective order prohibiting disclosure of documents, testimony, and other information in the possession of The Connecticut Indemnity Company ("TCIC"). Plaintiff claims that this information is protected by the attorney-client and/or work-product privileges. TCIC is not a party to this action, but instead an insurer with whom plaintiff has a patent enforcement litigation expense policy. Plaintiff claims that, based on the "common interest rule", information in TCIC's possession is privileged -- more specifically, that plaintiff and TCIC have a common interest arising from TCIC's patent enforcement litigation expense insurance policy in favor of plaintiff. Under that policy, TCIC pays certain litigation expenses. Defendant emphasizes that TCIC is not obligated for any liability incurred by plaintiff.

Plaintiff has the burden of establishing a common interest with TCIC. *United States v. Gotti,* 771 F. Supp. 535, 545 (E.D.N.Y. 1991). In general, the common interest rule "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer,* 892 F.2d 237, 243 (2nd Cir. 1989). *See also In re Bairco Corp. Securities Litigation,* 148 F.R.D. 91, 102 (S.D.N.Y. 1993) (joint defense privilege protects communications from one party to another). The Seventh Circuit has limited the common interest rule to "parties or potential parties to an action." *Russell v. General Electric Co.,* 149 F.R.D. 578, 580 (N.D.Ill. 1993).

**\*3** In support of its "common interest" argument, plaintiff cites *In the Matter of Grand Jury Subpoena Duces Tecum,* 406 F. Supp. 381 (S.D.N.Y. 1975).[FN6] In that case, the court found " that the attorney-client privilege covers communications to a prospective or actual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

co-defendant's attorney when those communications are engendered solely in the interests of a joint defense effort." *Id.* at 389. This case involved communications made during interviews intended to promote the joint defense of various individuals.

Plaintiff has failed to cite any cases where, as here, a party asserts the common interest rule applies to an insurance company that merely pays a party's litigation expenses (as opposed to liability). This court finds that the cases cited by plaintiff are neither persuasive nor binding on this court.

This court believes the case at bar is more analogous to *North River Insurance Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363 (D.N.J. 1992). In *North River*, the court found that an insurer-insured relationship "does not fall within the confines of the classic common interest doctrine" because the insured retained its own counsel wholly independent from the insurer, and the insurer had no input into, or control of, the relationship between the insured and the insured's counsel. *Id.* at 367. Similarly, both plaintiff and TCIC had their own counsel; TCIC did not control plaintiff's relationship with plaintiff's counsel.[FN7]

Further, plaintiff has not carried its burden of showing that the requested information was privileged -- for example, intended to be confidential. Nor has plaintiff demonstrated the it has not waived the attorney-client privilege. Therefore, plaintiff is not entitled to the requested protective order.[FN8]

### B. *Defendant's Motions To Compel Discovery*

In response, defendant moves this court for an order compelling Messrs. Golden and Starke of MMG to produce requested documents and appear for a deposition. As stated above, MMG shall produce all the requested documents to defendant, with the exception of the videotape, which shall be filed with this court for an *in camera* review. In addition, MMG does not oppose defendant's request to take the above depositions.[FN9]

Defendant also moves this court for an order

compelling plaintiff to provide responses to defendant's Interrogatory Nos. 2, 3, 5, and 6, and Document Request Nos. 7, 8, and 18. Plaintiff claims that this information already has been produced. Defendant argues that plaintiff has failed to identify each document that it seeks to withhold from production and has failed to make a specific claim of privilege for each such document. Instead, it appears as though plaintiff has make a blanket claim of privilege, which is improper. *Schachar v. American Academy of Ophthalmology, Inc.*, 106 F.R.D. 187, 193 (N.D.Ill. 1985); *In re Shopping Carts Antitrust Litigation*, 95 F.R.D. 299, 305 (S.D.N.Y 1982).

Defendant also argues that, assuming *arguendo* that plaintiff's claim of privilege extends only to those documents identified in TCIC's privileged document list, plaintiff has not shown that these documents are privileged. Plaintiff relies on the so-called "common interest doctrine" in order to assert the attorney-client privilege to the extent that TCIC could utilize the privilege.

*4 As stated in Section A., *supra*, plaintiff has not shown that the common interest rule applies or that these documents are otherwise privileged.[FN10] Therefore, this court GRANTS defendant's motions to compel discovery.

### C. *Defendant's Motion For Leave To Amend Answer*

Defendant moves this court pursuant to Fed.R.Civ.P. 9(b) and 15(a) for leave to file an amended answer -- namely, to add new allegations of inequitable conduct by plaintiff. It is well-established that Rule 15(a) should be construed liberally, and leave to amend should be granted freely when justice so requires. *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989). Nevertheless, leave to amend is not a matter of right, and in deciding whether to grant leave to amend, the court should consider factors such as undue delay, bad faith or dilatory motive on the part of the movant, the prejudice which would result to the non-movant, and the futility of the amendment. *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir. 1992).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                    Page 4

Not Reported in F.Supp., 1995 WL 605802 (N.D.Ga.), 32 Fed.R.Serv.3d 18
**(Cite as: Not Reported in F.Supp.)**

Defendant states that the new allegations of inequitable conduct is based on newly discovered facts learned by defendant during discovery.[FN11] More specifically, defendant claims that it has learned that (1) plaintiff was informed of a lapse in copendency between the first and second filed applications in August 1992, and (2) plaintiff's counsel, B.J. Powell, stated that he was informed of this lack of copendency "on or about March 8, 1993 " -- so as to appear to fall within the three-month period under 37 C.F.R. § 1.183 -- when in fact he learned this at least as early as March 5, 1993. Further, defendant contends that any delay in uncovering the above facts is due to plaintiff's attempts to block defendant's discovery efforts.

In response, plaintiff claims that defendant has known about the alleged facts supporting its motion since September 1994, thus defendant failed to move to amend its answer within a reasonable time. While defendant may have obtained some information to support its new allegations in September of 1994, this court will not penalize defendant for obtaining additional, confirming information in January 1995 to support its claims -- especially given that Rule 9(b) requires that allegations of fraud, such as inequitable conduct before the U.S. Patent Office, be stated with particularity.

Plaintiff also claims that it would be substantially prejudiced if defendant's motion (filed at the close of discovery) was granted, as plaintiff would be unable to conduct discovery regarding these new allegations. This court is not persuaded by this argument either. Plaintiff has not indicated the type of discovery it would desire undertake if defendant's motion is granted; in addition, plaintiff does not claim that defendant possesses any documents or other information that would be relevant to its claims that plaintiff acted inequitably.[FN12]

This court concludes that Rule 15(a) and applicable case law dictate that defendant should be allowed to amend its answer. Plaintiff has not shown that the amendment would cause undue delay, would prejudice plaintiff, or would be futile. Nor has plaintiff shown bad faith or dilatory motive on the part of defendant. Thus, this court GRANTS

defendant's motion for leave to amend answer.

### CONCLUSION

*5 Therefore, after due consideration, this court (1) DENIES Medical Marketing Group, Inc.'s motion to quash subpoena or in the alternative for protective order; (2) DENIES plaintiff's motions for a protective order; (3) GRANTS defendant's motions to compel discovery; and (4) GRANTS defendant's motion for leave to amend answer.[FN13]

SO ORDERED.[FN14]

> FN1. Medical Marketing Group, Inc. is the United States licensee for plaintiff, an Australian medical company. Where appropriate, both entities shall be referred to collectively as "plaintiff."
>
> FN2. Plaintiff also has introduced evidence that there were two "gaps" in the '259 patent.
>
> FN3. At the outset, this court notes that MMG has failed to comply with this court's local rules, which require that all motions be accompanied by supporting memorandum of law and, where appropriate, supporting affidavits. See LR 220-1(a)(1), NDGa. Nevertheless, this court will consider MMG's motion.
>
> FN4. Counsel's arguments in pleadings do not constitute evidence. In addition, the mere fact that the videotape was made at approximately the same time as plaintiff filed its litigation insurance claim does not dictate that it was prepared in anticipation of litigation.
>
> FN5. As stated above, however, this court will make an *in camera* review of the videotape in question, the only document MMG claims is subject to work-product immunity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                  Page 5

Not Reported in F.Supp., 1995 WL 605802 (N.D.Ga.), 32 Fed.R.Serv.3d 18
**(Cite as: Not Reported in F.Supp.)**

FN6. Plaintiff also cites an unreported case from the Northern District of Illinois, *In the Matter of Quantum Chemical/Lummus Crest.,* 1992 WL 71782 (N.D.Ill.), which involved a declaratory judgment action by an insurer against an insured regarding a coverage dispute.

FN7. In addition, the fact that TCIC may be paying plaintiff's attorneys' fees does not necessarily give TCIC a common interest with plaintiff. *Cf. Intern. Insurance Co. v. Newmont Mining Corp.,* 800 F. Supp. 1195, 1196-97 n. 2 (S.D.N.Y. 1992) (addressing "common interest" exception to attorney-client privilege).

FN8. In the course of briefing the various discovery motions, plaintiff has made a number of requests for a protective order. In denying plaintiff's formal motion for a protective order, this court is denying all of plaintiff's current requests for a protective order.

FN9. MMG requested, though, that this court limit the scope of those depositions. As stated above, though, this court has denied MMG's request.

FN10. Moreover, to the extent certain information is confidential in nature, plaintiff will be protected by the protective order executed by this court on June 3, 1994.

FN11. For example, defendant claims that the January 11, 1995 deposition of John C. Linderman, the attorney for plaintiff's insurance company, helped form the factual basis for this motion. Defendant also relies on the January 31, 1995 deposition of Nathaniel Humphries.

FN12. Moreover, plaintiff has acknowledged that, other than its British counsel Mr. Norman Patullo, it has taken the depositions "of all those involved." Defendant has consented to allow plaintiff

to take the deposition of its British counsel, Mr. Patullo, in Atlanta.

FN13. The clerk of court has listed as a pending motion Michael Joseph Powell's motion to withdraw as attorney for plaintiff. This docket entry (no. 64) actually is a notification that Michael Joseph Powell has left the firm representing plaintiff, the Law Offices of B.J. Powell, to join another firm. The Law Offices of B.J. Powell will continue to represent plaintiff, with B.J. Powell as lead counsel. Thus, the clerk may terminate entry no. 64 on the docket sheet and delete Michael Joseph Powell as attorney of record.

FN14. As a courtesy to the clerk of court, this court advises the clerk that this Order terminates entry nos. 58, 61, 64, 80, 82, 84, 85, and 86 on the docket sheet.

N.D.Ga.,1995.
Go Medical Industries Pty, Ltd. v. C.R. Bard, Inc.
Not Reported in F.Supp., 1995 WL 605802 (N.D.Ga.), 32 Fed.R.Serv.3d 18

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M

# REDACTED

# EXHIBIT N

# REDACTED

# EXHIBIT O

**REDACTED**

# EXHIBIT P

**REDACTED**

# EXHIBIT Q

## INVALIDITY OF ASSERTED CLAIMS OF U.S. Patent No. 6,516,416 B2 ANTICIPATED BY AND/OR OBVIOUS OVER KERBEROS WITH SMART CARDS

| Asserted Claim Language | Kerberos with Smart Cards |
|---|---|
| 1. A system for controlling the operation of and access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network in an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers, comprising: | Kerberos with a smart card discloses "[a] system for controlling the operation of and access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network in an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers."

Kerberos uses a trusted central authentication server referred to as a Kerberos Authentication Server (KAS) to verify a client Kerberos computer has a proper ticket in order to grant access to resources on a server. See e.g., "Smart Card Augmentation of Kerberos," Krajewski, Jr., Marjan; The MITRE Corporation; Bedford, MA; Privacy and Security Research Group Workshop on Network and Distributed System Security; Feb., 1993 (hereinafter, "Smart Card").[1] See e.g., Figs. 1-3. In a Kerberos system augmented by a smart card, all cryptographic processing is moved from the client Kerberos workstation into a user-unique, smart card that stores the user's private key in encrypted form on the smart card. Kerberos with smart card requires that a user provide something he/she possesses (i.e., a smart card) along with something he/she knows (i.e., a |

---

[1] See also, U.S. Patent No. 5,590,199 ("Krajewski *et al.*," hereinafter, "Krajewski '199"). Krajewski '199 discloses essentially the same system described in the Smart Card article - - the first named inventor being the author of the Smart Card article.

3392743.1

| | |
|---|---|
| | password). See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-22; and p. 123, ll. 16-33. |
| clearinghouse means for storing identity data of said first server computer and the identity data of each of said subscriber client computers; | Kerberos uses a trusted central authentication server referred to as a Kerberos Authentication Server (KAS). See e.g., Smart Card, p. 119, col. 2, ll. 18-31. The KAS includes a ticket granting service to provide a trusted means for logged-in users to prove their identity to system services. Id. A client Kerberos is issued a "ticket" by the KAS for a single user which contains a user ID, a service ID, a user's address, a timestamp, a ticket's lifetime and a randomly chosen session key. Smart Card, p. 119, col. 2, ll. 32-43. |
| server software means installed on said first server computer adapted to forward its identity data and identity data of each subscriber client computer to said clearinghouse means at the beginning of an operating session in which access to selected computer resources of said first server computer is requested; | A Server Kerberos includes software that forwards its identity data to the KAS.<br><br>It is equivalent and/or would have been obvious to one skilled in the art at the time of the invention of the '416 patent for the client Kerberos to contact the server Kerberos and the server Kerberos to forward the client Kerberos identity data to the KAS. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| client software means installed on each of said subscriber client computers adapted to forward its identity data to said first server computer at the beginning of an operating session in which access to selected computer resources is requested; | A Kerberos client Kerberos is issued a "ticket" by the KAS for a single user which contains a user ID, a service ID, a user's address, a timestamp, a ticket's lifetime and a randomly chosen session key. Smart Card, p. 119, col. 2, ll. 32-43. The client Kerberos is running Kerberos software to retrieve the encrypted session keys from the smart card for forwarding to the server Kerberos. See e.g., Smart Card, p. 121, col. 2, ll. 1-9. The client Kerberos sends the server ticket and authenticator to the requested service server Kerberos. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; |

3392743.1

| | p. 122-23; and Figs. 2-3. |
|---|---|
| at least one hardware key connected to the subscriber client computer, said key being adapted to generate a predetermined digital identification, which identification is part of said identity data; | In the smart card augmented version of Kerberos, a user-unique smart card stores a user's encrypted private key derived from a password. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. To access a service, the user inserts their smart card into a reader attached to a workstation and initiates login, the client Kerberos requests a user ID, the client Kerberos sends the user ID to the KAS, the KAS generates the user's ticket granting service, encrypts the TGS session key into the user's private key, and sends them to the client Kerberos. Through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. The client Kerberos sends a service request together with the TGS ticket and authenticator to the KAS. The KAS generates the appropriate server ticket and associated server session key, encrypts the session key in the user's TGS session key and sends them to the client Kerberos. The client Kerberos sends the server ticket and authenticator to the requested service server Kerberos. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| said server software means installed on the first server computer being adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer; | Kerberos with a smart card discloses "said server software means installed on the first server computer being adapted to selectively request the subscriber client computer to forward said predetermined digital identification to the first server computer to thereby confirm that said hardware key is connected to said subscriber client computer."<br><br>The client Kerberos holds no user-unique information -- the smart card holds the user's private key encrypted in a key |

Claims Chart – iii

3392743.1

| | |
|---|---|
| | derived from a password. The KAS generates the appropriate server ticket and associated server session key, encrypts the session key in the user's TGS session key and sends them to the client Kerberos. The client Kerberos sends the server ticket and authenticator to the requested service server Kerberos generated from the smart card. The server Kerberos thereby confirms that the smart card is connected to the client Kerberos computer because the smart card had to encrypt the TGS and server ticket. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| said clearinghouse means being adapted to authenticate the identity of said subscriber client computer responsive to a request for selected computer resources of said first server computer by a subscriber client computer; | The KAS authenticates the identity of the client Kerberos by receiving the user ID requested form the client Kerberos and through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| said clearinghouse means being adapted to authenticate the identity of said first server computer responsive to said subscriber client computer making the request for selected computer resources of said first server computer; and, | The KAS authenticates the identity of the server Kerberos by server Kerberos registration. KAS communicates with each system service (server Kerberos). See e.g., Smart Card, p. 119, col. 2, ll. 1831; p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3.<br><br>It would have been obvious to one skilled in the art at the time of the invention of the '416 patent for the client Kerberos to contact the server Kerberos and the server Kerberos to forward the request to the KAS. |
| said clearinghouse means being adapted to permit access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber | Through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. The client Kerberos sends a service request together |

Claims Chart – iv

3392743.1

| | |
|---|---|
| client computer making first request. | with the TGS ticket and authenticator to the KAS. The KAS generates the appropriate server ticket and associated server session key, encrypts the session key in the user's TGS session key and sends them to the client Kerberos. The client Kerberos sends the server ticket and authenticator to the requested service server Kerberos. The KAS then ultimately permits access to the resources of the server Kerberos. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| 4. A system as defined in claim 1 wherein successive ones of said intermittent requests occur at predetermined time intervals. | Kerberos with a smart card discloses intermittent requests occurring at predetermined time intervals. <br><br> Kerberos tickets granted by the KAS have an expiration. An authenticator is built using the smart card connected to the client Kerberos and must be generated every time user needs to use a ticket to access a server. See e.g., Smart Card, p. 119 |
| 5. A system as defined in claim 1 wherein said clearinghouse means provides authentication confirmation data to said subscriber client computers and to said first server computer when the identities of the same are authenticated, said authentication confirmation data being encrypted in subsequent communications from each of said first server computer, subscriber client computer and clearinghouse means to another of said first server computer, subscriber client computer and clearinghouse means. | Kerberos with a smart card discloses encrypting communications between the client Kerberos and the KAS and between the client Kerberos and the server Kerberos. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| | |

3392743.1

| | |
|---|---|
| 15. A system as defined in claim 1 wherein said server computer is adapted to selectively prompt said subscriber client computers to enter its identity data including its username and password in the beginning of an operating session. | Kerberos with a smart card discloses requesting a user ID and a password at the beginning of an operating session login. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| 16. A system as defined in claim 1 wherein said first server computer is adapted to assign one of a plurality of authorization levels to the computer resources provided by said first server computer, said identity data of each of said subscriber client computers including a particular authorization level, said first server computer only permitting access to particular computer resources by a subscriber client computer that are permitted by said particular authorization level. | It is inherent Kerberos that the ticket's grant a particular level of authorization levels to the computer resources.<br><br>Otherwise, it would have been obvious to one skilled in the art at the time of the invention of the '416 patent for the server (Kerberos) computer is adapted to assign one of a plurality of authorization levels to the computer resources provided by the server (Kerberos) computer, wherein the identity data of each of client (Kerberos) computers includes a particular authorization level, the server (Kerberos) computer only permitting access to particular computer resources by a client (Kerberos) computer that are permitted by said particular authorization level. See e.g., Smart Card, p. 119; p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| 24. A method of controlling access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network during an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers, comprising the steps of: | Kerberos with a smart card discloses "[a] method of controlling access to selected computer resources of at least a first server computer by at least one subscriber client computer via an untrusted network during an operating session, without necessarily controlling access to other computer resources provided by the first server computer and by other server computers and nonsubscriber client computers."<br><br>Kerberos uses a trusted central KAS to verify a client Kerberos |

Claims Chart – vi

3392743.1

| | |
|---|---|
| | computer has a proper ticket in order to grant access to resources on a server Kerberos. See e.g., Smart Card, Figs. 1-3. In a Kerberos system augmented by a smart card, all cryptographic processing is moved from the client Kerberos workstation into a user-unique, smart card that stores the user's private key in encrypted form on the smart card. Kerberos with smart card requires that a user provide something he/she possesses (i.e., a smart card) along with something he/she knows (i.e., a password). See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-22; and p. 123, ll. 16-33. |
| registering identity data of said first server computer and the identity data of each of said subscriber client computers and storing the registered identity data in a clearinghouse means associated with said first server computer and said subscriber client computers; | Kerberos with a smart card discloses "registering identity data of said first server computer and the identity data of said subscriber client computers and storing the registered identity data in a clearinghouse means associated with said first server computer and said subscriber client computers."<br><br>The KAS authenticates the identity of the server Kerberos by server Kerberos registration. KAS communicates with each system service (server Kerberos). Each client Kerberos registers with the KAS and the KAS requires the subscribers to proved their identity. See e.g., Smart Card, p. 119, col. 2, ll. 1831; p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| requiring a subscriber client computer to forward its identity data to said clearinghouse means at the beginning of an operating session in which access to selected computer resources is requested; | The KAS authenticates the identity of the client Kerberos by receiving the user ID requested form the client Kerberos and through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| requiring a subscriber client computer to forward a predetermined | The client Kerberos sends the server ticket and authenticator to |

3392743.1

| | |
|---|---|
| digital identification to said first server computer to thereby confirm that a hardware key is connected to said subscriber client computer; | the requested service server Kerberos. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| attempting to authenticate the identity of said subscriber client computer from said clearinghouse means responsive to a request for selected computer resources of said first server computer by a subscriber client computer; | The KAS authenticates the identity of the client Kerberos by receiving the user ID requested form the client Kerberos and through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| attempting to authenticate the identity of said first server computer from said clearinghouse means responsive to said subscriber client computer making the request for selected computer resources; and, | The KAS authenticates the identity of the server Kerberos by server Kerberos registration. KAS communicates with each system service (server Kerberos). See e.g, Smart Card, p. 119, col. 2, ll. 1831; p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3.<br><br>It would have been obvious to one skilled in the art at the time of the invention of the '416 patent for the client Kerberos to contact the server Kerberos and the server Kerberos to forward the request to the KAS. |
| permitting access to said selected computer resources responsive to successful initial authentication of said first server computer and of said subscriber client computer making said request. | Through a series of back and forth encrypted transactions, the KAS ultimately provides the client Kerberos with information for the smart card to generate a service authenticator and TGS ticket. The client Kerberos sends a service request together with the TGS ticket and authenticator to the KAS. The KAS generates the appropriate server ticket and associated server session key, encrypts the session key in the user's TGS session key and sends them to the client Kerberos. The client Kerberos sends the server ticket and authenticator to the requested service server Kerberos. The KAS then ultimately permits access to the resources of the server Kerberos. See e.g., Smart |

3392743.1

| | |
|---|---|
| | Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |
| 25. A method as defined in claim 24 wherein said subscriber client computer identity data includes a client name and a client password. | Kerberos with a smart card discloses requesting a user ID and a password at the beginning of an operating session login. See e.g., Smart Card, p. 120, col. 1, ll. 34-35 and col. 2, ll. 21-30; p. 121, col. 2, ll. 1-9; p. 122-23; and Figs. 2-3. |

Claims Chart – ix

# EXHIBIT R

US005590199A

# United States Patent [19]

## Krajewski, Jr. et al.

[11] **Patent Number:** 5,590,199

[45] **Date of Patent:** Dec. 31, 1996

[54] **ELECTRONIC INFORMATION NETWORK USER AUTHENTICATION AND AUTHORIZATION SYSTEM**

[75] Inventors: **Marjan Krajewski, Jr.**, Acton; **John C. Chipchak**, Dracut; **David A. Chodorow**, Groton; **Jonathan T. Trostle**, Lexington; **Peter T. Baldwin**, Rowley, all of Mass.

[73] Assignee: **The Mitre Corporation**, Bedford, Mass.

[21] Appl. No.: **134,399**

[22] Filed: **Oct. 12, 1993**

[51] Int. Cl.$^6$ ........................... H04L 9/32; H04L 9/08

[52] U.S. Cl. ................... 380/25; 380/4; 380/21

[58] Field of Search ..................... 380/25, 4, 23, 380/21

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,665,396 | 5/1987 | Dieleman . |
| 4,731,841 | 3/1988 | Rosen et al. . |
| 4,916,738 | 4/1990 | Chandra et al. . |
| 5,146,499 | 9/1992 | Geffrotin ..................... 380/23 |
| 5,237,611 | 8/1993 | Rasmussen et al. . |
| 5,347,580 | 9/1994 | Molva et al. ............... 380/25 |
| 5,349,643 | 9/1994 | Cox et al. ................... 380/25 |

### OTHER PUBLICATIONS

"*Kerberos*: An Authentication Service for Open Network Systems" by Jennifer G. Steiner et al., paper presented at Winter USENIX 1988, Dallas, Texas, Jan. 12, 1988, pp. 1–15.

"Evolution of the *Kerberos* Authentication Service" by John T. Kohl, paper presented at the Spring 1991 EurOpen Conference, Tromsø, Norway, pp. 1–16.

"Designing Security into Smart Card Applications" by G. Frederick Renner et al., paper presented at Card Tech Conference Proceedings, Crystal City, VA, Apr. 1992, pp. 128–132.

"Concept for a Smart Card Kerberos" by Marjan Krajewski, Jr., paper presented at the 15th National Computer Security Conference, Baltimore, MD, Oct. 1992.

"Smart Card Augmentation of Kerberos" by Marjan Krajewski, Jr., paper presented at the Privacy and Security Research Group Workshop on Network and Distributed System Security, San Diego, CA, Feb. 1993.

"Applicability of Smart Cards to Network User Authentication" by Marjan Krajewski, Jr. et al., The USENIX Association, Computing Systems, vol. 7, No. 1, Winter 1994 pp. 75–89.

*Primary Examiner*—Gilberto Barron, Jr.
*Attorney, Agent, or Firm*—Choate, Hall & Stewart

## [57] ABSTRACT

A system for authenticating and authorizing a user to access services on a heterogenous computer network. The system includes at least one workstation and one authorization server connected to each other through a network. A user couples a personally protectable coprocessor (smart card) to the workstation by means of a bidirectional communications channel. The coprocessor is adapted to receive signals including first encrypted authentication information and to decrypt the first encrypted authentication information using a preselected first key. The coprocessor is further adapted to assemble and encrypt second authentication information using a preselected second key and to transmit the encrypted second encrypted authentication information to the workstation. The workstation then communicates the information onto the network whereby the user is authenticated to access the networked computer or service.

**4 Claims, 3 Drawing Sheets**





FIG. 1 PRIOR ART



FIG. 2 PRIOR ART



F I G. 3



F I G. 4



5,590,199

**1**

# ELECTRONIC INFORMATION NETWORK USER AUTHENTICATION AND AUTHORIZATION SYSTEM

## BACKGROUND OF THE INVENTION

Widespread use of networks to interconnect heterogenous computer services is common today. Typically, in a distributed processing environment, a user will access an unsecured workstation itself, using the workstation itself, access a variety of other computer services on the network. But as the use of networks has increased so have the problems relating to securing and controlling the legitimate access of users to the computer systems.

Traditionally, access to computer services was controlled through the use of passwords. Each user was associated with a user id and a password. Both the computer system and the user who wished to access a service had to know the password. The user provided the user id and the computer systems challenged the user to then provide the password. This initiated access to the system.

FIG. 1 represents a typical prior art computer network configuration. A user 10 accesses a workstation 14 which is connected to a network 18. The user 10 then accesses services 20, 22 and 24 from the workstation 14 via the network 18. User authentication is controlled through the use of a password 11 known only by user 10 and services 20, 22 and 24.

A weakness with this authentication scheme can be seen in FIG. 2. Since the workstation 14 is often installed in an unsecured environment, an illicit user may install a trojan horse 15 on the workstation 14 to spy on the input of password 11 by user 10. Further, a password thief 12 may borrow or steal the password 11 from user 10. Finally, a network eavesdropper 16 can intercept the transmission of password 11 to services 20, 22 and 24. All of these methods may be utilized to gain illicit access to service 20, 22 and 24. It will be appreciated that the network 18 can connect many other untrusted workstations and services, compounding the danger if illicit access to network services.

As seen, in a distributed processing environment, a user often needs to access resources located at multiple servers from multiple workstations interconnected via a communications network. Authentication to each host accessed is crucial, but presenting separate user id/password pairs can be both unwieldy and unsecure. What is needed is a mechanism which requires users to identify and authenticate themselves once to a trusted agent which then performs the necessary user identification and authentication to each accessed resource transparently. This is known as unitary login.

Previous work in developing secure unitary login protocols for distributed systems include those intended for open environments (e.g., the Massachusetts Institute of Technology Kerberos protocol, the Digital Equipment Corporation SPX protocol, the Carnegie Mellon University Strongbox protocol, and the ISO OSI Directory Services protocols) and those intended for closed environments (e.g., the World Wide Military Command and Control System (WWMCCS) Information System Network Authentication Service (WIS-NAS) protocol, the Department of Defense Intelligence Information System Network Security for Information Exchange (DNSIX) protocol, and the Strategic Air Command Intelligence Network (SACINTNET) protocol).

Each of these protocols provides different authentication services (e.g., Kerberos, SPX, WISNAS, DNSIX, and

**2**

SACINTNET are more connection-oriented while Strongbox and the OSI Directory Services are more process-oriented) and depends upon different mechanisms to provide security (e.g., Kerberos employs conventional encryption, Strongbox employs zero-knowledge proofs, SPX and OSI Directory Services employ public key encryption). None of them are intended for a truly hostile environment (i.e., one subject to active attacks against both workstations/servers and the network). WISNAS, DNSIX and SACINTNET, though designed for military applications, are intended for physically secure environments with trusted users and no eavesdropping threats. The other protocols protect against the threat of network eavesdropping but assume that workstations and servers are protected by other mechanisms (e.g., physical ownership/control). Organizations could greatly ease the problems associated with password management and the threat from masquerading on their increasingly distributed information systems with a unitary login capability which is secure from both a workstation/server and a network perspective.

The Kerberos protocol possesses many advantages as a basis for this capability. Originally developed to provide user authentication for the distributed open computing environment of MIT's Project Athena, Kerberos is growing significantly in popularity (it has been adopted by the Open Software foundation and Unix International as well as being offered in several commercial products). It is based upon the use of a trusted authentication server to provide "tickets" for presentation to other system servers and uses algorithm-independent conventional (secret) key encryption to protect against network eavesdropping and masquerading. This latter feature is especially important for military/intelligence applications in that the current Data Encryption Standard (DES) algorithm might be inadequate for certain environments. If so, it can easily be replaced with a stronger algorithm.

Kerberos utilizes a trusted central authentication server, the Kerberos Authentication Server (KAS). The KAS contains a database of system entities (registered users and services) and its private cryptographic keys. Each user and each service is a separate entry, each with their own cryptographic key. These private keys, known only to the respective entity and the KAS, allow the KAS to communicate privately with the Kerberos agent of each system service (server Kerberos) and with the Kerberos agent of each registered user who wishes to be logged in (client Kerberos). The KAS also contains a "ticket" granting service to provide a trusted means for logged in users to prove their identity to system services. Finally, it contains a key generation service which supplies authorized pairs of entities with temporary cryptographic keys.

The Kerberos protocol is based upon the concept of tickets and authenticators. A ticket is issued by the KAS for a single user and a specified service. It contains the service id, the user id, the user's (workstation) address, a timestamp, the ticket's lifetime and a randomly chosen session key to be used by this service. This information is protected by encryption under the service's private key. Since this key is known only to the service and the KAS, the service is assured of the authenticity of the ticket. Once a ticket is issued, it can be reused by the named user to gain access to the indicated service until it expires. A new ticket can be issued upon the user's presenting his/her appropriate credentials.

Unlike the ticket, the authenticator is built by client Kerberos. A new one must be generated every time the user wishes to use a ticket. An authenticator contains the user's

5,590,199

|  3  |  4  |

id, the user's (workstation) address, and a timestamp. The authenticator is encrypted with the session key which is associated with the ticket. Encryption of the authenticator assures the service that the user presenting the ticket is the user to whom the original ticket was issued. The agreement of the user id in the authenticator with the user id in the ticket and the address in the authenticator with the address in the ticket proves a user's authenticity. Agreement of the timestamp with the current time proves that this is a fresh ticket/authenticator pair and not a replay of an old pair.

Security within Kerberos is enforced through the protection of session keys during transmission. The initial response from the KAS to the client, upon presentation of the user id, consists of a ticket to the ticket granting service and its associated session key. The ticket granting service ticket is encrypted with the ticket granting service's private key. The ticket granting service session key is encrypted with the client's private key. Additional session keys associated with tickets to system service requested by that particular client are henceforth encrypted in the ticket granting service session key.

Kerberos has been analyzed from a general security perspective. A significant vulnerability involves its manipulation of the user's Kerberos password and other sensitive authentication information (i.e., session keys) within the workstation, thereby making it vulnerable to Trojan Horse threats which could capture such data for later use by an intruder. Another vulnerability involves the threat of repeated attacks at the intruder's leisure following interception of the initial response from the authentication server. This response contains the ticket granting server ticket (required for obtaining other tickets) and its associated session key, which is encrypted using a relatively weak password-derived key. A third vulnerability involves the inherent weakness of depending solely upon a single factor (i.e., a password) for the initial user authentication. Passwords can be easily borrowed or stolen.

## SUMMARY OF THE INVENTION

The system, according to the invention, for authentication of a user to a variety of computer services on a network of heterogenous computer systems includes at least one user workstation and one authorization server connected to each other through a network. A user couples a personally protectable coprocessor (smart card) to the workstation by means of a bidirectional communication channel.

The coprocessor is adapted to receive signals including first encrypted authentication information received from the workstation. The first encrypted information is decrypted, using a preselected key, by the coprocessor. The coprocessor is further adapted to assemble second authentication information and to encrypt the second information with a preselected second key. This second information is then transmitted to the workstation. The workstation then communicates the information onto the network.

In preferred embodiments, the preselected first and second keys may either be preprogrammed into the coprocessor or be received by the coprocessor from the authorization server.

In another embodiment, the preprogrammed first and second keys may be stored in an encrypted form and be decrypted using a key derived from a user supplied password.

In another aspect of the invention, the system includes at least one user workstation connected to a network. A user

couples a personally protectable coprocessor (smart card) to the workstation by means of a bidirectional communication channel.

The coprocessor is adapted to receive signals including first encrypted authentication information received from the workstation. The first encrypted information is decrypted, using a preselected preprogrammed key, by the coprocessor. The coprocessor is further adapted to assemble second authentication information and to encrypt the second information with a preselected preprogrammed second key. This second information is then transmitted to the workstation. The workstation then communicates the information onto the network.

In greater detail, the invention disclosed here is based upon moving critical cryptographic processing from the workstation into a user-unique smart card and storing the user key in encrypted form on the smart card. The user key would be encrypted in a key derived from a password. In this way, neither possession of the card alone nor knowledge of the password alone would be sufficient to authenticate a user. Encryption and decryption operations and the storage of unencrypted authentication information would occur only within a personally protectable coprocessor (i.e., that of the smart card). Since the user can remove and carry the smart card on the person, the smart card, in effect, forms a personal protectable extension of the workstation processing environment.

Past implementation of user authentication required user intervention when requesting access to a new computer service. Typically, a user presented a user id and password combination for each service or computer system. Access to various computer services was not seamless in that user intervention was required prior to authorization. Each service or computer system required a unique user id and password pair which were known to both the user and the service or computer system.

The authentication mechanism of the present invention provides for authenticating a user on a remote untrusted workstation and allowing access by the user to various secured networked computer services with only a single user login operation.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a simplified block diagram illustrating a typical prior art network of computer systems and services.

FIG. 2 is a simplified block diagram illustrating a typical prior art network of computer systems and services in a hostile environment.

FIG. 3 is a simplified block diagram illustrating a typical network of computer systems and services augmented by the present invention.

FIG. 4 is a simplified block diagram illustrating a Kerberos system augmented by the invention.

FIG. 5 is a simplified diagram of the system during the first phase of user authentication.

FIG. 6 is a simplified diagram of the system during the second phase of user authentication.

FIG. 7 is a simplified diagram of the system during the third phase of user authentication.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Kerberos utilizes a trusted central authentication server, referred to herein as the Kerberos Authentication Server

5,590,199

| 5 | 6 |

(KAS). This central server contains a database of system entities (registered users and services) and their private cryptographic keys. These private keys, known only to the respective entity and the KAS, allow the KAS to communicate privately with the Kerberos agent of each system service (referred to herein as server Kerberos) and with the Kerberos agent of each registered user who wishes to be logged in (referred to herein as client Kerberos). The central server also contains a ticket granting service to provide a trusted means for logged in users to prove their identity to system services. Finally, it contains a key generation service which supplies authorized pairs of entities with temporary cryptographic keys (session keys).

The Kerberos protocol is based on the concept of tickets and authenticators. A ticket is issued by the KAS for a single user and a specified service. It contains the service id, the user id, the user's (workstation) address, a timestamp, the ticket's lifetime and a randomly chosen session key to be used by this user and this service. This information is protected by encryption under the service's private key. Since this key is known only to the service and the KAS, the service is assured of the authenticity of the ticket. Once a ticket is issued, it can be used many times by the named user to gain access to the indicated service until the ticket expires.

Unlike the ticket, the authenticator is built by client Kerberos. A new one must be generated every time the user wishes to use a ticket. An authenticator contains the user's id, the user's (workstation) address, and a timestamp. The authenticator is encrypted with the session key which is associated with the ticket. Encryption of the authenticator provides integrity of the authenticator and assures the service that the user is the system entity who received the original ticket. The further agreement of the user id in the authenticator with the one in the ticket and the address with the one from which the ticket arrived provides further assurance. Agreement of the timestamp with the current time assures the service that this is a fresh ticket/authenticator paid and not a replay of an old pair.

A new user or the administrator of a new system service must first register with Kerberos. Registration consists of making a new entry in the KAS database and issuing an id and private key. In the case of a user, the private key is issued in the form of a password. The administrator of the system service must load the service's private key into the server Kerberos software.

With reference to FIG. 3., the system, according to the invention, for authentication of a user 10 to a variety of computer services 20, 22 and 24 on a network 18 of heterogenous computer systems is comprised of at least one user workstation 14 and one authorization server 32 connected to each other through a network 18. A user 10 couples a personally protectable coprocessor 30 to the workstation 14 by means of a bidirectional communication channel 31.

In connection with the authentication procedure, the smart card is initialized at the central authorization center. The smart card is programmed with the user key which is encrypted using a key derived from a user supplied password. The encrypted user key is stored in nonvolatile memory which is only readable by the smart card. The user key and user id are also stored in the central physically secure authentication server at this time. The card is now ready for use by the user.

Following registration, user interaction with Kerberos consists of three phases. The first phase occurs during login as illustrated in FIG. 5. The user 10 first enters his user id 41 into the workstation 14 and sends a request 43 to the KAS

32. A ticket to the ticket granting service and its associated session key 44 are then generated by the KAS 32 and sent to the user's workstation 14, the session key being encrypted by the KAS 32 in a private key derived from the user's password. The user then enters a password 42 which is converted into a key and sent to the smart card 30. If the password derived key is correct, the session key is properly decrypted by the smart card 30. If the entered password is incorrect, the session key will not be decrypted.

In the second phase as illustrated in FIG. 6, the user 10, desiring to access a specific system service 20, presents the ticket granting service ticket and an associated authenticator 51 to the ticket granting service running on the KAS 32 to request a ticket for the desired system service 20. The authenticator is encrypted by the smart card 30. The ticket and associated authenticator 51 identifies and authenticates the user 10 to the ticket granting service. The ticket granting service then generates and sends an appropriate server ticket and server session key 52 to the user's workstation, the server session key being encrypted in the session key associated with the ticket granting service. This encrypted session key is then decrypted within by the user's smart card 30. In the third phase illustrated in FIG. 7, the user's workstation 14 and smart card 30 encrypts an appropriate authenticator for the desired server ticket, the user then presents the server ticket and associated authenticator 61 to the service 20, and, following validation by the server, obtains access. As illustrated in FIG. 4, the smart card 30 augments client Kerberos 70 running on the user's untrusted workstation 14 by moving the cryptographic processing 71 into the smart card 30. All encryption and decryption required for access to the authorization server 32 or a network service 20 is done within the smart card 30. With greater detail, the smart card augmented Kerberos would function as follows:

| | |
|---|---|
| Initial State: | Client Kerberos holds no user-unique information. The smart card holds the user's private key encrypted in a key derived from a password. |
| Step 1: | The user inserts his/her smart card into the card reader attached to the workstation. Client Kerberos requests a user id. |
| Step 2: | Client Kerberos sends the user id to the KAS and prompts the user for a password. Client Kerberos derives a key from the password and sends it to the smart card. The smart card uses the password-derived key to decrypt the user's private key. |
| Step 3: | The KAS generates the user's ticket granting service (TGS) ticket and associated TGS session key, encrypts the TGS session key using the user's private key, and sends the message to the client. |
| Step 4: | Client Kerberos stores the TGS ticket and transfers the encrypted TGS session key to the smart card. |
| Step 5: | The smart card uses the user's private key to decrypt the encrypted session key. The smart card stores the TGS session key in its volatile memory, destroys the password-derived key and the decrypted copy of the user's private key, encrypts a copy of the TGS session key using the stored version of the TGS session key as the encrypting key, and transfers the encrypted copy back to client Kerberos. |
| Step 6: | To access a system service, client Kerberos first determines if a ticket to that service is needed (one may have been obtained earlier and, if so, the process jumps to step 12). If a ticket is needed, client Kerberos transfers identification information and a timestamp to the smart card, along with the encrypted TGS session key. |
| Step 7: | The smart card then creates an authenticator for the TGS service by decrypting the encrypted TGS session key and encrypting the identification information and timestamp using the decrypted TGS session key. It sends |

5,590,199

7
-continued

| | the encrypted authenticator back to client Kerberos. |
|---|---|
| Step 8: | Client Kerberos sends the service request, together with the TGS ticket and encrypted authenticator, to the KAS. |
| Step 9: | The KAS validates the request and, if valid generates the appropriate server ticket and associated server session key, encrypts the server session key using the requesting user's TGS session key, and sends the message to client Kerberos. |
| Step 10: | Client Kerberos transfers the portion of the message encrypted using the TGS session key to the smart card. |
| Step 11: | The smart card decrypts the message, re-encrypts the server session key using the TGS session key, and sends it back to client Kerberos. |
| Step 12: | Client Kerberos transfers the identification information, a timestamp, and the desired encrypted server session key to the smart card. |
| Step 13: | The smart card decrypts the encrypted server session key and encrypts the identification information and timestamp in the decrypted server session key. The smart card sends the encrypted authenticator to client Kerberos. |
| Step 14: | Client Kerberos sends the server ticket and encrypted authenticator to the requested service. |
| Step 15: | Server Kerberos decrypts the server ticket and authenticator and authenticates the user |

In addition to enhancing security, it is possible for the invention to maintain interoperability with existing authentication systems. For example, the invention allows smart card augmented Kerberos components to be gradually introduced into an operational environment as time and resources permit. This invention provides that neither the Kerberos authentication server (KAS) nor the server Kerberos implementations be affected in any way.

Smart cards are small credit card sized processing systems. A smart card typically contains a microcontroller (CPU), an amount of volatile random access memory (RAM), an amount of electrically erasable programmable read only memory (EEPROM), an interface to communicate outside of the card and an "operating system" residing in masked read only memory (ROM). Numerous vendors currently produce such cards, each with different CPU, RAM, EEPROM, ROM and programming characteristics. For a prototype of the present invention, the ΩmegaCard™ by Sota Electronics, Inc. was used.

Advances in encryption and smart card technology have reached the point where significant amounts of information can be stored and significant processing can be performed entirely within the isolated environment of the card itself. When this technology is combined with user-unique information (e.g., a password) that is useless except when processed by the appropriate smart card, a significantly stronger authentication mechanism can be constructed than is available with "standard" Kerberos. Kerberos itself has evolved to accommodate such augmentations.

With reference to Appendix A, the smart card is programmed to be an encryption service provider for the encryption of Kerberos authenticators and the decryption of Kerberos KAS/TGS responses. It implements the DES CBC mode, performing an encryption or decryption operation on 8 byte blocks of data using a DES key and an initialization vector. The software architecture of the smart card consists of the operating system, I/O routines, interface routines, the control application, and DES algorithm. The operating system and I/O routines are provided in the smart card development system. Assembler interface routines were modified to allow Archimedes version 4.0 C-8051 to make calls to the operating system to read messages into the smart card, write messages out of the smart card, and write bytes to EEPROM. Both the control application and the DES algorithm are written in C.

8

The control application implements the control protocol to communicate with client Kerberos and performs the requested encryption service on the input data. There are two additional functions in support of the encryption service: decrypting the user key for decryption of the first KAS message and downloading a session key for encryption of authenticators. The control protocol has been implemented such that each request message sent to or from the smart card has a corresponding response message (acknowledgment) returned before another message may be sent. This serves to keep the client Kerberos and the smart card message exchanges tightly coupled and helped in smart card software debugging. There are some smart card initialization procedures regarding card reset, card login, and execution of the control application. Once the smart card control application is running, all messages sent to the smart card are delivered to the control application.

In support of KAS/TGS response decryption, the following operations are performed. To process the initial KAS response, it is first necessary to decrypt the Kerberos user key (stored in encrypted form in EEPROM). To do this, client Kerberos sends a hash of the user password to the smart card to be used as a DES key. The smart card decrypts the user key using this hashed password key. Client Kerberos then sends the KAS response to the smart card, one block at a time in a Download Block message. The last block is sent in a Decrypt message, notifying the smart card to start the decryption process. The last block is sent in a Decrypt message, notifying the smart card to start the decryption process. The smart card assumes that the first response to be decrypted following initialization comes from the KAS. This response is encrypted in the user key and contains the TGS session key. Subsequent responses are assumed to come from the TGS. These responses are encrypted in the TGS session key and contain server session keys. Decrypted blocks are sent back in a Return message. The last decrypted block is sent back in an End message. All decrypted session keys are re-encrypted in the TGS session key before being sent back. The decrypted user key is destroyed after the first response is processed. Thereafter, the smart card uses the stored TGS session key for all decryptions.

For subsequent support of the TGS authenticator encryption, the following operations are performed. The appropriate session key is sent to the smart card in the Send Session Key message. The session key is decrypted with the TGS session key and stored in memory. Next, the TGS authenticator is sent down to the smart card one block at a time in a Download Block message. The last block is sent as an Encrypt message, notifying the smart card to start the encryption process. The TGS authenticator is then encrypted in the session key previously downloaded. As each block is encrypted, it is sent back to the client Kerberos in a Return message. The last block is sent in an End message.

Given that the smart card was not required to act as a bulk encryptor for message data streams, the implementation of the DES algorithm on the smart card was driven by memory constraints rather than encryption rate, with the understanding that higher encryption rates could be achieved by trading space for time. We chose a straightforward implementation of the DES algorithm as illustrated in Press, W. H., Flannery, B. P., Teulosky, S. A., and Vetterling, W. T., "Numerical Recipes: The Art of Scientific Computing," Cambridge University Press, Cambridge, UK, 1986, pp. 218–220. The DES algorithm is used for exemplary purposes only. One skilled in the art may substitute an alternate encryption algorithm.

While the Kerberos implementation is illustrated here, it should be clear to one trained in the art that the invention is not limited to Kerberos, but may also be used in conjunction with other authorization systems to provide a secure method to authenticate users.

5,590,199

9                                              10

- 15 -
APPENDIX A

Jan 25 18:29 1993  exdemo2.c Page 1

```
/****************************************************************/
/*                                                            */
/*  THIS IS THE SMART CARD MAIN PROGRAM WHICH WILL HANDLE     */
/*  INTERFACING WITH THE MASKED ROM TO GET MESSAGES AND SEND  */
/*  RESPONSES TO THE WORKSTATION.  THIS PROGRAM ALSO PARSES THE */
/*  INCOMING MESSAGES AND CONTROLS THE SMART CARD DES PROCESSING */
/*                                                            */
/****************************************************************/
/*

/* #define DEBUG */
/* #define DEBUG1 */


#define INBUFF  0x33     /* assemble ramdef.inc to find address  */
#define OUTBUFF 0x33     /* assemble ramdef.inc to find address  */

/* defines for memory locations for the INBUFF buffer */

#define IO_MSG_SOH      (* (unsigned char *) 0x000033) /* Msg start of header */
#define IO_MSG_LTH      (* (unsigned char *) 0x000034) /* Msg length in header */
#define IO_MSG_CMD      (* (unsigned char *) 0x000035) /* Msg command in header */
#define IO_MSG_DATA     (* (unsigned char *) 0x000036) /* MAX 16B + CRC (2B) */
#define IO_RAM_LO       (* (unsigned char *) 0x000036) /* Low order 8B of ms */
#define IO_RAM_HI       (* (unsigned char *) 0x000040) /* Hi order 8B after . */

#define EVER    ;;

/*                                                            */
/****************************************************************/
/*                                                            */
#include "c:\archimed\h\stdio.h"      /* required header for printf, putchar */
#include "c:\archimed\h\io51.h"   /* required header for output, bit_set, etc. */
#include "c:\archimed\h\string.h" /* new for strlen function */
#include "config.h"
#include "sio.h"
#include "ee_opt.h"
#include "regdef.h"
#include "crc16.h"
#include "cmdequs.h"
#include "card_des.h"

#pragma language-extended

/*                                                            */
/****************************************************************/
/*                                                            */
/*  External prototype declarations for asminf.msa assembly I/F routines */
/*                                                            */

/* function to receive data into the smart card */
```

5,590,199

11                                    12

- 16 -

```
Jan 25 18:29 1993  exdemo2.c Page 2

extern int receiveData();

/* function to copy count bytes from source to desti  .ion in eeprom */
extern void c_byte_write(unsigned char count, unsign.  char *source,
                                              unsigned char *dest);

/* function to copy a source pointer into destination eeprom pointer */
extern void copy_ptr_to_EE(unsigned char *source, unsigned char **dest);

/* function to transmit count bytes from the buffer out of the smart card
   using the command code provided */
extern void TxRamBuffer(unsigned char count, unsigned char command);

/* function to take the bytes_to_steal from the stack to use as memory
   available for the smart card */
extern void StealStack(unsigned char bytes_to_steal);

/*                                                                      */
/*********************************************************************/
/*                                                                      */
/*  External prototype declaration for des.c function                  */
/*                                                                      */

/* function to perform des encryption or decryption */
extern void des(bit isw); /* isw == 0 => encrypt, isw == 1 => decrypt */

/*                                                                      */
/*********************************************************************/
/*                                                                      */

#pragma memory=xdataconst
#pragma stringalloc=xdata

/* user key encrypted in hashed password */

const unsigned char user_key_encr[]={ 0x01, 0x01, 0x01, 0x01,
                                      0x01, 0x01, 0x01, 0x01 };

#pragma memory=default
#pragma stringalloc=default

/*                                                                      */
/*********************************************************************/
/*                                                                      */
/*  DES pointer global declarations                                    */
/*                                                                      */

xdata immense *inp; /* Pointer to 8 byte block holding DES input.
                       Can point to RAM or EEPROM */
xdata immense *key; /* Pointer to 8 byte block holding DES key.  Can
                       point to RAM or EEPROM, but should be RAM to
                       preserve security. */
```

5,590,199

13                                                        14

```
                                    - 17 -

Jan 25 18:29 1993 exdemo2.c Page 3


xdata immense *out; /* Pointer to 8 byte block to receive DES output.
                       Must point to RAM */

/*
/*****************************************************************************
/*                                                                          */
/* Working storage area for processing Authentication Server response       */
/* message sent by client for decryption.                                   */
/*                                                                          */

union des_block {
  immense      i;
  unsigned char b[8];
};                              /* DES block that we can work with
                                   either as 4 or 1 bytes components. */
#define AS_RESP_SIZE    35      /* Maximum number of 8-byte chunks we
                                   can handle in any one message */
xdata union des_block as_resp[AS_RESP_SIZE+1];
                                /* Response message buffer, plus 1
                                   block for the CBC IV */
xdata union des_block sk_buf[2];        /* Temp storage for decrypted response
                                   blocks that hold the session key */
xdata immense hp_IV;            /* User's hashed password acting as
                                   the DES CBC IV for the KAS response
                                   message. */
xdata union des_block tgs_sk_ram;
                                /* tgs session key storage location.
                                   Yes, I know it says RAM and it
                                   should be in RAM, but there's just
                                   no room for it. */
BIT got_TGS_SK;                 /* Indicates if we've got the TGS SK
                                   decrypted in RAM */

/*                                                                          */
/*****************************************************************************
/*                                                                          */
/* main()                                                                   */
/*                                                                          */

void main(void)   /* Main EXAMPLE.C program */
{
        /* local variable declarations */

        idata unsigned char resp_blk_cnt;
                                /* Count of response message blocks received */
        idata unsigned char resp_blk_indx;
                                /* Index into current response message
                                   block being processed */
        idata union des_block sk_ram_buf;
                                /* Temp storage for red session key
                                   from response message */

        /* Steal bytes from the stack to use as working storage. */
```

5,590,199

15                                                    16

```
                              - 18 -

Jan 25 16:29 1993  exdemo2.c Page 4

     StealStack(9);

     resp_blk_cnt = 1;
     got_TGS_SK = 0;
/*                                                                    */
/**********************************************************************/
/*                                                                    */
/*  LOOP HERE FOREVER TO PERFORM SMART CARD OPERATIONS                */
/*                                                                    */

     for (EVER)
       {
         /*  READ A MESSAGE  */
         receiveData();

         /*  PROCESS MESSAGE AND SEND RESPONSE  */

         switch( IO_MSG_CMD )
           {
           case CMD_SKD_KPW:

             /* move *key to point to hashed password in received buffer */
             copy_ptr_to_EE(&IO_RAM_LO, (unsigned char **) &key);

             /* move *inp to point to the user_key_encr in card */
             copy_ptr_to_EE(user_key_encr, (unsigned char **) &inp);

             /* move *out to point to the output buffer */
             copy_ptr_to_EE(&IO_RAM_HI, (unsigned char **) &out);

             /* call des and decrypt the user key with the hashed pw */
             des(1);
             got_TGS_SK = 0; /* Act like we don't have a TGS SK yet */

#ifdef DEBUG
             /* copy uk output to the transmit buffer and send out */
             key->l = out->l;
             key->r = out->r;

             /* send a CMD_ACK_KPW back with 8 bytes of data */
             TxRamBuffer((unsigned char) 8, (unsigned char) CMD_ACK_KPW );
#else

             /* send a CMD_ACK_KPW back with no data */
             TxRamBuffer((unsigned char) 0, (unsigned char) CMD_ACK_KPW );
#endif
             /* Put red user key into TGS SK buffer for use in
                decrypting the TGT response message */
             c_byte_write((unsigned char ) 8, (unsigned char *) out,
                          (unsigned char *) &tgs_sk_ram);
             break;
```

5,590,199

17                                    18

- 19 -

Jan 25 18:29 1993 exdemo2.c Page 5

```
case CMD_SND_ENC_PART:
                    /* Store the next block of the
                       encrypted part of a message. Note,
                       that this may need to be encrypted
                       before transmission, or decrypted
                       after reception.*/

    if (resp_blk_cnt < AS_RESP_SIZE) {
        c_byte_write((unsigned char) 8, &IO_RAM_LO,
                     (unsigned char *) &as_resp[resp_blk_cnt]);
        resp_blk_cnt++;
        TxRamBuffer((unsigned char) 0,
                    (unsigned char) CMD_ACK_SND_ENC_PART);
    } else {
        TxRamBuffer((unsigned char) 0, (unsigned char) CMD_UNKNOWN);
        resp_blk_cnt = 1; /* Discard overflowing message */
    }
    break;


case CMD_SND_DECR:
                    /* Received a complete authentication
                       server response message.  Decrypt
                       it, then return it with the session ke-
                       encrypted with the TGS SK.  Flag
                       got_TGS_SK reset implies this is a TGS
                       session key message  */

    c_byte_write((unsigned char) 8, &IO_RAM_LO,
                 (unsigned char *) &as_resp[resp_blk_cnt]);
    TxRamBuffer((unsigned char) 0,
                (unsigned char) CMD_ACK_SND_DECR);
    copy_ptr_to_EE((unsigned char *) &tgs_sk_ram,
                   (unsigned char **) &key);
    copy_ptr_to_EE((unsigned char *) &IO_RAM_LO,
                   (unsigned char **) &out);
    for (resp_blk_indx=1; resp_blk_indx <= resp_blk_cnt;
         resp_blk_indx++) {
        copy_ptr_to_EE((unsigned char *) &as_resp[resp_blk_indx],
                       (unsigned char **) &inp);

        des(1);

        out->l ^= (resp_blk_indx > 1)
                  ? as_resp[resp_blk_indx-1].i.l : tgs_sk_ram.i.l;
        out->r ^= (resp_blk_indx > 1)
                  ? as_resp[resp_blk_indx-1].i.r : tgs_sk_ram.i.r;

        if (resp_blk_indx == 4) {
            /* This block contains the first byte of the red
               session key per Kerberos V5 message spec.
               Stash away that byte in RAM and store the rest
               of the harmless decrypted response block in EE
```

5,590,199

19                                                20

- 20 -

Jan 25 18:29 1993  exdemo2.c Page 6

```
                        for later xmission to the client. */

           sk_ram_buf.b[0] = ((union des_block *) &IO_RAM_LO)->b[7];
           ((union des_block *) &IO_RAM_LO)->b[7] = 0;
           c_byte_write((unsigned char) 8, & IO_RAM_LO,
                        (unsigned char *) &sk_buf[0]);

       } else if (resp_blk_indx ==5) {
           /* We now have the rest of the red session key
              from the response message.  Collect the
              complete red session key in RAM, clear it from
              the response block buffer, and store the
              harmless response block for later xmission. */

           sk_ram_buf.b[1] = ((union des_block *) &IO_RAM_LO)->b[0];
           sk_ram_buf.b[2] = ((union des_block *) &IO_RAM_LO)->b[1];
           sk_ram_buf.b[3] = ((union des_block *) &IO_RAM_LO)->b[2];
           sk_ram_buf.b[4] = ((union des_block *) &IO_RAM_LO)->b[3];
           sk_ram_buf.b[5] = ((union des_block *) &IO_RAM_LO)->b[4];
           sk_ram_buf.b[6] = ((union des_block *) &IO_RAM_LO)->b[5];
           sk_ram_buf.b[7] = ((union des_block *) &IO_RAM_LO)->b[6];
           ((union des_block *) &IO_RAM_LO)->i.l = 0l;
           ((union des_block *) &IO_RAM_LO)->b[4] = 0;
           ((union des_block *) &IO_RAM_LO)->b[5] = 0;
           ((union des_block *) &IO_RAM_LO)->b[6] = 0;
           c_byte_write((unsigned char) 8, & IO_RAM_LO,
                        (unsigned char *) &sk_buf[1]);


           /* Now encrypt the red session key with the TGS
              SK.  If we are processing the TGT response then
              the red session key in sk_ram_buf IS the TGS
              SK.  In this case encrypt it with itself as
              key. */
           copy_ptr_to_EE((unsigned char *) &sk_ram_buf,
                          (unsigned char **) &inp);
           if (! got_TGS_SK)
             copy_ptr_to_EE((unsigned char *) &sk_ram_buf,
                            (unsigned char **) &key);
           des(0);
           if (! got_TGS_SK)
             copy_ptr_to_EE((unsigned char *) &tgs_sk_ram,
                            (unsigned char **) &key);
           ((immense *) &IO_RAM_HI)->l = ((immense *) &IO_RAM_LO)->l;
           ((immense *) &IO_RAM_HI)->r = ((immense *) &IO_RAM_LO)->r;
           ((immense *) &IO_RAM_LO)->l = sk_buf[0].i.l;
           ((immense *) &IO_RAM_LO)->r = sk_buf[0].i.r;
           ((union des_block *) &IO_RAM_LO)->b[7] =
             ((union des_block *) &IO_RAM_HI)->b[0];
           TxRamBuffer((unsigned char) 8,
                       (unsigned char) CMD_RTN_ENC_PART);
           receiveData();
           if (IO_MSG_CMD != CMD_ACK_RTN_ENC_PART)
             break;    /* Discard response message and wait
```

5,590,199

21                                                    22

- 21 -

Jan 25 18:29 1993  exdemo2.c Page 7

```
                              for next input from client. */
        ((union des_block *) &IO_RAM_LO)->b[0] =
            ((union des_block *) &IO_RAM_HI)->b[1];
        ((union des_block *) &IO_RAM_LO)->b[1] =
            ((union des_block *) &IO_RAM_HI)->b[2];
        ((union des_block *) &IO_RAM_LO)->b[2] =
            ((union des_block *) &IO_RAM_HI)->b[3];
        ((union des_block *) &IO_RAM_LO)->b[3] =
            ((union des_block *) &IO_RAM_HI)->b[4];
        ((union des_block *) &IO_RAM_LO)->b[4] =
            ((union des_block *) &IO_RAM_HI)->b[5];
        ((union des_block *) &IO_RAM_LO)->b[5] =
            ((union des_block *) &IO_RAM_HI)->b[6];
        ((union des_block *) &IO_RAM_LO)->b[6] =
            ((union des_block *) &IO_RAM_HI)->b[7];
        ((union des_block *) &IO_RAM_LO)->b[7] = sk_buf[1].b[7];
        TxRamBuffer((unsigned char) &,
            (unsigned char) CMD_RTN_ENC_PART);
        receiveData();
        if (IO_MSG_CMD != CMD_ACK_RTN_ENC_PART)
            break;    /* Discard response message and wait
                         for next input from client. */

    } else {
        /* Not one of the message blocks containing a
           session key. */
        TxRamBuffer((unsigned char) &,
            (resp_blk_indx < resp_blk_cnt)
            ? (unsigned char) CMD_RTN_ENC_PART
            : (unsigned char) CMD_RTN_END);
        receiveData();
        if (IO_MSG_CMD != CMD_ACK_RTN_ENC_PART &&
            IO_MSG_CMD != CMD_ACK_RTN_END)
            break;    /* Discard response message and wait
                         for next input from client. */
    }
}                         /* end for loop */
if (! got_TGS_SK) {
    /* We just got the red TGS SK in sk_ram_buf.  Move
       it to its permanent ram buffer and remember that
       we have it. */
    c_byte_write((unsigned char) &,
        (unsigned char *) &sk_ram_buf,
        (unsigned char *) &tgs_sk_ram);
    got_TGS_SK = 1;
    /* Now zero out hp_IV so that anyone stealing the
       card doesn't get the user's hashed password at
       the same time. */
}
resp_blk_cnt = 1; /* Clear response message buffer */
break;

case CMD_END_KEY:
```

5,590,199

23                                                24

- 22 -

```
/* move *key to point to TGSsk in tgs_sk_ram */
copy_ptr_to_EE((unsigned char *) &tgs_sk_ram,
               (unsigned char **) &key);

/* move *inp to point to the (sk)TGSsk in buffer low */
copy_ptr_to_EE(&IO_RAM_LO, (unsigned char **) &inp);

/* move *out to point to the buffer high */
copy_ptr_to_EE(&IO_RAM_HI, (unsigned char **) &out);

/* call des and decrypt the (sk)TGSsk with the TGSsk */
des(1);

/* send a CMD_ACK_KEY back with no data */
TxRamBuffer((unsigned char) 0, (unsigned char) CMD_ACK_KEY );

break;


case CMD_SND_ENCR:
                /* Received a complete authenticator.
                   Encrypt it in the last key sent
                   down. */

c_byte_write((unsigned char) 8, &IO_RAM_LO,
             (unsigned char *) &as_resp[resp_blk_cnt]);
TxRamBuffer((unsigned char) 0,
            (unsigned char) CMD_ACK_SND_ENCR);
/* move *key to point to sk in buffer high */
copy_ptr_to_EE(&IO_RAM_HI, (unsigned char **) &key);
copy_ptr_to_EE((unsigned char *) &IO_RAM_LO,
               (unsigned char **) &inp);
/* Setting the DES output area to be the same as the
   input area is safe because the algorithm is
   finished reading the input before it first destroys
   the output area. But, beware if the DES algorithm changes.*/
copy_ptr_to_EE((unsigned char *) &IO_RAM_LO,
               (unsigned char **) &out);
for (resp_blk_indx=1; resp_blk_indx <= resp_blk_cnt;
     resp_blk_indx++) {

    inp->l = as_resp[resp_blk_indx].i.l
             ^ ((resp_blk_indx > 1)
                ? bp_IV.l
                : key->l);
    inp->r = as_resp[resp_blk_indx].i.r
             ^ ((resp_blk_indx > 1)
                ? bp_IV.r
                : key->r);

    des(0);
    c_byte_write((unsigned char) 8,
```

5,590,199

25                                                           26

- 23 -

Jan 25 18:29 1993  exdemo2.c  Page 9

```
                              (unsigned char *) &IO_RAM_LO,
                              (unsigned char *) &hp_IV);

        TxRamBuffer((unsigned char) 8,
                    (resp_blk_indx < resp_blk_cnt)
                        ? (unsigned char) CMD_RTN_ENC_PART
                        : (unsigned char) CMD_RTN_END);
        receiveData();
        if (IO_MSG_CMD != CMD_ACK_RTN_ENC_PART &&
            IO_MSG_CMD != CMD_ACK_RTN_END)
            break;          /* Discard response message and wait
                               for next input from client. */
        }                    /* end for loop */
                             /* Uses whichever session key was sent
                                in the last CMD_SND_KEY message */
        resp_blk_cnt = 1; /* Clear response message buffer */
        break;


    case CMD_SND_HELLO:

        /* send a CMD_ACK_HELLO back with no data */
        TxRamBuffer((unsigned char) 0, (unsigned char) CMD_ACK_HELLO);

        break;


    default:

        /* send a CMD_UNKNOWN back with no data */
        TxRamBuffer((unsigned char) 0, (unsigned char) CMD_UNKNOWN);

        } /* end switch */
    } /* end for */
} /* end main */
```

5,590,199

27                                                  28

- 24 -

```
Jan 25 18:22 1993  des.c Page 1

#include "card_des.h"

#ifdef CARD
#pragma memory=xdataconst
#pragma stringalloc=xdata
#endif

const unsigned long bit_pos[33]=
        {0, 0x80000000L, 0x40000000L, 0x20000000L, 0x10000000L,
            0x8000000L,  0x4000000L,  0x2000000L,  0x1000000L,
            0x800000L,   0x400000L,   0x200000L,   0x100000L,
            0x80000L,    0x40000L,    0x20000L,    0x10000L,
            0x8000L,     0x4000L,     0x2000L,     0x1000L,
            0x800L,      0x400L,      0x200L,      0x100L,
            0x80L,       0x40L,       0x20L,       0x10L,
            0x8L,        0x4L,        0x2L,        0x1L
        };
static const char ip[65]=
        {0,58,50,42,34,26,18,10,2,60,52,44,36,
         28,20,12,4,62,54,46,38,30,22,14,6,64,56,48,40,
         32,24,16,8,57,49,41,33,25,17,9,1,59,51,43,35,
         27,19,11,3,61,53,45,37,29,21,13,5,63,55,47,39,
         31,23,15,7};
static const char ipm[65]=
        {0,40,8,48,16,56,24,64,32,39,7,47,15,
         55,23,63,31,38,6,46,14,54,22,62,30,37,5,45,13,
         53,21,61,29,36,4,44,12,52,20,60,28,35,3,43,11,
         51,19,59,27,34,2,42,10,50,18,58,26,33,1,41,9,
         49,17,57,25};


#ifdef CARD
#pragma memory=default
#pragma stringalloc=default
#endif

immense itemp1;
extern xdata immense     *inp;
extern xdata immense     *key;
extern xdata immense     *out;
extern xdata great       ks_sub_n, ie;
extern xdata unsigned long       ietmp2;


void
#ifdef CARD
des(BIT iew)
#else
des(iew)
        BIT iew;
#endif
{
        idata unsigned char loop_ctr;
#ifdef CARD
        void ks(unsigned char n, BIT iew);
```

5,590,199

29                                                      30

- 25 -

Jan 25 18:22 1993  des.c Page 2

```
        void c_byte_write(data unsigned char count,
                          data unsigned char *source,
                          data unsigned char *dest);
#else
        void ks();
        void c_byte_write();
#endif
        void prep_key();
        void cyfun();

        itempl.r = itempl.l = 0L;
        for(loop_ctr=1; loop_ctr<=32; loop_ctr++) {
                itempl.r = (itempl.r << 1) | getbit(*inp,ip[loop_ctr+32],32);
                itempl.l = (itempl.l << 1) | getbit(*inp,ip[loop_ctr],32);
        }
        prep_key();
        for(loop_ctr=1; loop_ctr<=16; loop_ctr++) {
                ks((unsigned char) (isw ? 17-loop_ctr : loop_ctr), isw);
                cyfun();
                out->l ^= itempl.l;
                itempl.l=itempl.r;
                itempl.r=out->l;
        }
        out->l=itempl.r;
        itempl.r=itempl.l;
        itempl.l=out->l;
        out->r = out->l = 0L;
        for(loop_ctr=1; loop_ctr<=32; loop_ctr++) {
                out->r = (out->r << 1) | getbit(itempl,ipm[loop_ctr+32],32);
                out->l = (out->l << 1) | getbit(itempl,ipm[loop_ctr],32);
        }
        /* Zero out the EEPROM areas holding security relevant data. */
        itempl.r = itempl.l = 0L;
        c_byte_write(6, (unsigned char *) &itempl,
                        (unsigned char *) &ks_sub_n);
        c_byte_write(6, (unsigned char *) &itempl, (unsigned char *) &ie);
        c_byte_write(4, (unsigned char *) &itempl, (unsigned char *) &ietmp2);
}
```

5,590,199

31                                                        32

- 26 -

```
Jan 25 18:22 1993  desks.c Page 1

#include "card_des.h"

: :def CARD
*: ragma memory=xdataconst
#pragma stringalloc=xdata
#endif

extern const unsigned long bit_pos[];   /* defined in des.c */
static const char ipc1[57]={0,57,49,41,33,25,17,9,1,58,50,
                42,34,26,18,10,2,59,51,43,35,27,19,11,3,60,
                52,44,36,63,55,47,39,31,23,15,7,62,54,46,38,
                30,22,14,6,61,53,45,37,29,21,13,5,28,20,12,4};
static const char ipc2[49]={0,14,17,11,24,1,5,3,28,15,6,21,
                10,23,19,12,4,26,8,16,7,27,20,13,2,41,52,31,
                37,47,55,30,40,51,45,33,48,44,49,39,56,34,
                53,46,42,50,36,29,32};

#ifdef CARD
#pragma memory=default
#pragma stringalloc=default
#endif

static immense icd;
xdata union {
   great a;
   unsigned char b[6];
} ks_sub_n, ie;
xdata union {
   unsigned long l;
   unsigned char b[4];
} ietmp2;

extern immense itempl;
extern xdata immense      *imp;
extern xdata immense      *key;
extern xdata immense      *out;

#ifndef CARD
void
c_byte_write(count, source, dest)
     unsigned char        count;
     unsigned char        *source, *dest;
{
   idata unsigned char    index;

   for (index=0; index<count; index++) *dest++ = *source++;
}
#else
extern void c_byte_write(data unsigned char count,
                         data unsigned char *source,
                         data unsigned char *dest);
#endif
```

5,590,199

33                                                      34

- 27 -

```
Jan 25 18:22 1993  desks.c Page 2

void
prep_key()
{
   idata unsigned char loop_ctr;

   icd.r = icd.l = 0L;
   for(loop_ctr=1; loop_ctr<=28; loop_ctr++) {
      icd.r = (icd.r << 1) | getbit(*key,ipc1[loop_ctr+28],32);
      icd.l = (icd.l << 1) | getbit(*key,ipc1[loop_ctr],32);
   }
   icd.r <<= 4;
   icd.l <<= 4;
}

#ifdef CARD
void ks(data unsigned char n, BIT isw)
#else
void ks(n, isw)
      unsigned char n;
      BIT isw;
#endif
{
      idata unsigned char    ks_buff;
      if (isw) {
                              /* Do decrypt key schedule */
         if (n < 16) {
            icd.r = (icd.r << 27) | ((icd.r >> 1) & 0x7ffffff0L);
            icd.l = (icd.l << 27) | ((icd.l >> 1) & 0x7ffffff0L);
            if (n != 1 && n != 8 && n != 15) {
               icd.r = (icd.r << 27) | ((icd.r >> 1) & 0x7ffffff0L);
               icd.l = (icd.l << 27) | ((icd.l >> 1) & 0x7ffffff0L);
            }
         }
      }
      else {                  /* Do encrypt key schedule */
         icd.r = (icd.r << 1) | ((icd.r >> 27) & 16L);
         icd.l = (icd.l << 1) | ((icd.l >> 27) & 16L);
         if (n != 1 && n != 2 && n != 9 && n != 16) {
            icd.r = (icd.r << 1) | ((icd.r >> 27) & 16L);
            icd.l = (icd.l << 1) | ((icd.l >> 27) & 16L);
         }
      }
      ks_buff = 0;
      for (n=1; n<=48; n++) {
         ks_buff = (ks_buff << 1) | (unsigned char) getbit(icd,ipc2[n],28);
         if (n%8 == 0) {
            c_byte_write(1, &ks_buff, &ks_sub_n.b[(n-1)/8]);
            ks_buff = 0;
         }
      }
}

#ifdef CARD
```

5,590,199

35                                           36

- 28 -

```
Jan 25 18:22 1993  desks.c Page 3

#pragma memory=xdataconst
#pragma stringalloc=xdata
#endif

static const char iet[49]={0,32,1,2,3,4,5,4,5,6,7,8,9,8,9,
        10,11,12,13,12,13,14,15,16,17,16,17,18,19,
        20,21,20,21,22,23,24,25,24,25,26,27,28,29,
        28,29,30,31,32,1};
static const char ipp[33]={0,16,7,20,21,29,12,28,17,1,15,
        23,26,5,18,31,10,2,8,24,14,32,27,3,9,19,13,
        30,6,22,11,4,25};
static const char is[16][4][9]={
        0,14,15,10,7,2,12,4,13,0,0,3,13,13,14,10,13,1,
        0,4,0,13,10,4,9,1,7,0,15,13,1,3,11,4,6,2,
        0,4,1,0,13,12,11,2,0,15,13,7,8,11,15,0,15,
        0,1,14,6,6,2,14,4,11,0,12,8,10,15,8,3,11,1,
        0,13,8,9,14,4,10,2,8,0,7,4,0,11,2,4,11,13,
        0,14,7,4,9,1,15,11,4,0,8,10,13,0,12,2,13,14,
        0,1,14,14,3,1,15,14,4,0,4,7,9,5,12,2,7,8,
        0,8,11,9,0,11,5,13,1,0,2,1,0,6,7,12,8,7,
        0,2,6,6,0,7,9,15,6,0,14,15,3,6,4,7,4,10,
        0,13,10,8,12,10,2,12,9,0,4,3,6,10,1,9,1,4,
        0,15,11,3,6,10,2,0,15,0,2,2,4,15,7,12,9,3,
        0,6,4,15,11,13,8,3,12,0,9,15,9,1,14,5,4,10,
        0,11,3,15,9,11,6,8,11,0,13,8,6,0,13,9,1,7,
        0,2,13,3,7,7,12,7,14,0,1,4,8,13,2,15,10,8,
        0,8,4,5,10,6,8,13,1,0,1,14,10,3,1,5,10,4,
        0,11,1,0,13,8,3,14,2,0,7,2,7,8,13,10,7,13,
        0,3,9,1,1,8,0,3,10,0,10,10,12,2,4,5,6,14,12,
        0,15,5,11,15,15,7,10,0,0,5,11,4,9,6,11,9,15,
        0,10,7,13,2,5,13,12,9,0,6,0,8,7,0,1,3,5,
        0,12,8,1,1,9,0,15,6,0,11,6,15,4,15,14,5,12,
        0,6,2,12,8,3,3,9,3,0,12,1,5,2,15,13,5,6,
        0,9,12,2,3,12,4,6,10,0,3,7,14,5,0,1,0,9,
        0,12,13,7,5,15,4,7,14,0,11,10,14,12,10,14,12,11,
        0,7,6,12,14,5,10,8,13,0,14,12,3,11,9,7,15,0,
        0,5,12,11,11,13,14,5,5,0,9,6,12,1,3,0,2,0,
        0,3,9,5,5,6,1,0,15,0,10,0,11,12,10,6,14,3,
        0,9,0,4,12,0,7,10,0,0,3,9,11,10,9,11,15,14,
        0,10,3,10,2,3,13,5,3,0,0,5,5,7,4,0,2,5,
        0,0,3,2,4,14,5,6,12,0,3,11,15,14,8,3,8,9,
        0,5,2,14,6,0,11,9,5,0,6,14,2,2,5,8,3,6,
        0,7,10,8,15,9,11,1,7,0,6,5,1,9,6,8,6,2,
        0,0,15,7,4,14,6,2,8,0,13,9,12,14,3,13,12,11};

#ifdef CARD
#pragma memory=default
#pragma stringalloc=default
#endif

void
cyfun()
{
```

5,590,199

37                                          38

- 29 -

Jan 25 18:22 1993  desks.c Page 4

```
idata unsigned char loop_ctr, j;

j = 0;
for (loop_ctr=1; loop_ctr<=48; loop_ctr++) {
    j = (j << 1)
        | (unsigned char) (bit_pos[iet[loop_ctr]] & itempl.r ? 1 : 0);
    if (loop_ctr%8 == 0) {
        c_byte_write(1, &j, &ie.b[(loop_ctr-1)/8]);
        j = 0;
    }
}
for (loop_ctr=0; loop_ctr<6; loop_ctr++) {
    j = ie.b[loop_ctr] ^ ks_sub_n.b[loop_ctr];
    c_byte_write(1, &j, &ie.b[loop_ctr]);
}
out->l = (((unsigned long) (ie.s.c & 0xff)) << 18)
        +((unsigned long) ie.s.r << 2);
out->r = ((unsigned long) ie.s.l << 10)+((unsigned long) ie.s.c >> 6);
c_byte_write(4, (unsigned char *) &out->r, (unsigned char *) &ietmp2);
out->r = 0L;
for(loop_ctr=1; loop_ctr<=8; loop_ctr++) {
    if(loop_ctr > 4)
        j = ((out->l <<= 6) >> 26) & 0x3f;
    else {
        j = (ietmp2.b[0] << 6) | (ietmp2.b[1] >> 2);
        c_byte_write(1, &j, &ietmp2.b[0]);
        j = (ietmp2.b[1] << 6) | (ietmp2.b[2] >> 2);
        c_byte_write(1, &j, &ietmp2.b[1]);
        j = (ietmp2.b[2] << 6) | (ietmp2.b[3] >> 2);
        c_byte_write(1, &j, &ietmp2.b[2]);
        j = ietmp2.b[3] << 6;
        c_byte_write(1, &j, &ietmp2.b[3]);
        j = (ietmp2.l >> 26) & 0x3f;
    }
    out->r = (out->r << 4) |
        is[(j & 0x1e) >> 1]
            [((j & 0x20) >> 4)+(j & 0x1)]
            [loop_ctr];
}
out->l=0L;
for(loop_ctr=1; loop_ctr<=32; loop_ctr++)
        out->l = (out->l << 1)
                | (bit_pos[ipp[loop_ctr]] & out->r ? 1 : 0);
```

5,590,199

39                                          40

- 30 -

Jan 25 18:32 1993  asminf.msa Page 1

```
TITL'C INTERFACE ROUTINES '
        EXTERN  _R
        EXTERN  WRTCARD
        EXTERN  RDCARD
        extern  BYTE_WRITE
;
$RAMDEF.INC
$SIO.INC
$MASKROM.INC
PAGE
;       NAME    asminf(16)
        RSEG    CODE(0)
;       PUBLIC  TxRAMData
;       SDEFFN  TxRAMData(0,0,0,0,5,0,0,0)
        PUBLIC  receiveData
        SDEFFN  receiveData(0,0,0,0,0,0,0,0)
;       PUBLIC  txEEData
;       SDEFFN  txEEData(0,0,0,0,4,0,0,0)
        PUBLIC  c_byte_write
        SDEFFN  c_byte_write(0,0,0,0,7,0,0,0)
        PUBLIC  copy_ptr_to_EE
        SDEFFN  copy_ptr_to_EE(0,0,0,0,6,0,0,0)
        PUBLIC  TxRamBuffer
        SDEFFN  TxRamBuffer(0,0,0,0,2,0,0,0)
;       PUBLIC  SetTimr0Rdlr
;       SDEFFN  SetTimr0Rdlr(0,0,0,0,0,0,0,0)
        PUBLIC  StealStack
        SDEFFN  StealStack(0,0,0,0,1,0,0,0)
        RSEG    CODE
; 1.    /*-----------------------------------------------------*/
; 2.    /*                                                     */
; 3.    /*      THIS IS AN EXAMPLE PROGRAM WHICH WILL DEMONSTRATE */
; 4.    /*      HOW TO GENERATE A C PROGRAM AND ALSO HOW TO COMMUNICATE */
; 5.    /*      WITH THE MASK ROM OF THE OMEGA CARD.           */
; 6.    /*                                                     */
; 7.    /*      THIS DEMONSTRATION PROGRAM WILL FIRST OUTPUT A MESSAGE, */
; 8.    /*      "HELLO RS", AND THEN ECHO A RECEIVED MESSAGE BACK */
; 9.    /*      TO A TRANSMITTER.                              */
; 10.   /*                                                     */
; 11.   /*-----------------------------------------------------*/
; 12.
; 13.   int txEEData(char *message, char command)
; 14.   {
;txEEData:
;       MOV     $LOCBD txEEData+2,R7
;       MOV     $LOCBD txEEData+1,R6
;       MOV     $LOCBD txEEData,R5
; 15.
;
;       C INTERFACE ROUTINE TO TRANSMIT A BUFFER, CONTAINED IN EE MEMORY.
;       MEMORY MODEL IS SMALL.
;
;       INTERFACE:
;               char count = txEEData(char *message, char command)
```

5,590,199

41                                                    42

- 31 -

Jan 25 18:32 1993  asminf.msa Page 2

```
    ;
    ;        NOTES:
    ;                AT ENTRY R2 AND R3 CONTAIN THE ADDRESS OF
    ;                THE BUFFER TO TRANSMIT TO.
    ;
    ;                AT EXIT R3 WILL CONTAIN THE COUNT OF THE
    ;                THE NUMBER OF BYTES TRANSMITTED.
    ;
    ;                The buffer passed to this routine is assumed to be
    ;                a string buffer which is terminated by a '\0'.
    ;
    ;        MOV A, $LOCBD txEEData+3
    ;        MOV    B,A               ;SAVE IN B REGISTER
    ;        MOV    DPL,_R+7          ;SET DPTR TO BUFFER ADDRESS
    ;        MOV    DPH,_R+6
    ;        MOV    _R+3,#0           ;CLEAR TOTAL COUNT VALUE
    ;TXEE10:
    ;        MOV    R0,#RDS_DATA      ;SET ADDRESS OF RAM BUFFER
    ;        MOV    _R+2,#MAXUDATA    ;CLEAR THE TX BYTE COUNT
    ;        MOV    _R+4,#0           ;CURRENT BYTES TX
    ;TXEE20:
    ;        MOVX   A,@DPTR           ;GET A BYTE
    ;        JZ     TXEE_BUFFER_DONE
    ;        MOV    @R0,A             ;STORE BUFFER
    ;        INC    _R+3              ;UPDATE TOTAL NUMBER OF BYTES TX
    ;        INC    _R+4              ;UPDATE CURRENT NUMBER OF BYTES TX
    ;        INC    DPTR              ;BUMP SOURCE BUFFER POINTER
    ;        INC    R0                ;BUMP TARGET BUFFER POINTER
    ;        DJNZ   _R+2,TXEE20
    ;
    ;        TRANSMIT THE BUFFER NOW
    ;
    ;        MOV    RDS_MODE,#1       ;SET START OF FRAME
    ;        MOV    _R+6,#RDS_MODE    ;SET START ADDRESS
    ;        MOV    _R+7,_R+4         ;SET TX DATA BYTE COUNT
    ;        MOV    A,_R+4            ;CHECK FOR ZERO BYTES
    ;        JZ     TXEE_EXIT
    ;        MOV    RDS_CMDVAL,B      ;STORE COMMAND VALUE
    ;        CALL   WRITCARD
    ;        JMP    TXEE10
    ;TXEE_BUFFER_DONE:
    ;
    ;        CHECK FOR FINAL TRANSMISSION
    ;
    ;        MOV    A,_R+4            ;CHECK FOR HOLDING DATA
    ;        JZ     TXEE_EXIT         ;BRANCH IF NONE
    ;
    ;        TRANSMIT THE BUFFER NOW
    ;
    ;        MOV    RDS_MODE,#1       ;SET START OF FRAME
    ;        MOV    _R+6,#RDS_MODE    ;SET START ADDRESS
    ;        MOV    _R+7,_R+4         ;SET TX DATA BYTE COUNT
    ;        MOV    RDS_CMDVAL,B      ;STORE COMMAND VALUE
```

5,590,199

43                                              44

- 32 -

Jan 25 18:32 1993  asminf.msa Page 3

```
;      CALL    WRTCARD
;
;      FLUSH RESIDUAL DATA OUT THE UART TO
;      COMPLETE THE TRANSMISSION PROCESS
;
;TXEE_EXIT:
; 16.           return (byte count);
;      MOV      R7,_R+3
;      MOV      R6,#0
; 17.  )
;      RET
; 18.
PAGE
; 19.  int receiveData()
; 20.  {
;
;
;      C INTERFACE ROUTINE TO RECEIVE A FRAME
;      MEMORY MODEL IS SMALL.
;
;      INTERFACE:
;                char count = receiveData()
;
;      NOTES:
;                The system returns the number of data bytes
;                that have been read.
;
;                The data byte count returned to the user does
;                not include the frame overhead.  This means
;                that a frame which contains only a header and
;                crc will return a data byte count of zero.
;
;
;
receiveData:
;      CALL     RDCARD
;      MOV      _R+7,RD8_CMDLTH                    ;RETURN BYTE COUNT
; 21.           return (0);
;      MOV      R6,#0
; 22.  )
;      RET
; 23.

PAGE
; 24.  int TxRAMData(char *buffer, char command, char count)
; 25.  {
;TxRAMData:
;      MOV      $LOCBD TxRAMData+2,R7
;      MOV      $LOCBD TxRAMData+1,R6
;      MOV      $LOCBD TxRAMData,R5
; 26.
;
```

5,590,199

45                                                    46

- 33 -

Jan 25 18:32 1993  asminf.msa Page 4

```
;
;         routine to WRITE RAM data TO the serial I/O port.
;         MEMORY MODEL IS SMALL.
;
;         INTERFACE:
;               char count = TxRAMData(char BUFFER,char COMMAND,char BCOUNT)
;
;         NOTES:
;
;               AT EXIT R3 WILL CONTAIN THE COUNT OF THE
;               THE NUMBER OF BYTES TRANSMITTED.
;
;
;
;         MOV    _R+4,$LOCBD TxRAMData+3      ;SAVE COMMAND
;         MOV    _R+5,$LOCBD TxRAMData+4      ;SAVE TX COUNT
;         MOV    _R+1,_R+7       ;BUFFER ADDRESS
;         MOV    _R+3,#0         ;CLEAR TOTAL COUNT VALUE.
;         MOV    A,_R+5          ;CHECK FOR ZERO COUNT
;         JZ     RAMTX_EXIT      ;BRANCH IF BYTE COUNT IS ZERO
;
;         SET THE LOOP TO CONTROL MOVING
;         DATA FROM SOURCE BUFFER TO THE
;         TRANSMIT BUFFER.
;
;RAMTX10:
;         MOV    R0,#RDS_DATA    ;SET ADDRESS OF RAM BUFFER
;         MOV    _R+2,#MAXUDATA  ;CLEAR THE TX BYTE COUNT
;         MOV    _R+4,#0         ;CURRENT BYTES TX
;
;         MAIN LOOP TO MOVE DATA FROM THE SOURCE
;         BUFFER TO THE TRANSMIT BUFFER.
;
;RAMTX20:
;         MOV    A,@R1           ;GET DATA BYTE
;         MOV    @R0,A           ;SAVE DATA BYTE
;         INC    _R+3            ;UPDATE TOTAL NUMBER OF BYTES TX
;         INC    _R+4            ;UPDATE CURRENT NUMBER OF BYTES TX
;         DJNZ   _R+5,RAMTX30    ;BRANCH WHEN ALL DATA HAS NOT BEEN TX'ED
;         JMP    RAMTX_BUFFER_DONE ;BRANCH WHEN ALL DATA HAS BEEN TX'ED
;RAMTX30:
;         INC    _R+1            ;BUMP SOURCE BUFFER POINTER
;         INC    _R+0            ;BUMP TARGET BUFFER POINTER
;         DJNZ   _R+2,RAMTX20    ;CHECK FOR TX BUFFER BEING FULL
;
;         TRANSMIT A FRAME OF THE BUFFER NOW
;
;         MOV    RDS_MODE,#1     ;SET START OF FRAME
;         MOV    _R+6,#RDS_MODE  ;SET START ADDRESS
;         MOV    _R+7,_R+4       ;SET TX DATA BYTE COUNT
;         MOV    RDS_CMDVAL,_R+5 ;STORE COMMAND VALUE
;         CALL   WRTCARD
;         JMP    RAMTX10
```

5,590,199

47                                                      48

- 34 -

Jan 25 18:32 1993  asminf.msa Page 5

```
;RAMTX_BUFFER_DONE:
;
;         CHECK FOR FINAL TRANSMISSION
;
;         MOV     A,_R+4        ;CHECK FOR HOLDING DATA
;         JZ      RAMTX_EXIT    ;BRANCH IF NONE
;
;         TRANSMIT THE BUFFER NOW
;
;         MOV     RDS_MODE,#1              ;SET START OF FRAME
;         MOV     R+6,#RDS_MODE           ;SET START ADDRESS
;         MOV     _R+7,_R+4               ;SET TX DATA BYTE COUNT
;         MOV     RDS_CMDVAL,_R+5         ;STORE COMMAND VALUE
;         CALL    WRTCARD
;
;         COME HERE TO EXIT SEGMENT
;
;RAMTX_EXIT:
; 27.            return (0);
;         MOV     R7,_R+3
;         MOV     R6,#0
; 28.    }
;         RET
;
PAGE
;
;         Routine to copy RAM into EE PROM, callable from C.
;
;         Interface:
;
;              (void) c_byte_write(data unsigned char count,
;                                  data unsigned char *source,
;                                  data unsigned char *dest);
;         Notes:
;              Although the third parameter must be stored in RAM,
;              the address itself must point to EE PROM.
c_byte_write:
;         mov     _R, $LOCBD c_byte_write+3     ; Put RAM address into R0
          mov     _R+5, $LOCBD c_byte_write+5   ; Put EEPROM address...
          mov     DPH,_R+5
          mov     _R+5, $LOCBD c_byte_write+6   ; into DPTR.
          mov     DPL,_R+5
                                                ; Count already in R7
          CLR     EA                            ; Turn off interrupts
          call    BYTE_WRITE    ; Call masked ROM to do the transfer
          SETB    EA                            ; Turn interrupts back on
          ret
;
PAGE
;
;         Routine to copy a pointer value into a EE PROM resident
;         C pointer variable.  Callable from C.
;
;         Interface:
```

5,590,199

49                                    50

- 35 -

Jan 25 18:32 1993  asminf.msa Page 6

```
;              (void) copy_ptr_to_EE(data unsigned char *source,
;                                    data unsigned char **dest);
;     Notes:
;              Although the second parameter must be stored in RAM,
;              the address itself must point to EE PROM.
copy_ptr_to_EE:
       mov     $LOCBD copy_ptr_to_EE, _R+5    ; Save source ptr value
       mov     $LOCBD copy_ptr_to_EE+1, _R+6
       mov     $LOCBD copy_ptr_to_EE+2, _R+7
       mov  _R, #$LOCBD copy_ptr_to_EE  ; Put RAM address into R0
       mov     _R+5, $LOCBD copy_ptr_to_EE+4  ; Put EEPROM address...
       mov     DPH, _R+5
       mov     _R+5, $LOCBD copy_ptr_to_EE+5  ; into DPTR.
       mov     DPL, _R+5
       mov     _R+7, #3              ; Put count in R7
       call    BYTE_WRITE      ; Call masked ROM to do the transfer
       ret
PAGE
;
;     Routine to send the buffer to the workstation.
;     C pointer variable. Callable from C.
;     Send it the number of bytes to send and the command code.
;
;     Interface:
; 1.   void TxRamBuffer(unsigned char count, unsigned char command)
;
; 2.   {
TxRamBuffer:
       MOV     $LOCBD TxRamBuffer,R7
       MOV     RDS_NODE,#1                 ;SET START OF FRAME
       MOV     _R+7,$LOCBD TxRamBuffer ;SET TX DATA BYTE COUNT
       MOV     _R+5,#RDS_NODE              ;SET START ADDRESS
       MOV     RDS_CMDVAL,$LOCBD TxRamBuffer+1      ;STORE COMMAND VALUE
       CALL    WRTCARD

; 3.   }
       RET

PAGE
;
;     Routine to set a dummy timer 0 interrupt handler.
;     This is strictly a workaround for an unexplained problem with the
;     masked ROM code that is supposed to ignore the interrupt by default.
;
;     Interface:
;              (void) SetTimr0Hdlr();
;
; SetTimr0Hdlr:
;      MOV     DPTR, #IGNORE
;              CALL    SET_TIMER_ZERO
;IGNORE:
;      RET
```

5,590,199

51                                                    52

- 36 -

Jan 25 18:32 1993  asminf.msa Page 7

```
;
PAGE
;        Routine to set a dummy timer 0 interrupt handler.
;        This is strictly a workaround for an unexplained problem with the
;        masked ROM code that is supposed to ignore the interrupt by default.
;
;        Interface:
;                (void) StealStack(unsigned char amount);

STACK_BASE    EQU    4CH        ; Starting stack location as set by masked ROM
STACK_TOP     EQU    7FH        ; Last legal stack location
StealStack:
        MOV  A, R7             ; Compute new stack base...
        ADD  A, #STACK_BASE    ; by adding in the amount we want to steal...
                               ; from the bottom
        CLR  C                 ; No borrow
        SUBB A, #STACK_TOP+1   ; Find out if new stack bottom is a
                               ; legal address
        JNC  WONTFIT           ; Caller stole too many bytes
        MOV  R1, SP            ; Save the current stack pointer contents

        MOV  A, R1             ; Compute new SP value...
        ADD  A, R7             ; by adding count of stolen bytes to current S:
        MOV  R0, A             ; Save new SP value
        CLR  C                 ; No borrow
        SUBB A, #STACK_TOP+1   ; Find out if new stack top is a legal address
        JNC  WONTFIT           ; It isn't
        MOV  A, R1             ; Get old SP
        CLR  C                 ; No borrow
        SUBB A, #STACK_BASE-1  ; Bytes to move = old SP - old SP base + 1
        MOV  R7, A             ; Save count for loop control
        CLR  EA                ; Disable all interrupts while we're messing...
                               ; with the stack.
        MOV  SP, R0            ; Set new SP
MOV_STACK:                     ; Move the current contents of the stack up past...
                               ; the stolen memory area
        MOV  A, @R1            ; Get next byte of current stack
        MOV  @R0, A            ; Move it to its new home
        DEC  R1               ; Point to next item of current stack to move
        DEC  R0               ; Point to location of item on new stack
        DJNZ R7, MOV_STACK     ; Go move the next word
        SETB EA                ; Reenable interrupts
        RET                    ; Return to caller
WONTFIT:
        SETB EA                ; Reenable interrupts
DIEHERE:
        SJMP DIEHERE           ; Loop forever until we're rescued.
        END
```

5,590,199

53

54

What is claimed is:

1. A system for authenticating a user to any service or computer on a heterogenous computer network comprising:

at least one workstation in communication with a network; and

a removable, personally protectable coprocessor adapted to communicate with the workstation,

the coprocessor adapted to receive user-provided initialization information from the workstation,

the coprocessor adapted to receive signals including first encrypted authentication information from the workstation, the coprocessor including a preselected first key to decrypt the first encrypted authentication information, the coprocessor further programmed to assemble second authentication information and to encrypt the second authentication information using at least one of (i) a key contained within the first encrypted authentication information and (ii) a preselected second key and to send the second encrypted authentication information to the network via the workstation,

whereby the user is authenticated to access the networked computer or service.

2. The system of claim 1 wherein the first and second keys are preprogrammed into the personally protectable coprocessor.

3. The system of claim 2 wherein the first and second keys are preprogrammed in encrypted form into the personally protectable coprocessor.

4. A system for authenticating a user to any service or computer on a heterogenous computer network comprising:

one authorization server in communication with the network;

at least one workstation in communication with the network; and

a removable, personally protectable coprocessor adapted to communicate with the workstation,

the coprocessor adapted to receive user-provided initialization information from the workstation,

the coprocessor adapted to receive signals including first encrypted authentication information from the workstation, the coprocessor programmed to include a preselected first key to decrypt the first encrypted authentication information, the coprocessor further programmed to receive signals including a preselected second key from the authorization server, the coprocessor further programmed to assemble second authentication information and to encrypt the second authentication information using at least one of (i) a key contained within the first encrypted authentication information and (ii) the preselected second key, and to send the second encrypted authentication information to the network via the workstation,

whereby the user is authenticated to access the networked computer or service.

* * * * *